## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

ROBERT HADEN,

          Plaintiff,

    v.

KARL HELLINGER, *et al.*,

          Defendants.

Civil Action No.
9:14-CV-0318 (GLS/DEP)

_____

APPEARANCES:                                    OF COUNSEL:

FOR PLAINTIFF:

ROBERT HADEN, *Pro se*
#70751
Central New York Psychiatric Center
P.O. Box 300
Marcy, NY 13403

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN            KEVIN M. HAYDEN, ESQ.
New York State Attorney General           Assistant Attorney General
615 Erie Blvd. West
Suite 102
Syracuse, NY 13204

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by *pro se* plaintiff Robert Haden, a convicted sex offender who, following completion of his sentence, was civilly committed to the Central New York Psychiatric Center ("CNYPC") for participation in a sex offender treatment program. Plaintiff's amended complaint, which names eighteen present or former CNYPC employees as defendants, alleges, *inter alia*, that he was assaulted by some of the defendants on five separate occasions and denied adequate medical treatment.

Currently pending before the court is a motion brought by the defendants seeking the entry of partial summary judgment dismissing all of plaintiff's causes of action, with the exception of his excessive force claims. For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied.

I.    <u>BACKGROUND</u>[1]

The CNYPC is a facility operated by the New York State Office of Mental Health ("OMH") and located in Marcy, New York. Dkt. No. 84-26 at 1. The Sex Offender Treatment Program ("SOTP") operates within the

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

CNYPC, and "promotes community safety through the provision of quality sex offender treatment services in a secure setting that employs evidence-based methods and is consistent with best practices in the field of sex offender treatment."[2] Dkt. No. 84-24 at 2. At the times relevant to his claims in this action, plaintiff was a resident involuntarily confined at the CNYPC, where he was undergoing sex offender treatment after having completed a thirty-year prison sentence following convictions of first-degree rape, burglary, sodomy, and robbery. Dkt. No. 42 at 1; Dkt. No. 84-21 at 9; *see also* New York State DOCCS, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited Sept. 28, 2016).

At various times described in his amended complaint, plaintiff was placed on constant observation and in the Administrative Restrictions/Motivations on Deck ("MOD") program operated at the CNYPC.[3] Dkt. No. 84-24 at 16. When residents become violent, a medical

---

[2] The Supreme Court has recognized that "[s]tates . . . have a vital interest in rehabilitating sex offenders [because when they] reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune v. Lile*, 536 U.S. 24, 33 (2002) (citations omitted).

[3] In his affidavit submitted in support of defendants' motion, the CNYPC Medical Director, Dr. Joseph Colosi, who is not a named defendant, indicates that he has attached the policies governing the constant observation and MOD programs as Exhibits B and C. Dkt. No. 84-24 at 14. Neither of those exhibits, however, is included as an attachment, nor does defendants' submission include them elsewhere.

doctor or nurse practitioner may direct that he be placed on constant observation. *Id.* at 14. "The purpose of this is to allow the resident to calm down in a safe environment without access to objects that may injure or threaten the resident or staff." *Id.* at 13. One staff member is required to observe the resident under observation "at all times as to allow for immediate unobstructed intervention." *Id.*  In that setting, staff members document all of the resident's actions, including his behavior, sleeping patterns, consumption of meals, use of the bathroom, and bathing. *Id.* at 13-14. The resident under constant observation is not permitted to possess sharp objects, pens, reading materials, certain foods, certain clothing, utensils, and mattresses. *Id.* at 14.

After the period of constant observation ends, the resident "may be placed in the [MOD] program," which provides a strategy for dealing with violent and aggressive residents "[i]n order to better ensure a therapeutic environment and protect the safety and security of SOTP residents and staff[.]" Dkt. No. 84-24 at 14. There are three levels of MOD restrictions, including room MOD, unit MOD, and program MOD. *Id.* The intent of the

---

Nonetheless, the court has located both of those policies among the materials supplied by plaintiff in opposition to defendants' summary judgment motion. Dkt. No. 94-2; Dkt. No. 94-3 at 28-34; Dkt. No. 94-4 at 63-86; *see also* Dkt. No. 97-1.

MOD program is to progressively restore privileges as behavior is normalized, with the first and most restrictive step being room MOD, under which a resident is confined to his dormitory room except when using the bathroom, showering, attending medical appointments, or utilizing the telephone. *Id.* at 15. A resident placed in unit MOD is given greater freedom to interact with residents and staff and may leave his dormitory room to attend the day room and other activities on the unit.[4] *Id.* at 16.

Plaintiff's claims in this action arise from a series of incidents occurring at the CNYPC, as well as the medical treatment received from health care professionals at the facility. The incidents and plaintiff's medical treatment are summarized below.

A.    February 20, 2012 Incident

On February 20, 2012, defendant Karl Hellinger, a Secure Care Treatment Aid ("SCTA") at the CNYPC, assaulted plaintiff as he was returning to his room. Dkt. No. 42 at 7-8; *see also* Dkt. No. 84-21 at 17-18. After an alarm was triggered, an emergency response team comprised of defendant SCTA Hans Kuntz and other SCTAs employed at the facility

---

[4]    The third component, program MOD, is not discussed in Dr. Colosi's affidavit. It does not appear, however, that plaintiff has complained about being placed on program MOD, instead focusing on being restricted to room and unit MOD.

5

assisted in restraining plaintiff. Dkt. No. 42 at 8; *see also* Dkt. No. 84-21 at 18; Dkt. No. 84-27. After plaintiff was placed in five-point restraints, defendant Maura Pavlot, a registered nurse employed at the CNYPC, injected drugs into plaintiff's thigh without his consent.[5] Dkt. No. 42 at 8; *see also* Dkt. No. 84-21 at 19; Dkt. No. 84-27 at 6. That injection was made at the direction of the staff physician, Dr. Hernandez, in accordance with the facility's policy for emergency medications.[6] Dkt. No. 84-24 at 21; Dkt. No. 85 at 3. Following the incident, Dr. Hernandez placed plaintiff on constant observation through February 24, 2012. Dkt. No. 84-24 at 16; *see also* Dkt. No. 42 at 9; Dkt. No. 84-21 at 19.

At plaintiff's request, the February 20, 2012 incident was investigated by the CNYPC Incident Review Committee ("IRC"), which is chaired by defendant Anthony Gonzalez, the Director of Risk Management at the facility. Dkt. No. 84-26 at 1-2; *see also* Dkt. No. 84-27. As a result of that investigation, the IRC determined that plaintiff's complaints concerning the incident were not substantiated and did not warrant a criminal

---

[5]     Plaintiff alleges defendant Pavlot injected him with psychotropic drugs. Dkt. No. 42 at 8. Defendants' evidence, however, reflects that the injection was a combination of Benadryl and Ativan, neither of which is a psychotropic drug. Dkt. No. 84-24 at 21.

[6]     Again, Dr. Colosi indicates that he has attached the CNYPC's Emergency IM Medications policy as Exhibit D to his affidavit submitted in support of defendants' motion, but that exhibit is not included in defendants' submission. Dkt. No. 84-24 at 21.

investigation. Dkt. No. 84-26 at 2, 4.

### B.    August 20, 2012 Incident

Plaintiff alleges that on August 20, 2012, he was assaulted by defendants Eric Fical, Jason Searcy, and David Sill, all of whom are SCTAs, aided by defendant Daniel Simpkins, a registered nurse at the facility.[7] Dkt. No. 42 at 10-13; Dkt. No. 84-21 at 54. After plaintiff was restrained, defendant Simpkins injected him with a combination of Haldol, a psychotropic drug, Ativan, and Benadryl at the direction of a physician, again without Haden's consent. Dkt. No. 42 at 13; Dkt. No. 84-21 at 56; Dkt. No. 84-24 at 21. Plaintiff suffered, *inter alia*, shoulder injuries as a result of the assault. Dkt. No. 84-21 at 56, 85, 93; *see also* Dkt. No. 42 at 14.

Immediately after the incident, plaintiff was again placed under constant observation. Dkt. No. 84-24 at 16; *see also* Dkt. No. 42 at 13; Dkt. No. 54-21 at 57. He was taken off of constant observation on the morning of August 21, 2012, and placed on room MOD. *Id.* at 17.

The August 20, 2012 incident was investigated by Risk Management

---

[7]    The clerk of the court is respectfully directed to modify the docket in this matter to reflect that the correct spelling of this individual's last name is "Simpkins." *See* Dkt. No. 85 at 43.

at the CNYPC. Dkt. No. 84-26 at 2-3; *see also* Dkt. No. 84-28. The investigation failed to substantiate plaintiff's claims or reveal the existence of any potentially criminal conduct. Dkt. No. 84-26 at 4.

C.     August 24, 2012 Incident

On August 24, 2012, while on unit MOD status, plaintiff became involved in another physical altercation with defendant Hellinger. Dkt. No. 42 at 17; Dkt. No. 84-21 at 94; Dkt. No. 84-24 at 17. An emergency response team arrived and restrained plaintiff to a bed for a period of approximately two hours. Dkt. No. 42 at 17; Dkt. No. 84-21 at 96-97. Plaintiff was placed on constant observation until August 29, 2012. Dkt. No. 84-21 at 97; Dkt. No. 84-24 at 17-18.

D.     September 22, 2012 Incident

Plaintiff again became involved in a physical confrontation with staff members on September 22, 2012; that incident stemmed from an earlier interaction with defendant SCTA Tom Box on September 19, 2012. Dkt. No. 42 at 18; Dkt. No. 84-21 at 107; *see also* Dkt. No. 84-26 at 3. Plaintiff contends that, after filing a complaint at the CNYPC alleging that he had been threatened by defendant Box on September 19, 2012, he was assaulted by Box three days later on September 22, 2012.[8] Dkt. No. 42 at

_____

[8]     According to defendants, an investigation into the incident revealed that plaintiff

18; Dkt. No. 84-21 at 107-09; *see also* Dkt. No. 84-26 at 3. Plaintiff was placed in room MOD immediately following the incident, and then placed in unit MOD on September 24, 2012, where he remained through approximately October 17, 2012. Dkt. No. 85 at 110-78.

    E.    June 20, 2013 Incident

On June 20, 2013, while plaintiff was getting dressed, defendant SCTA John Santamassino assaulted him. Dkt. No. 42 at 20; Dkt. No. 84-21 at 132-35. While the assault was underway, defendant SCTA David Paulson responded to the scene and, according to plaintiff, began punching him. Dkt. No. 42 at 20-21; Dkt. No. 84-21 at 137-38. After plaintiff was restrained and placed on constant observation, defendant Kuntz threatened him with further physical harm. Dkt. No. 42 at 21; Dkt. No. 84-21 at 143. Plaintiff remained on constant observation until June 24, 2013, at which time he was placed in MOD for another twenty-eight days.[9] Dkt. No. 85 at 196-226.

This incident was also the subject of the investigation by Risk Management. Dkt. No. 42 at 21; Dkt. No. 84-26 at 4; Dkt. No. 84-29. The investigation revealed that plaintiff was subjected to psychological abuse

---

attempted to stab defendant Box with a ball point pen. Dkt. No. 84-26 at 3.
[9]    It is not clear from the record whether plaintiff was placed in room, unit, or program MOD on June 24, 2013.

on June 20, 2013. Dkt. No. 84-26 at 4. Plaintiff also reported the incident to the New York State Police, who, after an investigation, concluded that plaintiff had provided false statements and charged plaintiff accordingly. Dkt. No. 84-29 at 20.

F.      History of Medical Treatment Regarding Plaintiff's Shoulders

Beginning as early as February 2012, plaintiff complained to medical personnel at the CNYPC of bilateral shoulder pain. *See, e.g.*, Dkt. No. 85 at 1. Defendant Richard Kaskiw, a medical doctor employed at the CNYPC, ordered an x-ray of plaintiff's left humerus on February 24, 2012. Dkt. No. 84-24 at 4. The x-ray revealed no fractures, dislocations, or abnormalities. *Id.*; Dkt. No. 85 at 1. On March 1, 2012, in response to plaintiff's complaints of left shoulder pain, he was provided Tylenol for relief. Dkt. No. 85 at 37. Following the incident on August 20, 2012, plaintiff again complained of left shoulder pain and was provided Naprosyn. *Id.* at 46. On August 26, 2012, plaintiff complained of bilateral shoulder pain. *Id.* at 79. It does not appear that plaintiff received any treatment on that date. *Id.* Plaintiff refused Tylenol on September 3, 2012, when he complained again of bilateral shoulder pain. *Id.* at 103.

On September 5, 2012, plaintiff was prescribed physical therapy one-to-two times per week for his left shoulder pain. Dkt. No. 85 at 104.

After four physical therapy sessions, plaintiff showed slow progress. *Id.* at 105, 107.

Plaintiff's shoulders were x-rayed again on September 21, 2012, upon the referral of defendant Kaskiw. Dkt. No. 85 at 108, 109. Plaintiff's right shoulder showed no fracture and mild degenerative disease. *Id.* Plaintiff's left shoulder showed "mild degenerative change" and "superior subluxation of the humeral head suggesting chronic rotator cuff tear." *Id.* at 109. When plaintiff continued to complain of shoulder pain on September 27, 2012, Gregory Paradis, whose position at the CNYPC is unknown, recommended that plaintiff follow-up with an orthopedic surgeon to address a possible torn rotator cuff. *Id.* at 128, 130.

Following plaintiff's annual physical examination, conducted on October 5, 2012, a request for a consultation was made to address his bilateral shoulder pain.[10] Dkt. No. 85 at 162-66. Dr. Bhatt saw plaintiff on November 15, 2012, and administered a steroid injection in his left shoulder and suggested that an additional x-ray of the right shoulder be conducted. *Id.* at 177; *see also* Dkt. No. 84-24 at 5. Defendant Kaskiw subsequently reviewed the report of the consultation and, on November

---

[10]     The quality of the photocopy of the consultation request submitted by defendants does not permit me to discern who signed the request. Dkt. No. 85 at 166.

19, 2012, issued an order for the recommended x-ray. Dkt. No. 85 at 179; *see also* Dkt. No. 84-24 at 5. While the x-ray was scheduled for December 1, 2012, plaintiff refused the examination on that date, demanding that both shoulders be x-rayed.[11] Dkt. No. 85 at 180-81.

On December 13, 2012, Dr. Bhatt again examined plaintiff, reviewed the x-rays from September 21, 2012, and recommended that magnetic resonance imaging ("MRI") testing of plaintiff's left shoulder be conducted as soon as possible. Dkt. No. 85 at 182; *see also* Dkt. No. 84-24 at 5-6. Both of plaintiff's shoulders were x-rayed again on January 4, 2013. Dkt. No. 85 at 183. The x-ray report noted that there were "mild degenerative changes . . ., no fracture, dislocation or destructive changes" to plaintiff's right shoulder as compared to the x-rays taken on September 21, 2012. *Id.* With respect to the left shoulder, the report noted "mild degenerative changes[,] no fracture or dislocation." *Id.*

The record reveals that, on January 9, 2013, and January 23, 2013, plaintiff was observed engaging in strenuous physical activity, including 200 jumping jacks, sprinting, aggressive one-on-one basketball, push-ups,

---

[11]    In his response to defendants' statement of undisputed material facts, plaintiff denies that he refused the scheduled x-ray. Dkt. No. 94 at 5. There is no citation to the record to support this denial, however, nor has plaintiff submitted an affidavit to that effect. *Id.*

pull-ups, bicep curls, and shoulder shrugs. *Id.* at 185-86, 189. On January

18, 2013, plaintiff received Tylenol for his shoulder pain. *Id.* at 187.

According to defendant Pavlot's progress note dated January 23, 2013,

plaintiff requested Tylenol only three times in one month. *Id.* at 189. Based

upon plaintiff's physical activity and limited need for pain medication,

defendant Kaskiw discontinued the planned MRI of plaintiff's left shoulder.

*Id.* at 298; *see also* Dkt. No. 84-24 at 6. Defendant Kaskiw discussed

plaintiff's activity level with him on February 6, 2013, and explained to

plaintiff that his symptoms did not warrant an MRI. Dkt. No. 85 at 299. On

the same date, defendant Kaskiw conferred with Dr. Bhatt regarding the

MRI, and in defendant Kaskiw's progress note he indicates that Dr. Bhatt

"agree[d] the MRI [was] not indicated at [that] time." *Id.*

Defendant Kaskiw requested another orthopedic consultation for

plaintiff on April 23, 2013. Dkt. No. 85 at 191. On June 6, 2013, Dr. Bhatt

examined plaintiff and recommended that MRI testing of plaintiff's left

shoulder be conducted. *Id.* at 192. Defendant Kaskiw ordered the MRI on

the same day, which was performed on July 11, 2013. *Id.* at 193, 230. The

MRI disclosed a rotator cuff tear. *Id.* at 230, 231. Although plaintiff was

advised that an operation might not be successful, he ultimately opted to

proceed with arthroscopic surgery, which was performed on October 15,

2013.[12] *Id.* at 232-34, 237, 242-44. Although the surgery revealed no repairable tissue, *id.* at 266, upon a follow-up examination with Dr. Bhatt, plaintiff was found to be doing well. *Id.* at 247.

Following the surgery on his left shoulder, plaintiff continued to lodge complaints about right shoulder pain. An MRI of plaintiff's right shoulder was administered on December 18, 2013, revealing "a full-thickness tear of the supraspinatus tendon extending to involve the anterior portion of the infraspinatus tendon with tendon retraction and with atrophy of the belly of the supraspinatus muscle[.]" Dkt. No. 85 at 251. The MRI testing also revealed degenerative changes in the plaintiff's AC joint, and the possibility of labral tears. *Id.*

Defendant Kaskiw subsequently made arrangements for plaintiff to be examined at State University of New York Upstate Orthopedics ("Upstate Orthopedics") on several occasions, including by Drs. Scuderi and Setter and Physician Assistant ("PA") Bowser, beginning in February 2014. Dkt. No. 85 at 257, 259, 265-68, 275-84. During a visit to Upstate Orthopedics in April 2014, plaintiff was told that "there is nothing they can do for his shoulder." *Id.* at 276. During an examination in August 2014,

---

[12]     Plaintiff's surgery was originally scheduled for October 3, 2013, but it was cancelled by the hospital  because a "previous case ran late." Dkt. No. 85 at 241.

however, Dr. Setter concluded that plaintiff would be a candidate for reverse shoulder replacement with respect to his left shoulder, and an additional MRI could be performed on his right shoulder to determine if arthroscopic surgery was appropriate. *Id.* at 283. Plaintiff opted to "hold off any surgery" at that time. *Id.* As of the date of defendants' pending motion, it does not appear that any definitive decisions had been reached concerning the appropriate course of action moving forward.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about March 24, 2014, and, after a series of initial rulings by the court, filed an amended complaint, the currently operative pleading, on or about January 13, 2015. Dkt. Nos. 1, 42. Named as defendants in plaintiff's amended complaint are the following CNYPC employees:

| Name | Position |
|------|----------|
| Karl Hellinger | SCTA |
| Maura Pavlot | Registered Nurse |
| Jason Searcy | SCTA |
| David Sill | SCTA |
| Eric Fical | SCTA |
| Daniel Simpkins | Registered Nurse |
| Elizabeth Farnum | Psychiatrist |
| Quaseem Piracha | SCTA |
| James Morgan | Treatment Team Leader |
| Thomas Box | SCTA |
| Cindy Comstock | Nurse Administrator |
| Charmaine Bill | Treatment Team Leader |

15

| | |
|---|---|
| John Santamassino | SCTA |
| David Paulson | SCTA |
| Hans Kuntz | SCTA |
| Anthony Gonzalez | Director of Risk Management |
| Richard Kaskiw | Medical Doctor |
| Jeff Nowicki | Chief of Mental Health Services |

Dkt. No. 42 at 2-6. His amended complaint asserts claims (1) against

defendants Hellinger, Pavlot, Morgan, Searcy, Sill, Farnum, Fical,

Simpkins, Piracha, Gonzalez, Box, Comstock, Santamassino, Paulson,

Kuntz, and Bill based upon their alleged physical and psychological abuse,

in violation of the Fourteenth Amendment; (2) against defendants Farnum,

Pavlot, Simpkins, and Kaskiw for failing to provide adequate medical

treatment and care, including injecting plaintiff with alleged psychotropic

drugs without his consent, also in violation of the Fourteenth Amendment;

(3) against defendants Hellinger, Searcy, Sill, Fical, Simpkins, Piracha,

Santamassino, Box, and Kuntz for retaliating against him for filing

complaints at the CNYPC regarding alleged mistreatment, in violation of

the First and Fourteenth Amendments; and (4) against defendants

Nowicki, Gonzalez, Morgan, and Bill for failing to take appropriate action to

address the constitutional deprivations, in violations of the First and

Fourteenth Amendments.[13] Dkt. No. 42 at 24-26. Liberally construed,

---

[13]     In his opposition to defendants' motion, plaintiff appears to assert that his rights
to procedural due process were violated by his placement in isolation without being

plaintiff's amended complaint also asserts a conditions of confinement cause of action arising under the Fourteenth Amendment. *See, e.g., id.* at 9.

On October 23, 2015, following the close of discovery, defendants moved for the entry of partial summary judgment. Dkt. No. 84. In their motion, which seeks dismissal of certain of plaintiff's claims, defendants have argued that (1) plaintiff's deliberate medical indifference claims are subject to dismissal for failure to satisfy the objective and subjective requirements for establishing such a claim; (2) plaintiff's conditions of confinement claims are subject to dismissal as a matter of law; (3) plaintiff's claims against defendants Nowicki, Gonzalez, Morgan, Bill, Farnum, Comstock, Piracha, and Kuntz are subject to dismissal based upon his failure to establish their personal involvement in the constitutional deprivations alleged; (4) plaintiff's retaliation claims lack merit as a matter

---

afforded necessary process envisioned under the Fourteenth Amendment. Dkt. No. 94-1 at 4-5, 6. A close reading of plaintiff's second amended complaint, however, fails to disclose the existence of a procedural due process cause of action. *See generally* Dkt. No. 42. To the extent plaintiff's second amended complaint could be construed as asserting a procedural due process claim, however, it would nonetheless fail because there is no authority in this circuit for the proposition that plaintiff has a liberty interest in being assigned to any particular status at the CNYPC. *Smith v. Hogan*, No. 09-CV-0554, 2011 WL 4343978, at *10 (N.D.N.Y. Aug. 1, 2011) (Lowe, M.J.), *report and recommendation adopted by* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011) (Suddaby, C.J.), (citing *Groves v. N.Y.*, No. 09-CV-0412, 2010 WL 1257858, at *8-10 (N.D.N.Y. Mar. 1, 2010) (Peebles, M.J.)).

of law, and are unduly conclusory and speculative; (5) plaintiff's damage claims against the defendants in their official capacities are subject to dismissal under the Eleventh Amendment; and (6) defendants are entitled to qualified immunity. *See generally* Dkt. No. 84-1. In essence, defendants request that the court enter judgment dismissing all of plaintiff's claims with the exception of those in which he alleges the use of excessive force. *Id.* at 3. On January 11, 2016, plaintiff responded in opposition to defendants' partial summary judgment motion. Dkt. No. 94. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III. DISCUSSION

    A.    Summary Judgment Standard

    Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.    Defendant John Santamassino

Among the defendants named in plaintiff's amended complaint is John Santamassino, who, at the relevant times, was an SCTA at the CNYPC. Dkt. No. 42 at 4. The summons issued for that individual, however, was returned unexecuted on or about September 10, 2014. Dkt. No. 26. On September 17, 2014, plaintiff requested an extension of time to complete service upon defendants Santamassino and Piracha. Dkt. No. 30. The request was denied as moot, however, because, on September 10, 2014, an answer was filed on behalf of all named defendants, including defendants Santamassino and Piracaha. Dkt. Nos. 28, 31. According to defendants' counsel, the filing of an answer on behalf of defendants Santamassino and Piracha, who had not yet been served and therefore had not yet requested representation, was inadvertent. Dkt. No.

[32](). That oversight was rectified on January 27, 2015, by the filing of an answer to the amended complaint, which had been filed by plaintiff in the interim.[14] [Dkt. No. 44]().

Following an inquiry by the court to defendants' counsel as to whether the Office of the New York State Attorney General was authorized to accept service on behalf of defendant Santamassino, Dkt. No. 47, defendants' counsel responded on February 5, 2015, advising that the office was not authorized to accept service on his behalf and provided his last-known address to assist plaintiff in serving him.[15] Dkt. Nos. 48, 49. The court reissued a summons as to defendant Santamassino on February 6, 2015. [Dkt. No. 50](). The summons, which was sent to the address provided by defendants' counsel, together with a request for acknowledgment of service, however, was returned as undeliverable with a notation "not at this address." [Dkt. No. 58]().

Plaintiff thereafter filed a letter with the court requesting a status update regarding the service of defendant Santamassino. [Dkt. No. 60](). On

---

[14]     Defendant Piracha was served in the action on December 14, 2014. [Dkt. No. 40]().

[15]     In order to clarify the fact that the Office of the New York State Attorney General was not authorized to represent defendants Santamassino, who has yet to appear in the action, a text order was issued on August 26, 2015, granting an oral application by the defendants' counsel to withdraw as attorney of record for that defendant. [Dkt. No. 77]().

April 1, 2015, I issued a text order informing plaintiff that, according to the docket, "defendant John Santamassino is no longer employed at CNYPC" and that service upon that individual had been unsuccessful. Dkt. No. 61. The court advised plaintiff that, because "defendant Santamassino is no longer employed by CNYPC and defendants' counsel does not have within their possession, custody, or control any information for locating and serving this defendant, the court cannot offer advice to the plaintiff on how to litigate this matter regarding service upon this individual." *Id.*

On September 25, 2015, plaintiff submitted a written request that the United States Marshal Service serve defendant Santamassino at a new address provided by the plaintiff. Dkt. No. 81. That request was granted by text order issued on September 28, 2015, Dkt. No. 82, and a summons was reissued to that defendant on the same day. Dkt. No. 83. The summons was again returned unexecuted on December 7, 2015. Dkt. No. 89.

When this action was filed, Rule 4(m) of the Federal Rules of Civil Procedure authorized "the court – on motion or on its own after notice to the plaintiff" – to dismiss a plaintiff's claims against a defendant where a summons and complaint were not served upon that party within 120 days

after filing of the complaint, absent a showing of good cause.[16] Fed. R. Civ. P. 4(m); *see also Shuster v. Nassau Cnty.*, No. 96-CV-3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) ("Rule 4(m) authorizes a court upon a motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint.");[17] *Romand v. Zimmerman*, 881 F. Supp. 806, 809 (N.D.N.Y. 1995) (McAvoy, J.) ("[T]he 120-day filing requirement applies to pro se plaintiffs as well as those represented by counsel."). This is because when named defendants have not been served or otherwise appeared in the action within this time period, the court does not acquire jurisdiction over them. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citing *Miss. Publ'g Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946)).

Upon a showing of good cause, the time for service must be extended. *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th

---

[16]     Effective on December 1, 2015, Rule 4(m) was amended to require service of a summons within ninety days. It should be noted, moreover, that the period specified in Rule 4(m) is further restricted by the local rules of this court, which require that service be effectuated within sixty days. N.D.N.Y. L.R. 4.1(b).

[17]     All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras*, 94 F.3d at 340 (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of N.Y.*, 502 F.3d 192, 196 (2d Cir. 2007) ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata*, 502 F.3d at 197.

As was explained in detail above, plaintiff has had ample opportunity to locate and serve defendant Santamassino in this action. There is no indication that plaintiff has made any further attempts after his last effort to serve that individual failed in December 2015. In addition, both the court and defendants' counsel have assisted plaintiff in his efforts to locate defendant Santamassino, to no avail. Accordingly, dismissal of plaintiff's claims against defendant Santamassino appears to be appropriate at this juncture. Before *sua sponte* dismissal, however, Rule 4 requires the court provide plaintiff with notice of that possibility. *See* Fed. R. Civ. P. 4(m) ("If

a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant[.]"); *see also Thompson v. Maldonado*, 309 F.3d 107, 110 (2d Cir. 2002) ("Because [the plaintiff] was not given prior notice and was, therefore, precluded from attempting to show good cause for his failure to serve process. . ., the District Court's dismissal violated [Rule 4(m)]."). For that reason, plaintiff is notified of my recommendation that, unless he provides good cause for his failure to serve defendant Santamassino during the objection period following the issuance of this report, his claims against that individual should be dismissed without prejudice.

    C.    <u>Plaintiff's Deliberate Medical Indifference Claims</u>

Liberally construed, plaintiff's deliberate medical indifference claim has three components. First, he accuses defendant Kaskiw of not providing him with adequate medical care for his shoulders. *See* Dkt. No. 84-21 at 160. Second, plaintiff contends that defendants Pavlot and Simpkins provided inadequate medical care when they allegedly injected him with medication without his consent. Dkt. No. 42 at 8, 13, 25-26; Dkt. No. 84-21 at 41. Lastly, plaintiff maintains that defendant Farnum ignored his need for medical treatment after sustaining injuries during the August

20, 2012 incident. Dkt. No. 42 at 13; Dkt. No. 84-21 at 53.

As a civilly committed resident at the CNYPC, plaintiff is not entitled to the protections afforded by the Eighth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 312 (1982). He is, however, entitled to the substantive due process protections afforded by the Fourteenth Amendment, which include a guaranty of certain minimal levels of medical treatment. *See, e.g., Youngberg*, 457 U.S. at 315-16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed – who may not be punished at all – in unsafe conditions."). The standard governing medical indifference claims brought by civilly committed individuals, like the plaintiff in this case, is the same as the one applicable to medical claims asserted by convicted prisoners and pretrial detainees. *See, e.g., Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health and safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Ahlers v. Kaskiw*, No. 12-CV-0501, 2014 WL 4184752, at *4-6 (N.D.N.Y. Aug. 21, 2014) (Sharpe, J., *adopting report and recommendation by* Baxter, M.J.)

(concluding that *Youngberg* did not mandate a different standard for medical claims brought by civil detainees as compared to those brought by pretrial detainees or convicted prisoners).

A claim that officials have been deliberately indifferent to an individual's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the

particular risk of harm faced by [the individual] due to the challenged deprivation of care, rather than the severity of [his] underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

1.    Defendant Kaskiw

It appears from plaintiff's amended complaint that his medical indifference claim against defendant kaskiw is based upon allegations that defendant Kaskiw (1) "failed to forward X-rays of plaint's [sic] shoulders to Dr. Bhatt" on November 16, 2012; (2) delayed in ordering an MRI of plaintiff's left shoulder as recommended by Dr. Bhatt on December 15, 2012; and (3) failed to schedule shoulder replacement surgery for plaintiff's left shoulder as recommended by Dr. Bowser in August 2014. Dkt. No. 42 at 16, 22.

a.    Failure to Forward X-ray Films

Plaintiff's medical records do not substantiate plaintiff's claim that defendant Kaskiw failed to forward x-rays to Dr. Bhatt on November 16, 2012. No mention is made by Dr. Bhatt in his November 15, 2012 report of not having reviewed plaintiff's shoulder x-rays. Dkt. No. 85 at 167. While it appears that Dr. Bhatt recommended a right shoulder x-ray on November 15, 2012, plaintiff refused to submit to an x-ray examination on December 1, 2012.[18] Id. at 167; Dkt. No. 42 at 15. In addition, it is uncontroverted that Dr. Bhatt examined plaintiff on December 13, 2012, at which time he

---

[18]    Plaintiff alleges that he refused the x-ray because he had "endure[d] a large number of X-rays . . . and began to become cautious of having to have to [sic] much radiation." Dkt. No. 42 at 15.

reviewed both of the shoulder x-rays performed on September 21, 2012. *Id.* at 182. Even assuming *arguendo* that the delay occurred as alleged by plaintiff, however, there is no record evidence giving rise to a genuine dispute of material fact regarding whether defendant Kaskiw failed to forward the x-rays with the requisite deliberate indifference in light of the treatment plaintiff had received for his shoulder pain up until that time, which included pain medication, physical therapy, x-rays, and an orthopedic consult. *See, e.g., id.* at 59, 104-05, 107, 109, 162-66.

### b.     Delay in Conducting MRI of Left Shoulder

Following Dr. Bhatt's examination of plaintiff on December 13, 2012, he recommended that an MRI be performed "as soon as possible" on plaintiff's left shoulder to rule out a rotator cuff tear. Dkt. No. 85 at 182. According to a progress note dated January 28, 2013, defendant Kaskiw had scheduled an MRI as recommended by Dr. Bhatt but canceled it because of reports from CNYPC staff that plaintiff had been engaged in weight lifting and aggressive athletic activity. *Id.* at 298.  Six days later, defendant Kaskiw met with plaintiff to discuss his activity level as observed by staff. *Id.* at 299. Defendant Kaskiw's progress note regarding that discussion indicates that plaintiff became upset, demanded an MRI, and left the visit angry. *Id.* Defendant Kaskiw immediately consulted with Dr.

Bhatt about his decision to cancel the MRI in light of plaintiff's activity, and Dr. Bhatt is reported to have "agreed [that] the MRI is not indicated at present time." *Id.* It is clear from those exchanges that plaintiff's complaint regarding the canceled MRI represents a classic disagreement as to the appropriate medical care, which does not give rise to a deliberate indifference cause of action and is therefore not cognizable. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("But the question [of] whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a "classic" example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not [give rise to a section 1983 claim].");" *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

c. Failure to Schedule Recommended Shoulder Replacement

Plaintiff alleges that he was seen by PA Bowser, an outside specialist, on or about August 25, 2014, and, at the time, a possible shoulder replacement was recommended. Dkt. No. 42 at 16. He claims that despite this recommendation, "the medical department at CNYPC never scheduled it because they claim not to know anything of it." *Id.* While plaintiff's medical records support plaintiff's allegation that PA

Bowser indicated that plaintiff would "be a candidate for a reverse [left] shoulder replacement," PA Bowser also noted that, during the same appointment in which he rendered that recommendation, plaintiff opted "to hold off any surgery[.]" [Dkt. No. 85 at 283](). Accordingly, any allegation that CNYPC medical staff violated any of plaintiff's constitutional rights by failing to follow-up with PA Bowser's recommendation is not supported by the record. In any event, there is no evidence that anyone in particular at CNYPC, much less defendant Kaskiw, was involved in ignoring any of PA Bowser's recommendations for treatment. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.").

For all of the reasons discussed above, I recommend that defendants' motion for summary judgment be granted with respect to defendant Kaskiw, and that all claims asserted against that individual be dismissed.

### 2. Defendants Pavlot and Simpkins

Plaintiff has also asserted medical indifference claims against defendants Pavlot and Simpkins based upon his allegation that they injected him with psychotropic medications without his consent on two

occasions. *See, e.g.,* Dkt. No. 42 at 8, 13, 25-26; Dkt. No. 84-21 at 41. It is

well established that psychiatric patients have "a significant liberty interest

in avoiding the unwanted administration of antipsychotic drugs under the

Due Process Clause of the Fourteenth Amendment." *Washington v.*

*Harper*, 494 U.S. 210, 221-22 (1990); *see also Kulak v. City of N.Y.*, 88

F.3d 63, 74 (2d Cir. 1996) ("It is a firmly established principle of the

common law of New York that every individual of adult years and sound

mind has a right to determine what shall be done with his own body and to

control the course of his medical treatment." (quotation marks omitted)).

"Such a right may be set aside only in narrow circumstances, including

those where the patient presents a danger to himself or other members of

society or engages in dangerous or potentially destructive conduct within

the institution." *Kulak*, 88 F.3d at 74 (quotation marks omitted).

Plaintiff's medical records reveal that, following the February 20,

2012 incident, defendant Pavlot injected plaintiff with a combination of

Benadryl and Ativan, neither of which is a psychotropic drug.[19] Dkt. No.

---

[19]     It appears that, by its statutory scheme, New York has created a liberty interest
applicable to psychiatric patients to control their medical treatment, regardless of the
nature of the medication or medical procedure. *See* N.Y.C.C.R.R. § 527.8(c) ("Patients
who object to any proposed medical treatment or procedure . . . may not be treated
over their objection except . . . where the patient is presently dangerous and the
proposed treatment is the most appropriate reasonably available means  of reducing
that dangerousness."); *accord, Kulak*, 88 F.3d at 74. Thus, the analysis of plaintiff's
claim against defendant Pavlot does not turn on whether he was in fact injected with a

84-24 at 21; Dkt. No. 85 at 2-3. On August 20, 2012, defendant Simpkins injected plaintiff with Haldol, a psychotropic drug, in combination with Ativan and Benadryl. Dkt. No. 85 at 39, 43. With respect to both incidents, there are genuine disputes of material fact that exist within the record evidence regarding whether plaintiff became a danger to himself or others. Plaintiff alleges in his amended complaint, and testified during his deposition, that, in both instances, he did not instigate the physical altercations nor did he resist once force was used upon him. *See, e.g.,* Dkt. No. 42 at 7-8, 10-11; Dkt. No. 84-21 at 17-19, 52-56. In contrast to those allegations are plaintiff's medical records, which describe the plaintiff as having been volatile and assaultive during the incidents. *See, e.g.,* Dkt. No. 85 at 2-3, 39, 43. While there is some evidence that defendant Pavlot administered Benadryl and Ativan on February 20, 2012, at the direction of a physician in accordance with a CNYPC policy,[20] Dkt. No. 85 at 2-3, only Dr. Colosi's affidavit obliquely suggests that defendant Simpkins administered Haldol, Benadryl, and Ativan to plaintiff on August 20, 2012, pursuant to that policy. Dkt. No. 84-24 at 21; *see also* Dkt. No. 85 at 39,

_____

psychotropic drug.
[20]    A copy of the policy has not been included in defendants' submission in support of the pending motion.

43. Indeed, the CNYPC form documenting the intervention exercised on August 20, 2012, does not indicate the "Name of Physician Called," Dkt. No. 85 at 39, and Dr. Colosi similarly failed to identify the physician consulted before the drugs were administered to plaintiff on that date, Dkt. No. 84-24 at 21. Even assuming that a physician did authorize CNYPC staff to inject plaintiff with the medications, however, there is no evidence describing the information the physician considered in rendering his decision. Moreover, even if a physician was consulted, it does not resolve the dispute regarding whether plaintiff became a danger to himself or others, which would otherwise justify the medical intervention at issue. Accordingly, I recommend the court deny defendants' motion for partial summary judgment with respect to defendants Pavlot and Simpkins.[21]

### 3. Defendant Farnum

Plaintiff alleges that defendant Farnum, a psychiatrist, entered his

---

[21] Defendants Pavlot and Simpkins are not entitled to qualified immunity at this juncture in light of the competing evidence regarding plaintiff's conduct during the February 20, 2012 incident and August 20, 2012 incident. As was noted above, it is well established that psychiatric patients have a due process right to refuse medical intervention absent circumstances where they become a danger to themselves or others. *Washington*, 494 U.S. at 221-22. Defendants do not dispute that plaintiff did not consent to the administration of the drugs. Thus, the question in this case regarding qualified immunity is whether defendants Pavlot and Simpkins believed that their conduct was objectively reasonable and not in violation of any of plaintiff's established constitutional rights. In the event a factfinder credits plaintiff's version of the events, however, no official could believe that administering medication to plaintiff without his consent did not violate his rights.

room on August 21, 2012, but failed to render medical treatment for his physical injuries.[22] Dkt. No. 42 at 13; Dkt. No. 84-21 at 53. Although plaintiff alleges he was "bloody" from the physical altercation, his medical records from that date indicate that he complained only of shoulder pain and was noted to have "erythema L outer orbit." Dkt. No. 85 at 43. Plaintiff refused medical treatment after the incident. *Id.* In light of the well-documented and ongoing treatment plaintiff received for his shoulders during the relevant time period, and the vague allegations regarding plaintiff's other injuries suffered during the August 20, 2012 incident, I recommend dismissal of plaintiff's medical indifference claim asserted against defendant Farnum. In my view, no reasonable factfinder could conclude that defendant Farnum ignored a serious medical condition with deliberate indifference to plaintiff's healthy and safety.

D. Conditions of Confinement Claim

Liberally construed, plaintiff's complaint could be construed as asserting a claim challenging the conditions of his confinement at the

---

[22]     Plaintiff also alleges that defendant Farnum directed that plaintiff be placed in a side room following the August 20, 2012 incident, and that he strip down to his underwear. Dkt. No. 84-21 at 53. This allegation, on its own, is not sufficient to give rise to a cognizable constitutional claim. *See, e.g., Holland v. City of N.Y.*, --- F.3d ----, No. 14-CV-5517, 2016 WL 3636249, at *9 (S.D.N.Y. June 24, 2016) ("For challenges to strip searches in particular, . . . courts in this Circuit require that a plaintiff allege that the defendants engaged in egregious conduct." (citing cases)).

CNYPC under the substantive due process clause of the Fourteenth Amendment. *See, e.g., Gallagher v. Sullivan*, No. 15-CV-1327, 2016 WL 4146128, at *4 (N.D.N.Y. Aug. 4, 2016) (McAvoy, J.) (analyzing a conditions of confinement claim asserted by a civil detainee under the Fourteenth Amendment). More specifically, plaintiff alleges that, while under constant observation or in the MOD program, he was denied various liberties, including access to a telephone and mail, recreation, communication with friends and family, writing materials, and, in one instance, hygienic living conditions. *See, e.g.,* Dkt. No. 42 at 9, 13, 19.

It is well established that involuntarily committed civil detainees enjoy "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321. Due process "requires that the conditions and duration of confinement [of civil detainees] bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001). In determining whether a plaintiff's rights have been violated, a court must balance "the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints." *Youngberg*, 457 U.S. at 321. In doing so, courts must "make certain that professional judgment . . .

37

was exercised." *Id.*

According to plaintiff's medical records, he was placed under constant observation and/or into the MOD program after the incidents on February 20, 2012, August 20, 2012, August 24, 2012, September 22, 2012, and June 20, 2013. On February 20, 2012, Dr. Hernandez ordered plaintiff on constant observation. Dkt. No. 85 at 3. Plaintiff remained under observation until February 24, 2012. *Id.* at 36. During the period of observation, plaintiff was given a mattress, used the bathroom regularly, visited with Risk Management and medical providers, ate his meals, was provided a pen and pain medications, made a legal phone call, and showered. *Id.* at 3-36.

At approximately 11:45PM on August 20, 2012, plaintiff was placed on constant observation. Dkt. No. 85 at 40. He was restrained just after midnight because it is alleged that he assaulted defendant Fical. *Id.* at 41, 43. At 2:00AM on August 21, 2012, plaintiff was released from the restraints and fell asleep on a mattress. *Id.* at 41. At approximately 10:30AM, plaintiff was removed from constant observation and placed on room MOD. *Id.* at 45. While on room MOD, plaintiff ate his meals, visited with Risk Management and his treatment team leader, was provided medical care and an opportunity for a half hour of recreation, and

showered. *Id.* at 47-49.

During the afternoon on August 23, 2012, plaintiff was placed on unit MOD. Dkt. No. 85 at 52-53. Plaintiff was seen by medical providers, spent a half hour in the dayroom, used the bathroom, and ate his meals. *Id.* at 52-54. Plaintiff returned to constant observation on August 24, 2012, however, after he allegedly attacked defendant Hellinger. *Id.* at 55-59. While on constant observation between August 24, 2012 and August 29, 2012, plaintiff received a mattress, met with Risk Management, used the bathroom regularly, was treated by medical providers, used the telephone, showered, received mail, had access to a pen, and ate his meals. *Id.* at 57-96.

At approximately 9:00AM on August 29, 2012, plaintiff's status was changed to room MOD, and he was restricted to leaving his room only for use of the bathroom, telephone, and shower. Dkt. No. 85 at 97. On August 31, 2012, he was upgraded to unit MOD, and was permitted to use the dayroom and participate in off-ward activities. *Id.* at 100. Plaintiff received a visitor on September 1, 2012. *Id.*

Although it is unclear based on plaintiff's medical records when he was removed from unit MOD status, when plaintiff became involved in another physical altercation with staff on September 22, 2012, he was

immediately transferred to a different ward for "[a]lternate housing" and placed in room MOD until September 24, 2012, at which time he was again placed in unit MOD. Dkt. No. 85 at 110-19. While in unit MOD, plaintiff had access to his mail, the telephone for legal business, a pen, and the dayroom. *Id.* at 119-78. In addition, plaintiff regularly used the bathroom and was granted access to the dayroom, as well as routinely ate most of his meals. *Id.* Plaintiff remained on unit MOD under these conditions until at least October 17, 2012.

Following another physical altercation with staff on June 20, 2013, plaintiff was again placed on constant observation. Dkt. No. 85 at 196. Plaintiff was placed on a different ward for "alternate sleep"[23] on June 23, 2013. *Id.* at 220. While on constant observation, plaintiff used the bathroom regularly, visited with a psychiatrist and his treatment team leader, showered, ate his meals, attended to legal matters, and received medical treatment. *Id.* at 196-225. Plaintiff was removed from constant observation at 9:00AM on June 24, 2012. *Id.* at 225.

The above-described medical records overwhelmingly contradict plaintiff's allegations that he "was not allowed to receive mail, had no

---

[23]     There is nothing in the record that explains what types of conditions accompany "alternate housing" or "alternate sleep," or under what circumstances they are implemented.

access to the phone, had no access to any type of recreation or outdoor exercise, had no access to his attorney, any other communication with his family, friends or loved ones[, h]ad very limited access to the toilet[, and n]o psychiatrist or any other doctor interviewed [him while he was on constant observation]." Dkt. No. 42 at 9; *see also* Dkt. No. 84-21 at 19, 57, 58, 119-20. Aside from plaintiff's allegations, there is no record evidence to support a factfinder's conclusion that plaintiff was deprived of those liberties. It appears that each of plaintiff's periods on constant observation or in the MOD program (either on room or unit MOD) were well documented, and plaintiff was closely monitored. Moreover, plaintiff's medical records support the medical professionals' decisions to place plaintiff on constant observation or in the MOD program. Each time plaintiff was placed in some restricted status, it was prompted by a physical altercation with CNYPC staff. The medical records also reflect that plaintiff was released or upgraded from a particular restricted status after he demonstrated good behavior. While I acknowledge that the parties dispute whether plaintiff or CNYPC staff initiated the physical altercations preceding his placement on restricted status, they seem to agree that, on each occasion, plaintiff was in fact involved in a physical altercation prior to being placed on restricted status. Because the policies governing

constant observation and the MOD program are aimed at reducing safety threats, and plaintiff's medical records overwhelmingly reflect that plaintiff's behavior created a safety risk, no reasonable factfinder could conclude, based on all of the record evidence, that the decisions to place him on restricted status were not supported by adequate professional judgment.

Similarly, the conditions of confinement experienced by plaintiff on both constant observation and in the MOD program did not deprive him of any constitutional rights. Plaintiff was clearly permitted to use the bathroom and showers; he was provided access to recreation upon demonstrating good behavior, as well as the telephone and mail; and he continued working on his legal matters. Aside from plaintiff's bare allegations contending otherwise, there is no support in the record for his claims that he was deprived of any right that was unreasonably related to the safety risk he posed with his conduct, as documented in his medical records.

Accordingly, I recommend plaintiff's conditions of confinement claim be dismissed. *See Yeldon v. Hogan*, No. 08-CV-0769, 2010 WL 983819, at *4-5 (N.D.N.Y. Mar. 15, 2010) (Mordue, J., *adopting report and recommendation by* Treece, M.J.), (approving of the MOD program implemented at the CNYPC, finding that, while it imposes "greater liberty

restrictions than those imposed upon the general SOTP population, . . .

the[] additional restrictions are [neither] arbitrary nor . . . arbitrarily

applied").

### E.    Personal Involvement

In their motion, defendants argue that plaintiff's claims against

defendants Jeff Nowicki, Gonzalez, Morgan, Bill, Farnum, Comstock,

Piracha, and Kuntz are subject to dismissal based the absence of any

record evidence demonstrating their personal involvement in the offending

conduct. Dkt. No. 84-1 at 16-20.

As was noted above, "[p]ersonal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of

damages under [section] 1983." *Wright*, 21 F.3d at 501 (citing *Moffitt v.*

*Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v.*

*Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). Indeed, the Supreme Court

has noted that a defendant may only be held accountable for his actions

under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be

held liable unless they themselves acted on account of a constitutionally

protected characteristic."). In order to prevail on a section 1983 cause of

action against an individual, a plaintiff must show "a tangible connection

between the acts of a defendant and the injuries suffered." *Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. United States Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

Certain of the individuals identified in this portion of defendants' motion have been named by plaintiff because of their roles as supervisors at the CNYPC. It is well-established that a supervisor cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 554 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

44

1995); *Wright*, 21 F.3d at 501.

### 1.    Defendant Nowicki

Defendant Nowicki is identified by plaintiff as the Chief of Mental Health Services at the CNYPC. Dkt. No. 42 at 6. Plaintiff's amended complaint does not identify any role defendant Nowicki played in connection with any of the events giving rise to his claims, instead stating, in his sixth cause of action, that Nowicki, along with defendants Gonzalez, Morgan, and Bill, were informed of the violations committed by others against plaintiff but failed to take appropriate action to "stop the violations." Dkt. No. 42 at 26. When asked at his deposition why he is suing defendant Nowicki, plaintiff responded as follows:

> Because he was the Chief of Mental Health Services. He was the supervisor. I wrote him many complaints concerning the fact that I was being abused at this facility physically and mentally. My Mental Hygiene Legal Service lawyer also wrote him many complaints about what was happening to me, and he failed miserably in protecting me from the assaults that took place against me.

Dkt. No. 84-21 at 159. Although plaintiff admits that he never spoke with defendant Nowicki directly concerning his grievances, *id.*, the record includes defendant Nowicki's written responses to complaints sent to him by both plaintiff and plaintiff's attorney. Dkt. No. 94-4 at 3, 5, 7, 14, 16, 18, 20, 22, 24, 26. Although supervisory liability cannot be established by lone

allegations that a supervisor failed to respond to a grievance, courts in this circuit have held that personal involvement may be found where a supervisor receives, reviews, and responds to a plaintiff's grievance. *See, e.g., Cole v. N.Y.S. Dep't of Corrs. Servs.*, No. 10-CV-1098, 2012 WL 4491825, at \*22 (N.D.N.Y. Aug. 31, 2012) (Dancks, M.J.), *report and recommendation adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.), (finding that the supervisor-defendant's memoranda responding to the plaintiff's complaints were sufficient to establish that defendant's personal involvement); *Bourgoin v. Weir*, No. 10-CV-0391, 2011 WL 4435695, at \*5 (D. Conn. Sept. 23, 2011) ("A supervisor's response to a prisoner's grievance or complaint that attempt[s] to defend or explain alleged constitutional violations is sufficient to establish the personal involvement of that supervisor."). Accordingly, I recommend defendants' motion be denied to the extent it requests dismissal of plaintiff's claims asserted against defendant Nowicki on the basis of lack of personal involvement.

2.     Defendant Gonzalez

Plaintiff is suing defendant Gonzalez based on his alleged failure to protect him and for not contacting the New York State police after the alleged assaults. Dkt. No. 42 at 26; Dkt. No. 84-21 at 91. The record

evidence does not include any evidence from which a reasonable factfinder could conclude that defendant Gonzalez was personally involved in failing to protect plaintiff from harm. The record includes three letters authored by plaintiff's attorney to defendant Gonzalez.[24] Dkt. No. 94-4 at 27, 32-33, 35. One of those letters predates the commencement of this lawsuit, *id.* at 27; one letter involves an allegation of physical abuse by a CNYPC staff member on November 27, 2014, *id.* at 35; and the other letter concerns allegations of mistreatment that occurred after the filing of plaintiff's amended complaint, *id.* at 32-33. In the letter predating the commencement of this action, plaintiff's attorney alleges "that on an unspecified date, TA Piracha 'threatened' [plaintiff], while he was sitting in a sideroom." *Id.* Verbal threats, however, do not give rise to a cognizable constitutional claim. *See, e.g., Holland*, 2016 WL 3636249, at *10. Moreover, because plaintiff's claims in this matter do not stem from allegations of abuse in November 2014, I find that there is no record evidence from which a reasonable factfinder could conclude that defendant Gonzalez was personally involved in any of the constitutional violations alleged by plaintiff in his amended complaint. For that reason, I

---

[24] Defendant Gonzalez responded to each of the letters. Dkt. No. 94-4 at 31, 34, 36.

recommend that defendants' motion be granted to the extent it requests dismissal of plaintiff's claims asserted against defendant Gonzalez based on lack of personal involvement.

### 3. Defendants Morgan and Bill

Defendants James Morgan and Charmaine Bill are similarly sued by plaintiff based on allegations that they failed to protect him after the incidents on February 20, 2012 and June 20, 2013 by not contacting the New York State police. Dkt. No. 42 at 8-9, 21; Dkt. No. 84-21 at 46, 146. Although defendants appear to argue that dismissal of plaintiff's claims asserted against defendants Morgan and Bill is appropriate on the basis of lack of personal involvement, they actually seek dismissal of the failure-to-protect claims asserted against those individuals based on their contention that officials cannot be responsible for failing to protect an individual unless they were presented with a reasonable opportunity to intervene to prevent the harm. Dkt. No. 84-1 at 18. This argument stems from the legal standard governing failure-to-protect claims arising in the context of a prison setting. *See Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (finding that a plaintiff asserting a failure to protect claim under the Eighth Amendment must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety).

It remains unclear in this circuit whether the standard applicable to failure-to-protect claims arising under the Eighth Amendment is applicable to similar claims asserted by civil detainees. *See, e.g., Lane v. Carpinello*, No. 07-CV-0751, 2009 WL 3074344, at *19 (N.D.N.Y. Sept. 24, 2009) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.); *accord, Yeldon v. Sawyer*, No. 10-CV-0266, 2012 WL 1995839, at *7 (N.D.N.Y. Apr. 26, 2012) (Treece, M.J.), *report and recommendation adopted by* 2012 WL 1987134 (N.D.N.Y. June 4, 2012) (McAvoy, J.). As has been discussed above, the Supreme Court explained in *Youngberg* that civilly detained individuals are entitled to substantive due process under the Fourteenth Amendment, and that a defendant's conduct violates due process where it "substantial[ly] depart[s] from accepted professional judgment, practice, or standards in the care and treatment of [the individual] as to demonstrate that the defendant[] did not base [his] conduct on a professional judgment." *Youngberg*, 457 U.S. at 314 (quotation marks omitted). In the absence of any binding precedent from the Second Circuit, at least one court in this circuit has determined that the *Youngberg* standard does not apply to failure-to-protect claims asserted by civil detainees against "low-level staff members." *Vallen v. Carrol*, No. 02-CV-5666, 2005 WL 2296620, at *8 (S.D.N.Y. Sept. 20, 2005).

Defendants Morgan and Bill, however, are identified as Treatment Team Leaders and, at the very least, are supervisory officials. Accordingly, I conclude that the court is bound by *Youngberg*.

Defendants have provided no evidence against which to judge whether refusing to contact the New York State police following two alleged assaults at the CNYPC deviates from accepted practice either at the CNYPC or more generally, and the court is therefore hampered in its ability to apply the *Youngberg* test in connection with plaintiff's claims asserted against defendants Morgan and Bill. In the event plaintiff's version of the events that preceded his encounters with defendants Morgan and Bill are credited,[25] a reasonable factfinder could conclude that a supervisory official at the CNYPC should have contacted the police. Accordingly, I recommend that defendants' motion be denied as to defendants Morgan and Bill to the extent it seeks dismissal of those individuals on the basis of personal involvement.

### 4.    Defendant Farnum

Plaintiff alleges that defendant Farnum failed to protect him during

---

[25]    Specifically, plaintiff alleges that defendant Morgan spoke with plaintiff following the February 20, 2012, August 24, 2012, and September 22, 2012 incidents, where plaintiff alleges that he was assaulted by defendant Hellinger, Kuntz, and Box. Dkt. No. 42 at 8-9, 17, 19. Similarly, plaintiff alleges that defendant Bill responded to the use-of-force incident on June 20, 2013, during which defendants Santamassino and Paulson allegedly assaulted plaintiff. *Id.* at 21.

the alleged assault on August 20, 2012. Dkt. No. 42 at 11, 24; Dkt. No. 84-21 at 53-56. Citing only plaintiff's amended complaint, defendants contend that "[p]laintiff. . . fails to allege that Dr. Farnum was actually present during the alleged assault." Dkt. No. 84-1 at 18. This argument, however, ignores plaintiff's deposition testimony, in which he specifically alleges that defendant Farnum ordered him out of his room and into the side room where he was allegedly assaulted, and that, prior to plaintiff exiting his room, he informed defendant Farnum that he was in fear of his safety based on the alleged threats made against him by defendants Sill and Searcy. Dkt. No. 84-21 at 53. In light of these specific allegations, I recommend defendants' motion be denied to the extent it seeks dismissal of defendant Farnum based on personal involvement.

### 5.    Defendant Comstock

Defendant Cindy Comstock is identified by plaintiff as an OMH Nurse Administrator employed at the CNYPC. Dkt. No. 42 at 4. Plaintiff alleges that it was defendant Comstock that ordered him to be taken to the room at the CNYPC filled with urine and feces, where he was allegedly tortured for weeks. Dkt. No. 42 at 18-19; Dkt. No. 84-21 at 126. While these allegations could suffice to demonstrate Comstock's involvement, because I have recommended that plaintiff's conditions of confinement

claims be dismissed, it is unnecessary to address the issue of personal involvement with respect to this defendant.

###### 6.    Defendant Piracha

According to plaintiff, he is suing defendant Piracha only for threatening him after the incident on August 20, 2012. Dkt. No. 84-21 at 90, 140, 165. Plaintiff acknowledges that Piracha never used force or threatened to use force against him, but only told him to take defendant Searcy's name out of his grievance. *Id.* at 90. As was noted above, it is well-established that allegations of threats, without any accompanying use of force or damage, are insufficient to support a claim for liability under section 1983. *See, e.g., Holland*, 2016 WL 3636249, at *10. Accordingly, I recommend that plaintiff's claims against defendant Piracha be dismissed.

###### 7.    Defendant Kuntz

Although he identified defendant Kuntz as one of the SCTAs involved in the use-of-force incident on February 20, 2012, *see, e.g.,* Dkt. No. 84-21 at 34, plaintiff testified at his deposition that he is not suing that individual in connection with the February 20, 2012 incident. *Id.* at 49. In addition, plaintiff testified that, with respect to the June 20, 2013 incident, defendant Kuntz did not use any force against him, but instead only verbally threatened him. *Id.* at 143-44. Because verbal threats are not

sufficient to support a section 1983 cause of action, and because

defendant Kuntz is not sued in connection with any other incidents, I

recommend that defendants' motion be granted to the extent it seeks

dismissal of plaintiff's claims asserted against defendant Kuntz on the

basis of personal involvement.

F.    Retaliation

In his fourth cause of action, plaintiff alleges that defendants

Hellinger, Searcy, Sill, Fical, Simpkins, Santamassino, and Box retaliated

against him for claiming abuse and mistreatment and complaining about

the conditions of his confinement.[26] Dkt. No. 42 at 25.

As the Second Circuit has repeatedly cautioned, retaliation claims

are easily incanted and courts should examine them "with skepticism and

particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). To

establish a claim under section 1983 for retaliatory conduct, a plaintiff

must demonstrate that (1) he engaged in protected conduct; (2) the

defendants took adverse action against him; and (3) there was a causal

connection between the protected activity and the adverse action – in

---

[26]     The amended complaint also appears to assert a retaliation claim against
defendants Kuntz and Piracha. Dkt. No. 42 at 25. As was noted above, however,
plaintiff clarified at his deposition that he is suing those individuals based only verbal
threats rendered against him. Dkt. No. 84-21 at 90, 140, 143-44, 165.

other words, the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Ahlers v. Nowicki*, No. 12-CV-0539, 2014 WL 1056935, at *3 (N.D.N.Y. Mar. 18, 2014) (Hurd, J., *adopting report and recommendation by* Treece, M.J.). If the plaintiff carries this burden, then to avoid liability the defendants must show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

When a claim of retaliation is alleged in only conclusory fashion, and there is no record evidence establishing the requisite nexus between protected activity and the adverse action complained of, dismissal is warranted. *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *McQuilkin v. Cent. N.Y. Psychiatric Ctr.*, No. 08-CV-0975, 2010 WL 3765847, at *15 (N.D.N.Y. Aug 27, 2010) (Peebles, M.J.), *report and recommendation adopted by*, 2010 WL 3765715 (N.D.N.Y. Sept. 20,

2010) (McAvoy, J.). In addition, as was discussed earlier, personal involvement of a named defendant in any alleged constitutional deprivation, including retaliation, is a prerequisite to an award of damages against that individual under section 1983. *See, e.g., Wright*, 21 F.3d at 501; *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, J., *adopting report and recommendation by* Lowe, M.J.).

In this case, plaintiff's allegations concerning the February 20, 2012 incident involving defendant Hellinger do not support a finding of unlawful retaliation. Plaintiff's amended complaint does not include any allegations of protected activity engaged in by the plaintiff prior to that incident that could have motivated the assault. Indeed, according to plaintiff, the earliest complaint authored by him was dated February 20, 2012. Dkt. No. 42 at 6-7.

With respect to the incident on August 20, 2012, plaintiff alleges that, immediately prior to being assaulted by defendants Fical, Searcy, Sill, and Simpkins, defendants Searcy and Sill "said they were going to teach [him] a lesson for being a snitch," and that plaintiff "knew they were referring to the February 20th incident where [he] was assaulted by Defendant Hellinger and [him] reporting it to risk management." Dkt. No. 84-21 at 52.

55

While the amount of time that passed between the two incidents presents only modest evidence of the link between the two, defendants have submitted no evidence that rebuts plaintiff's testimony. Viewing the facts in light most favorable to plaintiff, a reasonable factfinder could conclude that the use of force on August 20, 2012, if it occurred, constituted an adverse action taken in response to plaintiff's complaints regarding the February 20, 2012 incident. Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of plaintiff's retaliation claim related to the August 20, 2012 incident.

Plaintiff also claims that on August 24, 2012, defendant Hellinger punched him in the back of the head. Dkt. No. 42 at 17. Plaintiff does not make any allegations, however, linking that incident to specific complaints or other protected activity. Accordingly, I recommend that any retaliation claim arising from that incident be dismissed.

Plaintiff's claim concerning the September 22, 2012 incident is based on allegations that, on September 19, 2012, defendant Box threatened to break plaintiff's fingers if he wrote any additional complaints. Dkt. No. 42 at 18. Plaintiff then filed a complaint at the CNYPC regarding defendant Box's threats, and defendant Box allegedly assaulted him "just three days later" on September 22, 2012. *Id.* Given the close temporal proximity

between the filing of the complaint and the alleged assault, and in light of the absence of any evidence from defendants that dispute plaintiff's allegations, I recommend defendants' motion be denied with respect to plaintiff's retaliation claim arising from this incident.

The last event forming the basis for plaintiff's retaliation claims surrounds the June 20, 2013 incident, involving defendants Santamassino and Paulson. Although plaintiff alleges that defendant Santamassino initiated the assault and referenced plaintiff's grievances immediately prior to the assault, there is no record evidence that defendant Paulson, who arrived after defendant Santamassino began assaulting plaintiff, was aware of any complaints filed by plaintiff or thereafter participated in the alleged assault in retaliation for plaintiff filing complaints. Accordingly, I recommend the retaliation claim asserted against defendant Paulson in connection with this incident be dismissed.

In sum, I recommend plaintiff's retaliation claims arising from the August 20, 2012 and September 22, 2012 incidents remain in the action, but that the remaining portions of plaintiff's retaliation claim be dismissed.[27]

---

[27] In the event the assigned district judge does not dismiss defendant Santamassino from this action based on plaintiff's failure to timely serve and join him in the action, I recommend that plaintiff's retaliation claim asserted agaomst jo, survive defendants' motion for summary judgment and proceed to trial.

### G.    Eleventh Amendment

According to his amended complaint, plaintiff has sued all of the defendants in both their individual and official capacities. Dkt. No. 42 at 1. Among the relief sought by the plaintiff are awards of monetary damages against those defendants. *Id.* at 27. In their motion, defendants seek dismissal of plaintiff's damages claims against them in their official capacities. Dkt. No. 84-1 at 23-24.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. *See, e.g., Daisernia v. State of N.Y.*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see*

*also Richards v. State of N.Y. App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (*citing, inter alia, Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named-defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that, to the extent that any of the claims asserted in plaintiff's amended complaint are asserted against any of the named-defendants in their official capacities, those claims be dismissed with prejudice.[28]

## H.    Qualified Immunity

As an alternative ground for dismissal of plaintiff's claims,

---

[28]    Because plaintiff is also requesting injunctive relief, to that extent his claims are properly asserted against the defendants in their official capacities. *See, e.g., King v. McIntyer*, No. 11-CV-1457, 2014 WL 689028, at *6 (N.D.N.Y. Feb. 20, 2014) (Hurd, J., *adopting report and recommendation by* Dancks, M.J.) (citing *Quern v. Jordan*, 440 U.S. 332, 338 (1979)).

defendants assert their entitlement to qualified immunity from suit. Dkt. No. 84-1 at 24-25. This portion of defendants' motion does not single out or identify specific defendants as potentially qualifying for immunity, but instead appears to request dismissal of all of plaintiff's claims including the excessive force claims. *Id.*

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

The determination of whether a government official is immune from

suit is informed by two factors. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014); *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Id.*, *see also Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations

omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). In addressing the two relevant qualified immunity factors, the court must draw all inferences in favor of the non-moving party. *Tolan*, 134 S. Ct. at 1866.

In the event the above recommendations are adopted, the following causes of action remain for an analysis regarding qualified immunity: (1) deliberate medical indifference under the Fourteenth Amendment asserted against defendants Pavlot and Simpkins; (2) retaliation under the First and Fourteenth Amendments asserted against (a) defendants Fical, Searcy, Sill, Simpkins regarding the August 20, 2012 incident, (b) defendant Box regarding the September 22, 2012 incident, and (c) defendant Santamassino (in the event the assigned district judge does not dismiss him from the action based on plaintiff's failure to timely serve and join the

individual); (3) excessive force and deliberate medical indifference based on his supervisory capacity against defendant Nowicki.  I am unable to conclude that these remaining individuals are entitled to qualified immunity at this juncture. Instead, as was discussed above, there are issues of fact that must be resolved with respect to both the question of whether plaintiff's constitutional rights were violated, and whether a reasonable person in the defendants' respective positions would have understood that their conduct violated plaintiff's constitutional rights.

IV.   SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action asserts several claims against a host of defendants, the majority of which revolve around discrete incidents involving the use of force and the medical treatment provided to him for his bilateral shoulder condition. For the reasons set forth above, it is hereby respectfully

RECOMMENDED that plaintiff's claims asserted against defendant John Santamassino be dismissed, without prejudice, in the event that, no later than fourteen days following the issuance of this report and recommendation, plaintiff does not provide good cause for his failure to effectuate service upon defendant Santamassino; and it is further

RECOMMENDED that defendants' motion for summary judgment

([Dkt. No. 84](Dkt. No. 84)) be granted, in part, and the following claims be DISMISSED:

(1)     Plaintiff's deliberate medical indifference claims asserted against defendants Kaskiw and Farnum;

(2)     Plaintiff's conditions of confinement claims asserted against all defendants;

(3)     All claims asserted against defendants Gonzalez, Comstock, Piracha, and Kuntz;

(4)     Plaintiff's retaliation claim asserted against defendant Hellinger; and

(5)     Plaintiff's damage claims asserted against all defendants sued in their official capacities; and it is further

RECOMMENDED that, in the event the above-recommendations are adopted, the following claims remain for trial:

(1)     Plaintiff's excessive force and failure to protect claims asserted against defendants Hellinger, Pavlot, Morgan, and Nowicki related to the incident on February 20, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(2)     Plaintiff's excessive force, failure to protect, and retaliation claims asserted against defendants Fical, Searcy, Sill, Simpkins, Farnum, and Nowicki related to the incident on August 20, 2012, for damages in

64

their individual capacities, and for injunctive relief in their individual and official capacities.

(3)     Plaintiff's excessive force and failure to protect claims asserted against defendants Hellinger, Morgan, and Nowicki related to the incident on August 24, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(4)     Plaintiff's excessive force and failure to protect claims asserted against defendants Box, Paulson, Morgan, and Nowicki related to the incident on September 22, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(5)     Plaintiff's excessive force and failure to protect claims asserted against defendants Santamassino (if he is not otherwise dismissed from the action based on plaintiff's failure to timely serve and join the individual), Paulson, Bill, and Nowicki related to the incident of June 20, 2013, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(6)     Plaintiff's deliberate medical indifference claims asserted against defendants Pavlot and Simpkins for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(7)     Plaintiff's retaliation claims asserted against defendants Searcy, Sill, Fical, and Simpkins related to the incident on August 20, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(8)     Plaintiff's retaliation claim asserted against defendant Box related to the incident on September 22, 2012, for damages in his individual capacity, and for injunctive relief in his individual and official capacity.

(9)     Plaintiff's retaliation claim asserted against defendant Santamassino (if he is not otherwise dismissed from the action based on plaintiff's failure to timely serve and join the individual) related to the incident on June 20, 2013, for damages in his individual capacity, and for injunctive relief in his individual and official capacity; and it is further hereby

ORDERED that the clerk of the court is respectfully directed to modify the docket sheet to reflect the correct spelling of defendant Daniel Simpkins' last name; and it is further

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

Dated:     September 30, 2016
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

2008 WL 268366
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Isidro ABASCAL, Plaintiff,
v.
Bryan HILTON, Psychologist, and
Mitchell Langbart, M.D., Defendants.

No. 9:04-CV-1401 (LEK/GHL).
|
Jan. 30, 2008.

**Attorneys and Law Firms**

Isidro Abascal, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Richard Lombardo, Esq., Assistant Attorney General, of Counsel, Albany, NY, Counsel for Defendant Hilton.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 **\*1** This matter comes before the Court following a Report-Recommendation filed on December 28, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 41). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Isidro Abascal, which were filed on January 7, 2008. Objections (Dkt. No. 42).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 41) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED** that Defendant Hilton's Motion to dismiss (Dkt. No. 37) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's Motion to dismiss (Dkt. No. 37) are **DISMISSED** pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Fed.R.Civ.P. 12(h)(3), for the reasons stated above; and it is further

**ORDERED,** that Plaintiff's claims against Defendant Langbart are **DISMISSED** with prejudice for failure to serve, for the reasons stated above; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Isidro Abascal ("Plaintiff"), while an inmate at Attica Correctional Facility, commenced this *pro se* civil rights action, pursuant to 42 U.S.C. § 1983, against, *inter alia,* two medical care providers employed (at the time) by the State of New York-Bryan Hilton and Mitchell Langbart. Generally, Plaintiff's Third Amended Complaint alleges, in pertinent part, that, between December 27, 2001, and October 29, 2002, while he was incarcerated at Auburn Correctional Facility, Defendants Hilton and Langbart violated his rights under the First, Eighth and Fourteenth Amendments by wrongfully treating or classifying him as mentally ill and wrongfully transferring him to the Central New York Psychiatric Center as a form of punishment and/

or retaliation for writing to public officials about certain "symptoms and body scars" that Plaintiff had allegedly experienced or sustained while in the custody of DOCS. (*See generally* Dkt. No. 24 [Plf.'s Third Am. Compl.].)

**\*2** Currently pending before the Court is Defendant Hilton's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 37.) For the reasons that follow, I recommend that Defendant Hilton's motion be granted. I also recommend that those of Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's motion to dismiss be *sua sponte* dismissed pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Rule 12(h)(3) of the Federal Rules of Civil Procedure. Finally, I recommend that Plaintiff's claims against Defendant Langbart be *sua sponte* dismissed with prejudice for failure to serve, pursuant to Rules 4(m) and 16(f) of the Federal Rules of Civil Procedure.

### I. BACKGROUND

#### A. Relevant Procedural History

Throughout the course of this action, Plaintiff has, in his several pleadings, asserted claims against a number of individuals. All of those claims have been dismissed by Judge Kahn under Rules 8, 10 and/or 12 of the Federal Rules of Civil Procedure, except Plaintiff's claims against Defendants Hilton and Langbart.

Specifically, on January 5, 2005, Judge Kahn dismissed Plaintiff's claims, asserted in his original Complaint, against Defendants Jarkos, Tatum, Graham, Filion, Goodman, and Lape. (Dkt. No. 5, at 9.) On March 1, 2005, Judge Kahn struck Plaintiff's Amended Complaint from the docket, under Rules 8, 10 and 12 of the Federal Rules of Civil Procedure. (Dkt. No. 10.) On June 15, 2006, Judge Kahn dismissed Plaintiff's claims, asserted in his Second Amended Complaint, against Defendants Muse, Smith, Pena, and "Unknown HTE Operators." (Dkt. No. 23, at 8.) On November 6, 2006, Judge Kahn dismissed Plaintiff's claims, asserted in his Third Amended Complaint, against Defendants Burge, Stone, Goord and Conway. (Dkt. No. 25, at 3.)

Remaining in the case, following Judge Kahn's Order of November 6, 2006, were Plaintiff's claims against Defendants Hilton and Langbart. (*Compare* Dkt. No. 25 [Order of 11/6/06] *with* Dkt. No. 24 [Plf.'s Third Am. Compl.].)

#### B. Plaintiff's Failure to Serve Defendant Langbart

Prior to Judge Kahn's Order of November 6, 2006, regarding Plaintiff's Third Amended Complaint, none of Plaintiff's prior pleadings had been served on Defendants Hilton or Langbart. (*See generally* Docket.) On November 6, 2006, Judge Kahn ordered, *inter alia,* that (1) "the Clerk shall issue summonses and forward them, along with copies of the [Third] Amended Complaint, to the United States Marshall for service on the [two] remaining Defendants," and (2) "Plaintiff shall ... comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 25, at 3-4.) On January 27, 2007, the summonses for Defendants Hilton and Langbart were returned unexecuted because Plaintiff had, on the USM-285 Forms, listed their addresses as Auburn C.F., and both had left Auburn C.F. several years before. (Dkt. No. 27.)

**\*3** On February 5, 2007, the Clerk's Office for this Court sent a letter to the Deputy Counsel for the New York State DOCS requesting his assistance in determining whether DOCS has a current address on file for Defendants Hilton and Langbart (or whether, perhaps, Defendants Hilton and Langbart would designate an agent for service of process). (Dkt. No. 28.) On April 21, 2007, the Deputy Counsel responded with Defendant Hilton's current address but stated that Defendant Langbart was neither currently employed by DOCS nor was he previously employed by DOCS (but by the Central New York Psychiatric Center). (Dkt. No. 29.)

On March 22, 2007, the Clerk's Office reissued summonses for Defendants Hilton and Lanbart. (Dkt. No. 30.) On March 26, 2007, an acknowledgment of service was filed as to Defendant Hilton. (Dkt .33.) However, on April 26, 2007, the summons for Defendant Langbart was returned unexecuted because Plaintiff had, on the USM-285 Form, listed his address as "750 E. Adams St., Syr. N.Y. 13210," and Langbart was "no longer [t]here." (Dkt. No. 34.)

On June 28, 2007, in his motion to dismiss Plaintiff's Third Amended Complaint, Defendant Hilton stated, *inter alia,* that "[o]n April 27, 2007, the summons was returned unexecuted as to defendant Langbart." (Dkt. No. 37, Part 2, at 1, n. 1.) However, the docket contains no record

of Plaintiff having completed another USM-285 Form as to Defendant Langbart. Consequently, it appears he was never served with a copy of Plaintiff's Third Amended Complaint.

Because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on Defendant Langbart, Plaintiff has violated Rule 4(m) of the Federal Rules of Civil Procedure. Alternatively, Plaintiff has violated Rule 16(f) of the Federal Rules of Civil Procedure due to the fact that he violated Judge Kahn's Order of November 6, 2006 (directing him to comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action," *see* Dkt. No. 25, at 4) by failing to complete new USM-285 Forms listing Defendant Langbart's current address.

As a result, the Court should dismiss Plaintiff's claims against Defendant Langbart. I note that the Court need not issue such an order only upon motion of defense counsel but may do so *sua sponte. See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just....").

Remaining in the case, then, are only Plaintiff's claims against Defendant Hilton.

### C. Summary of Plaintiff's
### Claims Against Defendant Hilton

In federal court, all pleadings must be liberally construed. *See* Fed.R.Civ.P. 8(e). Generally, pleadings filed by *pro se* civil rights litigants must be construed with an *extra* degree of liberality or leniency. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or extra leniency that is normally afforded *pro se* litigants. [1] Generally, the rationale for withdrawing of this extra leniency (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending

extraordinary leniency to a *pro se* litigant in the first place. [2]

**\*4** Here, Plaintiff is certainly no stranger to the court system, having filed some 13 federal or state court actions or appeals (other than the current action) [3] I note that, by the time Plaintiff filed his Third Amended Complaint in this action on July 14, 2006, Plaintiff had filed some 12 federal or state court actions or appeals. [4] Ordinarily, I would find that the Court should withdraw from Plaintiff, or at least diminish, the extraordinary leniency normally afforded to *pro se* litigants. However, because Plaintiff, may well have been laboring under a mental illness at the time he drafted his Third Amended Complaint (for the reasons discussed below in this Report-Recommendation), I will continue to afford him special solicitude. [5]

Construed with an *extra* degree of liberality, Plaintiff's Third Amended Complaint alleges as follows.

1. On December 27, 2001, Plaintiff was transferred from the Central New York Psychiatric Center ("CNYPC") to Auburn Correctional Facility ("Auburn C.F."), where he was interviewed by Defendant Hilton. (*Id.* at ¶ 10.) During the interview, Defendant Hilton asked Plaintiff if he wanted to live in the Intermediate Care Program ("ICP"). (*Id.*) Plaintiff responded that he neither wanted to live in ICP nor take psychotropic medication, but that he wanted to live in the prison's general population. (*Id.*)

2. At some point between December 27, 2001, and April 25, 2002, Plaintiff sent a letter to then-Governor George Pataki concerning "symptoms and body scars" that Plaintiff had experienced or sustained while in the custody of DOCS. (*Id.* at ¶ 12.) While Plaintiff does not attach a copy of this letter to his Third Amended Complaint, he does describe the substance of the letter in some detail. (*Id.* at ¶ 12.a.-12.d.) Among the symptoms described in the letter were the following: (1) the sensation that Plaintiff's "mind was being read" and that he had been subjected to the "broadcasting of [his] thoughts [by someone else]"; (2) the sensation that Plaintiff had also been subjected to "sleep deprivation," "changes to [his] hearing," "waking visions ... synced with body motions," "wild flailing of arms and legs, sometimes followed by rigor mortis," "very high body heat," "sudden, violent itching" in "hard-to-reach areas," "electrical shock[s],"

"cigarette burn type scars," and "penis shriveling"; and (4) the fact that he had been "sexually provoked by female staff for many years while in the custody of the DOCS." (*Id.*)

3. Apparently, Plaintiff alleges that these symptoms and scars were caused by the "pscyho-electronic weapons" and "behavior modification experimentation" (including "personality breaking techniques") to which he has been involuntarily subjected by DOCS. (*Id.* at ¶¶ 16, 40, 41 & Ex. 8.)

4. On April 25, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had sent to Governor Pataki. (*Id.* at ¶ 12.)

**\*5** 5. At some point before June 17, 2002, Plaintiff sent a letter to DOCS Deputy Commissioner of Corrections Lucien LeClaire, concerning the above-described "symptoms and body scars." (*Id.* at ¶ 13 .)

6. On June 17, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had sent to Deputy Commissioner LeClaire. (*Id.*) During the meeting, Defendant Hilton asked Plaintiff if the symptoms he alleged were becoming worse, and Plaintiff responded that they were. (*Id.*)

7. At some point before July 18, 2002, Plaintiff sent a letter to the DOCS Inspector General concerning the above-described "symptoms and body scars." (*Id.* at ¶ 14.)

8. On July 18, 2002, a correctional sergeant informed Plaintiff that he could not leave his cell until he had been interviewed by a Mental Health Unit psychologist because of the letter he had written to the DOCS Inspector General, concerning the above-described "symptoms and body scars." (*Id.*)

9. On July 19, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had written to the DOCS Inspector General. (*Id.* at ¶ 15.) During the meeting, Plaintiff told Defendant Hilton that he just wanted to be left alone so that he could pursue his college education. (*Id.*) In addition, Plaintiff showed Defendant Hilton his "irritated face," which bore "multiple little bumps, and patches of redness." (*Id.*)

10. At some point before October 24, 2002, Plaintiff sent a letter to a New York State senator concerning the above-described "symptoms and body scars." (*Id.* at ¶ 16.)

11. On October 24, 2002, Defendant Hilton "interviewed" Plaintiff because of the letter he had written to the New York State senator. (*Id.*) During the meeting, Defendant Hilton (and Dr. Mitchell Langbart, who was also present) tried to persuade, or "coerce," Plaintiff to stop writing such letters. (*Id.*) Specifically, Dr. Langbart asked Plaintiff, "Do you want to be transferred to CNYPC and miss your college semester, or stay in the facility and be able to finish it?" (*Id.*) [6] Plaintiff responded that he would "do what he had to do," and that Langbart and Hilton would do "what they wanted to do." (*Id.*) Defendant Hilton responded that "all the pain and discomfort that plaintiff was suffering was maybe a revenge." (*Id.*) Subsequently, Plaintiff was placed in a "strip cell" with just his underwear and a mattress. (*Id.*)

12. On October 29, 2002, Plaintiff was transferred back to CNYPC. (*Id.* at ¶ 18.) While at CNYPC, Plaintiff was told by Dr. Qamar Abassi that he had been sent to CNYPC because he had not been eating. (*Id.*) Plaintiff responded that that was false. (*Id.*)

13. On December 6, 2002, Plaintiff was again transferred from CNYPC to Auburn C.F. (*Id.* at ¶ 28.) Plaintiff alleges that, during the two months that followed the transfer, he wrote a letter to a politician concerning the above-described "symptoms and body scars," and that he was "interviewed" by "an individual from [the Mental Health Unit]" because of the letter (and apparently urged not to write such letters). (*Id.* at ¶ 29.) He also alleges that, during the six months that followed the interview, he was interviewed by two other psychologists. (*Id.* at ¶¶ 37, 39.) However, he does not allege that any of these three interviews were conducted by, or even were caused by, Defendant Hilton. (*See generally id.* at ¶¶ 28-45 [not mentioning Defendant Hilton]; *see also id.* at Exs. 1-3, 5 [attaching grievances and complaint-letters not mentioning Defendant Hilton].)

### D. Summary of Arguments on Defendant Hilton's Motion to Dismiss

**\*6** In his memorandum of law, Defendant Hilton argues that Plaintiff's claims against him, asserted in Plaintiff's Third Amended Complaint, should be dismissed for

failure to state a claim for two alternative reasons: (1) Plaintiff fails to allege facts plausibly suggesting that Defendant Hilton was personally involved in any of the constitutional violations alleged by Plaintiff; and (2) even assuming as true all of the factual allegations of Plaintiff's Third Amended Complaint, Defendant Hilton is protected from liability by the doctrine of qualified immunity, as a matter of law. (Dkt. No. 37, Part 2, at 4-7.)

In his memorandum of law, Plaintiff responds to both of Defendant Hilton's arguments. With regard to Defendant Hilton's personal-involvement argument, Plaintiff argues that (1) Paragraphs 10, 15 and 18 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "arbitrarily classified plaintiff as mentally ill," (2) Paragraphs 12, 13, 14 and 16 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "persecuted him for writing to public officials," (3) Paragraph 16 of his Third Amended Complaint alleges facts plausibly suggesting that Defendant Hilton "threatened" and "coerced" him not to write to public officials, (4) Paragraphs 14 and 16 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton, wrongfully "secluded" him in a "strip cell," and (5) Paragraph 18 of his Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton transferred Plaintiff to the Central New York Psychiatric Center for writing to a State Senator. (Dkt. No. 40, Part 1, at 3-6.)

With regard to Defendant Hilton's qualified immunity argument, Plaintiff essentially argues that Defendant Hilton fails to appreciate that it was clearly established that the First Amendment forbade Defendant Hilton from inhibiting Plaintiff from, or retaliating against him for, exercising his right to send letters of complaint to public officials about his prison conditions. (*Id.* at 6-9.)

## II. GENERAL LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2);[7] or (2) a challenge to the legal cognizability of the claim.[8]

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[9] The purpose of this rule is to "facilitate a proper decision on the merits."[10] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[11]

**\*7** The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[12] However, it is well established that even this liberal notice pleading standard "has its limits."[13] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard.[14]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-1969, 167 L.Ed.2d 929 (2007).[15] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-1974. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.; see also Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the

[Supreme] Court [in *Bell Atlantic Corp. v. Twombly*] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original],

It must be remembered that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [16] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [17] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality. Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [18] Moreover, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [19]

**\*8** Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [20] Moreover, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [21] This is because, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [22]

### III. ANALYSIS

#### A. Whether Plaintiff Has Failed to State a First Amendment Claim

Liberally construed, Plaintiff's Third Amended Complaint asserts two related but different types of First Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton retaliated against Plaintiff for engaging in speech or activity that was protected by the First Amendment; and (2) a claim that Defendant Hilton impermissibly interfered with Plaintiff's right to petition the government for the redress of grievances. (Dkt. No. 24, ¶ 47 & Prayer for Relief, ¶ A.1.)

#### 1. Retaliation for Engaging in Protected Activity

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. [23] Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. [24] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. [25] As the Second Circuit has noted,

> This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act. [26]

To prevail on a First Amendment claim of retaliation under 42 U.S .C. § 1983, a plaintiff must prove by a preponderance of the evidence the following: (1) that the speech or conduct at issue was "protected"; (2) that the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) that there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. [27] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. [28]

**\*9** Here, Plaintiff appears to argue that the "protected" speech or conduct in which he had engaged when he was punished by Defendant Hilton consisted of sending letters to four New York State officials (Governor George Pataki, DOCS Deputy Commissioner Lucien LeClaire, the DOCS Inspector General, and a New York State senator) concerning "symptoms and body scars" that he had allegedly experienced or sustained while in the custody

of DOCS. (Dkt. No. 24, ¶¶ 12-14, 16.) Although Plaintiff does not specifically allege that his letters contained complaints of mistreatment and requests for intervention, I liberally construe them as doing so. Furthermore, for the sake of argument, I will assume that such letters constituted speech or conduct that was "protected" by the First Amendment.

The first problem with Plaintiff's retaliation claim is that, by and large, it fails to allege any facts plausibly suggesting that Defendant Hilton took any "adverse action" against Plaintiff. For example, Plaintiff alleges that, following his letters to Governor Pataki, Deputy Commissioner LeClaire, and the Inspector General, Defendant Hilton only "interviewed" Plaintiff about the subject matter of the letters. (Dkt. No. 24, ¶¶ 12, 13, 15, 16.) It is difficult for me to imagine circumstances under which an inquiry by a prison psychologist about a prisoner's complaints that his "mind was being read," and he was being subjected to "waking visions," "changes to [his] hearing," and the involuntary "flailing of [his] arms and legs" could be construed as anything other than sound medical treatment. (I certainly cannot conceive of it as being "adverse action.") I note that, in the sole detailed account of these "interviews" that Plaintiff provides in his Third Amended Complaint, he acknowledges that Defendant Hilton had asked him if the symptoms alleged in his letters were getting worse. (*Id.* at ¶ 13.)

The only "adverse action" that Plaintiff has even remotely alleges is Plaintiff's placement in a "strip cell with just his underwear and mattress" on October 24, 2002, after Defendant Langbart tried to "coerce" Plaintiff to stop writing letters like his recent letter to a New York State senator concerning his alleged "symptoms and body scars," and Plaintiff had responded that he would "do what he had to do." (*Id.* at ¶ 16.) For the sake of argument, I will assume this is "adverse action." Even it were an "adverse action," Plaintiff's retaliation claim would fail.

This is because the second problem with Plaintiff's retaliation claim is that he alleges absolutely no facts plausibly suggesting that this particular instance of "adverse action" was *causally connected* to the "protected conduct" in which Plaintiff had engaged. Plaintiff's allegation that, immediately before he was placed in a "strip cell," Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge" is too cryptic and innocuous to plausibly

suggest a causal link between the "protected conduct" and the "adverse action." (*Id.*) Moreover, any shred of a conceivable causal connection between Defendant Hilton's statement and Plaintiff's placement in a "strip cell" is severed when one considers the *nature* of the symptoms of which Plaintiff had complained, which, included a belief that his "mind was being read," that his hearing was being manipulated, that he saw "waking visions," that he felt "violent itching" which could not be stopped, that he lacked control of his arms and legs, that he was being scarred and burned by "electrical shock[s]," and that he was being "provoked by female staff." (*Id.* at ¶ 12.) By any rational assessment, it was these symptoms, and not Defendant Hilton, that *caused* Plaintiff to be placed in a strip cell.

**\*10** Indeed, Plaintiff does not even allege sufficient facts to plausibly suggest that it was Defendant Hilton, and not Defendant Langbart, who took the "adverse action" of placing Plaintiff in the "strip cell." (*Id.* at ¶ 16.) I note that it was Defendant Langbart, not Defendant Hilton, whom Plaintiff wrongfully transferred him to the CNYPC less than a week after this October 24, 2002, placement in a "strip cell." (Dkt. No. 24, ¶ 18 & Exs. 1-2.) As a result, I am persuaded that Defendant Hilton's lack-of-personal-involvement argument serves as an alternative ground for dismissing Plaintiff's retaliation claim against Defendant Hilton. [29]

For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim against Defendant Hilton.

### 2. Interference with Right to Petition Government

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [30] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [31] "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [32] As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual

injury. [33] It is worth noting that "[t]his actual injury requirement 'is not satisfied by just any type of frustrated legal claim,' because the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.'" [34] " 'Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.' " [35]

Here, Plaintiff has not alleged facts plausibly suggesting that Defendant Hilton acted *deliberately* and *maliciously* in interfering with Plaintiff's right to petition government officials for the redress of grievances. The closest that Plaintiff comes to doing so is when he alleges that, immediately before he was placed in a "strip cell" on October 24, 2002, Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge." (Dkt. No. 24, ¶ 16.) Again, this is too cryptic and innocuous a statement to plausibly suggest deliberate malice, especially when one considers Plaintiff's other allegations, which plausibly suggest that Defendant Hilton (who was a prison psychologist) rather promptly responded to Plaintiff's claims of experiencing delusional symptoms, at least one time with an inquiry as to whether the symptoms were getting worse. (*Id.* at ¶¶ 12, 13, 15, 16.)

**\*11** Even if Plaintiff had alleged such facts, he has not alleged facts plausibly suggesting that Plaintiff suffered any actual injury or that such actual injury was *caused* by Defendant Hilton (as opposed to being caused by someone else, such as Defendant Langbart). For example, as stated earlier, it was Defendant Langbart, not Defendant Hilton, whom Plaintiff alleges wrongfully transferred him to the CNYPC less than a week after this October 24, 2002, placement in a "strip cell." (*Id.* at ¶ 18 & Exs. 1-2.) As a result, I am persuaded that Defendant Hilton's lack-of-personal-involvement argument serves as an alternative ground for dismissing Plaintiff's interference claim against Defendant Hilton. [36]

For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's First Amendment interference claim against Defendant Hilton.

### B. Whether Plaintiff Has Failed to State an Eighth Amendment Claim

Liberally construed, Plaintiff's Third Amended Complaint asserts two related but different types of Eighth Amendment claims against Defendant Hilton: (1) a claim that Defendant Hilton was deliberately indifferent to Plaintiff's serious medical needs (for example, by "arbitrarily classifying him as mentally ill"); and (2) a claim that Defendant Hilton subjected Plaintiff to "cruel and unusual" prison conditions by harassing him for writing to public officials, and by placing him, without justification, in a "strip cell with just his underwear and a mattress." (Dkt. No. 24, ¶¶ 16, 47 & Prayer for Relief, ¶ A.1.)

### 1. Deliberate Indifference to a Serious Medical Need

Generally, to prevail on such a claim, a plaintiff must show two things: (1) that the plaintiff had a sufficiently serious medical need; and (2) that the defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Here, the only serious medical needs that Plaintiff plausibly alleges are (1) a mental illness involving delusions and/or (2) a collection of skin irritations coupled with possible exposure to cold temperatures (due to his placement in a "strip cell" with only his underwear and a mattress for five days). (Dkt. No. 24, ¶¶ 15, 16, 18, 47.) For the sake of argument, I will set aside the fact that Plaintiff appears to deny that he is, in fact, mentally ill. (*Id.* at ¶¶ 10, 47.) I will also assume that, taken together, these conditions constitute a *serious medical need* for purposes of the Eighth Amendment.

The problem is that Plaintiff has asserted no facts plausibly suggesting that Defendant Hilton acted with any deliberate indifference with regard to this (presumed) serious medical need. To the contrary, Plaintiff alleges facts plausibly suggesting that Defendant Hilton "interviewed" him five times regarding his mental condition, always promptly responding to Plaintiff's claims of experiencing delusional symptoms, and at least once specifically inquiring as to whether the symptoms were getting worse. (*Id.* at ¶¶ 10, 12, 13, 15, 16.) [37] Granted, Plaintiff also alleges that, immediately before he was placed in a "strip cell" on October 24, 2002, Defendant Hilton told him that "all the pain and discomfort that plaintiff was suffering was maybe a revenge." (*Id.* at ¶ 16.) However, this statement-in addition

to being cryptic in nature-is too innocuous to plausibly suggest that Defendant Hilton possessed the state of mind necessary to be *deliberately indifferent,* which is a state of mind akin to *criminal recklessness.* [38] Plaintiff is not alleging facts plausibly suggesting criminal recklessness, only facts plausibly suggesting negligence or malpractice. (*See, e.g., id.* at 47 [alleging that Defendant Hilton "arbitrarily classif[ied] plaintiff as mentally ill"].) A claim of negligence or malpractice by a prison medical care provider is not actionable under 42 U.S.C. § 1983. [39]

**\*12** For both of these alternative reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment inadequate-medical-care claim against Defendant Hilton.

### 2. Inadequate Prison Conditions

Generally, to prevail on such a claim, a plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

Here, the only serious conditions of confinement that Plaintiff plausibly alleges are (1) repeated "interviews" by Defendant Hilton (regarding Plaintiff's complaints of the symptoms described above in Part I.C. of this Report-Recommendation), which conceivably caused Plaintiff to experience anxiety or pressure, and/or (2) incarceration in a "strip cell" for five days (with only his underwear and a mattress) when Plaintiff was suffering from a skin irritation and presumably a mental illness. (Dkt. No. 24, ¶¶ 15, 16, 18, 47.) I have some difficulty concluding that these conditions of confinement, even taken together, are *sufficiently serious* for purposes of the Eighth Amendment. *See Lock v. Clark,* 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at \*1, 11-12, 1992 WL 559660 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to the level of a constitutional violation."); *Dunkley v. Tate,* 07-CV-0465, 2007 U.S. Dist. LEXIS 73166, at \*2-4, 2007 WL 2900169 (W.D.Va. Oct. 1, 2007) (confinement in "strip cell" for three days did not violate Eighth Amendment as a matter of law). [40] For example, Plaintiff does not allege that,

while in the "strip cell" for five days, he was deprived of "the minimal civilized measure of life's necessities," *Farmer,* 511 U.S. at 834, such as medical care, food, water, warmth or a toilet.

Moreover, I note that, in this cruel-and-unusual *punishment* claim, Plaintiff has alleged facts plausibly suggesting that he was placed in a strip cell not as *punishment* but for non-punitive reasons such as (1) to protect his own safety, [41] (2) to protect other prisoners' safety, [42] (3) to protect prison employees' safety, [43] and/or (4) to await a transfer to CNYPC. [44]

However, even if one were to assume that, taken together, the conditions of confinement alleged by Plaintiff are *sufficiently serious* for purposes of the Eighth Amendment, Plaintiff's inadequate-prison-condition claim would fail. This is because, again, Plaintiff has asserted no facts plausibly suggesting that Defendant Hilton acted with any deliberate indifference to Plaintiff's health or safety. (*See, supra,* Part III.B.1. of this Report-Recommendation.) Indeed, the allegations of Plaintiff's Third Amended Complaint plausibly suggest that Defendant Hilton acted with due regard to Plaintiff's health or safety. (*Id.*) I note that the "symptoms" of which Plaintiff repeatedly complained to public officials included a belief that his "mind was being read," that he saw "waking visions," that he felt "violent itching" which could not be stopped, that he lacked control of his arms and legs, that he was being scarred and burned by "electrical shock[s]," and that he was being "provoked by female staff." (*Id.* at ¶ 12.) Simply stated, Plaintiff's allegations plausibly suggest that he was a danger to himself (and others) and in need of "interviews" conducted by Defendant Hilton, and placement in a "strip cell" for five days pending a transfer to the CNYPC, where he could receive further evaluation and appropriate treatment.

**\*13** For this reason, I recommend that the Court dismiss Plaintiff's Eighth Amendment prison-conditions claim against Defendant Hilton.

### C. Whether Plaintiff Has Failed to State a Fourteenth Amendment Claim

Liberally construed, Plaintiff's Third Amended Complaint asserts two different Fourteenth Amendment claims against Defendant Hilton: (1) a claim that

Defendant Hilton violated Plaintiff's substantive due process and/or procedural due process rights; and (2) a claim that Defendant deprived Plaintiff of equal protection under the laws. (Dkt. No. 24, ¶ 47 & Prayer for Relief, ¶ A.1.)

### 1. Due Process

The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

#### a. Substantive Due Process

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

The first step in a substantive due process analysis is to identify the constitutional right at stake. Plaintiff does not indicate what right he is claiming. For the sake of argument, I will assume that Plaintiff possessed a protected liberty interest in remaining free from confinement in a strip cell and/or transfer to CNYPC unless DOCS has obtained reasonable grounds to believe that he was suffering from a mental illness involving delusions to such an extent that he poses a threat to himself or others in the correctional facility. [45]

The next step in a substantive due process analysis is to consider whether the state action was arbitrary in the constitutional sense and therefore violative of substantive due process. Here, I find that Plaintiff has alleged no facts plausibly suggesting that the state action was arbitrary in the constitutional sense and therefore violative of substantive due process. Indeed, Plaintiff has alleged facts plausibly suggesting that, far from being arbitrary, the actions of Defendant Hilton were reasonable and appropriate. In addition to the litany of delusional symptoms acknowledged by Plaintiff (described above), I note that, when "interviewed" about them, Plaintiff steadfastly persisted in his beliefs, [46] and refused treatment. [47]

**\*14** As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment substantive due process claim against Defendant Hilton.

#### b. Procedural Due Process

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

Here, I find that the Due Process Clause does not give Plaintiff a liberty interest in remaining free from confinement to a "strip cell," given the duration and conditions of that confinement, as alleged by Plaintiff (described above). *See Dunkley v. Tate,* 07-CV-0465, 2007 U.S. Dist. LEXIS 73166, at *2-4, 2007 WL 2900169 (W.D.Va. Oct. 1, 2007) ("In this case, while the conditions of Dunkley's confinement in the strip-cell [for three days] were more restrictive than those applied to inmates in the general population and possibly even segregation, they were not nearly so restrictive and atypical as those at issue in *Wilkinson [v. Austin,* 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ]. Therefore, the court finds that Dunkley did not have a liberty interest in remaining out of the strip-cell and, thus, his due process claim fails."). [48]

Even if I were to find that Plaintiff possessed a limited such liberty interest, I would find that Plaintiff was, according to his own allegations, given all the process to

which he was due under the circumstances. For example, I note that Plaintiff's placement in a "strip cell," and transfer to the CNYPC, was immediately proceeded by not only three "interviews" with a psychologist about claims of delusional symptoms but a fourth "interview" with both a psychologist *and* a psychiatrist. (Dkt. No. 24, ¶¶ 12, 13, 15, 16.) This last "interview," conducted by two doctors, is reminiscent of the examination conducted by two physicians, under the New York State law, prior to a patient's involuntary commitment to a psychiatric hospital. *See* N.Y. Correction Law § 402(1); N.Y. Mental Hygiene Law ¶ 9.27(a). Furthermore, here, Plaintiff was not even involuntarily *committed* to a psychiatric hospital, only temporarily *transferred* to one (where he previously had been committed) on an emergency basis (for "closer observation" and "diagnostic clarification" as stated in one medical record). [49]

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Hilton.

### 2. Equal Protection

To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Travis v. N.Y. State Div. of Parole,* 96-CV-0759, 1998 U.S. Dist. LEXIS 23417, at *11, 1998 WL 34002605 (N.D.N.Y. Aug. 26, 1998) (Sharpe, M.J.), *adopted,* 96-CV-0759, Decision and Order (N.D.N.Y. filed Nov. 2, 1998) (McAvoy, C.J.). Where the alleged classification involves a "suspect class" or "quasi-suspect class," the alleged classification is subject to "strict scrutiny" by a court. *Travis,* 1998 U.S. Dist. LEXIS 23417, at *11, 1998 WL 34002605. However, neither prisoners nor the mentally ill comprise a suspect or quasi-suspect class for Equal Protection purposes. *See Holley v. Carey,* 04-CV-2708, 2007 U.S. Dist. LEXIS 64699, *23, 2007 WL 2533926 (E.D.Cal. Aug. 31, 2007) ("[N]either prisoners nor persons with mental handicaps are a suspect class entitled to heightened scrutiny.") [citations omitted]; *Coleman v. Martin,* 04-CV-72534, 363 F.Supp.2d 894, 902 (E.D.Mich.2005). As a result, the alleged classification is subject to only "rational basis scrutiny." *Holley,* 2007 U.S. Dist. LEXIS 64699, at *23, 2007 WL 2533926; *Coleman,* 363 F.Supp.2d at 902. To survive such scrutiny, the alleged classification need only be "rationally related"

to a "legitimate state interest." *Holley,* 2007 U.S. Dist. LEXIS 64699, at *23, 2007 WL 2533926; *Coleman,* 363 F.Supp.2d at 902.

**\*15** Here, Plaintiff has not even alleged facts plausibly suggesting there has been any *classification* at all in this case, i.e., that he was treated differently from anyone else. In any event, he has not alleged any facts plausibly suggesting that the "discrimination" he allegedly experienced was not rationally related to a legitimate state interest, namely, the preservation of safety and order in its prisons, and the diagnosis and treatment of mentally ill prisoners.

As a result, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment equal protection claim against Defendant Hilton.

### D. Defendant Hilton's Qualified Immunity Argument

Because I have already concluded that adequate grounds exist upon which to base a recommendation of dismissal of Plaintiff's claims against Defendant Hilton, I need not, and do not, reach the merits of Defendant Hilton's alternative argument in favor of dismissal, namely, his qualified immunity argument.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant Hilton's motion to dismiss (Dkt. No. 37) be *GRANTED;* and it is further

**RECOMMENDED** that those of Plaintiff's claims against Defendant Hilton that are not the subject of Defendant Hilton's motion to dismiss (Dkt. No. 37) be *DISMISSED* pursuant to the Court's authority to do so under 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b), and/or Fed.R.Civ.P. 12(h)(3), for the reasons stated above; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendant Langbart be *DISMISSED* with prejudice for failure to serve, for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d

85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 268366

## Footnotes

1    *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

2    *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

3    **Federal Court Actions:** *Abascal-Montalvo v. I.N.S.,* 901 F.Supp. 309 (D.Kan.1995) (habeas corpus proceeding, filed by Plaintiff *pro se* ); *Abascal v. Thornburgh,* 90-CV-1399, Order of Dismissal (W.D. Okla. filed March 13, 1991) (habeas corpus proceeding, filed by Plaintiff *pro se* ).

     **Federal Court Appeals:** *Abascal v. Thornburgh,* No. 91-6136, 1993 WL 118840 (10th Cir. Apr.13, 1993) (appeal from decision by W.D. Okla., in habeas corpus proceeding, filed by Plaintiff *pro se* ).

     **State Court Actions:** *Abascal v. Marshall,* Index No. 000520/2007 (N.Y. Sup.Ct., Bronx County) (Walker, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 1/11/07); *Abascal v. City of New York,* Index No. 401171/2006 (N.Y. Sup.Ct., New York County) (Feinman, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 5/31/06); *Abascal v. N.Y.S. Bd. of Parole,* Judgment of Dismissal (N.Y. Sup.Ct., Albany County, filed March 1, 2005) (Canfield, J.); *Abascal v. Maczek,* Judgment of Dismissal (N.Y. Sup.Ct., Albany County, filed Aug. 6, 2004) (Canfield, J.); *Abascal v. Roach,* Judgment of Dismissal (N.Y. Sup.Ct., Albany County, filed Fed. 14, 2004) (Teresi, J.) (dismissing Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. Levy,* Index No. 402959/2003 (N.Y. Sup.Ct., New York County) (Wetzel, J.) (Article 78 proceeding, filed by Plaintiff *pro se* on 9/12/03).

     **State Court Appeals:** *Abascal v. Maczek,* 5 N.Y.3d 713, 806 N.Y.S.2d 164, 840 N.E.2d 133 (N.Y.2005) (denying motion for poor person relief during appeal from decision by Third Department in Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. N.Y.S. Bd. of Parole,* 23 A.D.3d 740, 802 N.Y.S.2d 803 (N.Y.App.Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup.Ct. in Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. Roach,* 802 N.Y.S. 569 (N.Y.App. Div., 3d Dept ., 2005) (appeal from decision by N.Y. Sup.Ct. in Article 78 proceeding, filed by Plaintiff *pro se* ); *Abascal v. Maczek,* 19 A.D.3d 913, 796 N.Y.S.2d 757 (N.Y.App.Div., 3d Dept., 2005) (appeal from decision by N.Y. Sup.Ct. in Article 78 proceeding, filed by Plaintiff *pro se* ).

4    (*Id.*)

5    I note that Plaintiff appears to have made a material misrepresentation to the Court in his Third Amended Complaint. Specifically, in his Third Amended Complaint (which was verified), Plaintiff swore that, as of July 8, 2006 (the date of his Third Amended Complaint), the only "lawsuit[ ] [that Plaintiff had ever filed] in any state [or] federal court relating to [his] imprisonment" was the action of *Abascal v. New York,* Index No. 107872 (N.Y. Ct. of Cl.) (Minarik, J.) (action filed on 6/12/03, and judgment entered for Plaintiff on 11/22/04). (Dkt. No. 24, ¶ 6 [Plf.'s Third Am. Compl.].) While I have not found any record of this action in the New York State Unified Court System's electronic docketing system (and I therefore have not taken it into account in assessing Plaintiff's litigation experience), I have found record of at least *seven* other actions regarding Plaintiff's imprisonment which had been filed by Plaintiff before July 8, 2006. (*See, supra,* note 3 of this Report-Recommendation.) Generally, such information is material in prisoner civil rights actions since it enables the Court to determine one or more of the following issues: (1) whether any of the issues in the action have been previously litigated and decided (for purposes of the doctrines of res judicata and collateral estoppel); (2) whether the plaintiff had, prior to being granted *in forma pauperis status* in this action, earned "three strikes" for purposes of 28 U.S.C. § 1915(g); (3) whether the plaintiff had a record of frivolous litigation sufficient to warrant either (a) what is known as a "bar order" (i.e., an order barring him from litigating further in that court without meeting certain preconditions) pursuant to 28 U.S.C. § 1651(a), or (b) an order declaring plaintiff to be a "vexatious" litigator pursuant to 28 U.S.C. § 1927; and (4) whether the plaintiff's litigation experience was so extraordinary that it effectively dispenses with the need to afford him special solicitude. While a plaintiff is under no duty to provide this information in order to state an actionable civil rights claim, here, Plaintiff chose to provide the information and swore to the truthfulness of it. Ordinarily, I would find such a material misrepresentation to be sanctionable. However, because Plaintiff may well have been laboring under a mental illness at the time he drafted his Third Amended Complaint, I will not recommend that the Court sanction him for his material misrepresentation.

6 Apparently, during the time in question, Plaintiff had already received his college degree and was pursuing an advanced degree at Cornell University. (Dkt. No. 24, Ex. 5 [Plf.'s Third Am. Compl., attaching Plaintiff's letter of 31/1/03 to James L. Stone, Commissioner of New York State Office of Mental Health]; *see also* Dkt. No. 24, Ex. 8 at 3 [attaching medical record summarizing Plaintiff's education].)

7 *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

8 *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

9 *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also* *Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

10 *See* *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

11 *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

12 *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

13 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

14 *See, e.g., Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See* *Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

15 The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

16 *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

17 *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

18 *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

19 *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

20 *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

21 *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

22 *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

23 *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

24 *See Gill,* 389 F.3d at 381-383.

25 *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

26 *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) [citations omitted], *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

27 *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d Cir.2001] ).

28 *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

29 I note that none of the paragraphs (of Plaintiff's Third Amended Complaint) cited in Plaintiff's opposition memorandum of law actually alleges facts plausibly suggesting Defendant Hilton's personal involvement in any constitutional violation. (Dkt. No. 40, Part 1, at 4.) For example, Paragraphs 10, 15 and 18 of Plaintiff's Third Amended Complaint do not allege facts plausibly suggesting either that it was Defendant Hilton who "classified" Plaintiff as mentally ill or that such classification was "arbitrary," as Plaintiff argues in his memorandum of law. (*See* Dkt. No. 47, ¶¶ 10, 15, 18.) Nor do Paragraphs 12, 13, 14 and 16 of Plaintiff's Third Amended Complaint allege facts plausibly suggesting that Defendant Hilton "persecuted" Plaintiff for writing to public officials, as Plaintiff argues in his memorandum of law. (*See* Dkt. No. 47, ¶¶ 12-14, 16.) Nor does Paragraph 18 of Plaintiff's Third Amended Complaint allege facts plausibly suggesting that it was Defendant Hilton who caused Plaintiff to be transferred to CNYPC, as Plaintiff argues in his memorandum of law. (*See* Dkt. No. 47, ¶ 18.)

30     *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

31     *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

32     *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

33     *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

34     *Collins,* 423 F.Supp.2d at 415-16 (quoting *Lewis,* 518 U.S. at 355).

35     *Id.*

36     As stated earlier, I note that none of the paragraphs (of Plaintiff's Third Amended Complaint) cited in Plaintiff's opposition memorandum of law actually allege facts plausibly suggesting Defendant Hilton's personal involvement in any constitutional violation. (*See, supra,* note 29 of this Report-Recommendation.)

37     I note that Plaintiff also alleges facts plausibly suggesting that, during the relevant time period (December 27, 2001, to October 29, 2002), he received medical care from other employees of Auburn C .F. (*See, e.g.,* Dkt. No. 24, ¶ 11, 16.)

38     *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

39     *Farmer,* 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].

40     *See also Lewis v. Angelone,* 00-CV-0161, 2001 U.S. Dist. LEXIS 25539, at *12 (E.D.Va. May 16, 2001) ("Lewis has failed to allege facts which suggest his [24-hour] confinement in the strip cell and his confinement in segregation were sufficiently severe and prolonged as to give rise to an Eighth Amendment claim.") [citation omitted]; *Winn v. Delaware Dept. of Corr.,* 02-CV-0034, 2003 U.S. Dist. LEXIS 18678, at *11, 2003 WL 21456628 (D.Del. Sept. 30, 2003) ("Plaintiff has not presented any facts proving that State Defendants' placing him on strip cell status involves the wanton and unnecessary infliction of pain [sufficient to establish an Eighth Amendment claim.").

41     (Dkt. No. 24, ¶¶ 7, 9, 12 [alleging that he was physically assaulted by other inmates on November 23, 2001, and December 24, 2001, and that, *inter alia,* he felt "violent itching" which could not be stopped, and he lacked control of his arms and legs].)

42     (*Id.* at ¶ 7 [alleging that, on November 23, 2001, Plaintiff got in a fight with another inmate].)

43     (*Id.* at ¶¶ 12, 40, 42 [alleging that the symptoms he experienced included a belief that his "mind was being read" by DOCS, that his hearing was being manipulated by DOCS, that he was being scarred and burned by "electrical shock[s]" administered by DOCS, and that he was being "sexually provoked by female staff."].)

44     (*Id.* at ¶¶ 16, 18 [alleging that, five days after Plaintiff was placed in a "strip cell," he was transferred to CNYPC].)

45    I note that I do *not* liberally construe Plaintiff's Third Amended Complaint as alleging that he was forcibly injected with anti-psychotic medications (or that he possessed a protected liberally interest in being free from such forcible injections)-a constitutional claim that I understand he tried to assert in his original Complaint. (*See* Dkt. No. 5, at 5-6 [Order of Judge Kahn, referring to this attempted claim].) The closest Plaintiff comes to making this claim is when he alleges that, on December 27, 2001, he told Defendant Hilton that he did not want to "take any psychotrophic medication." (Dkt. No. 24, ¶ 10.) Notably missing is any allegation that he was subsequently forced (by Defendant Hilton or anyone) to take any such medication.

46    (Dkt. No. 24, ¶¶ 13, 15, 16.)

47    (*Id.* at ¶¶ 10, 15 & Exs. 8-9.)

48    *See also Winn v. Delaware Dept. of Corr.,* 02-CV-0034, 2003 U.S. Dist. LEXIS 18678, at *8, 14, 2003 WL 21456628 (D.Del. Sept. 30, 2003) ("Because plaintiff does not have a constitutionally protected liberty interest at issue, plaintiff's claims [arising from his placement in a 'strip cell' apparently several times for periods of 24 hours] will be dismissed.").

49    (Dkt. No. 24, ¶¶ 8, 10, 18 & Ex. 9.)

---

**End of Document**                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4184752
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Karl AHLERS, Plaintiff,
v.
Richard KASKIW, Defendant.

No. 9:12–cv–501 (GLS/ATB).
|
Signed Aug. 21, 2014.

**Attorneys and Law Firms**

Karl Ahlers, pro se.

C. Harris Dague, Ass't Att'y Gen., for the Defendant.

### *SUMMARY ORDER*

GARY L. SHARPE, Chief Judge.

**\*1** Plaintiff *pro se* Karl Ahlers commenced this action against defendant Dr. Richard Kaskiw,[1] pursuant to 42 U.S.C. § 1983, alleging violations of his Fourteenth Amendment due process rights. (*See generally* Am. Compl., Dkt. No. 6.) Specifically, Ahlers, who is a civilly committed sex offender, confined at the Central New York Psychiatric Center (CNYPC), and in the custody of the New York State Office of Mental Health (OMH), alleged that, between July 2011 and September 2012, Kaskiw denied him an adequate diet and appropriate medical care. (*Id.*) In a Report–Recommendation (R & R) issued on July 9, 2014, Magistrate Judge Andrew T. Baxter recommended that Kaskiw's motion for summary judgment be granted and Ahlers' amended complaint be dismissed in its entirety. (Dkt. No. 21.) For the reasons that follow, the R & R is adopted in its entirety.

Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. *See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at \*3, \*5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*4–5.

Here, neither party has filed objections to the R & R, and the court, therefore, has reviewed it for clear error. *See id.* While the thoughtful and well-reasoned R & R is free of clear error and is adopted in its entirety, the court takes this opportunity to comment on the proper legal framework for analyzing constitutional medical care claims filed by civilly committed sex offenders, which, as Judge Baxter noted, is an area of uncertainty in this District and Circuit. (Dkt. No. 21 at 6–12.) The confusion arises over whether the courts should apply the same deliberate indifference standard that is employed when such claims are raised by convicted prisoners or pretrial detainees, or whether a more plaintiff-friendly reasonable-professional judgment standard is warranted. (*Id.*)

For substantially the same reasons as articulated in the R & R, this court agrees with the majority of our sister courts, and concludes that the appropriate standard for constitutional medical claims asserted by civilly committed sex offenders is the same deliberate indifference standard that applies to convicted prisoners and pretrial detainees. (*See id.* at 8 (collecting cases).) To the extent that this court has hinted otherwise, and inadvertently contributed to the confusion, *see Treat v. Cent. N.Y. Psychiatric Ctr.,* No. 9:12–cv–602, 2013 WL 6169746, at \*2 n. 4, \*3 (N.D.N.Y. Nov. 20, 2013) (noting the different standards, and indicating that individuals who have been involuntarily committed may be entitled to more considerate treatment and conditions of confinement than prison inmates, but not squarely or definitively deciding the appropriate standard), the court now clarifies which standard it finds appropriate.

**\*2** Accordingly, having found no clear error in the R & R, the court adopts it in its entirety.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's July 9, 2014 Report–Recommendation (Dkt. No. 21) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Kaskiw's motion for summary judgment (Dkt. No. 17) is **GRANTED;** and it is further

**ORDERED** that Ahlers' amended complaint (Dkt. No. 6) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendant Kaskiw's motion for summary judgment pursuant to Fed.R.Civ.P. 56 (Dkt.Nos.17, 18), which plaintiff has opposed (Dkt. No. 20). This matter was referred to me for Report and Recommendation on January 31, 2014 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff Karl Ahlers is a civilly-committed sex offender, confined at the Central New York Psychiatric Center ("CNYPC"), in the custody of the New York State Office of Mental Health ("OMH"). Liberally construed, the amended complaint ("AC," Dkt. No. 6) alleges that, between July 2011 and September 2012, Dr. Kaskiw denied plaintiff an adequate diet and appropriate medical care, in violation of the Due Process Clause of the Fourteenth Amendment.[1] For the reasons set forth below, this court recommends that defendant's summary judgment motion be granted, and that the remaining claim set forth in plaintiff's amended complaint be dismissed.

### *FACTS*

The amended complaint alleges that, based on an improper diagnosis that plaintiff suffered from a nut allergy, he was kept on a restricted diet at CNYPC, which

deprived him of certain foods that were provided to other residents. (AC ¶¶ 2–9, 26–27, 46–48). Plaintiff's requests to be taken off the restrictive diet and to be scheduled for allergy testing, to determine whether he was allergic to nuts, were denied by Dr. Kaskiw and others. (AC ¶¶ 10–18, 21, 28–35, 38). The amended complaint states that, as a result of the restricted diet, plaintiff lost an average of one pound per month since December 2010. (AC ¶¶ 45, 48). Plaintiff also alleges that the medical staff refused to continue to prescribe Lidex cream to address a persistent itchy rash on plaintiff's legs and feet. (AC ¶¶ 39, 41 & Exs. 23, 25; Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4).[2]

When plaintiff was transferred to CNYPC in May 2009, his prior medical records from other facilities contained numerous references to his nut allergies and the fact that his diet was not to include, *inter alia,* nuts and honey. (Kaskiw Aff. ¶¶ 17, 18, Dkt. No. 17–4; AG DEF–1–3, 11–12, Dkt. No. 18).[3] Based upon plaintiff's documented medical history, the CNYPC staff imposed an allergy-tailored diet plan that excluded foods to which plaintiff was allergic, including nuts and honey.[4] (Kaskiw Aff. ¶ 20, AG DEF–12, 13).

**\*3** On or about November 7, 2011, plaintiff attended a medical appointment with Dr. Kaskiw, during which he objected to his allergy-tailored diet plan and requested to have the plan discontinued so that he could regulate his own diet. Dr. Kaskiw advised plaintiff that eliminating his dietary restrictions was not medically appropriate, would be in violation of facility policy, and would present a danger to plaintiff. Plaintiff also requested further allergy testing, which Dr. Kaskiw refused as medically unnecessary, given plaintiff's well-documented allergy history. (Kaskiw Aff. ¶ 21; AG DEF–15).

Plaintiff thereafter made repeated complaints to Dr. Kaskiw and other OMH officials, claiming that he had no food allergies, objecting to his restricted diet, and demanding allergy testing. (AC ¶¶ 12–23, 26–38). OMH consistently responded that a change in plaintiff's dietary restrictions and re-testing for allergies were not medically indicated given his history of nut allergies. (Kaskiw Aff. ¶¶ 22–23; AG DEF 31–38).

On or about November 13, 2012, two months after plaintiff filed this lawsuit, he was given a Radioallergosorbent ("RAST") test by an outside allergy

testing laboratory. The RAST test was positive for a "Class III" peanut allergy, indicating a "moderate to strong" food allergy. (Kaskiw Aff. ¶¶ 24–26; AG DEF–16–17). Based on the re-testing results, CNYPC continued plaintiff on a restrictive diet, excluding peanuts and peanut by-products. (AG DEF–28–30).

Medical records from the Manhattan Psychiatric Center indicated that, as of August 2007, plaintiff weighed 236 pounds, and that the nursing staff was tasked with educating him about the importance of better dietary choices. (AG DEF–7–8). Upon his transfer to CNYPC on May 28, 2009, plaintiff's height was 75.5 inches and his weight was 260 pounds, placing him in the "obese" category on the American Medical Association's Body Mass Index ("BMI") scale. (Kaskiw Aff. ¶¶ 34–35 & Ex. 2). Plaintiff's weight was gradually reduced to 216 pounds ("overweight" on the BMI scale) as of September 28, 2011; to 203 pounds (still "overweight") as of September 29, 2012; and to 194 pounds (a normal and healthy weight on the BMI scale) as of December 28, 2013. (Kaskiw Aff. ¶¶ 36–38 & Ex. 2). Dr. Kaskiw observed that plaintiff's "gradual and steady" weight loss over the course of four years "placed him in a vastly improved, medically desirable, healthy place." Dr. Kaskiw concluded that "there has been no need for treatment or medical intervention to curb or other[ ]wise address [plaintiff's] weight loss or dietary restrictions." (Kaskiw Aff. ¶ 39).

Dr. Kaskiw prescribed Lidex cream to plaintiff on January 9, 2012, based on his complaints of dry, scaly skin on his ankles/feet. (Kaskiw Aff. ¶ 43; AG DEF 20–22). [5] On July 30, 2012, CNYPC medical staff examined plaintiff, following his request for Lidex cream, and found dry and itchy skin on his legs, with four to five scattered small scabs. A nurse practitioner determined that a prescription for Lidex cream was not indicated, and suggested that plaintiff use an over-the-counter skin moisturizer available through the facility's commissary. (Kaskiw Aff. ¶ 44; AG DEF–23). Plaintiff was examined again on August 21, 2012 and presented with a raised rash on his arm and scabbed areas on his calves. A nurse practitioner advised plaintiff to try a lower-potency steroid cream first, instead of Lidex. (Kaskiw Aff. ¶ 45; AG DEF–24–25). Plaintiff was seen again on November 27, 2012, still complaining of dry, itchy skin and a raised rash on his legs. Plaintiff was treated by a nurse practitioner with Benadryl, Bacitracin and Lac–Hydrin. (Kaskiw Aff. ¶ 46; AG DEF–26–27).

## DISCUSSION

### I. Summary Judgment

**\*4** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. See United States v. Diebold, Inc ., 369 U.S. 654, 655 (1962); Salahuddin v. Goord, 467 F.3d at 272.

### II. Medical Care

#### A. Applicable Law

In analyzing the contours of the constitutional standard applicable to medical care claims of civilly committed sex offenders, it is helpful to discuss first the standards applied by the courts when such claims are raised by convicted prisoners and pretrial detainees. In order to state a claim for cruel and unusual punishment under the Eighth Amendment, based on constitutionally inadequate medical treatment, a sentenced prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble,

429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

Constitutional medical care claims by pretrial detainees must be analyzed under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's cruel and unusual "punishment" clause is not directly applicable to prisoners who have not been convicted. *Mayo v. County of Albany,* 357 F. App'x 339, 341 (2d Cir.2009). In 2009, the Second Circuit held that the Eighth Amendment "deliberate indifference" standard, as articulated in the Supreme Court's decision in *Farmer v. Brennan,* 511 U.S. 825 (1994)[6], should be applied to constitutional medical care claims of pretrial detainees under the Due Process clause. *Caiozzo v. Koreman,* 581 F.3d 63, 66, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"). *Caiozzo,* following the position taken by several other circuit courts, reversed prior Second Circuit precedent which had applied a strictly objective standard in evaluating medical claims by pretrial detainees under the Due Process clause. *Mayo,* 357 F. App'x at 341; *Caiozzo v. Koreman,* 581 F.3d at 71 & n. 4.[7]

**\*5** Civilly committed sex offenders are neither convicted inmates, nor "pretrial detainees." However, most of the judges in the Northern District of New York who have analyzed constitutional medical care claims by civilly committed sex offenders at CNYPC have relied upon *Caiozzo* in applying the same deliberate indifference standard applied by the Second Circuit to sentenced prisoners and pretrial detainees. *See, e.g., James v. Morgan,* 9:13–CV–526 (DNH/CFH), 2014 WL 841344, at *2 (N.D.N.Y. March 4, 2014)[8]; *Ali v. Hogan,* No. 9:12–CV–0104 (DNH/RFT), 2013 WL 5466302, at *4 (N.D.N.Y. Sept. 30, 2013); *Smith v. Carey,* No. 9:10–CV–1247 (NAM/TWD), 2012 WL 6923338, at *7 (N.D.N.Y. Dec. 28, 2012) (Rep't–Rec.), *adopted,* 2013 WL 237722 (N.D.N.Y. Jan. 22, 2013); *Balkum v. Sawyer,* No. 6:06–

CV–1467 (NPM), 2011 WL 5041206, at *11 (N.D.N.Y. Oct. 21, 2011); *Smith v. Hogan,* No. 9:09–CV–554 (GTS/GHL), 2011 WL 4343978, at *8 (N.D.N.Y. Aug. 1, 2011) (Rep't–Rec .), *adopted,* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011). Some of our judges, however, have noted uncertainty as to whether a different standard for medical care claims of civilly committed persons should be applied, at least in the alternative, based on the Supreme Court's case in *Youngberg v. Romeo,* 457 U.S. 307, 321–22 (1982) and its progeny. *See, e.g., Groves v. New York,* No. 9:09–CV–412 (GLS/DEP), 2010 WL 1257858, at *6, *8 (N.D.N.Y. Mar. 1, 2010) (persons in nonpunitive detention have a right to "reasonable medical care," a standard demonstrably higher than the Eighth Amendment standard that protects prisoners-"deliberate indifference to serious medical needs") (citing *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd,* 60 F.3d 812 (2d Cir.1995) (table)) (Rep't–Rec.), *adopted,* 2010 WL 1257942 (N.D.N.Y. Mar. 26, 2010).

*Youngberg* considered the legal standard that should be applied to assess the claim asserted on behalf of a "mentally retarded" individual, who was involuntarily committed to a state institution, and whose substantive due process rights to safe conditions of confinement, freedom from bodily restraint, and training or "habilitation" were allegedly violated. *Youngberg,* 457 U.S. at 309. The Supreme Court noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. The Youngberg court held that the standard articulated by Chief Judge Seitz in the lower court opinion under review

> ... affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."

**\*6** *Id.* at 321 (quoting *Romeo v. Youngberg,* 644 F.2d 147, 178 (3d Cir.1980) (en banc) (Seitz, C.J., concurring).

It does not appear that the Supreme Court or the Second Circuit have explicitly ruled on whether *Youngberg* would require the application of a different standard for constitutional medical care claims for civilly committed persons than is now applied to sentenced prisoners and pretrial detainees. [9] There is disagreement among other courts on this question. *See, e.g., Battista v. Clarke,* 645 F.3d 449, 453 & n. 4 (1st Cir.2011) (the opinions as to whether a different, more plaintiff-friendly reasonable-professional-judgment standard applies to civilly committed individuals, based on *Youngberg v. Romeo,* are "not uniform") (collecting cases).

This court is persuaded by the opinions in other circuits that *Youngberg,* when construed in light of subsequent Supreme Court cases, does not compel a different standard for medical care claims for civilly committed individuals and prisoners or pretrial detainees. *See, e.g., Scott v. Benson,* 742 F.3d 335, 339 (8th Cir.2014) (because the Supreme Court later said that *Youngberg* "did not deal with decisions to administer or withhold medical treatment[ ]," *Cruzan by Cruzan v. Dir., Mo. Dep't of Health,* 497 U.S. 261, 279–80 (1990), we apply the deliberate indifference standard from the Eighth Amendment to the medical care claims of a civilly committed plaintiff); *Hare v. City of Corinth, Miss.,* 74 F.3d 633, 646–47 (5th Cir.1996) (although *Youngberg* announced a distinct standard to be applied in measuring the state's constitutional duties to mental incompetents, the Court's later decision in *DeShaney,* called into question the constitutional significance of the *Youngberg* decision) [10] (citing *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 199–200 (1989)). *See also Serna v. Goodno,* 567 F.3d 944, 949 (8th Cir.2009) (applying the Fourth Amendment standard applicable to a pretrial detainee to a civil detainee, based on an analogy drawn by the *Youngberg,* 457 U.S. at 320–21, between pretrial detainees and civilly committed persons, as two groups that could be subjected to liberty restrictions "reasonably related to legitimate government objectives and not tantamount to punishment") . [11] However, like the Fifth Circuit in *Hare,* 74 F.3d at 647, I need not resolve whether the professional judgment standard suggested by *Youngberg* has continuing vitality in the context of medical care claims, because, as discussed below, the standard is not substantially different from "deliberate indifference," and both would produce the same outcome on the facts of this case.

### 1. Deliberate Indifference

The objective prong of the deliberate indifference standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d at 702).

**\*7** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if

objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

### 2. Professional Judgment

Chief Judge Seitz's concurring opinion in the Third Circuit elaborated on the professional judgment standard adopted, on review, by the Supreme Court in *Youngberg:*

> [T]he defendants are liable if their conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment.... By "accepted professional judgment" I do not mean some standard employed by a reasonable expert or a majority of experts in the community, as state malpractice actions would require, but rather that the choice in question was not a sham or otherwise illegitimate.... The 'substantial departure from accepted professional judgment' standard effectively distinguishes between conduct that violates the minimum requirements of the Constitution and conduct, such as ordinary malpractice, that does not.

**\*8** *Romeo v. Youngberg,* 316 F.3d at 178. I agree with the judges who have parsed this standard and have concluded that it is not "all that far apart" from the deliberate indifference standard articulated in *Farmer.* See, e.g., *Battista v. Clarke,* 645 F .3d at 453 ("[b]oth the *Farmer* and *Youngberg* tests leave ample room

for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"). *See also Groves v. New York,* 2010 WL 1257858, at \*6 (concluding that "[a]t a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed" and focusing on the "deliberate indifference" standard in reviewing the medical care claim of the civilly-committed CNYPC sex offender).

I would respectfully disagree with the 1993 Eastern District of New York opinion in *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. at 1043, and other cases to the extent they suggest that *Youngberg* imposed a "reasonable medical care" standard for civil detainees that is "demonstrably higher" than the Eighth Amendment deliberate indifference standard.[12] Such a "reasonable medical care" "is easily confused" with a negligence or medical malpractice standard that was clearly not intended by the Court in *Youngberg. Hare v. City of Corinth, Miss.,* 74 F.3d at 646.

### B. Analysis

Pursuant to the legal analysis above, this court will evaluate plaintiff's complaints about his medical care primarily under the "deliberate indifference" standard applicable both to prisoners under the Eighth Amendment and to persons in non-punitive detention under the Due Process Clause. However, in the alternative, I will also assess how plaintiff's claims would fare under the "professional judgment" standard, to the extent that applies to civilly committed individuals.

### 1. Restrictive Diet/Weight Loss

"The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health .... While prison officials are duty bound to provide inmates with nutritionally adequate food, 'absent religious or medical [ly] peculiar circumstances, a prisoner does not have a right to a specialized diet while incarcerated[.]' " *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/DEP), 2007 WL 527320, at \*10 (N.D.N.Y. Feb. 20, 2007) (citations omitted). Prison officials have the discretion to control a prisoner's diet within these constitutional constraints, and " '[p]reference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu.' " *Collado v. Sposato,* No. 12–

CV–2151, 2012 WL 3113837, at *4 (E.D.N.Y. July 24, 2012) (quoting *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001)). To establish a deliberate indifference claim with respect to a medically prescribed diet, " 'one must establish that there was a sufficiently serious condition that resulted from the food not being received.' " *Gaines v. Armor Health Care, Inc.,* No. 12–CV–4666, 2012 WL 5438931, at *5 (E.D.N.Y. Nov. 2, 2012) (citing, *inter alia, Evans v. Albany County Correctional Facility,* No. 9:05–CV–1400 (GTS/DEP), 2009 WL 1401645, at * 9 (N.D.N.Y. May 14, 2009)).

**\*9** As discussed above, plaintiff Ahlers was placed on a restricted diet based on nut allergies that were clearly documented in his medical records and that were eventually confirmed by independent laboratory testing, albeit after plaintiff filed this action. The only medical consequence of the restricted diet imposed on plaintiff was that, over the course of more than four years, he gradually lost 66 pounds, going from a body weight that was classified as "obese" on the BMI scale, to a normal and healthy weight of 194 pounds. While "rapid weight loss or weight loss coupled with other conditions may present a serious medical condition[,]"[13] plaintiff's gradual transformation from obesity to a healthy body weight clearly does not satisfy the objective prong of the deliberate indifference standard. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at *10 (even assuming that plaintiff lost 30 pounds and experienced dizziness and headaches over a four-month period the court concludes that there is no evidence in the record from which a reasonable fact finder could conclude that plaintiff's ' 'weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation' ") (citing *Bost v. Bockelmann,* 2007 WL 527320, at *8).

The defendant and the OMH staff did not violate plaintiff's constitutional rights by imposing a diet on plaintiff that was contrary to his medical needs. Rather, they restricted plaintiff's diet in a manner that was reasonably consistent with his documented food allergies. As noted above, Dr. Kaskiw made a medical judgment that the restricted diet was medically necessary and that the resulting weight loss greatly improved plaintiff's overall health. Plaintiff's disagreement with Dr. Kaskiw's treatment decisions, even if it had some factual support (which it does not), clearly is not sufficient to create an

issue of fact about whether plaintiff could establish the subjective element of the deliberate indifference standard. *See, e.g., Bost v. Bockelmann,* 2007 WL 527320, at *10 ("[to the extent that plaintiff complains about having been prescribed a high protein diet, as distinct from the high calorie intake diet which he sought in order to secure extra portions of food, the claim fails to rise to a level of constitutional significance, instead merely representing the sort of disagreement with a prescribed course of treatment that does not establish a defendant's deliberate indifference"). Even if there were occasional issues as to how plaintiff's restricted diet was implemented by food services workers at CNYPC (who are not, in any event, defendants in this action), such arguably negligent oversight of plaintiff's food choices would not constitute deliberate indifference. *See, e.g., Evans v. Albany County Correctional Facility,* 2009 WL 1401645, at * 11 (the evidence is lacking that any prison medical personnel or food service providers were cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed diet would result in a substantial risk of serious harm); *Gaines v.. Armor Health Care, Inc.,* 2012 WL 5438931, at *5–6.

**\*10** Moreover, no reasonable fact finder could conclude that Dr. Kaskiw's medical care of plaintiff reflected such a "substantial departure from accepted professional judgment" as to make his treatment choices "a sham or otherwise illegitimate."[14] Hence, even if the "professional judgment" standard suggested by *Youngberg* applied to plaintiff's medical claims, defendant is still entitled to summary judgment.

### 2. Lidex Cream

No rational fact finder could conclude, on the record in this case, that plaintiff's complaints about the treatment of his skin rash and eczema at CNYPC met either the objective or subjective prongs of the deliberate indifference test.[15] Plaintiff's skin condition is clearly not a sufficiently serious medical condition to meet the objective element of this standard. *See, e.g., Melendez v. Costello,* No. 6:12–CV–6226, 2013 WL 5937052, at *7 (W.D.N.Y. Nov. 1, 2013) ("[p]laintiff cannot establish the 'serious medical need' component of a deliberate indifference claim based on his eczema" (citing *Sledge v. Kooi,* 564 F.3d 105, 107, 108 (2d Cir.2009) ("Sledge failed to produce sufficient evidence that any one of the conditions complained of [i.e., eczema, back pain,

stomach disorders, allergies, and asthma] qualified as a 'serious medical need.' ")); *Samuels v. Jackson,* 97–CV–2420, 1999 WL 92617, at *1–3 (S.D.N.Y. Feb. 22, 1999) (prisoner's "[p]apules, vesicles, pustules, burrows, and intense itching resulting in eczema" did not constitute a sufficiently "serious medical need" for purposes of Eighth Amendment). Nor, based on the authority cited above, is plaintiff's disagreement with his medical care providers about the appropriate medication for his skin condition sufficient to create a factual issue as to whether they harbored subjective deliberate indifference to his serious medical needs. [16] To the extent that the "professional judgment" standard suggested by *Youngberg* applies to plaintiff's medical care claim, the treatment of plaintiff's skin condition with more conservative medications than the one he preferred certainly does not constitute a "substantial departure from accepted professional judgment."

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendant Kaskiw's motion for summary judgment (Dkt. Nos.17, 18) be **GRANTED** on the grounds stated herein, and that the remaining claims in plaintiff's amended complaint be **DISMISSED** in their entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**\*11 Dated: July 9, 2014.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4184752

---

Footnotes

1    Ahlers originally named several additional defendants, all of whom have since been dismissed. (Dkt. No. 8.)

1    Chief Judge Sharpe's Decision and Order dated April 19, 2013, dismissed various other claims against five additional defendants who were named in the amended complaint. (Dkt. No. 8 at 17).

2    The amended complaint also alleges that Dr. Kaskiw ignored (1) a complaint from plaintiff on March 26, 2012 "concerning pain that had developed" in his arms, legs, and abdomen (AC ¶¶ 24–25 & Ex. 15); (2) a request on July 13, 2012 concerning a prescription from an ophthalmologist which plaintiff never received (AC ¶ 40 & Ex. 24); and (3) a July 22, 2102 letter noting plaintiff's problems climbing multiple flights of stairs, and requesting an elevator pass (AC ¶ 42 & Ex. 26). Neither plaintiff's amended complaint, nor his motion papers, provide further information regarding any negative impact on plaintiff's health or well-being resulting from the alleged lack of response to these complaints; hence, they clearly do not support a constitutional claim for inadequate medical care based on the legal standards discussed below.

3    For example, an August 8, 2007 Nursing Assessment from the Manhattan Psychiatric Center noted that plaintiff had allergies to honey, rice, and nuts, which resulted in abdominal discomfort and vomiting. (AG DEF–2).

4    "Examples of products that might contain tree nuts include ... [h]oney ...." USDA Food Allergy Fact Sheet, http://www.nfsmi.org/documentlibraryfiles/PDF/20130227020259.pdf. Plaintiff's medical records also indicate that he was allergic to bee stings, which may have influenced the exclusion of honey in his restricted diet. (AG DEF–12–13, 20).

5    Lidex cream is a topical steroid anti-inflammatory medication often prescribed to relieve symptoms of eczema, such as itching or skin dryness. (Kasiw Aff. ¶ 42).

6    Farmer included a subjective element in the Eighth Amendment standard for deliberate indifference, requiring evidence that the defendant "disregard[ed] a risk of harm of which he [was] aware." *Caiozzo,* 581 F.3d at 65 (quoting *Farmer,* 511 U.S. at 837).

7    As the Second Circuit in *Caiozzo* elaborated: "[D]espite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.... That pretrial detainees may have more protections or rights in general ... does not mean that they are entitled to greater protection of rights shared in common with convicted inmates.' " 581 F.3d at 71–72 (quoting *Hare v. City of Corinth, Mississippi,* 74 F.3d 633, 649 (5th Cir.1996) (en banc)).

8  "Because plaintiff was civilly committed at the time of the incident, his medical care claims are analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment..... Despite this distinction, the same standard applies to Fourteenth Amendment medical care claims involving non-prisoners as to Eighth Amendment medical claims regarding prisoners." *Id.* (citing, *inter alia, Caiozzo, 581 F.3d at 72*).

9  In *Ahlers v. Rabinowitz,* 684 F.3d 53, 61 (2d Cir.2012), the Second Circuit discussed *Youngberg* in assessing prior civil rights claims of the plaintiff in this action relating to the seizure of certain of his DVDs by officials at CNYPC:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22.... However, the state's interest in maintaining order and security is not punitive in purpose or character, and remains valid in institutions of civil commitment." ... The state also has an interest in treating the civilly committed individual.... The reasonableness of the seizure in this case depends on a balance of interests: the state's interests in order, security, and treatment, and Ahlers's property interest in his discs..... In striking the appropriate balance, decisions made by the Defendants are entitled to a " 'presumption of correctness.' "

> This panel decision indicates the Second Circuit may still adhere to the general proposition that civilly committed individuals are entitled to more considerate conditions of confinement than convicted prisoners. However, it does not shed much light on the appropriate standard to apply to medical care claims of a civilly committed sex offender following the decision in *Caiozzo* that the deliberate indifference standard applies to pretrial criminal detainees.

10  "*DeShaney* clarified that 'the affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.' 489 U.S. at 200.... In other words, *DeShaney* suggests that a State's declared intent to confine incompetents for their own benefit, as opposed to its announced purpose to punish convicted criminals, should have no bearing on the nature of the constitutional duty owed to either group.... Since the State restrains the individual liberty of both mental incompetents and convicted inmates in a like manner, the State should incur the same duties to provide for the basic human needs of both groups." *Hare,* 74 F.3d at 647. In holding that the "deliberate indifference" standard applies to claims that a pretrial detainee was deprived of basic human needs, including medical care, the Fifth Circuit also noted that subsequent Supreme Court cases such as *Farmer,* which articulated the deliberate indifference standards for prisoners, "cast doubt on the vitality of *Youngberg." Id.* As noted above, the Second Circuit in *Caiozzo* relied on *Hare* and *Farmer* in deciding to apply the deliberate indifference standard to pretrial detainees asserting medical care claims.

11  "The similarity in the grounds for detaining persons awaiting trial and persons determined to be sexually dangerous supports application of the analogy to pretrial detainees ...." *Serna v. Goodno,* 567 F.3d at 948.

12  *Bost v. Bockelmann,* No. 9:04–CV–246 (GLS/DEP), 2007 WL 527320, at * 1 (N.D.N.Y. Feb. 20, 2007) distinguished *Haitian Centers* because it dealt with immigration issues and was "wholly outside the context of prisoner litigation." *Owens v. Colburn,* 860 F.Supp. at 974, a 1994 Northern District of New York case which applied the "reasonable medical care" standard to pretrial detainees, was clearly overruled by the Second Circuit's 2009 opinion in *Caiozzo,* which held that the "deliberate indifference" standard should apply in that context.

13  *See, e.g., Anderson v. Kooi,* No. 9:07–CV–1257 (DNH/GHL), 2011 WL 1315721, at * 12 (N.D.N.Y. Jan. 24, 2011) (citing *Kaminsky v. Rosenblum,* 929 F.2d 922, 924, 926–27 (2d Cir.1991) (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss)) (Rep't Rec.), *adopted,* 2011 WL 1256942 (N.D.N.Y. Apr. 1, 2011).

14  This is part of Chief Judge Seitz's formulation of the "professional judgment" standard that was adopted by reference by the Supreme Court in *Youngberg. Romeo v. Youngberg,* 316 F.3d at 178; *Youngberg v. Romeo,* 457 U.S. at 321.

15  Plaintiff's response to defendant Kaskiw's summary judgment motion suggests that he may dispute that his skin condition was treated at various times, albeit with medications other than those he requested. (Pl.'s Aff. ¶¶ 40–46, Dkt. No. 20 at 4 ("it took almost one full year to treat my itchy rash on both legs and feet!")). Given the affidavits submitted by defendant Kaskiw and the supporting medical records, plaintiff's unsupported suggestion that he may have not received the documented treatment for his skin condition does not create an issue of fact that would defeat the summary judgment motion. *See, e.g., Benitez v. Pecenco,* No. 92 Civ. 7670, 1995 WL 444352 at *7 n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")); *Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record). *See also Jeffreys v. City*

*of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

16  As discussed in the factual summary above, the nurse practitioners who denied plaintiff the Lidex cream originally prescribed by Dr. Kaskiw, are not named defendants in this case. Although Dr. Kaskiw may have supervised the nurse practitioners at CNYPC, it does not appear that he was personally involved in denying Lidex cream to plaintiff, which would provide further support for granting defendant Kaskiw's motion for summary judgment with respect to this aspect of plaintiff's medical care claim. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Plaintiff alleged that Dr. Kaskiw ignored two letters that plaintiff wrote requesting treatment with Lidex cream. (AC ¶¶ 39, 41). It is well-settled that the failure of a supervisory official to respond to a letter of complaint written by an inmate is not sufficient to show personal involvement. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (collecting cases); *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006).

---

**End of Document**                                  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1056935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Karl AHLERS, Plaintiff,
v.
Jeffery NOWICKI, Chief of Sotp, CNYPC;
Barbara Miller, Director of Administrative
Services, CNYPC; Cynthia Comstock, Nurse
Administrator, Sotp, CNYPC, Defendants.

No. 9:12–CV–0539 (DNH/RFT).
|
Signed March 18, 2014.

**Attorneys and Law Firms**

Karl Ahlers, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Cathy Y. Sheehan, Esq., Ass't Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Karl Ahlers brought this action pursuant to 42 U . S.C. § 1983. On February 25, 2014, the Honorable Randolph F. Treece, United States Magistrate Judge, advised by Report–Recommendation that defendants' motion for summary judgment be granted and plaintiff's complaint be dismissed. No objections to the ReportRecommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED; and

2. The complaint is DISMISSED in its entirety.

The Clerk is directed to serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

### REPORT–RECOMMENDATION and ORDER

ROANDOLPH F. TREECE, United States Magistrate Judge.

Plaintiff Karl Ahlers brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging violations of his First, Fourth, Fifth, and Fourteenth Amendment rights as a result of a room search conducted by staff members of the Central New York Psychiatric Center (CNYPC), where Plaintiff is involuntarily civilly committed. *See* Dkt. No. 1, Compl. Defendants now move for Summary Judgment. *See* Dkt. No. 18. Plaintiff opposes the Motion. *See* Dkt. No. 20. For the reasons stated below, we recommend that the Defendants' Motion be **GRANTED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely

on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

Except where noted, the following facts are undisputed.

At all times relevant to the Complaint, Plaintiff was an involuntarily civilly committed resident at CNYPC. Dkt. No. 18–2, Defs.' Statement of Material Fact Pursuant to Local Rule 7.1(a)(3) ("hereinafter 7.1 Statement"), at ¶ 1.

On Wednesday, February 1, 2012, members of CNYPC's security team, searched Ahler's assigned room at CNYPC. *Id.* at ¶¶ 3, 8, & 12. As a result of the search, security staff found and removed from Ahler's room "2 screws missing fluorescent light/screws loose on desk, 3 ketchup, 3 Lorna Doones [cookies], 1 gallon size plastic bags [sic], 1 quart plastic bag, 1 sandwich bag, 3 mayonnaise relish packets." *Id.* at ¶¶ 13 & 14. In violation of CNYPC's policy, Plaintiff's possessions were not returned to their original state after the search. His bedding was thrown on the floor and walked on by staff. Compl. at ¶¶ 5(g) & (s). As a result, Plaintiff had to sleep on dirty sheets, or without sheets. *Id.* at ¶ 5(h). Prior to the search, Plaintiff had verbally complained to CNYPC's business office regarding his phone bill. Dkt. No. 18–6, Karl Ahlers Dep., dated Mar. 12, 2013, at pp. 63–66.

### B. Fourth Amendment

Plaintiff alleges that, without any probable cause or other suitable justification, Defendant Comstock supervised an unconstitutional search of his room, and that Defendants Miller and Nowicki are liable for this search in their supervisory capacity. *See generally* Compl.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV. "The purpose of the fourth amendment [ ] is to protect people from arbitrary and oppressive governmental conduct." *Aiken v. Nixon,* 236 F.Supp.2d 211, 230 (N.D.N.Y. Sept.30, 2002). However, "involuntarily committed individuals do not have a right to privacy in their cells, and therefore cannot challenge a cell search under the Fourth Amendment." *See Ahlers v. Bosco,* 2012 WL 6649191, at * 3 (N.D.N.Y. Dec.20, 2012) (DNH) (citing *Lombardo v. Holanchock,* 2008 WL 2543573, at *8 (S.D.N.Y. Jun.24, 2008), and rejecting a similar claim bought by Plaintiff Karl Ahlers regarding a search of his sleeping quarters). Likewise, Plaintiff's claims that the search violated CNYPC Policy 5.15 are also insufficient to state a cause of action under § 1983. *Id.* (quoting *Sealed Plaintiff v. Sealed Defendant,* 332 F.3d 51, 57 n. 5 (2d Cir.2003) for the proposition that "[e]levating a state-mandated procedure to the status of a constitutionally protected liberty or property interest, would make process an end in itself rather than a requirement whose constitutional purpose

is to protect a substantive interest in which the individual has a claim of entitlement") (further citing *Taylor v. Fischer,* 841 F.Supp.2d 734, 738 (W.D.N.Y.2012) for the proposition that "Plaintiff's allegations that defendants failed to follow New York regulations and prescribed procedures with respect to the disciplinary charges against him also fail to support his § 1983 claims. Those alleged procedural violations do not implicate plaintiff's constitutional rights.").

**\*3** Accordingly, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's Fourth Amendment claims against Defendants Comstock, Nowicki, and Miller.

### C. Retaliation

Plaintiff next argues that the search of his room was conducted in retaliation for verbal complaints he had previously made to CNYPC's business office, regarding his phone bills. *See* Ahlers Dep. at pp. 63–66.

Claims of retaliation fall within the protections of the First Amendment. Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872. To prevail on a section 1983 retaliation claim plaintiff must prove: (1) that he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 3 89 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

However, here, even if we accept that Plaintiff was engaged in a protected exercise, [1] he fails to show that there was a causal nexus between that exercise and the search of his room. Furthermore, Plaintiff's claim fails because a search of an involuntarily civilly committed persons room does not constitute an adverse action. *See Lombardo v. Holanchock,* 2008 WL 254357, at \* 8 (holding that involuntarily civilly committed plaintiff's claim that his room was searched in retaliation for complaints he made cannot be the basis for a retaliation claim because

involuntarily civilly committed plaintiffs do not enjoy a right to privacy in their rooms).

Accordingly, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's retaliation claim against Defendant Comstock.

### D. Due Process

Ahlers claims that his right to due process under the Fifth and Fourteenth Amendments were violated when, contrary to facility procedure, as set forth in § 5.15 of the CNYPC Handbook, he was not given a receipt for the items that were confiscated from his room and because his room was not put back in its original condition after the search. Ahlers Dep. at pp. 50–52.

To the extent that Plaintiff is claiming he had a due process property interest in the items confiscated from his room, such a claim must fail:

> Even an intentional deprivation of an inmate's property that is random and unauthorized does not give rise to a due process claim so long as "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 ... (1984). New York law provides such a remedy in the form of an action before the New York Court of Claims.

*Ahlers v. Bosco,* 2012 WL 6649191, at \*4–5 (N.D.N.Y. Dec.20, 2012) (quoting *Collins v. Goord,* 438 F.Supp.2d 399, 418–19 (S.D.N.Y.2006)); *see also Smith v. Hogan,* 2011 WL 4343978, at \*9 (N.D.N.Y. Aug.1, 2011) ("This Circuit has held that 'confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court postdeprivation remedies' in the New York Court of Claims.") (quoting *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996)).

**\*4** Moreover, claims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *see also Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (holding that violations of state procedural requirements do not give rise to section 1983 liability).

Since Ahlers's had an adequate remedy to address the confiscation of his property, and his claim that his room was not put back in order is based upon an alleged violation of CNYPC's room policy, we recommend that Defendants' Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment due process claims be **GRANTED.**

Likewise, the Fifth Amendment applies only to federal actors, not state actors. *Snow v. Vill. of Chatham,* 84 F.Supp.2d 322, 326–27 (N.D.N.Y.2000). Since none of the Defendants in the instant action are federal officials, we further recommend that Defendants' Motion for Summary Judgment as to Plaintiff's Fifth Amendment due process claims be **GRANTED.**

### E. Conditions of Confinement

Although Plaintiff did not explicitly identify conditions of confinement as a cause of action in his Complaint, the Second Circuit has held that in addressing *pro se* pleadings, a court must read the plaintiff's papers liberally and interpret them to raise the strongest arguments that they suggest. *Lane v. Carpinello,* 2009 WL 3074344, at *6 (N.D.N.Y. Sept.24, 2009)). Examining Plaintiff's papers liberally, it is possible that his claim that during the search of his room, his sheets were thrown on the floor and stepped on, but not replaced with clean sheets, raises a conditions of confinement claim.

The Eighth Amendment's proscription against the cruel and unusual punishment of convicted criminals is inapplicable to involuntarily civilly confined plaintiffs. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Rather, any claims arising from the conditions under which involuntarily civilly committed persons are confined are evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. March 15, 2007). However, in practice, courts apply the same legal standards when analyzing either type of claim. *Butler v. Suffolk Cnty.,* 289 F.R.D. 80, 92 (E.D.N.Y.2013).

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with

"deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). In *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

> **\*5** Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling [v. McKinney* ], 509 U.S. 25, 32 [1993] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency. *Id.* at 35–36; *Rhodes [v. Chapman* ], 452 U.S. 337[,] 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 [ (2002) ].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer [v. Brennan* ], 511 U.S. [825,] 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 [ (1994) ].

*Phelps v. Kapnolas,* 308 F.3d at 185–86.

Here, Plaintiff has claimed that he was forced to sleep on dirty sheets for approximately four nights. [2] Compl. at ¶¶ g & h; *see also* Ahlers Dep. at pp. 30 & 53. Even if true, such a temporary and minimal deprivation is *de minimus* at best, and as such does not rise to constitutional proportions. See *Dilworth v. Goldberg,* 914 F.Supp.2d 433, 469 (S.D.N.Y.2012) (dismissing plaintiff's conditions of confinement claim where alleged conditions were ***"de minimis"*** to state a claim) (alterations in original).

Accordingly, to the extent that Plaintiff may have attempted to raise a conditions of confinement claim regarding his bedding, we recommend that such a claim be **DISMISSED.**

### F. Qualified Immunity

Defendants have argued that they are entitled to qualified immunity; however, having found no evidence of any underlying constitutional violations, we need not, and do not, discuss qualified immunity.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 18) be **GRANTED** and this action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**\*6** Filed Feb. 25, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1056935

### Footnotes

1   There is certainly support for the proposition that verbal complaints constitute a protected exercise under the First Amendment. *See Monko v. Cusack,* 2013 WL 5441724, at *10 (N.D.N.Y. Sept.27, 2013) (citing cases for the proposition that "[a]n inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim.").

2   Plaintiff never clarifies how long he had to wait for clean sheets. However, the search of his room occurred on Wednesday February 1 st, and Plaintiff has alleged that clean sheets were distributed every Sunday. Ahlers Dep. at p. 30. Therefore, it is reasonable to assume that Plaintiff's sheets may have remained soiled for up to four nights after the search.

2011 WL 4435695
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

John G. BOURGOIN, Plaintiff,

v.

Kimberly WEIR, Defendant.

Civil No. 3:10cv391 (JBA).

|

Sept. 23, 2011.

**Attorneys and Law Firms**

John R. Williams, Katrana K. Engstrom, John R. Williams and Associates, LLP, New Haven, CT, for Plaintiff.

Deann S. Varunes, Attorney General's Office, Hartford, CT, for Defendant.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JANET BOND ARTERTON, District Judge.

 **\*1** On August 19, 2010, Plaintiff John G. Bourgoin filed a Second Amended Complaint, suing Defendant Kimberly Weir, Deputy Warden at the Willard–Cybulski Correctional Institution in Enfield, Connecticut, in her individual capacity for inflicting cruel and unusual punishment through deliberate indifference to serious medical needs in violation of the Eighth Amendment to the U.S. Constitution. Defendant now moves [Doc. # 26] for summary judgment in her favor, arguing that Plaintiff has failed to demonstrate her personal involvement and has failed to offer evidence that would support an Eighth–Amendment claim and that she is entitled to qualified immunity. For the reasons stated below, Defendant's motion for summary judgment will be granted on the ground that Plaintiff has failed to offer evidence of Defendant's deliberate indifference.

### I. Undisputed Facts

Mr. Bourgoin was an incarcerated inmate of the Department of Corrections ("DOC") between December 8, 2004 and May 31, 2007. (Steele Aff., Ex. 1 to Def.'s Loc. R. 56(a)1 Stmt. ¶ 5.) He was housed at the Willard–Cybulski Correctional Institution ("Willard") from May 5, 2006 through March 23, 2007 and at the Osborn Correctional Institution ("Osborn") from March 23, 2007 through May 3, 2007, when he was released to a re-entry furlough through May 31, 2007. (*Id.* ¶¶ 6–7.) In 2007, Defendant Weir held the rank of Deputy Warden at Willard, acting as an assistant to the Correctional Warden and directing the operations and administration at Willard; she is not a medical professional. (Weir Aff., Ex. 2 to Def.'s 56(a)1 Stmt. ¶¶ 3–4.) Deputy Warden Weir does not hire medical staff or supervise their clinical practice; instead the Correctional Managed Health Care Program at the University of Connecticut Health Center provides those services under contract to the DOC. (*Id.* ¶ 5.)

### A. Mr. Bourgoin's Condition/Treatment

Mr. Bourgoin's DOC Medical Records ("Records") note a diagnosis of and treatment for constipation beginning on March 12, 2006. (Medical Records, Ex. 13 to Def.'s 56(a)1 Stmt. at 71.) On March 13, 2006, he was being treated with the stool softener colace. (*Id.* at 72.) On March 24, 2006, he had "worsening symptoms" with respect to his constipation and was treated with the laxative dulcolax. (*Id.* at 72.) On April 19, he complained that his "belly is bloated" and that he was in pain and experiencing alternating loose bowel movements and constipation; metoclopramide was added to his treatment regimen "as a prokinetic agent." (*Id*. at 72–73.) An April 14, 2006 x-ray showed a "nonobstructive bowel gas pattern." (*Id.* at 39.) A second x-ray on May 4, 2006 "reveal[ed] formed stool throughout the colon consistent with constipation." (*Id.* at 38.)

On May 31, 2006, after DOC transferred Mr. Bourgoin to Willard, his Records note that he complained "my digestive tract is upset," which had been "ongoing since September, but more since January." (*Id.* at 75.) Mr. Bourgoin's Records contain entries on June 13 and 19, 2006 that do not include reference to his constipation. (*Id.* at 76–77.) On June 22, he complained of a "full, bloated feeling" and his Records note a plan to continue his same treatment; on June 23, he complained of a "bloated sensation." (*Id.* at 77.) Mr. Bourgoin weighed 210 pounds on June 22. (*Id*.) A June 22 writeup for outside consultation for Mr. Bourgoin's constipation notes that simethicone and metamucil have been effective in the past and states "needs orders please." (*Id.* at 78.)

**\*2** Further entries on June 26, July 18 and 21, and August 3, 7, and 11, 2006 do not refer to Mr. Bourgoin's constipation. (*Id.* at 79–80.) On August 23, 2006, Mr. Bourgoin weighed 200 pounds and complained that his last bowel movement had been the previous Friday, August 18. (*Id.* at 80.) An August 25, 2006 entry in his Records does not discuss constipation, but on September 18, 2006, Mr. Bourgoin complained of "midline" pain that "feels like a string pulling tight." (*Id.* at 81.) He weighed 206 pounds on September 18 and was "tak[ing] medications [and] metamucil; his abdomen was distended but he "[d]enie[d] constipation" and his Records note that he would be referred to a doctor for further evaluation. (*Id.*) The doctor's note on September 18 reads "will evaluate [and] start [treatment]." (*Id.*) Entries on September 25 and October 3, 2006 do not mention Mr. Bourgoin's constipation. (*Id.* at 82.) On October 13 his Records note a "sensation of bloating," that Mr. Bourgoin "has sluggish bowel habit," that he has a distended abdomen but good bowel sounds, and that "treatment [is] in progress." (*Id.*) Mr. Bourgoin received another x-ray on October 17, 2006, the report for which reads: "There is marked fecal loading of the large bowel. There is no evidence of abnormal calcifications or organomegaly." (*Id.* at 40.) He stated on October 24 that his "appetite is great." (*Id.* at 83.) On November 1, 2006 his Records read " 'bloating', diff[iculty] relieving gas, very constipated despite meds he is taking. In addition to prescribed medication [Mr. Bourgoin] claims to be taking metamucil [and water].... States 'swelling just won't go down.' " (*Id.*)

The November 1 entry notes that Mr. Bourgoin's x-ray on October 17, 2006 "shows significant fecal loading in [large] bowel," and that he would be referred "back to MDSC" on November 3. (*Id.*) His November 3 entry states that he has "abdominal bloating" and "fecal loading." (*Id.* at 84.) On November 17, 2006, Mr. Bourgoin's Records read: "Continues to have severe constipation—will [increase] lactulose also place him on simethicone for flatulence." (*Id.*) On November 28 his Records read: "[Mr. Bourgoin] states the lactulose is only [increasing] his gas, however still constipated." (*Id.* at 86.) On December 5, 2006: "He continues to have severe bloating [and] constipation—He had clinical trial [with] several GI agents [with] no success." (*Id.*)

A December 5 physician's order in Mr. Bourgoin's Records shows that a doctor ordered a barium enema on that date. (*Id.* at 12.) The request form for the barium enema lists diverticulitis as a differential diagnosis. (*Id.* at 52.) The barium enema was scheduled for February 7, 2007 at the University of Connecticut Health Center but was not performed because Mr. Bourgoin did not undergo the proper "prep." (*Id.* at 47, 88.) The Records note "no show" on December 13, 1006 and January 8, 2007 and contain entries on December 14 and 26, 2006 and January 10, 16, and 22, 2007 that do not mention his constipation. (*Id.* at 86–87.) On January 24, 2007, Mr. Bourgoin stated that he was not "taking in" anything but protein shakes and could not drink coffee or juice "for fear of gas buildup," and that he "would like to have simethicone renewed." (*Id.* at 87.) He weighed 199 pounds on February 20, 2007. (*Id.* at 88.)

**\*3** An entry in the Records on March 8, 2007 states "chronic obstipation" and "try polyclose, [increase] dose lactulose." (*Id.* at 89.) Another barium enema was scheduled for March 9, 2007, but was again cancelled and re-booked for March 29, 2007 because Mr. Bourgoin did not undergo the proper prep. (*Id.* at 47, 89.) On March 19, 2007, he weighed 182 pounds and was "noticeabl[y] upset about what he describes as an intestinal blockage." (*Id.* at 90.) Medical staff reviewed the prep for the barium enema with Mr. Bourgoin on March 22; the prep began on March 26. (*Id.* at 90–92.) The barium enema was not performed on March 29, however, and the report stated that Mr. Bourgoin "needs better prep." (*Id.* at 93.)

Mr. Bourgoin's Transfer Summary of March 23, 2007 lists as a current condition "chronic constipation" and includes as current medications lactulose, castor oil, dulcolax, simethicone, and a fleets enema performed twice daily. (*Id.* at 23.) He states in his affidavit: "When I was discharged from prison, I immediately sought medical treatment and obtained two diagnostic procedures which helped me learn how to treat my chronic condition of diverticulitis within six (6) months and avoid further pain." (Bourgoin Aff., Ex. G to Pl.'s Loc. R. 56(a)2 Stmt. ¶ 10.)

### B. Deputy Warden Weir

On January 25, 2007, Mr. Bourgoin submitted an Inmate Request Form to Deputy Warden Weir:

> Many request, in every manner possible except disrespectful has

been written asking for medical help. The medical file should tell the story of my plight. The law(s) pertaining to what an inmate's rights to medical care reads: An inmate shall be entitled to reasonable and consistent care equaling that of a non-inmate. I was wondering when said law(s) would be respected.

(1/25/07 Request, Ex. B to Pl.'s 56(a)2 Stmt.) Deputy Warden Weir responded on February 1, 2007: "Mr. Bourgoin, now that you have quoted everything can you write me back stating your concern/problem and I will review to see how I may assist you." (*Id.*) In a letter to Deputy Warden Weir on February 12, 2007 [1] Mr. Bourgoin wrote:

I need medical care. I have truly made every effort, including writing your office months ago. A blockage worsens preventing consumption of food and the severity was realized in January, 2006. Since the first xray was taken four others have shown a serious problem, however the D.O.C. continues to treat my situation with indifference. I was brought to UConn Medical Center and again an xray revealed extreme fecal blockage. The hospital's complaint was based on a failure for a colon flush which did not do the job. Medical has continued to evade their responsibility by again allowing me to suffer with this situation. The question posing concern here is: Why does medical fail to provide care even when the hospital states a serious problem exist [sic] and a colon flush needs prompt attention. Today is the sixth (6) day since I returned from hospital, why or how come I still am not recognized as having a real issue?

**\*4** (2/12/07 Letter, Ex. C to Pl.'s 56(a)2 Stmt. at 1.) Deputy Warden Weir responded: "Mr. Bourgoin you are being seen by Medical here and an outside [appointment] has been scheduled for you." (*Id.*) Mr. Bourgoin wrote to Deputy Warden Weir again on March 5, 2007: "Does this make sense? Because the D.O.C. is a public institution: '... its employees are protected by qualified immunity from civil liability as long as their conduct does not violate 'clearly established' statutory or constitutional rights.' Sounds right to me. Concluding: '... that a reasonable person would understand.' Please advise, respectfully." (3/5/07 Request, Ex. C to Pl.'s 56(a)2 Stmt. at 2.) Deputy Warden

Weir responded: "Mr. Bourgoin, what is your point? Do you have a medical concern that needs to be addressed. I checked with medical. Nurse White states that you have been seen several times at sick call, MHV, and Dr. You have an [appointment] scheduled for 3/9." (*Id.*)

On March 13, 2007, Mr. Bourgoin wrote to Deputy Warden Weir once more:

Should you consider a simple objective review of my medical file you would do a great service to yourself and countless others. There [sic] contain in the chart are several letters from UConn Medical Center which define procedures and contrary to positions held here, a real medical problem. That having been said please give thought to just one of the screaming questions which jump out at the reader. Is fairness sought for either party? Why on two occasions has UConn Medical Center not been able to perform a Barium (intestinal/colon) test? You might consider a second obvious question: Why while waiting the lengthy time period for test was I not at least given a reasonable flush (colon) so the incredible pain and nutritional discord could be minimized? This situation continues today.

(3/13/07 Letter, Ex. C to Pl.'s 56(a)2 Stmt. at 3.) The letter contains a postscript: "With all due respect, Ms. White no longer can remain objective—she's involved." (*Id.*) To Mr. Bourgoin's question about the inability to perform the barium enema, Deputy Warden Weir wrote: "Don't know." (*Id.*) To the question about why Mr. Bourgoin did not receive a flush, she wrote: "Don't know. Will forward your concerns." (*Id.*)

During her deposition, Deputy Warden Weir acknowledged that Mr. Bourgoin asked her to help him get proper medical treatment for his on-going condition, did not recall the exact dates of Mr. Bourgoin's letters, but recalled that he "quoted a lot of laws" and that after she asked him to get to the point "he wrote me back stating he had some medical concerns and that

he didn't think he was being—receiving proper medical treatment. I referred his concerns to the nurse supervisor in medical." (Weir Dep., Ex. H to Pl.'s 56(a)2 Stmt. at 6:14–7:10.) Weir also testified that she later followed up as follows: "I responded to his request, and I also had communication with the nursing supervisor [Enrica White] there and advised her that he had wrote me asking about medical concerns that he had, and if she could speak with him or review his charts to ensure he was receiving proper medical care. (*Id.* at 7:11–20.) Nursing supervisor White reported back to Deputy Warden Weir that Mr. Bourgoin's "medical concerns were addressed, that he had scheduled appointments outside the facility, and he had seen medical and mental health." (*Id.* at 7:23–8:5.)

**\*5** A March 7, 2007 e-mail from Deputy Warden Weir to Enrica White reads:

> Can you please review the chart of the above inmate and see him if necessary. He is writing me with complaints of not receiving proper medical attention for a severe problem he has (extreme fecal blockage/colon flush? ?) Claims he has been to UCONN had x-rays which show his problem yet he is still not receiving proper medical care.

(Ex. F to Pl.'s 56(a)2 Stmt.) Ms. White responded: "The above inmate has been seen several times at sick call, MHU, and MD call. Approved for an Outside Appointment tomorrow, March 9, 2007. Inmate is very angry, but also has mental health issues. Have a good day." (*Id.*) Mr. Bourgoin's March 13, 2007 Letter contains a note in the upper right corner directed to's Ms. White: "CHNS White Please Review and advise" (3/13/07 Letter), but the record is silent as to any response from Ms. White thereafter.

## II. Discussion

### A. Personal Involvement

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (internal quotation marks and citations omitted). Liability cannot rest on *respondeat superior,* or, in the prison context, on "proof of linkage in the prison

chain of command." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (internal quotation marks and citations omitted). Supervisor liability can be demonstrated in one or more of the following ways:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145.

A deputy warden such as Defendant may be liable under the second prong, for "failure to remedy a wrong after being informed through a report or appeal," where he or she acts or responds in an inadequate fashion to a prisoner's letter of protest or request. *See Walker v. Pataro,* No. 99Civ.4607 (GDB)(AJP), 2002 WL 664040, *12 (S.D.N.Y. April 23, 2002) ("[W]here a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable.") A supervisor's response to a prisoner's grievance or complaint that "attempt[s] to defend or explain alleged constitutional violations" is sufficient to establish the personal involvement of that supervisor. *Id.* at *13–14 (denying defendant superintendent's motion for summary judgment where he responded to the plaintiff prisoner's retaliation grievance by responding that the grievance "was unsubstantiated based upon information received during investigation"). Failure to adequately supervise subordinates in response to a prisoner's grievance also may give rise to constitutional liability. *Johnson v. Wright,* 234 F.Supp.2d 352, 364 (S.D.N.Y.2002) (prisoner's allegations that the Commissioner of the Department of Correctional Services' failure to supervise his subordinates in response to grievance letter resulted in the plaintiff not getting medical treatment were sufficient to survive a motion to dismiss).

**\*6** Deputy Warden Weir's involvement in Mr. Bourgoin's medical grievances satisfies the second type of supervisory liability under *Hernandez.* According to the letters between Mr. Bourgoin and Deputy Warden Weir, she did not merely receive correspondence from Mr. Bourgoin, but responded to him personally and communicated with the nursing supervisor regarding his concerns. Although Deputy Warden Weir was not directly involved in the provision of medical care to Mr. Bourgoin and did not directly oversee his treatment plan, Mr. Bourgoin claims that as deputy warden for the facility, she was constitutionally deficient in personally communicating his complaints to the medical staff that did directly oversee his treatment. These actions in response to Mr. Bourgoin's complaints sufficiently demonstrate Deputy Warden Weir's personal involvement. *See Johnson,* 234 F.Supp.2d at 364; *Walker,* 2002 WL 664040 at \*12.

**B. Deliberate Indifference to Serious Medical Need**
"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (citations omitted). "Deliberate indifference has two necessary components, one objective and the other subjective ." *Collazo v. Pagano,* 656 F.3d 131, 2011 WL 3873791, \*3 (2d Cir.2011). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

*1. Medical Need*
Whether a deprivation is objectively severe is itself a two-part inquiry: (1) the prisoner must be "actually deprived of adequate medical care"; and (2) the inadequacy in medical care must be sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* at 280. This objective component "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione,* 657 F.3d 116, 2011 WL 4090760, \*5 (2d Cir.2011) (internal quotation marks and citations omitted).

Where a prisoner's complaint focuses on the adequacy of services provided during the course of regular treatment for a chronic condition, the seriousness factor does not focus on the underlying condition itself, but on the serious medical need posed by the failure to provide a particular treatment or a delay in the provision of that treatment. *Salahuddin,* 467 F.3d at 280 ("In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the allegedly unconstitutional conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' ") (quoting *Carpenter,* 316 F.3d at 185).

**\*7** The evidence comprised of Mr. Bourgoin's letters and Records reflects severe abdominal pain, fecal blockage, and significant weight loss. Medical staff noted several times that he suffered from "severe" constipation and bloating, on one occasion going at least five days between bowel movements. From March 12, 2006 on, his Records reflect regular treatment for constipation, bloating, and "swelling [that] just won't go down," often without satisfactory results or marked improvement in Mr. Bourgoin's symptoms. On June 22, 2006, Mr. Bourgoin weighed 210 pounds; his Records reflect a weight of 182 pounds on March 19, 2007 and when he was discharged on May 4, 2007 he weighed 170 pounds. He frequently complained of pain and at times ate little more than protein shakes due to his discomfort. The failure to alleviate the symptoms associated with Mr. Bourgoin's chronic condition over this one-year period of time resulted in a painful and debilitating condition that both Mr. Bourgoin and his doctors regularly found worthy of comment. *See Salahuddin,* 467 F.3d at 280. His condition affected his daily activities, in particular his food intake, and caused chronic and substantial pain. *See id.* The significant weight loss—more than forty pounds—may be objective evidence of a deterioration in the state of Mr. Bourgoin's health from March 2006 on. The record is such that reasonable jurors could find that Mr. Bourgoin suffered from an objectively serious medical condition.

2. Deliberate Indifference

With respect to the subjective deliberate indifference component, "the official must have acted with the requisite state of mind, the equivalent of criminal recklessness." *Collazo,* 2011 WL 3873791 at *3 (internal quotation marks and citations omitted). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Instead, to rise to the level of culpable recklessness, a prison official's actions, or lack thereof, must "evince[ ] a conscious disregard of a substantial risk of serious harm." *Hill,* 2011 WL 4090760 at *6 (quoting *Chance,* 143 F.3d at 703).

Where prison medical staff have provided a constant and evolving course of treatment—even if not entirely effective—the failure to immediately provide a prisoner's preferred course of treatment does not constitute deliberate indifference to serious medical need. *See Ross v. McGinnis,* 2004 WL 1125177, * 10 (W.D.N.Y. Mar. 29, 2004) ("Plaintiff's complaints of abdominal pain, vomiting, heartburn, constipation, body odor and extreme body heat did not constitute a serious medical need. Even if they did, defendants were not deliberately indifferent to these complaints. Plaintiff was examined frequently and found to be in no acute distress. He underwent blood tests and was given a variety of medications to relieve his complaints. When these medications failed to provide relief, plaintiff was referred to a gastroenterologist and underwent additional blood tests, x-rays, and a lower and upper endoscopy, a barium enema and upper GI series."); *Brisbon v. Thompson,* 2010 WL 2933627, *2 (W.D.Va. July 26, 2010) ("Even if I assume that plaintiff has a serious medical condition warranting Eighth Amendment protection, plaintiff fails to establish Dr. Thompson's deliberate indifference. Plaintiff admits, and his medical record confirms, that he has been receiving constant treatment from the defendant, including at least one prescription, for chronic constipation. Thus, plaintiff does not establish an Eight Amendment violation because he merely alleges a disagreement with the doctor's medical decisions about his treatment.")

**\*8** Mr. Bourgoin claims that Deputy Warden Weir was deliberately indifferent to his serious medical need by failing to cause "the Department of Correction to provide him with appropriate and necessary medical care and treatment." (2d Am.Compl.¶¶ 8–9.) Mr. Bourgoin argues that Deputy Warden Weir's deliberate indifference is evinced by her response to his March 5, 2007 request for help "asking him what the heck he was talking about," and the fact that she only sent Ms. White a single e-mail in response to Mr. Bourgoin multiple requests despite the fact that Mr. Bourgoin had been returned to the prison facility several times without the barium enema being performed because of insufficient "prep." (Opp'n at 9–10.)

In fact, Deputy Warden Weir responded to each of Mr. Bourgoin's communications, although in a caustic or snarky tone on occasions. In response to Mr. Bourgoin's January 25, 2007 request, Deputy Warden Weir asked him to clarify his problem so that she could review and assist him. (1/25/07 Request.) When Mr. Bourgoin wrote back on February 12 detailing his concerns, Deputy Warden Weir made inquiries and verified that he was being seen by the medical staff at Cybulski and told Mr. Bourgoin that he had an outside appointment scheduled. (2/ 12/06 Letter.) In response to Mr. Bourgoin's March 5, 2007 communication describing the law of qualified immunity, Deputy Warden Weir responded in part by telling him that she had "checked with medical" and that he had an outside appointment scheduled. (3/5/07 Request.) Deputy Warden Weir e-mailed Nursing Supervisor Enrica White on March 7 directing her to review Mr. Bourgoin's chart and received Ms. White's response confirming that he had been seen several times and had an outside appointment scheduled for March 9. (Ex. F. to Pl.'s 56(a)2 Stmt.)

This chain of communications makes clear that Deputy Warden Weir knew he was seeking her help in obtaining adequate care for his chronic and painful condition and that Deputy Warden Weir responded by obtaining information to "ensure that he was receiving proper medical care." (Weir Dep. at 7:11–20.) Prior to and during the period of these communications, Mr. Bourgoin received attention from the medical staff at Cybulski for his chronic constipation, including several x-rays and a diverse and evolving array of medications including dulcolax, metoclopramide, simethicone, metamucil, lactulose, and castor oil. In his March 13, 2007 letter to Deputy Warden Weir, Mr. Bourgoin challenged nursing supervisor White's attitude

toward him and complained that UConn Medical Center had twice been unable to perform the prescribed barium enema, and that he had not received a colon flush while waiting for the barium enema in order to relieve his "incredible pain and nutritional discord." (3/13/07 Letter.) On March 23, 2007, Mr. Bourgoin was transferred to Osborn, which according to Defendant's counsel at oral argument, was a facility better suited to serve Mr. Bourgoin's medical needs.

**\*9** After responding to Mr. Bourgoin's March 13 letter and forwarding it to Ms. White's attention, Deputy Warden Weir did not follow up with Ms. White during the ten-day period between the letter and his transfer to Osborn. This is the period that Mr. Bourgoin's counsel focused the Court's attention to as the time when nothing was being done to properly treat him because Deputy Warden Weir made no further response or inquiry, arguing that this evidences Deputy Warden Weir's culpable state of mind. The Court disagrees and no reasonable juror could find that this ten-day period of inaction after her prior responsiveness to this chronic condition that presented no immediate critical health threat constitutes "a conscious disregard of a substantial risk of serious harm," where Mr. Bourgoin was transferred to another facility where was seen on March 24, 2007 for medical treatment including preparation for the barium enema. *See Hill,* 2011 WL 4090760 at \*6.

Nothing in the record suggests that Deputy Warden Weir acted to interfere with or prevent Mr. Bourgoin from receiving a diagnostic barium enema or colon flush or that she failed to make appropriate supervisory inquiries while aware that a serious harm would result from any further delay in treatment. *See Salahuddin,* 467 F.3d at 280. Even if Deputy Warden Weir's responses to Mr. Bourgoin's letters hardly sounded sympathetic, this is not a case where an inmate's serious medical need was ignored or unreasonably delayed, prolonging his severe pain or worsening his medical condition. *See Chance,* 143 F.3d at 703; *Ross,* 2004 WL 1125177 at \* 10. Because the record contains insufficient evidence that Deputy Warden Weir acted with the requisite state of mind equivalent to criminal recklessness, she is entitled to summary judgment in her favor.

### III. Conclusion

For the reasons stated above, Defendant's motion [Doc. # 26] for summary judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4435695

Footnotes

1   The letter bears the date February 12, 2006, however Mr. Bourgoin was not yet housed at Cybulski at that point. In addition, Mr. Bourgoin claims that he requested Weir's assistance between January and March, 2007, without mentioning a letter from February, 2006. The letter also refers to four x-rays, the last of which, according to Mr. Bourgoin's Records was not completed until late 2006. At oral argument, Mr. Bourgoin's counsel clarified that the February 12 letter contains a typographical error and was actually sent on February 12, 2007. It will be referred to by this corrected date rather than the erroneous February 12, 2006 date.

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4491825
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie COLE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES, et al., Defendants.

No. 9:10–CV–1098 (NAM/TWD).
|
Aug. 31, 2012.

**Attorneys and Law Firms**

Ronnie Cole, of Counsel, Rome, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Kevin P. Hickey, Esq., of Counsel, Albany, NY, for Defendants.

**REPORT AND RECOMMENDATION AND ORDER**

THERÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, was initially referred to Magistrate Judge George H. Lowe for Report and Recommendation by the Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon Magistrate Judge Lowe's retirement on February 9, 2012, the case was reassigned to me. In his Amended and Supplemental Complaint ("Amended Complaint"), Plaintiff Ronnie Cole ("Cole") has alleged that Defendant New York State Department of Correctional Services [1] ("DOCS") and thirty of its employees violated his constitutional rights by subjecting him to excessive force; showing deliberate indifference to his medical needs; falsifying misbehavior reports; retaliating against him for filing grievances; conspiring to assault him, cover up the assault, and make false misbehavior reports; confining him in segregation; denying him a fair review of his Special Housing Unit ("SHU") confinement reviews; denying his requests for restoration of visiting privileges; and denying him due process in connection with a Tier III disciplinary hearing

that took place in July of 2010. (Dkt. No. 16.) Plaintiff has also asserted New York state law claims for assault and battery and negligence. *Id.* at 1. Currently pending before the Court is Defendants' motion for partial dismissal of Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for an order directing Plaintiff to file a more definite statement under Federal Rule of Civil Procedure 12(e). (Dkt. No. 62 at 1.)

In his opposition to Defendants' motion, Plaintiff has consented to the dismissal of the action as against named Defendants DOCS, Brian Fischer, Jack McDaniel, Albert Prack, Jeffrey St. Louis, Edward Dauphin, R. Judway, M.J. Cappadonia, R.J. Miller, S. Purdy, [2] C. Cucharale, H. Smith, T. Meachum, J. Mecca, D. Ashe, Debora Kinderman, A. Papaleo, Judy Palmer, C. Vail, Ted Vauss, Mary Shrimp, and Renna Piecce. (Dkt. No. 65 at ¶ 8.) The nine remaining Defendants are Ann Rabideau ("Rabideau"), First Deputy Superintendent for Health/Acting Superintendent at Walsh Medical Unit/Mohawk Correctional Facility ("MCF"); Stephen McCarthy ("McCarthy"), Deputy Superintendent of Security at MCF; G. Lawrence ("Lawrence"), Corrections Sergeant at MCF; Toney Szajer ("Szajer"), Corrections Sergeant at MCF; A. Durante ("Durante"), Corrections Officer at MCF; J. Griffith ("Griffith"), Corrections Officer at MCF; L. Russin ("Russin"), Registered Nurse at MCF; G. Reese ("Reese"), Licensed Practical Nurse at MCF; and Elaine Paluck ("Paluck"), Health Care Assistant at MCF.

By Plaintiff's own assessment, the claims against the remaining Defendants are limited to: (1) use of excessive force; (2) retaliation; and (3) deliberate indifference to Cole's medical needs for injuries he sustained as a result of the use of excessive force against him. [3] *Id.* at ¶¶ 2. Plaintiff's use of excessive force claims against Defendants Durante, Szajer, Griffith, and Lawrence are not presently at issue because Defendants have excepted those claims from their motion to dismiss. [4] (Dkt. No. 62 at 1; Dkt. No. 68 at 1.) Therefore, the sufficiency of those claims is not addressed herein.

**\*2** For the reasons that follow, I recommend that Defendants' motion for partial dismissal of the Plaintiff's Amended Complaint be **GRANTED** in part and **DENIED**

in part, and order that Defendants' motion for a more definite statement be **DENIED**.

## I. BACKGROUND

### A. Defendants Durante, Szajer, Griffith and Lawrence

Plaintiff is a prison inmate housed in the Walsh Regional Medical Unit at MCF. (Dkt. 16 at ¶ 3.) The allegations in the Amended Complaint describe a contentious relationship between Cole and Defendants Szajer, Durante, Griffith and Lawrence, which Plaintiff claims contributed to his filing of a number of grievance complaints. (*See generally* Dkt. No. 16.) According to Plaintiff, that, in turn, resulted in a series of retaliatory actions by the four Defendants, including harassment, the filing of numerous false misbehavior reports against him, and four alleged instances of the use of excessive force. (Dkt. No. 16 at ¶¶ 70–78, 80–84, 87–98.)

### 1. Defendant Durante

Defendant Durante is a corrections officer at MCF whose duties include escorting medical staff in and out of inmates' rooms during medication and treatment. (Dkt. No. 16 at ¶ 20.) Plaintiff claims that on September 30, 2010, Durante told him that he could "kick [Cole's] ass" and nothing would happen because We hate Niggers you terrorist Muslims, and then spit in his face and hit him on the head with big brass keys while continuing to say "Nigger, Nigger, Nigger." *Id.* at ¶ 70–2. [5]

Durante filed an inmate misbehavior report the same day charging Cole with yelling at him: "You are a straight up bitch, a Nigger! Open your ass up, I'm gonna fuck you, open your ass, I'm gonna fuck you." (Dkt. No. 16–2 at 25–26.) Plaintiff was found guilty of both harassment and making threats and was given thirty days in keeplock. *Id.* at 26. Durante filed another misbehavior report against Plaintiff on October 1, 2010 charging him with threats and harassment. (Dkt. No. 16–2 at 22–24). He claimed that Cole had called him a "Nigger" several times and yelled "While you're here someone is 4 foot up in your wife's ass, like I'll be up in yours." *Id.* at 22. Plaintiff was again found guilty and given thirty days of keeplock and thirty days loss of earphones and radio. *Id.* at 23.

According to Plaintiff, on October 3, 2010, during his prayer time while he was making a prayer wheel, Durante came up behind him, pulled the front wheels of his

wheelchair off the floor, dropping him backwards, and then began kicking him in the "butt" as he called him "cripple Nigger Muslim." (Dkt. No. 16 at ¶ 74.) Cole filed grievance complaint # MHK–11844–10, dated October 4, 2010, complaining of the alleged assaults on September 30 and October 3, 2010. (Dkt. No. 16–3 at 33.) Plaintiff filed a second grievance complaint, # MHK–11845–10, the same day complaining that his request to file an injury report in connection with the alleged assault by Durante had been wrongfully denied. [6] (Dkt. No. 16–3 at 34.) The grievance complaints were denied because Durante denied spitting in Plaintiff's face, striking him with keys, kicking him, and flipping him out of his wheelchair. Moreover, the nurse involved reported that Cole had not advised her of any physical altercation with the officer and had not requested an injury report or allowed a medical exam, and that the photographs and medical injury reports did not support any injury to Plaintiff. *Id.* at 33–34.

**\*3** Durante filed another misbehavior report for harassment against Plaintiff on October 5, 2010, the day after Cole had filed a grievance complaint against him. (Dkt. No. 16–2 at 19–21.) In the Report, Durante claimed that on October 4, 2010 Cole had said "get out Nigger" and thrown a water cup at him. *Id.* Cole was again found guilty and given a thirty day loss of radio. *Id.* at 20. Durante also filed a misbehavior report on Plaintiff the following day. (Dkt. No. 16–2 at 13–15.) It charged Cole with violent conduct, propelling food or water, interference, and wasting state property. *Id.* According to Durante, Plaintiff had slapped his food trays towards Defendants Szajer and Durante after Szajer had placed them on the table. *Id.* Cole was found guilty of all of the claimed violations and given a six day loss of packages, commissary, earphones/radio, and loss of good time. *Id.* at 14.

On October 13, 2010, Durante filed a misbehavior report against Plaintiff for failure to follow a direct order, attempted smuggling, and failure to comply with correspondence procedures. (Dkt. No. 16–2 at 16–18.) The misbehavior report was filed after another corrections officer had found a letter in a book he had picked up from Cole. Durante's charges against Plaintiff were dismissed. *Id* . at 17. The Affidavit of inmate Montell Emerson, included as an exhibit to Plaintiff's Amended Complaint, avers that on October 14, 2010, the day the misbehavior report was filed, Durante entered his living area and made the following statement to him:

> Your buddy Cole (who's living area
> is 52.A2.15–1) just said to me that
> he doesn't want any problems and
> seeking a truce; the only way I'll
> think about giving him a truce is first
> I have to speak with my boys, then
> he has to beg me, and after that he
> has to write upfront and says he lied
> about me attacking him ... I already
> have a couple assaults on file and
> I have to watch my ass with Dep.
> McCarthy.

(Dkt. No. 16–1 at 1–2.)

### 2. Defendant Szajer

Defendant Szajer is a corrections sergeant responsible for supervising corrections officers at MCF. (Dkt. No. 16 at ¶ 25.) Plaintiff had filed a grievance complaint against Szajer on September 27, 2010, three days prior to the September 30, 2010 incident involving Durante. (Dkt. No. 18–1 at 37–38; Dkt. No. 65 at 23.) The grievance complaint, which charged Szajer with making false claims against Cole with regard to his use of pre-stamped envelopes for mailing, also alleged a pattern of harassment and threats by Szajer. *Id.* Plaintiff claims that Szajer told him that the harassment and threats would continue as long as he kept making use of the Inmate Grievance Resolution Committee. (Dkt. No. 18–1 at 38.) Plaintiff's grievance complaint was denied on the grounds that Szajer had denied harassing him, and the Lieutenant and Corrections Officer whom Cole had identified as witnesses to the alleged harassment denied seeing Szajer harass him. (Dkt. No. 18–2 at 32.)

**\*4** In his Amended Complaint, Plaintiff has not specifically alleged that Szajer was either present during the assault by Durante on September 30, 2010 or that he participated in the assault. (Dkt. No. 16 at ¶ 70.) Cole has, however, alleged generally in his Amended Complaint that Szajer joined in on Durante's assaults on him from July 16, 2010 through October 31, 2010, *id.* at ¶ 103, and claims in his Supplemental Affidavit and Appendix that he was assaulted by both Szajer and Durante on September 30 and October 3, 2010. [7] (Dkt. No. 18 at ¶ 26.) Moreover, according to Cole, both Durante and Szajer continued to harass him and file false behavior reports after the alleged assaults. (Dkt. No. 16 at ¶¶ 73 and 78.) In addition, Cole

has alleged that Szajer co-signed four of the misbehavior reports submitted by Durante in October of 2010. (Dkt. No. 16 at ¶ 105.)

In a series of letters written to Defendants Rabideau and McCarthy, the Inspector General, Governor Patterson, and the Chair of the New York State Commission of Correction in early October of 2010, Plaintiff alleged a pattern of harassment, including the filing of false misbehavior reports, by Szajer. (Dkt. No. 16–3 at 3–7, 9–12, 17–19.) On October 1, 2010, Cole wrote to Rabideau asking for her assistance in the matter of staff harassment by Szajer and Durante, whom he claimed had filed false misbehavior reports against him in retaliation for his filing of grievance complaints. (Dkt. No. 61–3 at 3–4.) In an October 4, 2010 letter to Rabideau, Plaintiff accused Szajer of being the driving force behind Durante's misbehavior reports against him. (Dkt. No. 16–3 at 5.) Cole sent a similar letter to McCarthy the same day. (Dkt. No 16–3 at 7.) [8]

### 3. Defendant Griffith

Defendant Griffith is a corrections officer at MCF whose duties include escorting the medical staff during medication rounds. (Dkt. No. 16 at ¶ 27.) According to Plaintiff, Griffith had a history of harassing him by calling him names like "dumb monkey" and "Nigger," saying "Nigger death to all Muslims," trashing his incoming mail and pictures, cutting up his kufies/head coverings, and turning off the water in his room so that he could not cleanse himself before the start of Islamic prayer. *Id.* at ¶ 78.

Plaintiff maintains that at 9:35 p.m. on October 29, 2010, Griffith entered his room as Defendant Reese was giving him his 9:45 p.m. medication and told him to "shut the \*uck up Cole and take the \*ucking medication before I straight drill you in the \*ucking face." *Id.* at ¶ 82. After Cole responded that he had already taken his medication, Griffith allegedly told the medical staff in the room (Defendants Reese and Paluck), to step out for a minute and then proceeded to kick Cole's bedside table tray into his wheelchair, pinning him in the chair and causing his two cups of Ensure Plus to splash all over his personal belongings. *Id.* at ¶ 83. According to Plaintiff, Griffith then punched him with a closed fist on the right side of his face, grabbed him by the neck and head butted him, and then began choking him until he became dizzy. *Id.* Griffith

then struck Cole on the left side of his chest with a closed fist with some kind of silver metal object. *Id.* at ¶ 84. [9]

**\*5** Griffith filed a misbehavior report charging Cole with violent conduct, assault on staff, interference with employee, threats, and refusing a direct order. (Dkt. No. 16–3 at 39; Dkt. No. 18–1 at 8.) In his narrative of the October 29, 2010 incident, Griffith claimed that Plaintiff was harassing the medical staff, and when Griffith ordered him to stop, Cole became more abusive and threatening and said "fuck you motherfucker. I'll kick your ass." *Id.* Griffith wrote that Plaintiff then began removing his clothes as if to prepare for a fight at which point Griffith ordered the medical staff to leave the room. Griffith maintained in the Report that as he too prepared to leave the room, Cole stood up and launched himself at Griffith and grabbed the Defendant's biceps. Griffith claims to have defended himself by pushing Cole in the chest with both hands. Cole then fell over backwards. *Id.* Plaintiff was found not guilty on the charges of violent conduct, assault on staff, and refusing a direct order in Griffith's Misbehavior Report and guilty of interference with employee and making threats. (Dkt. No. 18–1 at 6.) He was given one month in keeplock and a one month loss of packages, commissary, and earphones. [10] *Id.*

Plaintiff filed an inmate injury report in which he claimed that Griffith had punched him with a closed fist, choked him, and hit him in the side of the chest. (Dkt. No. 16–3 at 41–42.) The injuries sustained by Cole, as described by the nursing staff on both the use of force report and inmate injury report, are largely consistent with Plaintiff's description of the alleged assault, including: "(1)½ inch abrasion above bridge of nose (2) 1 x½ inch abrasion Rt. cheek (3) 3x4 inch pink area [left] chest (4) 1 x½ inch pink area below Rt ear (5) 3/4 x½ inch pink area below [left] ear." *Id.* at 42–44.

Plaintiff has also alleged that Griffith was part of a conspiracy to assault him, cover up the assault, and make false misbehavior reports. *Id.* at ¶ 95.

### 4. Defendant Lawrence

Defendant Lawrence is a corrections sergeant at MCF, and his duties include supervising corrections officers working during his shift. (Dkt. No. 16 at ¶ 19.) On October 5, 2010, Lawrence filed a misbehavior report on Plaintiff for threats of violence arising out of an incident that had

occurred that morning. (Dkt. No. 61–2 at 38.) According to Lawrence, Plaintiff told the Defendant that he was going to "kick it up a notch," and when Lawrence asked what he meant, Cole said "you better call Judway, I'm not scared of you Lawrence and you're going to get hurt. I'm going to beat your ass." *Id.* Plaintiff was found guilty and given one month without his radio. *Id.* at 39.

Lawrence appears to have been the subject of Plaintiff's grievance complaint # MHK 11849–10 filed on October 7, 2010. [11] The complaint charged Lawrence with threatening and harassing Cole with actions that included tampering with his food and filing a false misbehavior report. (Dkt. No. 16–3 at 33; Dkt. No. 18–1 at 27.)

**\*6** According to Plaintiff, on October 31, 2010 at 1:30 p.m., Lawrence came into his room while he was sitting at his desk. (Dkt. No. 16 at ¶ 89.) Cole claims that Lawrence pulled at the front of his pants and pulled out his penis and made lewd comments to Cole including telling him "I *uck many muslims Cole and am here to *uck you as well." *Id.* Lawrence began to walk towards Cole and pushed over his bedside table causing two cups of Ensure Plus to fall from the table on the side where Lawrence was standing. *Id.* Plaintiff contends that Lawrence continued to push his wheelchair and slipped and fell on the Ensure, making the Defendant angry. *Id.* at ¶ 90.

Cole has alleged that Lawrence got up and yelled at Plaintiff that he was going to "fuck his ass up" and then with a closed fist punched Cole below his left eye and stabbed him in the left hand with a silver pen knife when Cole attempted to protect his face with his hands. *Id.* Plaintiff claims that another corrections officer who was present punched him in the hand, and Lawrence and the other officer kicked Plaintiff then grabbed him in the chest and slung his wheelchair over the bedside table leaving his legs pinned. Lawrence and the corrections officer allegedly continued to punch Cole and call him names including "nigger terrorist." *Id.* Lawrence then spit on Plaintiff's face and left him on the floor with his wheelchair tipped over and the table on his legs where he remained for an hour or more. *Id.* at ¶¶ at 91–92.

Following the incident, Lawrence filed both misbehavior and use of force reports. (Dkt. No. No. 16–2 at 43–45; Dkt. No. 18 at 49–51 .) In the reports, Lawrence wrote that while he was supervising Cole's medication, Cole became violent and repeatedly screamed at Lawrence to show

himself to the Plaintiff. (Dkt. No. 16–2 at 43; Dkt No. 18 at 49.) As he entered the room to address the issue, he slipped and fell in a puddle of Ensure landing on his back left side. *Id.* Cole then pushed his tray table onto Lawrence striking the Defendant in the right shin. Lawrence scrambled to his feet and took control of the tray table and pushed it into Cole knocking him and his wheelchair over and onto the floor. *Id.* The misbehavior report charged Plaintiff with assault on staff and violent conduct. (Dkt. No. 16–2 at 43.) Cole was found guilty on both charges on November 8, 2010 and given 270 days in the SHU, 180 days without packages and commissary, and 12 months loss of good time. *Id.* at 44.

### B. Defendants Russin, Reese, and Paluck

Defendants Russin, Reese, and Paluck are all part of the medical staff at MCF. (Dkt. No. 16 at ¶¶ 28–30.) Plaintiff's claims against them relate to Defendant Griffith's alleged assault on October 29, 2010.

Defendant Russin is employed as a Registered Nurse at MCF and is charged with supervising the medical staff on her post and listing inmates' complaints. *Id.* at ¶ 28. In his Amended Complaint, Plaintiff has alleged that after he was assaulted by Griffith, he pressed his call button and Russin answered. *Id.* at ¶ 85. He informed Russin of what had taken place and told her he wanted to see Mary Shrimp ("Shrimp"), also a Registered Nurse at MCF, *id.* at ¶ 24, Defendant Szajer, the area supervisor, and Ms. Shatz, R.N., the Nurse Administrator at MCF. *Id.* According to Plaintiff, Russin said nothing and turned off Cole's call bell. *Id* . Cole also claims in conclusory fashion that Russin was part of a conspiracy to assault him, cover up the assault, and make false misbehavior reports against him. *Id.* at ¶ 95.

**\*7** Defendant Reese is a Licensed Practical Nurse at MCF, whose duties included making rounds and handing out the evening medicine. *Id.* at ¶ 29. Plaintiff has alleged that she would always try to give him the wrong medicine, drop his pills on the floor and do anything else to cause him pain. *Id.* at ¶ 79. According to Plaintiff, Reese was giving him medication at 9:35 p.m. on October 29, 2010 when Griffith came in and told her to leave before Griffith began assaulting Cole. *Id.* at ¶ 83. Cole claims that Reese was yelling "kill the nigger" from the next room while Griffith was choking him, and that she was part of a conspiracy to assault him, cover up the assault, and file false misbehavior reports. *Id.* at ¶¶ 83, 95.

Defendant Paluck is a nursing assistant at MCF, and her duties include assisting the nursing staff with washing and cleaning inmates who are unable to do it for themselves. *Id.* at ¶ 30. In his Amended Complaint, Plaintiff has alleged that Paluck came in with Reese and Griffith to give him his medicine and was told to leave the room before Griffith assaulted Cole. *Id.* at 83. Plaintiff claims to have seen Griffith and Paluck talking after the alleged assault, with Paluck saying that they had to get their story straight. *Id.* at ¶¶ 84–5. He maintains that Paluck was a part of a conspiracy to assault him, cover up the assault, and make false misbehavior reports. *Id.* at ¶ 95.

### C. Defendant Rabideau

Defendant Rabideau is Deputy Superintendent of Health at MCF and was the Acting Superintendent during the time period relevant to Plaintiff's Amended Complaint. (Dkt. No. 16 at ¶ 6.) Plaintiff claims that between September 6, 2010 and October 31, 2010 he sent many letters of complaint to Rabideau regarding Durante and Szajer's continued harassment and filing of false misbehavior reports against him, and she never responded. *Id.* at ¶ 73.

In a September 30, 2010 letter, Plaintiff complained to Rabideau of continuing harassment by Defendants Durante and Szajer and asked Rabideau to meet with Durante, Szajer, and Cole to find common ground to end the staff harassment and retaliation. (Dkt. No. 16–3 at 1–2.) According to Plaintiff, Rabideau did not respond to his letter. (Dkt. No. 16 at ¶ 70–2.)

In his October 1, 2010 letter to Rabideau, Plaintiff complained that Durante and Szajer were continuing to harass him, threaten assault, and file false misbehavior reports. (Dkt. No. 16–3 at 3–4.) In the letter, Cole faulted Rabideau and Defendant McCarthy for allowing the filing of false reports and turning a blind eye to Durante and Szajer's misconduct and asked why Rabideau never responded to his letters. *Id.* Cole complained that as long as Rabideau allowed Durante and Szajer's lies to continue, he would never get a break from keeplock and would never get his visiting privileges restored. *Id.*

In his October 4, 2010 letter to Rabideau, Plaintiff told her that Durante had spit in his face and hit him on the head with his keys. *Id.* at 5–6. He also complained again of the harassment and filing of false misbehavior reports

by Durante and Szajer and told Rabideau that her failure to answer his letters had given Durante and Szajer a green light to continue the harassment and false misbehavior reports. *Id.* Plaintiff closed by asking Rabideau to review the misbehavior reports fairly. *Id.*

**\*8** Rabideau responded to Plaintiff's October 4, 2010 letter on the same date with a short message saying that "I will personally be looking into your allegations of assault from CO Durante." [12] (Dkt. No. 16–3 at 26.) Plaintiff wrote to Rabideau upon receipt of her message informing her of the incident on October 3, 2010 where Durante had allegedly flipped Cole's wheelchair and kicked him. *Id.* at 20–21. Rabideau sent Plaintiff another message on October 8, 2010 advising him that "[w]e are looking into all of your requests to see what we can do." (Dkt. 16–3 at 27.)

Plaintiff wrote to Rabideau again on October 11, 2010. (Dkt. No. 16–3 at 22–25.) In that letter, Cole expressed his continuing concern over her failure to respond to his many letters advising her of the threats and continued harassment by Defendants Durante and Szajer. *Id.* at 23.

### D. Defendant McCarthy

As Deputy Superintendent of Security at MCF, McCarthy is in charge of the supervision and discipline of the correctional staff at the facility. [13] (Dkt. No. 16 at ¶ 7.) In addition to copying McCarthy on his October 1, 2010 and first October 4, 2010 letters to Rabideau, Plaintiff communicated directly with McCarthy concerning his difficulties with Durante, Szajer, Griffith, and Lawrence, among other staff members.

In his October 4, 2010 letter to McCarthy concerning Durante and Szajer's continued harassment, Cole claimed that two misbehavior reports filed by Durante had been Szajer's doing. (Dkt. No. 16–3 at 7–8.) On October 22, 2010, McCarthy sent Cole a memorandum responding to his claim that Durante had assaulted him on September 30, 2010. (Dkt. No. 16–3 at 28.) McCarthy advised him that the incident had been investigated, and that although there was no way for him to know for sure what had occurred, he had found inconsistencies in Cole's statements about it. *Id.* McCarthy also wrote "I would appreciate (sic) you write to me exclusively when you have issue with security staff. I am in the best position to address these issue. It serves no purpose to write to

Albany or the Superintendent without my having a chance to review the issue(s). We spoke briefly about this and I left with the sense that you understood where I was coming from." [14] *Id.*

On October 29, 2010, Plaintiff wrote to McCarthy to inform him of his allegations that Griffith had assaulted him on that date. *Id.* at 13–14. Cole indicated in the letter that he was giving notice to McCarthy first because he was in the best position to address the issues. *Id.* at 14. On November 3, 2010, McCarthy notified the Inspector General's Office of the alleged assaults on Plaintiff of October 29 and 31, 2010 and forwarded Plaintiff's letters to that office. (Dkt. Nos. 16 at ¶ 102 and 16–3 at 30.)

McCarthy sent Plaintiff a memorandum on November 29, 2010 (in response to a November 26, 2010 letter from Cole) accusing him of improperly using the grievance system in an adversarial manner, directing him to cease doing so, and assuring him that "disciplinary action will continue until you cease this form of harassment." (Dkt. No. 18–2 at 34.) On December 7, 2010, McCarthy sent Plaintiff another memorandum, this one in response to a December 6, 2010 letter from Cole, in which he wrote that he had found no evidence to support Plaintiff's many allegations of malfeasance by the security and medical staff and suggested that Cole was the problem. He recommended that Plaintiff make an effort to get along with staff. (Dkt. No. 18–1 at 59.)

### II. PROCEDURAL HISTORY

**\*9** Plaintiff filed his original Complaint in this action on September 14, 2010. [15] On November 16, 2010, Cole moved for leave to serve an amended and supplemental complaint adding new defendants and additional claims, including excessive force claims arising out of four alleged assaults by prison personnel. (Dkt. No. 11.) On March 23, 2011, Judge Mordue granted Plaintiff's motion to amend and designated Cole's proposed amended complaint adding fifteen new defendants and the new claims as the operative complaint in the action. (Dkt No. 11–1; Dkt. No. 15 at 4.) A week later, on March 30, 2011, Plaintiff moved to file a Verified Supplemental Affidavit of Truth and Appendix in Support of Affidavit of Truth ("Supplemental Affidavit and Appendix") in support of his claims. (Dkt. Nos. 18, 18–1, and 18–2.) The papers were accepted for filing by Magistrate Judge Lowe in an April 8, 2011 text order.

Defendants thereafter filed their Rule 12(b)(6) motion for partial dismissal of the Amended Complaint. (Dkt. No. 62.)

## III. ANALYSIS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

**\*10** Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572

F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y .2004) (considering factual allegations in plaintiff's opposition papers) (internal quotations and citations omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). [16]

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). An opportunity to amend is not required where the plaintiff has already amended the complaint. [17] *See Advanced Marine Tech., Inc. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

### B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. ¶ 1983 against all of the remaining Defendants in his Amended Complaint. (Dkt. No. 16 at ¶¶ 6–7, 19–20, 25, 27–30 .) I recommend the *sua sponte* dismissal of those claims. [18] The Eleventh Amendment protects a state against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state

agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against all individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity).

### C. Plaintiff's Retaliation Claims

**\*11** Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506.

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

### 1. Defendants Durante and Szajer

**\*12** In Plaintiff's September 27, 2010 grievance complaint against Defendant Szajer, he charged Szajer with harassment and threatening to file false misbehavior reports against Cole as long as he continued to write complaints. (Dkt. No. 18–2 at 37–38.) On September 28, 2010, Plaintiff wrote to Defendant Rabideau complaining of Durante and Szajer's continuing threats of assault. [19] (Dkt. No. 18 at ¶ 23.) In a September 30, 2010 letter to Rabideau, Cole asked her to set up a meeting with Defendants McCarthy, Durante, and Szajer to find some common ground to end the "Staff Harassment Retaliation Repraesel Lies Threats Tag team set up." (Dkt. No. 16–3 at 2.) In his October 1, 2010 letter to Rabideau, Cole complained again about Durante and Szajer's threats of

assault and filing of false misbehavior reports against him in retaliation for his grievance complaint. (Dkt. No. 16–3 at 3.)

According to Plaintiff's letter of October 4, 2010 to the Inspector Generals Office, on September 27, 2010, Szajer came into his room and told him that if he had to answer one more of Cole's grievance complaints he would kick it up a notch and harass him every day and write false misbehavior reports. In the same letter, Plaintiff wrote that Szajer had come to him in a threatening manner "telling me what he going to do, he kick my wheelchair as he stated Cole we will *ucking put you in the hospital on many machines and he Toney Szajer would just lie and say I attack him." (Dkt. No. 16–3 at 9.) In his letter of October 4, 2010 to Governor Patterson, Plaintiff wrote that Szajer came to him after Durante had spit in his face and hit him over the head with his keys, told him it would be like that when he filed a grievance complaint against him and proceeded to punch him in the chest and tell him to fight back because that is what he and Durante and other corrections officers wanted him to do so that they could take his life. (Dkt. No. 16–3 at 11.)

Durante allegedly assaulted Plaintiff on September 30, 2010, and on the same day filed a misbehavior report which resulted in Plaintiff being given 30 days in keeplock. (Dkt. No. 16 at ¶¶ 70–2; Dkt. No. 16–2 at 25–26.) Durante filed another misbehavior report on Cole on October 1, 2010, which resulted in an additional 30 days in keeplock. Plaintiff claims Durante assaulted him again on October 3, 2010. (Dkt. No. 16 at ¶ 74.) Plaintiff has asserted in his Supplemental Affidavit and Appendix that Szajer was present and was a participant in alleged assaults on September 30 and October 3, 2010. (Dkt. No. 18 at ¶ 26.)

Both the September 27, 2010 grievance complaint and Plaintiff's letters of complaint to Rabideau of September 28, September 30, and October 1, 2010 constitute constitutionally protected conduct.[20] *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right to file grievances is a constitutionally protected activity for retaliation purposes); *Decayette v. Goord,* No. 9:06–CV–783, 2009 WL 1606753, at *9, 2009 U.S. Dist. LEXIS 48151 (N.D.N.Y. June 8, 2009) (plaintiff's right to send a letter of complaint to a prison official was constitutionally protected activity).

*13 An assault by corrections officers is sufficient to "chill a person of ordinary firmness from continuing to engage in his First Amendment activity." *See Rivera v. Goord,* 119 F.Supp.2d 327, 339–40 (S.D.N.Y.2000). Likewise, the filing of a misbehavior report which results in an inmate being placed in keeplock for 30 days has been found sufficient to satisfy the second element of a retaliation claim. *See, e.g., Jeffrey v. Ahmed,* No. 9:09–CV–0327, 2011 WL 4390220, at *11, 2011 U.S. Dist. LEXIS 106607, at *33 (N.D.N.Y. Aug. 22, 2011).

I find that Plaintiff's allegations of a "tag team" approach of harassment, the filing of false misbehavior reports, threats, and assaults by Durante and Szajer make a sufficient factual showing that the two were acting in concert with respect to Plaintiff's retaliation claims. Moreover, the temporal proximity between Plaintiff's grievance complaint and letters of complaint and the alleged assaults and false misbehavior reports is sufficiently close to plausibly suggest a causal relationship. Therefore, I recommend that Defendants Durante and Szajer's motion to dismiss the Plaintiff's retaliation claims against them be denied.[21]

### 2. Defendant Griffith

In his Memorandum of Law, Plaintiff contends that Griffith assaulted him on October 29, 2010 in retaliation for his filing of grievance complaints # MHK11844–10 and # MHK11845–10 on October 4, 2010. (Dkt. No. 65 at 23.) However, those grievances relate to the alleged assaults on Plaintiff by Defendant Durante (and possibly Szajer) on September 30 and October 3, 2010, and were not directed against Griffith. (Dkt. No. 16–3 at 33–34.) There are no facts alleged in the Plaintiff's Amended Complaint supporting a causal connection between Plaintiff's filing of those grievance complaints against Durante and the alleged assault by Griffith, or suggesting that the protected conduct was a "substantial or motivating factor" in Griffith's alleged assault on Plaintiff. *See Mt. Healthy,* 429 U.S. at 287. Nor has Plaintiff identified any other protected conduct to which Griffith's alleged assault can be causally connected. Given the absence of adequate factual support to state a plausible retaliation claim against Griffith, I recommend that the claim be dismissed, without prejudice to Plaintiff's right to replead.

### 3. Defendant Lawrence

Defendant Lawrence's alleged assault of Plaintiff on October 31, 2010 was preceded by Cole's October 7, 2010 grievance complaint against Lawrence claiming that the Defendant had threatened and harassed Plaintiff by tampering with his food and filing false misbehavior reports. (Dkt. No. 16–3 at 33.) Cole claims that the October 31, 2010 assault was in retaliation for the October 7, 2010 grievance complaint. (Dkt. No. 65 at 23.) Filing of the grievance complaint was protected conduct, and the alleged assault constituted an "adverse action" against Plaintiff that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Rivera,* 119 F.Supp.2d at 339–340. Furthermore, the less than one month time period between the filing of the grievance and the alleged assault is sufficient to support an inference that Plaintiff's grievance complaint played a substantial part in the alleged assault. *See Espinal,* 558 F.3d at 129 (the passage of "only six months" is sufficient to support an inference of a causal connection). Therefore, I recommend that Lawrence's motion to dismiss Plaintiff's retaliation claim against him be denied.

### D. Plaintiff's Claim of Medical Indifference Against Defendant Russin

**\*14** The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–03. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer,* 511 U.S. at 825; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–6.

**\*15** Plaintiff claims that when he pressed his call bell following the alleged assault by Griffith on October 29, 2010 at approximately 9:35 and asked to see Nurse Shrimp, Szajer, and the Nurse Administrator, Defendant

Russin answered the call, said nothing, and turned off Cole's call bell. (Dkt. No. 16 at ¶¶ 82, 85 and 95.) The use of force report, submitted as an exhibit to Plaintiff's Amended Complaint, shows that Russin examined Cole at 10:30 p.m. that evening, approximately one hour after he pressed his call bell. (Dkt. No. 16–3 at 43.) At that time she observed "(1)1/ inch abrasion above bridge of nose (2) 1 x½ inch abrasion Rt. cheek (3) 3x4 inch pink area [left] chest (4) 1 x½ inch pink area below Rt ear (5) 3/4 x½ inch pink area below [left] ear." *Id.* The Report gives no indication that any treatment was administered to Cole by Russin. *Id.* Plaintiff's health provider progress notes reveal that at 12:50 a.m. on October 30, 2010, he asked C. Foosek to cleanse his abrasions. She cleansed the reddened/pink areas on his neck and cheeks with sterile water and cleansed and applied a bandage to a very small abrasion on Plaintiff's nose at his request. (Dkt. No. 65 at 5.)

Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith,* 316 F .3d at 185. Where, as in this case, a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

Plaintiff, who sustained only two small abrasions and three small pink areas in the alleged assault by Griffith, has failed to allege the plausible existence of a sufficiently serious medical condition of constitutional proportions as required to state claim for deliberate medical indifference under the Eighth Amendment. *Caiozzo,* 581 F.3d at 72 (plaintiff must show that he or she had a serious medical condition); *see also Jordan v. Fischer,* 773 F.Supp.2d 255, 261–2 (N.D.N.Y.2011) (superficial red marks were not sufficiently serious to meet the objective test for medical indifference); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 354 (N.D .N.Y.2010) (two bruises and a superficial laceration were not enough to satisfy the objective test for medical indifference); *Dallio v. Hebert,* 678 F.Supp.2d 35, 44 (N.D.N.Y.2009) (black eyes, bruising, lacerations, red spots, and kick marks did not constitute a serious medical need). Further, Cole has failed to allege that he was harmed by the approximately one hour delay from the time of the alleged assault until his examination

by Defendant Russin and the three hour delay in the receiving treatment for his minor injuries. *See, e.g., Martinez v. Lape,* No. 9:09–CV–0665 (TJM/RFT), 2011 WL 4527943, at *5, 2011 U.S. Dist. LEXIS 116106, at *15–16 (N.D.N.Y. Mar. 28, 2011) (dismissal for failure to state a claim proper where amended complaint contained insufficient factual support to show serious harm or serious risk of harm as a result of alleged delay in response time).

**\*16** Plaintiff's pleading deficiencies with regard to the objective element of a medical indifference claims warrant dismissal of his claim for deliberate indifference to his serious medical need by Defendant Russin.[22] I therefore recommend that Defendant Russin's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim be granted. Given the documented lack of seriousness of Plaintiff's alleged injuries, and the absence of harm from the delay in treatment, I also recommend that Cole be denied the right to replead his deliberate indifference claim against Defendant Russin. *See Cuoco,* 222 F.3d at 112 (an opportunity to amend is not required where a better pleading will not cure the substantive deficiencies in the complaint).

### E. Plaintiff's Claim of Deliberate Indifference to his Safety and Failure to Intervene Against Defendants Reese and Paluck

Plaintiff claims that Defendants Reese and Paluck's failure to intervene on his behalf when he was assaulted by Griffith constituted deliberate indifference to his safety. (Dkt. No. 65 at 20.) Both Reese and Paluck were in Cole's room with Griffith prior to the alleged assault on October 29, 2010. (Dkt. No. 16 at ¶ 83.) They left in a hurry when Griffith directed them to leave the room before the assault began. *Id.* However, according to Plaintiff, during the time Griffith was allegedly choking him, Reese was in the next room yelling "kill the nigger." *Id.*

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.,* 84 F.3d 614, 620 (2d Cir.1996), citing *Farmer,* 511 U.S. at 832. Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of*

*Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers). A state actor can be held liable for failure to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008), *aff'd,* 461 Fed.Appx. 18 (2012). The duty to intervene has been found applicable to prison nurses. *See Decayette,* 2009 WL 1606753, at * *3, 8, U.S. Dist. LEXIS 48127 (summary judgment denied on Eighth Amendment failure to intervene claim against a prison nurse who was alleged to have observed plaintiff being beaten by corrections officers); *see also Durham v. Nu'Man,* 97 F.3d 862, 868 (6th Cir.1996), *cert. denied,* 520 U .S. 1157 (1997) (summary judgment denied state hospital nurse who "stood idly by" and watched while plaintiff prisoner was beaten by corrections officers).

**\*17** I find that Plaintiff has alleged facts sufficient to state a plausible Eighth Amendment claim that Defendant Reese failed to intervene. Cole has alleged facts supporting a claim that there was a substantial risk that he would suffer serious harm at Griffith's hand for purposes of this motion. (Dkt. No. 16 at ¶¶ 82–84.) Moreover, Plaintiff has alleged in his Amended Complaint that rather than intervene or seek assistance for Plaintiff, Reese stood in the next room while he was being choked by Griffith and yelled "kill the nigger." *Id.* at ¶ 83. That allegation suggests that the Defendant was aware that there was a substantial risk that Cole would suffer serious harm, and she actively encouraged Griffith to inflict serious harm instead of taking reasonable measures to abate it. Therefore, I recommend that Defendant Reese's motion to dismiss be denied.

Plaintiff's Amended Complaint contains no factual allegations with regard to Defendant Paluck's actions from the time Griffith directed her to leave Cole's room until she allegedly told Griffith that they had to get their story straight after the claimed assault was over. *Id.* at ¶¶ 84–85. Given the absence of adequate factual support to state a plausible Eighth Amendment claim against

Paluck, including the absence of allegations as to her actions after she was ordered out of the room by Griffith and her knowledge concerning a risk of serious harm to Plaintiff, I recommend that Defendant Paluck's motion to dismiss Plaintiff's Eighth Amendment claim against her be granted. However, I recommend that Plaintiff be allowed to replead with regard to Paluck.

### F. Plaintiff's Pendent State Claims for Negligence and Assault and Battery

Defendants argue that Plaintiff's state law claims for negligence and assault and battery, presumably directed at Defendants Szajer, Durante, Griffith, and Lawrence, should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 62–1 at 7.) Defendants are correct. Section 24 provides as follows:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 532 N.Y.S.2d 57, 62 (1988). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*18** In 2009, the United States Supreme Court held that Correction Law § 24 is unconstitutional to the extent it precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S.729 (2009). However, the

courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at *21, 2012 U.S. Dist. LEXIS 39232, at *60 (N.D.N.Y. Feb. 28, 2012); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at *4–5, 2010 U.S. Dist. LEXIS 104641, at *15–16 (N.D.N.Y. Sept. 30, 2010); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *16, 2010 U.S. Dist. LEXIS 124737, at *47– 48 (N .D.N.Y. Sept. 29, 2010); *Crump v. Ekpe,* No. 9:07– CV–1331, 2010 WL 502762, at *18, 2010 U.S. Dist. LEXIS 10799, at *61 (N.D.N.Y. Feb. 8, 2010). For the reasons set forth in those decisions, I recommend that the Court dismiss Plaintiff's pendent state law claims in this case without leave to amend.

### G. Plaintiff's Conspiracy Claim Against Defendants Griffith, Szajer, Russin, Reese, and Paluck

In order to support a claim for conspiracy under 42 U.S.C. § 1983, "a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Hamilton v. Fisher,* No. 9:10–CV–1066 (MAD/RFT), 2012 WL 987374, at *12, 2012 U.S. Dist. LEXIS 39118, at *36 (N.D.N.Y. Feb. 29, 2012) (citing *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (citations and internal quotation marks omitted).

Plaintiff has alleged in conclusory fashion that on October 29, 2010 at 9:35 p.m. (the time at which Griffith allegedly assaulted Cole), a group of Defendants, including Griffith, Szajer, Russin, Reese, and Paluck, got together and "conspired to assault the Plaintiff and cover it the assault up and make false behavior reports." (Dkt. No. 16 at ¶ 95.) However, Plaintiff's Amended Complaint fails to set forth the factual details necessary to sustain a conspiracy claim—the existence of an agreement and meeting of the minds, including details of time, place, and the alleged effect of the conspiracy. *See Clayton v. City of Poughkeepsie,* No. 06 Civ. 4881 SCR, 2007

WL 2154196, at *5, 2007 U .S. Dist. LEXIS 55082, at *15–16 (S.D.N.Y. June 21, 2007). It contains no factual allegations indicating that the alleged parties to the conspiracy got together prior to the alleged assault by Griffith to plan or agree upon the assault, a cover up plan, or the filing of a misbehavior report, or that they took any steps in furtherance of any such plan prior to the assault.

**\*19** The only non-conclusory factual allegation made in support of Plaintiff's conspiracy claim is that Defendant Paluck commented to Griffith following the claimed assault that they needed to get their stories straight. (Dkt. No. 16 at ¶¶ 84–85.) A claim that parties conspired to conceal the truth about an incident after the fact does not by itself set forth a plausible conspiracy claim. *Clayton,* 2007 WL 2154196, at *5, 2007 U.S. Dist. LEXIS 55082, at *15–16. I therefore recommend that Plaintiff's claim for conspiracy be dismissed with leave to replead in accordance with the requirements for stating a conspiracy claim set forth herein.

### H. Plaintiff's Supervisory Liability Claims Against Defendants Rabideau and McCarthy

In a § 1983 action against a defendant in his or her personal capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*").

The Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations,

or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [23]

"*[R]espondeat superior* liability does not lie against corrections officers in Section 1983 actions" (*Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986)), and "[h]olding a position in a hierarchical chain of command, without more is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate ... a prison superintendent in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass,* 790 F.2d at 263.

### 1. Defendant Rabideau

**\*20** Plaintiff has alleged in his Amended Complaint that he sent a number of letters to Acting Superintendent Rabideau complaining that he was being harassed by Defendants Durante and Szajer, that they were filing false misbehavior reports against him and threatening to assault him, and that Durante actually did assault him on two occasions. (Dkt. No. 16–3 at 1–6, 23.) In his letters to Rabideau, Cole complained that by turning a blind eye to their alleged misconduct and failing to respond to his requests she had given Durante and Szajer a green light to continue that behavior. *Id.* at 3–6. In his Memorandum of Law, Plaintiff argues that he has stated a claim for supervisory liability against Rabideau because she would have had notice of staff misconduct complaints, grievances, and letters by virtue of the procedure for dealing with allegations of employee harassment of inmates set forth in the regulatory guidelines at N.Y.Comp.Codes.R. and Regs. tit. 7, § 701.8 (2010). [24] (Dkt. No. 65 at 25.)

The mere receipt of a grievance appeal, or in this case, the grievance itself, "does not suffice to place a supervisor on notice that a constitutional violation has occurred." [25] *Mandell v. Goord,* No. 9:06–CV–01478 (GTS/DEP), 2009 WL 3123029, at *13, 2009 U.S. Dist. LEXIS 90043, at *35–36 (N.D.N.Y. Sept. 29, 2009). Further, simply affirming the denial of a grievance is insufficient to confer personal responsibility on a defendant under § 1983. *See Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007). Nor can supervisory liability be established by an official's failure to respond to grievance letters or requests for investigations from prisoners. [26] *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citation and internal quotation marks omitted); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at *12, 2002 U.S. Dist. LEXIS 7067, at *43 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose respondeat superior liability.").

" 'On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at *13, 2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying Superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); [27] *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint."); *Ramos v. Artuz,* No. 00 Civ. 0149 LTS HBP, 2001 WL 840131, at *10, 2001 U.S. Dist. LEXIS 10327, at *24–28 (S.D.N.Y. July 25, 2001) (court found personal involvement where a supervisory official's involvement "went beyond merely the receipt of complaint letters" and letters contained detailed information that should have been acted upon).

**\*21** The only response Plaintiff received to his many complaint letters to Rabideau concerning Durante and Szajer were the two one sentence notes of October 4 and

8, 2010 letting Cole know that she would "personally be looking into [his] allegations of assault from CO Durante," and that "[w]e are looking into all of your requests to see what we can do." (Dkt. No. 16–3 at 26–27.) There are no allegations in Plaintiff's Amended Complaint suggesting that he heard anything further from Rabideau, that she ever followed through on looking into Cole's assault allegations or any of his other requests, or that she took any action with regard to Plaintiff's complaints or grievances.

Rabideau can not be held liable based solely on a failure to respond to Plaintiff's complaint letters and requests for investigations. See *Johnson,* 234 F.Supp.2d at 363. However, in this case, she did respond by telling Cole that she was going to get personally involved in looking into his assault claim against Griffith and that she would be looking into his other complaints as well. Liberally construing Plaintiff's Amended Complaint and its exhibits and interpreting them to raise the strongest arguments they suggest, Plaintiff has alleged a plausible claim that Rabideau became personally involved in Durant and Szajer's alleged excessive use of force and unconstitutional retaliatory conduct by failing to take steps to remedy the alleged wrongs after learning of them and informing Cole of her intent to become personally involved in investigating them. [28] See *Williams v. Smith,* 781 F.2d 319, 323 (2d. Cir1986) (supervisory official may be personally involved in a constitutional deprivation by failing to remedy a wrong after learning of it); *Muhammad v. Rabinowitz,* No. 11 Civ. 2428(HB), 2012 WL 1155098, at *5, 2012 U.S. Dist. LEXIS 49163, at *15–16 (S.D.N.Y. Apr. 6, 2012) (allegations that supervisory personnel were aware of the allegedly unconstitutional conduct and were "either grossly negligent in their supervision [of the personnel personally involved in the conduct], aware of violations and failed to remedy the wrong, deliberately indifferent or condoned the alleged unconstitutional conduct" were sufficient to state a claim under § 1983). Therefore, I recommend that Defendant Rabideau's motion to dismiss be denied.

### 2. Defendant McCarthy

I find that Plaintiff has also stated a claim against Defendant McCarthy under the second *Colon* prong. McCarthy was copied on Plaintiff's October 1, 2010 letter to Rabideau complaining of Durante and Szajer's alleged harassment, threats of assault, and false misbehavior

reports. (Dkt. No. 16–3 at 3–4.) In his October 4, 2010 letter to McCarthy, Plaintiff complained about two false misbehavior reports that had been filed by Durante, which were alleged by Cole to be Szajer's doing. The misbehavior reports presumably are those filed by Durante on September 30 and October 1, 2010, each of which resulted in the imposition of a sentence of thirty days in keeplock. (Dkt. Nos. 16–2 at 22–26.)

*22 The submissions considered on this motion suggest that McCarthy was actively involved in investigating and acting upon Plaintiff's complaints concerning Durante and Szajer. On October 22, 2010 McCarthy informed Plaintiff that the alleged September 30, 2010 assault by Durante had been investigated, and that although there was no way to be certain what had actually happened, McCarthy had found inconsistencies in Plaintiff's statements. (Dkt. No. 16–3 at 28.)

In his October 22, 2010 memorandum, McCarthy asked Cole to write exclusively to him when he had issues with security staff, raising an inference that McCarthy not only intended to be personally involved in addressing Plaintiff's complaints that Durante and Szajer had violated his constitutional rights by using excessive force and filing false misbehavior reports, but that he wanted to maintain control over any investigation conducted of the claims. [29] *Id.* On November 29, 2010, a month after Griffith and Lawrence allegedly assaulted Plaintiff, McCarthy threatened Cole with disciplinary action if he continued using the grievance system in an adversarial manner. (Dkt. No. 18–2 at 34.)

McCarthy's December 7, 2010 memorandum to Plaintiff indicating that his investigation had uncovered no malfeasance by the security and medical staffs and concluding that Cole was the problem further reveals his personal involvement and, along with his other communications with Plaintiff, provide a plausible factual basis for denying his motion to dismiss. (Dkt. No. 18–1 at 59.) See *Bourgoin v. Weir,* No. 3:10cv391 (JBA), 2011 WL 4435695, at *5, 2011 U.S. Dist. LEXIS 108778, at *14 (D.Conn. Sept. 23, 2011) ("[a] supervisor's response to a prisoner's grievance or complaint that attempt[s] to defend or explain alleged constitutional violations is sufficient to establish the personal involvement of that supervisor.") (citation and internal quotation marks omitted); *Walker,* 2002 WL 664040, at *13, 2002 U.S. Dist. LEXIS 7067, at *47 (grievances or other inmate

complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement".); *Johnson,* 234 F.Supp.2d at 363 (personal involvement where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint). I therefore recommend that Defendant McCarthy's motion to dismiss be denied.

### I. Defendants' Motion for a More Definite Statement

Defendants have moved for a more definite statement pursuant Federal Rule of Civil Procedure 12(e) in the event the Court does not grant their motion for partial dismissal of the Plaintiff's Amended Complaint. Rule 12(e) permits the filing of a motion for a more definite statement "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Requests for a more definite statement are generally disfavored and should not be granted unless "the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Holmes v. Fischer,* 764 F.Supp.2d 523, 531 (W.D.N.Y.2011) (citation and internal quotations omitted). Plaintiff's Amended Complaint is neither so vague nor so ambiguous as to be unintelligible, and Defendants will not be prejudiced by having to answer whatever allegations remain after determination of their motion to dismiss. Moreover, to the extent Plaintiff's Amended Complaint may be deemed to be vague or ambiguous, Defendants have the benefit of the numerous exhibits to the Amended Complaint and the clarifying materials that Plaintiff submitted in his opposition to their motion to dismiss. (Dkt. Nos. 16–2, 16–3,65, and 69.) In light of the foregoing, Defendants' motion for a more definite statement is denied.

**\*23 WHEREFORE,** it is hereby

**RECOMMENDED** that Defendants' motion for partial dismissal of the Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ( Dkt. No. 62) be ***GRANTED IN PART AND DENIED IN PART.*** Specifically, I recommend the partial dismissal of Plaintiff's Amended Complaint as follows:

1. Dismissal by Plaintiff's consent as to the claims against Defendants DOCS, Brian Fischer, Jack McDaniel, Albert Prack, Jeffrey St. Louis, Edward Dauphin, R. Judway,

M.J. Cappadonia, R.J. Miller, S. Purdy, C. Cucharale, H. Smith, T. Meachum, J. Mecca, D. Ashe, Debora Kinderman, A. Papaleo, Judy Palmer, C. Vail, Ted Vauss, Mary Shrimp, and Renna Piecce, without leave to amend;

2. Dismissal on abandonment grounds of all claims arising out of or related to the July 2, 2010 Tier III inmate misbehavior report against Plaintiff and the hearing held in connection with the report, without leave to amend;

3. Dismissal on abandonment grounds of all claims arising out of Defendant Rabideau's alleged failure to review the denials of Plaintiff's SHU confinement reviews in a fair manner, and Rabideau and Defendant McCarthy's denial of his requests for restoration of his visiting privileges, without leave to amend;

4. The *sua sponte* dismissal on Eleventh Amendment grounds of all claims seeking money damages that have been asserted against the Defendants in their official capacities, without leave to amend;

5. Dismissal of Plaintiff's First Amendment retaliation claim against Defendant Griffith, with leave to amend;

6. Dismissal of Plaintiff's Eighth Amendment claim for deliberate indifference to his medical needs against Defendant Russin, without leave to amend;

7. Dismissal of Plaintiff's Eighth Amendment claim for deliberate indifference to his safety and failure to intervene against Defendant Paluck, with leave to amend;

8. Dismissal of Plaintiff's state law claims for assault and battery and negligence, without leave to amend; and

9. Dismissal of Plaintiff's § 1983 conspiracy claim against Defendants Griffith, Szajer, Russin, Reese, and Paluck, with leave to amend; and it is further

**RECOMMENDED** that Defendants' motion for partial dismissal be **DENIED** as to: Plaintiff's (1) First Amendment claim for retaliation against Defendants Durante, Szajer, and Lawrence; (2) Eighth Amendment claim against Defendant Reese for deliberate indifference to Plaintiff's safety and failure to intervene; and (3) claims against Defendants Rabideau and McCarthy for their alleged failure to remedy the alleged violation of Plaintiff's rights under the First and Eighth Amendments after

learning of those violations through Plaintiff's letters of complaint; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Amended Complaint that relate to the claims on which dismissal is denied as well as Plaintiff's claims for excessive force that were excepted by Defendants from their motion to dismiss; and it is hereby

**\*24 ORDERED** that Defendants' request for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* Roldan v. Racette, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4491825

---

Footnotes

1   On April 1, 2011, after the commencement of this lawsuit, the New York State Department of Correctional Services and the Division of Parole merged into one comprehensive agency entitled the New York State Department of Corrections and Community Supervision. Because all of the events relevant to this case occurred prior to the merger, I will refer to the Defendant agency as "DOCS."

2   S. Purdy was not included as a defendant in the caption of the Amended Complaint, as he had been in the original Complaint. However, he was identified as a defendant in the body of the Amended Complaint. (Dkt. No. 16 at ¶ 11.)

3   None of the claims in Plaintiff's Amended Complaint that arose out of, or are related to, the July 2, 2010 Tier III inmate misbehavior report and hearing held in connection with the report have been included in Cole's list of remaining claims and, with the exception of Rabideau and McCarthy, this action has been dismissed as against the Defendants allegedly involved in those claims. (Dkt. No. 65 ¶¶ 2, 9.) Furthermore, Plaintiff has not addressed the claims in his Memorandum of Law. *Id.* at 12–31. Plaintiff has likewise elected not to include any claims that might be have arisen out of Rabideau's alleged failure to review the denials of his SHU confinement reviews in a fair manner, and Rabideau and McCarthy's denial of his requests for restoration of his visiting privileges among the claims he intends to pursue. Nor has Cole argued against dismissal of those claims in his Memorandum of Law. *Id.* at ¶¶ 2 & 9; (Dkt. No. 16 at ¶¶ at107–110; Dkt. No. 16–2 at 27–35, 46–49; Dkt. No. 65 at 12–31). Given Plaintiff's clear showing of intent not to pursue claims arising out of the July 2, 2010 Tier III Inmate Misbehavior Report and the hearing on the Report, the review of the denials on his SHU confinement reviews, and the denial of his requests for restoration of visiting privileges, I have not addressed the sufficiency of those claims in this Report–Recommendation and recommend that they be dismissed as abandoned by Plaintiff.

   In his Memorandum of Law in opposition, Plaintiff has indicated his intent to pursue supervisory liability claims against Defendants Ann Rabideau and Stephen McCarthy. (Dkt. No. 65 at 3, 25–26.) In addition, Cole's Memorandum of Law appears to leave open the possibility that he intends to pursue his state law claims for negligence and assault and battery. *Id.* at 2–4. Because Plaintiff has made arguments in support of his claims for supervisory liability and negligence, assault and battery in his Memorandum of Law, I am assuming for purposes of this motion that he does not intend to abandon them even though they were not included in his list of remaining claims. Furthermore, inasmuch as Plaintiff's Amended Complaint includes allegations of conspiracy against some of the remaining Defendants that relate to claims he intends to pursue, Cole's allegations of conspiracy are addressed herein as well.

4   In their letter brief in reply to Plaintiff's opposition, Defendants also advised the Court that they were withdrawing their motion to dismiss on qualified immunity grounds without prejudice. (Dkt. No. 68 at 2.) Since Defendants did not pursue dismissal on qualified immunity grounds in their initial motion papers, there was nothing to withdraw. (Dkt. 62–1 at 1–26.)

5   Plaintiff's Amended Complaint contains an extra paragraph 70 (located between paragraphs 72 and 73 on page 19), which is referred to herein as Paragraph 70–2.

6   Plaintiff has not included copies of his two October 4, 2010 Grievance Complaints as exhibits to his Amended Complaint (Dkt. No. 16), his opposition papers (Dkt. No. 65), or in the Appendix to his Supplemental Affidavit of Truth. (Dkt. Nos.

18–1, and 18–2.) He has, however, submitted the denials from which it is apparent that both arose out of the incidents with Durante that had occurred on September 30, 2010 and October 3, 2010. (Dkt. No. 16–3 at 33–34.)

7    Plaintiff also claims that Szajer was present for the alleged assault by Durante on September 30, 2010 in his October 24, 2011 unverified surreply to Defendants' October 13, 2011 reply letter. (Dkt. No. 69 at 1.)

8    In his October 4, 2010 letter to the Inspector General's Office, Plaintiff claimed that Szajer had come to him in a threatening manner, kicked his wheelchair, and said "we will *ucking put you in the hospital on many machines" and then lie and say that Cole had attacked him. (Dkt. No. 16–3 at 9.) In his letter of the same date to Governor Patterson, Plaintiff maintained that Szajer came to him after Durante had spit at him and hit him with the keys and told him it would be like that when he filed a grievance complaint against Szajer and proceeded to punch him in the chest and tell him to fight back because that is what Szajer and Durante and other corrections officers wanted him to do so that they could take his life. (Dkt. No. 16–3 at 11.) Plaintiff said the same thing in an October 4, 2010 letter to the Chair of the New York State Commission of Correction. (Dkt. No. 16–3 at 15.)

9    Cole described the alleged assault by Griffith in an October 29, 2010 letter to Defendant McCarthy. (Dkt. No. 16–3 at 35–36.)

10   It appears that the guilty findings may have been reversed by the Central Office Review Committee on December 8, 2010. (Dkt. No. 18–1 at 1.)

11   The Grievance Complaint itself is not among the papers filed by Plaintiff. However, it appears from the denial of the Grievance that Lawrence was the subject. (Dkt. No. 16–3 at 33.)

12   Rabideau's message of October 4, 2010 indicates that it is in response to Plaintiff's correspondence of October 4, 2010 and September 28, 2010. Plaintiff's Amended Complaint does not contain any allegations regarding a letter of September 28th nor has the letter been included with any of his submissions. However, in his Supplemental Affidavit and Appendix, Plaintiff has described the letter as addressing Durante and Szajer's continued threats of assault. (Dkt. No. 18 at ¶ 23.)

13   In the capacity of Acting Superintendent, McCarthy also denied Plaintiff's Grievance Complaints MHK 11844–10 and MHK 11845–10 against Durante and Szajer, and MHK 11849–10 against Lawrence on October 27, 2010. (Dkt. No. 16–3 at 32–34.)

14   McCarthy's request may have been in response to Plaintiff's letters to the Inspector General's Office, former Governor Paterson, and the State Commission of Correction on the subject of Durante and Szajer's harassment, and Durante's alleged assaults. (Dkt. No. 16–3 at 9–12, 17–19.)

15   Plaintiff's original Complaint named only sixteen defendants and focused largely on his claims regarding the manner in which the hearing and appeal on the Tier III misbehavior report that had been filed against him on July 2, 2010 had been handled, including allegations of forgery, conspiracy, and cover-up relating to an envelope that was relevant to the charges against him. (Dkt. No. 1.) As previously noted, Plaintiff is no longer pursuing those claims. *See* p. 4, n. 3, *supra.*

16   In addition to Plaintiff's Amended Complaint and exhibits, I have considered his Affirmation in opposition with exhibits (Dkt. No. 65) and his Supplemental Affidavit and Appendix on Defendants' motion to dismiss. (Dkt. Nos. 18, 18–1, and 18–2.) Plaintiff filed an original Affidavit of Truth with Appendix as an exhibit to his original Complaint. (Dkt. No. 1–2; Dkt. No. 16 at.) The Supplemental Affidavit and Appendix, as previously noted, was not filed as an exhibit to Cole's Amended Complaint but rather a week after the District Court had issued an Order accepting the Amended Complaint as the operative pleading in the case. (Dkt. No. 15.) Plaintiff's Supplemental Affidavit and Appendix was served on counsel for the Defendants at the time it was filed. (Dkt. No. 18 at 33.)

     Giving consideration to the Supplemental Affidavit and Appendix is particularly appropriate in this case where: (1) Plaintiff has actual notice of, and clearly relied upon, their contents in drafting his Amended Complaint and specifically asked the Court to review them (Dkt. No. 18 at ¶ 66) (*see Chambers,* 282 F.3d at 153; *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960 (1992)); and (2) Defendants have themselves requested that a document in the Appendix be considered in support of their motion without converting it to a motion for summary judgment. (Dkt. No. 62–1 at 11, n. 4.)

17   In his Amended Complaint, Plaintiff has added new party defendants and claims not included in his original Complaint. (Dkt. Nos. 1 and 16.) Because the claims Plaintiff has elected to continue to pursue were for the most part first asserted in the Amended Complaint and are largely against newly named defendants, I have treated the Amended Complaint as Cole's initial pleading for purposes of considering whether leave to amend should be given.

18   Defendants did not seek dismissal of the official capacity claims for money damages asserted against them in their motion to dismiss. However, the District Court is empowered to dismiss the claims *sua sponte* pursuant to 28 U.S.C. §§ 1915(e) (2)(B)(iii). *See Johnson v. Enu,* No. 08–CV–158, 2011 WL 3439179, at *7, 2011 U.S. Dist. LEXIS 86831, at *19 (N.D.N.Y. July 13, 2011). The *sua sponte* dismissal is limited to claims for money damages and does not include any claims for

prospective injunctive relief Plaintiff may be asserting against any of the Defendants in their official capacities. *See Ex parte Young,* 209 U.S. 123, 155–156 (1908) (allowing prospective injunctive relief in certain circumstances in official capacity suits brought under section 1983).

19      Although it is not included among Plaintiff's submissions, Rabideau referenced the September 28, 2010 letter in her October 4, 2010 note to him. (Dkt. No. 16–3 at 26.)

20      Plaintiff also commenced this lawsuit, another constitutionally protected activity, prior to the alleged assaults. *See, e.g., Allah v. Malenski,* No. 04–CV–0912A(Sr), 2010 WL 2403098, at *9, 2010 U.S. Dist. LEXIS 51776, at *24 (S.D.N.Y. June 10, 2010) (prisoners have a constitutional right of access to the courts and may not be retaliated against by prison officials for exercising that right). Szajer was named as a defendant in Cole's original complaint.

21      Durante also filed misbehavior reports against Plaintiff on each of the two days after Cole had filed his October 4, 2010 grievance complaint against him with respect to the alleged assaults. (Dkt. No 16–2 at 13–15 and 19–21; Dkt. No. 16–3 at 33.) Cole was found guilty in both cases, and the punishment for the first was 30 days loss of radio and for the second was 6 days loss of packages, commissary, earphones/radio, and good time. (Dkt. No. 16–2 at 14 and 20.) With the possible exception of the loss of good time, the punishments were likely not serious enough to deter a person of ordinary firmness from exercising his constitutional rights. *Gill,* 389 F.3d at 381; *see also Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006) (The filing of misbehavior reports that result in a "temporary loss of various privileges such as permission to visit the commissary do not constitute adverse action because they are *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights.").

22      It is also doubtful that Plaintiff set forth sufficient factual matter to state a claim with regard to the subjective element of an Eighth Amendment claim for relief for deliberate indifference to serious medical needs, since he has not alleged facts which would allow me to infer more than the mere possibility that Russin "was aware of facts from which the inference could be drawn that [Cole] had a serious medical need," and that she "actually drew that inference." *Chance,* 143 F.3d at 702–03. However, since in order to state a plausible medical indifference claim Plaintiff must include sufficient factual matter as to both the objective and subjective elements of the claim, it is not necessary for me to make that determination.

23      The Supreme Court's decision in *Ashcroft,* 556 U.S. 662 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y .2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

24      N.Y.Comp.Codes.R.and Regs. tit. 7, § 701.8(b) requires that all documents submitted with grievances alleging harassment be forwarded to the superintendent by the close of business on the date of filing. Under § 701.8((d) and (f), if the superintendent determines that it is a true case of harassment, he or she must render a decision on the grievance within twenty-five days. If the superintendent determines that the grievance does not present a bona fide harassment issue, it is returned to the IGRC for normal processing. § 701.8(c).

25      Supervisors are permitted to delegate responsibility for handling grievances to subordinates and may properly rely on the subordinate's determination. *Burns v. Trombly,* 624 F.Supp.2d 185, 205 (N.D.N.Y.2008). In this case, Plaintiff's appeals from grievance complaints MHK 11844–10, MHK 11845–10, and MHK 11849–10 were decided by Defendant McCarthy as Acting Superintendent. (Dkt. No. 16–3 at 32–34.)

26      "It is well established ... that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate, or respond to a prisoner's grievance does not in itself give rise to a constitutional claim." *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008) (citing cases). *See also Groves,* 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *24 (inmates do not have a constitutional right to an investigation of any kind by the government) (citation omitted).

27      In *Walker,* the Superintendent whose motion for summary judgment was denied had responded to the plaintiff's grievance by informing him that it "was unsubstantiated based upon information received during investigation" *Id.,* 2002 WL 664040, at * 13, 2002 U.S. Dist. LEXIS 7067, at * 46–47.

28      It may ultimately turn out that Rabideau delegated responsibility for investigating Plaintiff's complaints about Durante and Szajer to Defendant McCarthy since he is the one who appears to have investigated the complaints and informed Cole that he had found no wrongdoing by the corrections staff. (Dkt. No. 16–3 at 28.) If she did, Rabideau could properly rely on McCarthy's determination. *Burns,* 624 F.Supp.2d at 205. However, at this point, Rabideau's memo assuring Plaintiff that she was going to personally look into his complaints is sufficient to state a claim.

29      McCarthy's October 22, 2010 memorandum containing his conclusions with regard to the alleged assault by Durante and his request that Cole write only to him on staff issues predated the alleged assaults by Griffith and Lawrence by

approximately a week, arguably raising an inference that the corrections staff at MCF, including Griffith and Lawrence, may have been led to believe that there would be no consequences for unconstitutional conduct towards Plaintiff.

---

**End of Document**                                 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4506010
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie COLE, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES ("DOCS"); Brian
Fischer, DOCS Commissioner; Ann Rabideau,
First Deputy Superintendent for Health, Mohawk
Correctional Facility; Stephen McCarthy, Deputy
Superintendent of Security, Mohawk Correctional
Facility; Jack McDaniel, Deputy Superintendent
of Programs, Mohawk Correctional Facility; Albert
Prack, Acting Director, DOCS Special Housing/
Inmate Discipline; Jeffrey St. Louis, Captain,
Mohawk Correctional Facility; S. Purdy, Correction
Officer, Mohawk Correctional Facility; Judy Palmer,
Inmate Records Clerk, Mohawk Correctional
Facility; Tony Szajer, Sgt., Mohawk Correctional
Facility; D. Ashe, Inmate Grievance Coordinator,
Mohawk Correctional Facility; Deborah Kinderman,
Supervising Correction Counselor, Mohawk
Correctional Facility; A. Papaleo, Correction
Counselor, Mohawk Correctional Facility;
Edward Dauphin, Captain, Mohawk Correctional
Facility; R. Judway, Lieutenant, Mohawk
Correctional Facility; M.J. Cappadonia, Lieutenant,
Mohawk Correctional Facility, Defendants.

No. 9:10–CV–1098 (NAM/TWD).
|
Sept. 28, 2012.

**Attorneys and Law Firms**

Ronnie Cole, Rome, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Kevin P. Hickey, Esq., Assistant New York
State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, District Judge.

**\*1** In this *pro se* inmate civil rights action under 42
U.S.C. § 1983, defendants move (Dkt. No. 62) for an order
dismissing all causes of action in the amended complaint,
except the excessive force claims, or for an order directing
plaintiff to file a more definite statement. Upon referral
pursuant to 28 U.S.C. § 636(b) (1)(B) and Local Rule
72.3(c), United States Magistrate Judge Thérèse Wiley
Dancks has issued a Report–Recommendation and Order
(Dkt. No. 71) recommending that defendants' motion be
granted in part and denied in part. Magistrate Judge
Dancks ordered that defendants' request for a more
definite statement pursuant to Federal Rule of Civil
Procedure 12(e) be denied.

Plaintiff objects (Dkt. No. 73) to only one aspect
of the Report–Recommendation and Order, *i.e.,* the
recommendation that this Court dismiss plaintiff's
pendent state-law personal-capacity claims against
employees of the Department of Corrections and
Community Services ("DOCCS"). Pursuant to 28 U.S.C.
§ 636(b)(1) (C), this Court reviews *de novo* those parts
of a report and recommendation to which a party
specifically objects. The Court has reviewed Magistrate
Judge Dancks' analysis of the legal issue involved as well
as plaintiff's objection. The Court agrees with Magistrate
Judge Dancks' conclusion that the Supreme Court's
decision in *Haywood v. Drown,* 556 U.S. 729 (2009), does
not affect the question of district courts' jurisdiction to
hear pendent state law claims against DOCCS employees,
and that therefore such claims are properly dismissed as
barred by section 24 of New York Correction Law. *See,
e.g., O'Diah v. Fischer,* 2012 WL 987726, *21 (N.D.N.Y.
Feb. 28, 2012);* *Tafari v. McCarthy,* 714 F.Supp.2d 317,
384 (N.D.N.Y.2010). Therefore, upon *de novo* review of
the issue to which plaintiff objects, and review of the
balance of the Report–Recommendation and Order for
plain error or manifest injustice, the Court adopts the
Report–Recommendation and Order in its entirety.

It is therefore

ORDERED that the Report–Recommendation and
Order (Dkt. No. 71) is accepted; and it is further

ORDERED that defendants' motion (Dkt. No. 62) for
partial dismissal for failure to state a claim is granted in
part and denied in part as follows:

Partial dismissal is granted as follows:

1. Dismissal is granted by Plaintiff's consent as to all claims against Defendants DOCS, Brian Fischer, Jack McDaniel, Albert Prack, Jeffrey St. Louis, Edward Dauphin, R. Judway, M.J. Cappadonia, R.J. Miller, S. Purdy, C. Cucharale, H. Smith, T. Meachum, J. Mecca, D. Ashe, Debora Kinderman, A. Papaleo, Judy Palmer, C. Vail, Ted Vauss, Mary Shrimp, and Renna Piecce, without leave to amend;

2. Dismissal is granted on abandonment grounds of all claims arising out of or related to the July 2, 2010 Tier III inmate misbehavior report against Plaintiff and the hearing held in connection with the report, without leave to amend;

3. Dismissal is granted on abandonment grounds of all claims arising out of Defendant Rabideau's alleged failure to review the denials of Plaintiff's SHU confinement reviews in a fair manner, and Rabideau and Defendant McCarthy's denial of his requests for restoration of his visiting privileges, without leave to amend;

 **\*2** 4. Sua sponte dismissal is granted on Eleventh Amendment grounds of all claims seeking money damages that have been asserted against the Defendants in their official capacities, without leave to amend;

5. Dismissal is granted of plaintiff's First Amendment retaliation claim against defendant Griffith, with leave to amend;

6. Dismissal is granted of Plaintiff's Eighth Amendment claim for deliberate indifference to his medical needs against Defendant Russin, without leave to amend;

7. Dismissal is granted of Plaintiff's Eighth Amendment claim for deliberate indifference to his safety and failure to intervene against Defendant Paluck, with leave to amend;

8. Dismissal is granted of Plaintiff's state law claims for assault and battery and negligence, without leave to amend; and

9. Dismissal is granted of Plaintiff's § 1983 conspiracy claim against Defendants Griffith, Szajer, Russin, Reese, and Paluck, with leave to amend.

Partial dismissal is denied as follows:

1. Dismissal is denied of plaintiff's first amendment claim for retaliation against defendants Durante, Szajer, and Lawrence;

2. Dismissal is denied of plaintiff's Eighth Amendment claim against defendant Reese for deliberate indifference to plaintiff's safety and failure to intervene; and

3. Dismissal is denied of plaintiff's claims against defendants Rabideau and McCarthy for their alleged failure to remedy the alleged violation of plaintiff's rights under the First and Eighth Amendments after learning of those violations through plaintiff's letters of complaint;

and it is further

ORDERED that defendants are directed to answer those allegations in plaintiff's amended complaint that relate to the claims on which dismissal is denied as well as his claims for excessive force (against Durante, Szajer, Griffith, and Lawrence) that were excepted by defendants from their motion to dismiss; and it is further

ORDERED that the following defendants remain in the case: Durante, Szajer, Lawrence, Reese, Rabideau, McCarthy, and Griffith; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this Memorandum–Decision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4506010

2010 WL 1257858
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth C. GROVES, Sr., Plaintiff,
v.
The State of NEW YORK, et al., Defendants.

Civil Action No. 9:09–CV–0412 (GLS/DEP).
|
March 1, 2010.

West KeySummary

1    **Searches and Seizures**
     👉 Skin, Strip, and Body Searches

     A civilly committed sex offender failed to state
     a § 1983 claim against a psychiatric center
     arising out of an attempted strip search. The
     offender refused a request that he submit
     to a strip search and as a result no strip
     search was conducted, and the mere request
     for the offender to submit to the search did
     not constitute a Fourth Amendment violation
     because the offender could have consented
     to the search. U.S.C.A. Const.Amend. 4; 42
     U.S.C.A. § 1983.

     Cases that cite this headnote

**Attorneys and Law Firms**

Kenneth C. Groves, Sr., Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Christina L. Roberts–Ryba, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Kenneth C. Groves, Sr., a former New
York State prison inmate who is currently confined in
the Central New York Psychiatric Center ("CNYPC"
or "Center") in Marcy, New York, has commenced this
action pursuant to 42 U.S.C. § 1983 complaining of civil
rights violations. In his complaint, plaintiff chronicles
events that followed his refusal to submit to a strip search
ordered by CNYPC officials, alleging that as a result of
his failure to consent to the search he was denied food and
medication and was reduced to a lower standing at the
facility without due process of law. Plaintiff's complaint
seeks compensatory damages in the amount of $10 million
as well as declaratory and injunctive relief.

Presently before the court is defendants' motion to dismiss
plaintiff's complaint on the grounds that plaintiff has
failed to state a claim upon which relief may be granted
or allege sufficient personal involvement of certain
of the defendants, including Michael Hogan, Donald
Sawyer, and Jeff Nowicki, in the offending conduct.
Defendants also assert that their entitlement to both
Eleventh Amendment and qualified immunity from suit
as a further grounds for dismissal.[1] Having carefully
considered defendants' motion, which plaintiff has not
opposed, I recommend dismissal of all claims against the
State of New York, the CNYPC, and the New York State
Office of Mental Health ("OMH"), with prejudice, and
that all other claims set forth in plaintiff's complaint be
dismissed but with leave to replead.

I. *BACKGROUND* [2]

Although not explicitly stated in his complaint, it appears
that plaintiff is and was at the relevant times a former
New York State prison inmate involuntarily committed
to the CNYPC for the purpose of undergoing sex
offender treatment. *See generally* Complaint (Dkt. No.
4). According to publically available information, plaintiff
was released by the New York State Department of
Correctional Services ("DOCS") "to another agency" on
June 18, 2008.[3]

The circumstances surrounding plaintiff's claims were set
in motion on February 2, 2009 when he and other residents
of his ward were ordered to submit to a strip search based
upon a suspicion that one or more of them possessed a
controlled substance. Complaint (Dkt. No. 1) § 7 ¶¶ A–C.
Plaintiff as well as six other patients involved refused to

comply with that directive and instead asked to speak with someone of authority concerning the matter. *Id.*

As a result of that request defendant Charmaine Bill, the Treatment Team Leader for the ward, and Dr. Teri Maxymillian, the Sex Offender Treatment Program ("SOTP") Director, were summoned. *Id.* Upon their arrival at the scene the two Center employees ordered the seven residents to cooperate, indicating that if they did not the New York State Police would be called for the purpose of conducting a forcible strip search of each of them. *Id.* At that time, defendant Maxymillian explained that the search was warranted due to the suspicion that one or more patients possessed a controlled substance and that the residents would not be permitted to call their attorneys until they consented to the requested search. *Id.*

**\*2** During the ensuing hours the plaintiff and the other non-consenting patients were monitored and restricted in their ability to use restroom facilities. Complaint (Dkt. No. 1) § 7 ¶¶ D–F. The defiant patients' suggestion that they be permitted to submit to a pat frisk and drug screening in lieu of a strip search was rejected by defendants Maxymillian and Bill. *Id.* In the interim, plaintiff and the other six residents were detained in the facility dining room. *Id.*

At approximately 8:25 p.m. on that same day plaintiff was informed that he would be placed in an empty room for the evening. Complaint (Dkt. No. 1) § 7 ¶ I. A few moments later, at 8:45 p.m., Groves was offered his evening snack; he refused to accept it, however, stating doctor's orders required that it be given to him between 7:00 and 7:30 p.m. pursuant to doctor's orders and that he would be unable to sleep if he consumed it at that late hour. *Id.* § 7 ¶ J. Plaintiff also declined medication offered to him by the ward nurse at 9:15 p.m., claiming that he was too frightened to come out of the room to retrieve it. *Id.* § 7 ¶ K.

On February 4, 2009, the plaintiff refused his breakfast, which was brought to the room in which he was being held, but inquired concerning his medication.[4] Complaint (Dkt. No. 1) § 7 ¶ (L–M). As of 9:30 a.m. plaintiff still had not received his morning medication or been afforded the opportunity to contact his attorney, although his medication was ultimately provided at approximately 10:05 a.m. on that morning.[5] *Id.* § 7 ¶ (N–O). While plaintiff did accept his afternoon medication, he refused lunch. *Id.* § 7 ¶¶ (Q–R).

After submitting to a drug screening test, the results of which were negative, plaintiff was permitted to return to his room at or about 8:30 p.m. on February 4, 2009. The next day, plaintiff was informed by his primary therapist, Mr. Morren, that in light of his refusal to submit to a strip search he "was being taken off AP status and dropped back to MOD status".[6] *Id.* § 7 ¶ Z. In light of that development, Groves advised officials at the Center that he would not participate in therapy sessions until he was returned to AP status. *Id.*

Plaintiff complained of defendants' allegedly unlawful action through various channels. Groves submitted a resident's request for an individual session with both his primary therapist at the time, James J. Carroll, and with defendant Bill. *See* Complaint (Dkt. No. 1) § 4(b). Plaintiff also alleges to have mailed a "Residents [sic] Concer[n] Form" detailing the facts of his "concerns and complaints" to defendant Maxymillian. *Id.* In addition, the plaintiff sent a "detailed letter of concern" to defendant Sawyer, the Executive Director of the CNYPC, both detailing the facts of his complaint and listing the previous steps taken to address the matter. *Id.* The plaintiff alleges that as of the date of his complaint he had received no response from any of those individuals, and nothing was done by the administration within the OMH or at the Center to address his grievances. *See id.*

## II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on April 8, 2009 and was thereafter granted *in forma pauperis* ("IFP") status.[7] Complaint (Dkt. No. 1). Named as defendants in plaintiff's complaint are the State of New York; the New York State OMH; the CNYPC; Michael Hogan, the Commissioner of the OMH; Donald Sawyer, the Executive Director at the CNYPC; Teri Maxymillian, Director of the SOTP at the Center; Charmaine Bill, Plaintiff's Ward Treatment Team Leader; and Jeff Nowicki, Chief of Mental Health Treatment Services. *Id.* Plaintiff's complaint does not formally identify any causes of action. Instead, he merely alleges that by their actions defendants violated his constitutional rights.

On May 15, 2009, in lieu of answering, the defendants moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of plaintiff's claims against them for failure to state a cause of action upon which

relief may be granted; defendants also assert lack of personal involvement with respect to defendants Hogan, Sawyer, and Nowicki, the Eleventh Amendment, and qualified immunity as further grounds for dismissal. Dkt. No. 7. Plaintiff has not opposed defendants' motion. [8] Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and North District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* —— U.S. at ——, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974).

**\*4** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (other quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 552 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081, —— (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

#### B. *Analysis of Plaintiff's Claims*

Plaintiff's complaint does not delineate any causes of action being asserted. Instead, it simply recites the salient facts and "request[s] an order declaring that the Defendants have acted in violation of the United States Constitution." Complaint (Dkt. No. 1) § 8. In their motion defendants argue that plaintiff's complaint fails to set forth a cognizable constitutional violation sufficient to support a claim under section 1983.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of

state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). As can be seen, an essential element of a section 1983 claim is proof that a violation of a right guaranteed under the Constitution has occurred. *Myers v. Wollowitz,* No. 95–CV–0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (holding that section 1983 "is the vehicle by which individuals may seek redress for violations of their constitutional rights) (citations omitted).

### 1. *Fourth Amendment*

**\*5** It appears from the allegations in his complaint that the plaintiff may be attempting to assert a claim under the Fourth Amendment, which provides that "[t]he right of the people to be secure in their persons against unreasonable searches and seizures, shall not be violated ..." U.S. Const. amend. IV; *see also Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Because the CNYPC is a state psychiatric center, the members of its staff are government actors subject to the strictures of the Fourth Amendment. *New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 739, 83 L.Ed.2d 720 (1985).

As an involuntarily committed patient, the plaintiff is entitled to some protection under the Fourth Amendment; courts have recognized that although civilly committed patients do not have an expectation of privacy equal to an individual in society generally, they do not "check their constitutional rights at the door". *Aiken v. Nixon,* 236 F.Supp.2d 211, 233 (N.D.N.Y.2002); *see also Jennings v. New York State Office of Mental Health,* 786 F.Supp. 376, 382, 384 (S.D.N.Y.1992), *aff'd,* 977 F.2d 731 (2d Cir.1992). The privacy expectation of the involuntarily committed must be balanced against "the societal interest in protecting the health, safety, and welfare of the patients and staff of these units who would be detrimentally affected without sufficient precautionary measures." *Aiken,* 236 F.Supp.2d at 232–33 (*citing Jennings,* 786 F.Supp. at 382–84).

In this instance, had plaintiff been involuntarily searched by CNYPC employees, he could have asserted a potentially plausible Fourth Amendment claim, in which case the court would have been required to analyze that claim against the backdrop of appropriate Fourth Amendment jurisprudence. Plaintiff, however, refused the request that he submit to a strip search, and as a result, by his own admission, no strip search was conducted. The mere act of requesting that a person submit to a search does not, in and of itself, run afoul of the Fourth Amendment, particularly since a person may freely consent to a search, as unreasonable it may otherwise be. *See United States v. Drayton,* 536 U.S. 194, 197, 122 S.Ct. 2105, 2108, 153 L.Ed.2d 242 (2002) (stating that the Fourth Amendment does not prohibit requests for consent to search where a reasonable person would understand that he or she is free to refuse) (citations omitted).

It is true that plaintiff ultimately submitted to a urine test and that such a test is considered as a search within the meaning of the Fourth Amendment. *Skinner v. Ry. Labor Executives' Ass'n.,* 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989).[9] In this case, however, again by his own admission, plaintiff voluntarily agreed to submit to the urine drug test. Complaint (Dkt. No. 1) § 7 ¶ S. Accordingly, that allegation provides no basis to support a Fourth Amendment violation.

Considering that he has attached the portion of the OMH policy manual governing patient searches to his complaint, it may be that plaintiff is alleging a violation of an OMH policy. It should be noted, however, that "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Moreover, a violation of a department directive or policy such as that cited does not support a claim of a violation of a New York state law or regulation, much less of section 1983. *Cabassa v. Gummerson,* 01–CV–1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.). This is so because such directives merely provide a system which the particular agency, in this case the OMH, has established to assist it in exercising discretion, which the agency nonetheless retains despite any violation of those directives. *Id.* Accordingly, any alleged violation of the OMH manual alone cannot supply the missing element necessary to support a violation of 42 U.S.C. § 1983." *Cusamano,* 604 F.Supp.2d at 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).[10]

**\*6** In sum, even affording when affording it the most generous of construction, plaintiff's complaint does not

support a section 1983 claim against the defendants for violation of the Fourth Amendment.

### 2. *Substantive Due Process*

Plaintiff's complaint alleges that on February 2, 2009, after he refused to consent to a strip search certain CNYPC staff members temporarily denied him his medication, a nightly snack, and access to a bathroom. Liberally construed, these allegations could be interpreted as an attempt to assert a substantive due process claim under the Fourteenth Amendment.

"The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989)). Since the plaintiff in this case was not a sentenced prison inmate at the time the alleged deprivations occurred, the Eighth Amendment, which prohibits cruel and unusual punishment of those convicted of crimes, is not applicable under the circumstances. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). Instead, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at * 7 (S.D.N.Y. March 15, 2007) (citing cases); *see, also, Vallen v. Carrol,* No. 02 Civ. 5666, 2005 WL 2296620, at *8–9 (S.D.N.Y. Sept.20, 2005) (holding that the Fourteenth Amendment, rather than the Eighth Amendment protects psychiatric facility patients); *Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug.20, 2001) (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment).

### a) *Medical Care*

"Courts have consistently held, in a variety of contexts, that the due process rights of persons in a nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners." *Haitian Ctrs. Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993) (citing cases); *Owens v. Colburn,* 860

F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd,* 60 F.3d 812 (2d Cir.1995) (citing cases). The rights of patients who are involuntarily committed have been likened to the rights of detainees awaiting trial. *See Serna v. Goodno,* 567 F.3d 944, 948 (8th Cir.) (involuntarily committed person's Constitutional claim "should be evaluated under the ... standard usually applied to ... claims brought by pretrial detainees"), *cert. denied,* —— U.S. ——, 130 S.Ct. 465, 175 L.Ed.2d 312 (2009); *Buthy v. Comm'r of Office of Mental Health of N. Y.,* 818 F.2d 1046, 1051 (2d Cir.1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or to their incompetence to stand trial). "Persons in nonpunitive detention have a right to 'reasonable medical care,' a standard demonstrably higher than the Eighth Amendment standard that protects prisoners: 'deliberate indifference to serious medical needs.' " *Owens,* 860 F.Supp. at 974 (quoting *Haitian Ctrs. Council,* 823 F.Supp. at 1043–44). At a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed. [11] *Haitian Ctrs. Council,* 823 F.Supp. at 1044.

**\*7** There are two elements to a claim of medical indifference; "[the plaintiff] must show that she [or he] had a "serious medical condition' and that it was met with 'deliberate indifference.' " *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000)). A serious medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995) (quotations and citation omitted). The Second Circuit recently joined its sister circuits in reaching the conclusion that, post *Farmer,* [12] a subjective standard should be used in assessing deliberate indifference. *Caiozzo,* 581 F.3d at 70. Thus, a "defendant prison official ... is liable for a Fourteenth Amendment violation only if he [or she] disregards a risk of harm to a detainee which he [or she] is aware." *Id.* In other words, a defendant is deliberately indifferent under the *Farmer* test if that person "knows of and disregards an excessive risk to inmate health or safety; [he or she] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" in order to be liable. *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *see also Caiozzo,* 581 F.3d at 72.

Plaintiff's medical indifference claim fails in the first prong of the analysis. In his complaint, the plaintiff alleges only that he was denied his request for medication on one occasion, on the evening of February 2, 2009.[13] *See* Complaint (Dkt. No. 1) at § 7(G). That plaintiff was not in dire need of his medication is evidenced by the fact that a little more than four hours later he refused his medication when it was offered to him.[14] *Id.* at § 7 ¶ (K). Additionally, the snack that plaintiff alleges was "doctor-ordered" was also offered to the plaintiff approximately one hour and fifteen minutes after he was initially denied it. *See id.* at 8–9.

Even liberally construing the complaint it is difficult to discern the existence of needs arising to the level of a serious medical condition. A the outset, plaintiff does not even identify the medical condition for which he required the medication at issued. He does not allege any facts suggesting that he suffered from a medical condition of urgency (such as one that may produce death, degeneration, or even extreme pain) that was affected by the defendants' behavior. *See Hathaway,* 37 F.3d at 66. Additionally, there is no indication that his condition was worsened, and his health put in serious risk, by the delay in his nightly medicine. *See generally* Complaint (Dkt. No. 1). As a result, the plaintiff has failed to meet his initial burden showing that he has a sufficiently serious medical condition. *See Smith v. Hughes,* No. 9:08–CV–1147, 2009 WL 3644279, at *4 (N.D.N.Y. Oct.29, 2009) (plaintiff prisoner's allegation that he required medication, without further alleging that his condition was serious enough to cause death, degeneration or pain, was not sufficient to state a claim for serious medical condition); *Osacio v. Greene,* No. 08–CV–0018, 2009 WL 369838,2 at *4 (N.D.N.Y. Nov. 2, 2009) (fracture to a plaintiff prisoner's third metacarpal "does not rise to the level of a serious medical condition").

**\*8** Turning to the subjective prong of the relevant test, it is equally difficult to classify the alleged deprivations as deliberately indifferent to the plaintiff's medical needs, whatever they may be. The complaint does not suggest that any of the defendants or SCTAs involved in the alleged denial of the plaintiff's medicine and snack knew that such deprivations would result in a substantial risk of serious harm to the plaintiff. In fact, the complaint does not allege that plaintiff experienced any pain or other serious side effects due to the four hour and fifteen minute lapse of his medication, the hour and fifteen minute lapse of his snack, or the two hour lapse for his request to use the bathroom .[15] Because plaintiff's complaint is devoid of any facts suggesting that defendants knew of and disregarded any excessive risk to the plaintiff's health, it is fatally deficient and should be dismissed. *See Smith,* 2009 WL 3644279 at *4 (dismissing a plaintiff's deliberate indifference claim where it lacked an allegation that a defendant had knowledge that the plaintiff would suffer serious harm as a result of a temporary deprivation); *see also Bourdon v. Roney,* 2003 WL 21058177, at *30–31 (N.D.N.Y. Mar.6, 2003) (dismissing a pre-trial detainee plaintiff's claim where he was denied access to a bathroom for a maximum of three hours.). Even if evaluated under a reasonableness standard, there are no facts alleged in the complaint that would suggest that any person denied the plaintiff reasonable medical care.

Before proceeding to the next possible constitutional claim alleged, it should also be noted that the plaintiff has not alleged that any of the defendants named in his complaint were the ones who engaged in an alleged deprivation of medication. It is well established that in order to bear liability for a civil rights violation under section 1983, a party must be personally involved in the unconstitutional conduct.[16] *Wright v. Smith,* 21 F.3d at 501 (citations omitted). Although the plaintiff asserts that defendant Maxymillian denied his request to use the bathroom, he further alleges that both a non-party nurse and various non-party SCTAs were responsible for the denial of his medicine. *See* Complaint (Dkt. No. 1) at 8. Moreover, the plaintiff does not identify the person who denied him his nightly snack. *See id.*

Notwithstanding these fatal deficiencies, in deference to plaintiff's *pro se* status, I recommend that the plaintiff be granted leave to amend his complaint in order to develop his Fourteenth Amendment claim for medical indifference. If he so chooses, the amended complaint must identify a serious medical condition and specifically identify the named defendants involved in the deprivation and indicate how they are alleged to have acted with knowledge that their actions could cause serious harm to the plaintiff's health.

### 3. *Procedural Due Process*

Also potentially encompassed within the plaintiff's complaint is a procedural due process deprivation cause

of action. It appears that plaintiff attempts to premise this claim upon the defendants' allegedly lowering his status from "AP" to "MOD" without providing him sufficient due process. The complaint alleges that while the plaintiff was apparently punished by the lowered status, other patients were rewarded for their compliance with the strip search by being transferred to regular wards. Plaintiff further alleges that he was required to remain in the dining hall under the supervision of non-party SCTAs for about eight hours and was later sent to an "empty room" for the night and following day until his drug test results came back negative, at which time he was allowed to return to his own room. During the time spent in the empty room plaintiff was offered food and was allowed to use the bathroom on multiple occasions. Liberally construed, the complaint appears to assert that the plaintiff was deprived of a liberty interest without the opportunity to be heard.

**\*9** The Fourteenth Amendment provides that a state may not deprive a person of liberty or property "without due process of law." *U.S. Const. amend. XIV.* To successfully state a claim under *section 1983* for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty or property interest, and 2) was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004); *see also Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000)* (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.)* cert. denied, 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (Oct. 5, 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

"[T]he first inquiry in the analysis of an alleged due process violation is whether there exists a protected liberty interest" that is at stake in the case. *Barna v. Travis,* No. CIV97CV1146 (FJS/RWS), 1999 WL 305515, at *1 (N.D.N.Y. Apr.22, 1999)* (Smith, M.J.) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989)). "In addition to the protected interests which originate in the Constitution itself, a constitutionally protected liberty or property interest may be found in laws enacted by the state or federal government creating a substantive entitlement to a specific government benefit. *Zigmund v. Foster,* 106 F.Supp.2d 352, 360 (D.Conn.2000)* (citing *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984)). If such a deprivation has occurred, the court then must consider what process was due and whether it was provided. *See Matthews*

*v. Eldridge,* 424 U.S. 319, 333–34, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976).

"[D]ue process rights of prisoners and pretrial detainees are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution." *Bell v. Wolfish,* 441 U.S. 520, 554, 99 S.Ct. 1861, 1882, 60 L.Ed.2d 447 (1979). In *Bell,* the Supreme Court held that pretrial detainees cannot be punished without procedural due process protections, but qualified that rule, adding that "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* at 539 n. 21 (quoting *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1974)).

Thus, the first inquiry is whether the plaintiff had a protected liberty interest in his "AP" status which was allegedly rescinded as a result of his refusal to comply with the strip search, and whether he had an interest in sleeping in his own room rather than in an empty one the night of the strip search request. The plaintiff does not provide any rule or law that might create an entitlement to either his own private room or retention of his "AP" status. *See Zigmund,* 106 F.Supp.2d at 361. In fact, in his complaint he acknowledges that defendant Maxymillian offered a justification for the initial request for a strip search stating that the administration "had reasonable cause to believe that one of the residents had in their pocession an [sic] controlled substance, and that gave them the right to conduct any type of search they deemed fit with out a Court order etc. [sic]". Complaint (Dkt. No. 1) § 7 ¶ C. Plaintiff also acknowledges later on in his complaint that defendant Bill told him he was not allowed to sleep in his own room because at that point in time the rooms had been searched, but the plaintiff himself had not. *Id.* at § 7 ¶ K.

**\*10** In *Youngberg,* the Supreme Court held that individuals involuntarily committed to a state institution enjoy constitutionally protected liberty interests in conditions of reasonable care and safety and freedom from undue bodily restraint and are entitled to such training as may be required to ensure their safety, and facilitate their ability to function free of restraints. *See Youngberg,* 457 U.S. at 322–23, 102 S.Ct. at 2461–62. The Second Circuit, however, has rejected the claim that a due process right exists for a specific type of treatment. *See Kulak v. City of New York,* 88 F.3d 63, 73 (2d Cir.1996)

(ruling that the civilly confined do not have a right to be placed in the least restrictive appropriate treatment environment); *see also Soc'y for Good Will to Retarded Children, Inc. v. Cuomo ("Society"),* 737 F.2d 1239, 1250 (2d Cir.1984) ("We do not find a due process right to a specific type of treatment or training beyond that geared toward safeguarding basic liberty interests."). Thus, the right to treatment exists only in order to safeguard the basic liberty interests of reasonable care and safety and freedom from undue bodily restraint. *Id.*

It should be noted, moreover, that in order to decide whether a bodily restraint being utilized is medically necessary, and thus not undue, courts will defer to professional judgment. In *Youngberg,* for example, the Court noted that the standard requiring that "the courts make certain that professional judgment in fact was exercised" affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. 457 U.S. at 321, 102 S.Ct at 2461. The Second Circuit has held that while locking of doors, and confinement of otherwise ambulatory persons into wheelchairs may represent a violation of residents' freedom from undue restraints, there are no liberty interests at stake when a resident is denied the opportunity to visit shops, restaurants and recreational facilities outside of the community. *Society,* 737 F.2d at 1247; *compare with, Holly v. Anderson,* No. 04–CV–1489, 2008 WL1773093, at *7–8 (D.Minn.2008) (no protected liberty interest where a civilly confined person was kept "in administrative isolation for eight days before he received a hearing .") *and Tran v. Kriz,* No. 08–C–228, 2008 WL 794546, at *5 (E.D.Wis.2008) (finding it "questionable" whether the standard was met when the plaintiff lost certain privileges for twenty days and a reduced status for two weeks that restricted his use of personal electronics, the library, group activities, and demoted him to the lowest pay scale).

The face of Grove's complaint does not disclose any fact that would show the significance of a change from "AP" or "MOD" status, how either status affected his way of living within the CNYPC, or how long this change in status affected him, if at all. Additionally, the complaint merely alleges that the plaintiff was confined in an empty room on February 2, 2009. There is no indication, however, that any defendant acted in a way that unreasonably restrained the plaintiff. Indeed, rather than being refused the opportunity to participate in programing while on MOD status, it was the plaintiff who advised officials at CNYPC that in light of the reduction in status he would no longer participate in program groups until returned to AP status. There is nothing in plaintiff's complaint suggesting that he was denied reasonable care and safety or freedom from undue bodily restraint. Plaintiff's complaint, as presently constituted, thus fails to allege facts rising to a level to support a plausible claim that by their actions defendants deprived him of a protected liberty interest. I therefore recommend dismissal of plaintiff's potential procedural due process claim with leave to replead.

### 4. *Sixth Amendment*

**\*11** In his complaint the plaintiff alleges that he was not allowed to contact or communicate with his attorney after refusing to consent to a strip search requested by CNYPC staff members. Broadly construed, the plaintiff may be asserting that the conduct resulted in a violation of his rights under the Sixth Amendment.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. However, "[w]hile the Sixth Amendment, by its express language, protect those in *criminal* proceeding, the Fourteenth Amendment protects all [civilly committed] detainees against governmental interference in their right of access to the courts." *Hydrick v. Hunter,* 466 F.3d 676, 701 (9th Cir.2006) (emphasis in original).

In his complaint the plaintiff does not allege that he was in police custody at the time he was not allowed to call his attorney. There is also no allegation in the complaint that the plaintiff was forced to appear at a hearing of any sort, let alone judicial, before he was allowed to contact his attorney. Although CNYPC staff members threatened to have the police forcibly search the plaintiff and other residents' bodies, and the K–9 unit was on the scene, the plaintiff does not allege that he had any direct contact with police officials. The plaintiff was not subjected to a criminal prosecution at the time of the alleged deprivations and, in any event, the plaintiff was allowed to call his attorney less than twenty-four hours after his request to do so. Under the circumstances presented, because the defendants did not interfere with plaintiff's access to the courts, as a civil

detainee his right to counsel is not implicated. *See Lynch v. Baxley,* 385 F.Supp. 378, 389 n. 5 (D.C.Ala.1974) (noting that the right to counsel in involuntary civil commitment proceedings pertains only to "all judicial proceedings"). I therefore recommend dismissal of plaintiff's potential Sixth Amendment claim, without leave to replead, in light of the fact that the amendment is inapplicable under the fact presented.

### C. *Eleventh Amendment*

As one of the grounds for their dismissal motion, the defendants argue that the State of New York, the New York OHM, and the CNYPC are not "persons" within the meaning of 42 U.S.C. § 1983 and that these defendants are, therefore, entitled to Eleventh Amendment immunity.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). [17] This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91 102 S.Ct. 2325, 2328–2329 (1982)). To the extent that a state official is sued for damages in his official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. [18] *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

**\*12** In this instance, the plaintiff's claims against the State of New York are precluded by the Eleventh Amendment. *Richards,* 597 F.Supp. at 691. Additionally, because plaintiff's section 1983 claims against the OMH and the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects and are also subject to dismissal on this basis. *See Wylie v. Bedford Hills Correct. Facility of the State of N.Y .,* No. 07 Civ. 6045, 2008 WL 2009287, \*1 (S.D.N.Y. May 8, 2008) (dismissing claims against CNYPC because it is an agency of the state); *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend

dismissal of plaintiff's claims against the State of New York, the OMH and the CNYPC.

### D. *Personal Involvement*

In their motion to dismiss defendants further assert that plaintiff has pleaded no facts demonstrating defendants Hogan, Sawyer, and Nowicki were personally involved in the alleged constitutional deprivations.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright,* 21 F.3d at 501 (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

#### 1. *Defendants Hogan and Nowicki*

Plaintiff's claims against defendants Hogan, Commissioner of New York State OMH, and Nowicki, Chief of Mental Health Treatment Services, are apparently predicated exclusively upon their roles as supervisors. The plaintiff alleges no specific contact with either of those defendants nor does he allege that either participated in the alleged constitutional deprivations in any manner.

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v.*

*Iqbal,* ___ U.S. ___, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

**\*13** Even if the plaintiff is alleging that defendants Hogan and Nowicki are responsible for the training, supervision, discipline, or control of the staff at CNYPC, without more, these allegations are insufficient to establish personal involvement. *See Lombardo v. Stone,* No. 99 CIV 4603, 2001 WL 940559, \*6 (S.D.N.Y. Aug. 20, 2001) (dismissing claims against the commissioner of the New York OMH where he was never informed that a violation had occurred). Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

Accordingly, I recommend dismissal of plaintiff's claims as against defendants Hogan and Nowicki with leave to replead. *See Orraca v. McCreery,* No. 9:04–CV–1183, 2006 WL 1133254, at \*6 (N.D.N.Y. Apr.25, 2006) (dismissing plaintiff's claim against a defendant with leave to replead where defendant was named in caption but not described in body of complaint).

### 2. *Defendant Sawyer*

The plaintiff alleges in his complaint that he sent a letter of concern to defendant Sawyer, Director of the CNYPC, regarding the relevant events, but he received no reply from Sawyer, and "nothing was done" by the CNYPC administration in relation to the events that took place on February 2, 2009 through February 5, 2009. Even if true, these allegations alone are nonetheless insufficient to establish the requisite personal involvement on the part of defendant Sawyer in the constitutional violations alleged. *See Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing

*Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)). I therefore also recommend dismissal of the plaintiff's claims as against defendant Sawyer with leave to replead.

### E. *Protective Order*

In their motion defendants also move pursuant to Federal Rules of Civil Procedure Rule 26(c)(1) for a protective order barring discovery pending the resolution of defendants' motion to dismiss. That rule provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure of discovery.

**\*14** Fed.R.Civ.P. 26(c)(1). In light of my recommendation that that court dismiss plaintiff's complaint with leave to amend, I find that good cause exists for issuing an order to protect the defendants from the burden of discovery until the court acts upon this report and, if adopted, until the plaintiff files an amended complaint that is accepted for filing by the court.

### IV. *SUMMARY AND RECOMMENDATION*

Having carefully considered defendants' motion in view of the formative stage of the proceedings at which it is made, I find that defendant State of New York, the OMH, and the CNYPC are entitled to dismissal on the basis of immunity afforded by the Eleventh Amendment, and further that defendants Hogan, Sawyer and Nowicki are entitled to dismissal based upon plaintiff's failure to plead facts showing their personal involvement in the constitutional violations alleged. I further recommend, however, that plaintiff be afforded leave to replead with regard to those three individual defendants in order to attempt to show the requisite level of personal involvement in the deprivations at issue.

Turning to the merits, after analyzing the potential claims which could be considered as having been asserted based upon the facts alleged in plaintiff's complaint, I find that he has failed to plead a plausible constitutional deprivation upon which relief may be granted and therefore recommend dismissal of his complaint on the merits, again with leave to replead, except as to any Sixth Amendment claim.[19] Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion to dismiss (Dkt. No. 7) be GRANTED and that plaintiff's claims for deprivations of due process and adequate medical care and those against defendants Hogan, Nowicki, and Sawyer be DISMISSED, with leave to amend, and that plaintiff's claim for violation of the Sixth Amendment as well as those against the State of New York, the CNYPC and the OMH be DISMISSED, without leave to replead; and it is further hereby

ORDERED, that pending a determination by the assigned district judge with respect to this report, and the plaintiff's filing of an amended complaint, discovery in this action is hereby STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1257858

## Footnotes

1    In their motion, defendants also seek a stay of discovery pending determination of the pending motion, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

2    In light of the pr cedural posture of this cas, the following recitation is drawn principally from plaintiffs complaint, the contents of which have following accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). I have also considered the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

3    *See* http://nysdocs. lookup.docs.state.ny.us/GCA00P00/Wiq3/Wing130.

4    It is not clear from plaintiff's complaint whether he meant to reference February 3, 2009, the next day after the strip search request was made, rather than February 4, 2009, and if not what, if anything, of significance to his claims occurred on that intervening day.

5    Plaintiff was eventually permitted to contact his attorney at approximately 10:40 p.m. that evening. *Id.* § 7 ¶ P.

6    Plaintiff's complaint does not elaborate as to the significance of that change and its effect, if any, on the conditions of his confinement.

7    Title 28 U.S.C. § 1915(b), a provision added through enactment of the Prison Litigation Reform Act ("PLRA"), requires a prison inmate who seeks IFP status to pay, over a period of time, the full amount of the filing fee provided for in 28 U.S.C. § 1914(a), which is currently $350.00 for most civil actions. In addition, this district requires all inmates granted IFP status to submit an inmate authorization form issued by the clerk's office. *See* Northern District of New York Local Rule 5.4(b). As a civil detainee, however, plaintiff is not considered a "prisoner" under the PLRA, and the requirement that he eventually defray the entire filing fee therefore does not apply in this instance. *See Makas v. Miraglia,* No. 05 CIV 7180, 2007 WL 724603, at *12 n. 6 (S.D.N.Y. March 5, 2007) (copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff) [Editor's Note: Appended decisions deleted for Westlaw purposes]; *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350, 2006 WL 1234971, at *3 (S.D.N.Y. May 8, 2006) (the definition of "prisoner" in the PLRA does not include a civil detainee). *See also Michau v. Charleston County, S.C.,* 434 F.3d 725,

727–28 (4th Cir.2006) (civil detainee is not a "prisoner" under the PLRA); *Perkins v. Hedricks,* 340 F.3d 582, 583 (8th Cir.2003) (same); *Page v. Torrey,* 201 F.3d 1136, 1139–40 (9th Cir.2000) (person civilly detained following completion of criminal sentence is not a "prisoner" within the meaning of the PLRA). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

8    Plaintiff's failure to respond to the pending motion does not preclude me from recommending its disposition without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99–CV–8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan.18, 2001). Such a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000).

     It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance; under this court's local rules, a party's failure to respond to a properly filed motion can be considered as consent to the granting of that motion, provided the court determines that the moving party has met its burden demonstrating entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322–23 (holding that plaintiff's failure to respond to a motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall* ).

9    The Supreme Court has observed that "in our special needs cases, we have routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment even though the results were not reported to the police, see, e.g., *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997); *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Treasury Employees v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)...." *Ferguson v. City of Charleston,* 532 U.S. 67, n. 9, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). Notably, here, the plaintiff does not even allege that the negative urine results were reported to any law enforcement official.

10   In his complaint, plaintiff appears to allege that a K–9 unit was brought in and that his room was searched. Complaint (Dkt. No. 1) § 7 ¶ D. The viability of such a claim is doubtful since at least one court in this Circuit has held that "involuntarily committed persons have no right to privacy in their cells." *Lombardo v. Holanchock,* No. 07 Civ. 8674(DLC), 2008 WL 2543573, at * 8 (S.D.N.Y. June 24, 2008). Furthermore, plaintiff's complaint fails to allege the participation of any of the named defendants participated in that search—a prerequisite to finding liability with regard to that claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983.").

11   In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection." *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994).

12   In *Farmer,* the Supreme Court addressed the question of whether a "subjective" or "objective" standard applies in determining deliberate indifference in the context of a convicted prisoner's rights under the Eighth Amendment. *Cuoco,* 222 F.3d at 69 (quoting *Farmer,* 511 U.S. at 837–38, 114 S.Ct. at 1979). The Court concluded that the subjective test should apply under the Eighth Amendment because it prohibits cruel and unusual punishment, and a prison official's action or inaction cannot properly be termed "punishment" of the detainee if the official was not actually aware of an excessive risk to an inmate's health or safety. *Cuoco,* 222 F.3d at 69, (quoting *Farmer,* 511 U.S. at 837–38, 114 S.Ct. at 1979).

13   The following morning when breakfast was delivered to the plaintiff, he was not offered his medication. This apparent confusion between the nurse and the Secure Care Treatment Assistant ("SCTA") involved may constitute a failure on CNYPC's part to properly administer the plaintiff's medication, but this incident does not seem to present a deliberate denial of medication, particularly since it appears the facility nurse was under the impression that it had been offered. *See* Complaint (Dkt. No. 1) at 10.

14   The nurse who plaintiff alleges denied him his medication on February 2, 2009 is not listed as a defendant in this action.

15   Alth ugh persons in custo6y have no constitutional right to use the bathroom whenever they please, *see e.g., Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4–5 (S.D.N.Y. Sept.17, 1997), "reasonable adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs ..." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994). While a cognizable claim regarding bathroom needs may be based on ailments such as an enlarged prostate and irritable bowel syndrome, plaintiff fails to allege any such condition requiring treatment. *Smith v. Hughes,* No. 9:08–CV–1147, 2009 WL 3644279, at *4 (N.D.N.Y. Oct.29, 2009) (McAvoy, S.J.) (citing *Hazelton v. NH Dep't of Corrections,* No. 08–cv–419–JL, 2009 WL 229664 *2 (D.N.H.

Jan.27, 2009)). In light of my ultimate finding, if plaintiff so chooses, he may amend his complaint to include any medical conditions that were exacerbated to a level of deliberate indifference by the defendants' alleged denial of the plaintiff's use of a bathroom for two hours.

Broadly construed, plaintiff's complaint also challenges the manner in which he was allowed to go to the bathroom. The plaintiff alleges that he was allowed to go to the bathroom on February 2, 2009 at approximately 4:30 p.m. but only under the direct observation of two SCTAs. *See* Complaint (Dkt. No. 1) at 8. Plaintiff further details that if he or one of the other patients had to "do more than urinate", that person would need to place all soiled tissue in a plastic bag and not flush the toilet. *Id.* The plaintiff was allegedly allowed to use the bathroom under these same conditions the following morning. *Id.* at 10. The complaint does not allege that the plaintiff suffered any injury from the SCTAs presence in the bathroom. However embarrassing this incident might have been to the plaintiff, it does not rise to the level of a constitutional violation. *See, e.g., Robinson v. Middaugh,* No. 95–CV–0836(RSP)(GJD), 1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997)* (Pooler, J.) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf. Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977.

16    The issue of personal involvement is more fully discussed further on in this report. *See* pp. 34–38, *post.*

17    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the state. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatam County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

18    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30–31, 112 S.Ct. at 364–65.

19    In light of this recommendation I have not addressed the additional argument by defendants claiming entitlement to qualified immunity from suit based upon the circumstances outlined in plaintiff's complaint.

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

1994 WL 23069
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dale HENDRICKSON, Plaintiff,

v.

UNITED STATES ATTORNEY GENERAL, G.L.
Hershberger, United States Bureau of Prisons, Gary
Morgan, Pamela Ashline, Kenneth Walicki, Hulet
Keith, Otisville Medical Department, Defendants.

No. 91 CIV. 8135.
|
Jan. 24, 1994.

MEMORANDUM AND ORDER

McKENNA, District Judge.

**\*1** On December 4, 1991, pro se plaintiff Dale
Hendrickson ("Plaintiff" or "Hendrickson"), an inmate
then in confinement at the Federal Correctional
Institution in Otisville, New York ("Otisville"), filed this
action for injunctive relief and damages based upon
alleged violations of his rights under the United States
Constitution, Amendments I, IV, V, VI, IX, and XIII,
and upon violations of various laws and/or regulations
governing prison administration. [1] The Complaint named
as defendants G.L. Hershberger ("Hershberger"), the
United States Attorney General ("Attorney General"),
Gary Morgan ("Morgan"), Pamela Ashline ("Ashline"),
Kenneth Walicki ("Walicki"), Hulett Keith ("Keith"), the
Bureau of Prisons ("BOP"), and the Otisville Medical
Department ("OTV Medical Department") (collectively
"Defendants"). Defendants moved for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules
of Civil Procedure, or, in the alternative, for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set out below, Defendants'
Rule 12(c) motion is granted.

I.

Defendants move to dismiss Plaintiff's Complaint,
pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for failure to state a claim upon which relief
can be granted. Rule 12(c) provides:

> After the pleadings are closed but
> within such time as not to delay
> the trial, any party may move
> for judgment on the pleadings.
> If, on a motion for judgment on
> the pleadings, matters outside the
> pleadings are presented to and
> not excluded by the court, the
> motion shall be treated as one for
> summary judgment and disposed
> of as provided in Rule 56, and all
> parties shall be given reasonable
> opportunity to present all material
> made pertinent to such a motion by
> Rule 56.

Fed.R.Civ.P. 12(c). "[T]he same standards that are
employed for dismissing a complaint for failure to state
a claim under Fed.R.Civ.P. 12(b)(6) are applicable" to a
Rule 12(c) motion to dismiss for failure to state a claim
upon which relief can be granted. See Ad–Hoc Comm.
of the Baruch Black & Hispanic Alumni Ass'n v. Bernard
M. Baruch College, 835 F.2d 980, 982 (2d Cir.1987); see
also Viacom Int'l. Inc. v. Time, Inc., 785 F.Supp. 371, 375
n. 11 (S.D.N.Y.1992); 5A Charles Wright and Arthur R.
Miller, Federal Practice and Procedure ¶ 1367, at 515–
16 (1990). Thus, the Court must read the Complaint
generously, drawing all reasonable inferences from the
complainant's allegations. See California Motor Transp. v.
Trucking Unlimited, 404 U.S. 508, 515 (1972). Moreover,
"consideration is limited to the factual allegations in
[the] amended complaint, which are accepted as true, to
documents attached to the complaint as an exhibit or
incorporated in it by reference, to matters of which judicial
notice may be taken, or to documents either in plaintiff['s]
possession or of which plaintiff[ ] had knowledge and
relied on in bringing suit." Brass v. American Film
Technologies, Inc., 987 F.2d 142 (2d Cir.1993); accord
Allen v. Westpoint–Pepperell, Inc., 945 F.2d 40, 44 (2d
Cir.1991); Cortec Indus., Inc. v. Sum Holding L.P., 949
F.2d 42, 47–48 (2d Cir.1991), cert. denied, 112 S.Ct.
1561 (1992); Frazier v. General Elec. Co., 930 F.2d 1004,
1007 (2d Cir.1991). Defendants, therefore, are entitled to
dismissal for failure to state a claim only if the Court finds
beyond a doubt that "plaintiff can prove no set of facts"
to support the claim that plaintiff is entitled to relief. See
Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

**\*2** Because the 3(g) statement and declarations submitted to this Court by Defendants have not been considered and are hereby excluded from the record, the Court renders its judgment on the pleadings pursuant to Rule 12(c).

## II.

Drawing all inferences in favor of the Plaintiff, *Miller v. Polar Molecular Corp.,* 12 F.3d 1170, 1993 WL 527434 (2d Cir.), the facts are as follows.

During Hendrickson's confinement at Otisville, certain video tapes which had been supplied to him by the government were "systematically and maliciously confiscated"; audio tapes and legal materials also were removed from Plaintiff's possession while he was a pre-trial detainee at Otisville. In retaliation for his bringing legal materials into the Otisville compound area, Plaintiff claims, he was placed in administrative detention. Compl. at 1 (presumably ¶ A.)

Hendrickson also claims at various times to have been wrongly isolated from the general prison population based on alleged and allegedly erroneous OTV Medical Department claims that he had tuberculosis. *Id.* ¶ B. During these periods of medical confinement, Hendrickson claims that the "4A unit team" denied him personal visits, his right to send mail, and telephone communications and consultations necessary to his legal representation. *Id.* ¶ C.

Hendrickson claims that as part of his medical confinement he was "subjected to ruthless and inhumane [d]isciplinary action from the D[isciplinary] H [earing] O[fficer]," and was for 15 days placed in administrative detention and for 30 days deprived of commissary, visitation, and phone privileges. *Id.* ¶ D.

Hendrickson further alleges that commissary items that he had in his possession before entering medical confinement were wrongly confiscated from him, and while in such confinement he was assaulted and searched by the "OTV Riot Squad." *Id.* ¶ E. In addition, he claims, commissary receipts, as well as legal documents and other legal materials were confiscated from him. *Id.* ¶ F.

## III.

Defendants argue that Plaintiff fails to state a claim for which relief may be granted. Of course, in considering a pro se pleading, the Court takes into consideration the special circumstances of pro se litigants. As the Second Circuit has often noted, "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988); *accord, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). We apply the same solicitous standard to the instant motion to dismiss.

Plaintiff, however, has failed to present to this Court either a colorable theory of violation of legal duties or facts to support a claim that might be inferred from the pleadings. Even assuming the truth of Plaintiff's allegations, the Court is left without a cognizable claim before it.

**\*3** At the outset, the Court notes that to the extent that the Complaint seeks injunctive relief from conditions of Plaintiff's treatment while at Otisville as a pre-trial detainee, the claim is now moot as Plaintiff has since been transferred to the United States Penitentiary in Lompoc, California following his conviction at trial. Hendrickson's Complaint also fails to the extent that it seeks damages from the United States government or government officials in their official capacity. Because the United States government enjoys sovereign immunity, it can be sued only to the extent it so consents. *United States v. Mitchell,* 445 U.S. 535, 538 (1980) (quoting *U.S. v. Sherwood,* 312 U.S. 584, 586 (1941)). No such immunity has been waived in suits for damages arising from constitutional violations. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983). Thus, the only possible redress remaining available to Plaintiff for the harms alleged is a *Bivens* action [2] against government officials in their personal capacities for actions taken under the color of governmental authority.

As Defendants point out, however, Plaintiff has nowhere, other than in the caption of the Complaint, mentioned by name any of the individual named Defendants. Defs.' Mem.Supp.Mot.Dismiss or Summ.Jt. at 2. It is true that Plaintiff did in the body of the Complaint name the "4A

Hendrickson v. U.S. Atty. Gen., Not Reported in F.Supp. (1994)

1994 WL 23069

Unit Team," the "DHO," and the "OTV Riot Squad," but these designations of group actions undifferentiated as to individuals and of official titles unconnected to any individual names do not allege the actionable *individual* behavior necessary to sustain a *Bivens* claim.

In a *Bivens* action, where Defendants are sued in their personal capacities, actionable behavior must be alleged as to individuals. *See, e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987), *cert. denied,* 489 U.S. 1065 (1989). A complaint that fails to make any specific factual allegations of "direct and personal responsibility on the part of any of the named defendants in regard to the loss of any of [plaintiff's] property" must be dismissed. *Lee v. Carlson,* 645 F.Supp. 1430, 1436 (S.D.N.Y.1986).

More importantly, the light in which a pro se complaint may be considered does not burn so brightly as to blind the court as to the rights of defendants who are entitled to have claims against them alleged with sufficient clarity as to make possible a defense. Even in a pro se complaint, claims must "specify in detail the factual basis necessary to enable [defendants] intelligently to prepare their defense ..." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Otherwise, blameless parties would be subject to damages claims for free-floating innuendo. To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law. Although the Court may make special efforts to understand the underlying claim of a vague, confusing, or poorly crafted pro se complaint that it would not undertake in connection with a claim prepared by legal counsel, it cannot do so to the extent that this would work an injustice to defendants, whose rights also must be protected. A defendant who is alleged to be liable for his actions has a right to have the claims against him spelled out with a basic degree of clarity and particularity. *See supra* at 7. Although some of the harms alleged by Plaintiff might conceivably be of some substance, the Court cannot understand from the documents before it which defendants are alleged to have participated in which allegedly actionable behavior. The Court cannot on such a basis subject a party to potential liability. *See* Defs' Mot. at 9, 10.

*Summary and Order*

**\*4** For the reasons stated, Plaintiff has failed to plead a colorable case. Defendants' motion to dismiss is granted.

**All Citations**

Not Reported in F.Supp., 1994 WL 23069

Footnotes

1    The Complaint states only that "Bureau of Prison institutional Law" was violated; subsequent documents filed by Plaintiff imply the violation of specific prison policies. *See, e.g.,* Letter from Hendrickson to Judge McKenna of 10/13/93 at 2 (citing BOP Policy Statement 1315.3 purportedly concerning prisoner access to legal materials while in administrative detention).

2    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971).

2016 WL 3636249
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rasheem M. Holland, Plaintiff,

v.

The City of New York, Commissioner of Correctional
Services, Dora B. Schriro, Deputy of Security Hazel
Jennings of R.N.D.C., Warden James Perrino
of R.N.D.C., Correctional Officers of R.N.D.C.,
Claude Luly Shield #3932, Garfield Clarke #14403,
John Louden #9250, each sued individually
and in his or her official capacity, Defendants.

14 Civ. 5517 (AT)
|
Signed June 24, 2016

**Synopsis**

**Background:** Muslim pretrial detainee, proceeding pro
se, brought § 1983 action against city, certain city
officials, and individual correction officers, alleging that
his constitutional rights were violated when he was
subjected to visual body cavity strip search by female
officer. Defendants moved to dismiss for failure to state
claim.

**Holdings:** The District Court, Analisa Torres, J., held that:

[1] female officer was entitled to qualified immunity from
detainee's free exercise claim;

[2] officer was entitled to qualified immunity from
detainee's Fourth Amendment claim;

[3] officer's alleged verbal threat to detainee, if proven, was
not objectively unreasonable;

[4] officer's strip search of detainee did not amount to
sexual harassment in violation of detainee's due process
rights;

[5] officer's alleged violation of jail's internal policies
during strip search, if proven, did not amount to violation
of procedural due process;

[6] detainee failed to allege that prison supervisors were
personally involved in officer's allegedly unconstitutional
strip search; and

[7] detainee failed to allege that allegedly unconstitutional
strip search occurred pursuant to official city policy.

Motion granted.

West Headnotes (56)

[1] **Attorney and Client**
    👉 Rights of litigants to act in person or by
    attorney
    **Federal Civil Procedure**
    👉 Pro Se or Lay Pleadings

    A court will liberally construe pleadings
    and briefs submitted by pro se litigants,
    reading such submissions to raise the strongest
    arguments they suggest.

    Cases that cite this headnote

[2] **Attorney and Client**
    👉 Rights of litigants to act in person or by
    attorney

    The policy of liberally construing pro se
    submissions is driven by the understanding
    that implicit in the right to self-representation
    is an obligation on the part of the court
    to make reasonable allowances to protect
    pro se litigants from inadvertent forfeiture of
    important rights because of their lack of legal
    training.

    Cases that cite this headnote

[3] **Federal Civil Procedure**
    👉 Pro Se or Lay Pleadings

    Although courts are obligated to draw the
    most favorable inferences that a pro se
    plaintiff's complaint supports, courts cannot
    invent factual allegations that he has not
    pled; the pleadings must still contain factual

allegations that raise a right to relief above the speculative level.

Cases that cite this headnote

**[4]     Civil Rights**
🔑 Grounds and subjects;compensatory damages

**Civil Rights**
🔑 Mental suffering, emotional distress, humiliation, or embarrassment

Although the Prison Litigation Reform Act (PLRA) bars compensatory damages for mental or emotional injury, even absent physical injury, a plaintiff may still recover compensatory damages for the loss of a constitutional liberty interest; such damages are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(e).

Cases that cite this headnote

**[5]     Damages**
🔑 Nominal or Substantial Damages

**Damages**
🔑 Injuries for Which Exemplary Damages May Be Awarded

The Prison Litigation Reform Act (PLRA) does not bar a plaintiff from recovering punitive or nominal damages. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(e).

Cases that cite this headnote

**[6]     Prisons**
🔑 Status, rights, and disabilities in general

While persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights.

Cases that cite this headnote

**[7]     Prisons**
🔑 Regulation and supervision in general; role of courts

**Prisons**
🔑 Discipline, security, and safety in general

**Prisons**
🔑 Rehabilitation and reformation

Limitations on the exercise of constitutional rights by prisoners arise both from the fact of incarceration and from valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security.

Cases that cite this headnote

**[8]     Prisons**
🔑 Regulation and supervision in general; role of courts

The constitutional claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.

Cases that cite this headnote

**[9]     Constitutional Law**
🔑 Prisons

**Constitutional Law**
🔑 Prisons and Pretrial Detention

Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion; a prisoner's right to practice his religion is, however, not absolute. U.S. Const. Amend. 1.

Cases that cite this headnote

**[10]    Constitutional Law**
🔑 Prisons and Pretrial Detention

To assess a prisoner's free exercise claim, a court must determine: (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely

held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective. U.S. Const. Amend. 1.

Cases that cite this headnote

[11] **Prisons**
👉 Religious Practices and Materials

Even assuming a prisoner can show that his religious beliefs are sincerely held and were infringed, prison officials' misconduct would be excusable if it was supported by legitimate penological interests. U.S. Const. Amend. 1.

Cases that cite this headnote

[12] **Constitutional Law**
👉 Freedom of religion and conscience

Once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these penological concerns were irrational. U.S. Const. Amend. 1.

Cases that cite this headnote

[13] **Constitutional Law**
👉 Beliefs protected;inquiry into beliefs

In free exercise cases, scrutiny of a plaintiff's sincerity provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud. U.S. Const. Amend. 1.

Cases that cite this headnote

[14] **Evidence**
👉 Pleadings

Prior inconsistent pleadings, though admissible against plaintiff in the case in which they were originally filed as well as in any subsequent litigation involving that party, are controvertible, not conclusive, admissions.

Cases that cite this headnote

[15] **Evidence**
👉 Pleadings superseded, withdrawn, or abandoned

**Federal Civil Procedure**
👉 Effect of amendment

While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course.

Cases that cite this headnote

[16] **Civil Rights**
👉 Good faith and reasonableness; knowledge and clarity of law;motive and intent, in general

Under the qualified immunity doctrine, government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

2 Cases that cite this headnote

[17] **Civil Rights**
👉 Good faith and reasonableness; knowledge and clarity of law;motive and intent, in general

A government official performing a discretionary function will not be liable for damages if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law.

Cases that cite this headnote

[18] **Civil Rights**

👉 Good faith and reasonableness; knowledge and clarity of law;motive and intent, in general

A right is clearly established, as required to defeat a qualified immunity defense, if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Court of Appeals has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.

Cases that cite this headnote

[19] Federal Civil Procedure
👉 Immunity

For qualified immunity to bar suit at the motion to dismiss stage, not only must the facts supporting the defense appear on the face of the complaint, but, as with all motions to dismiss for failure to state a claim, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

[20] Civil Rights
👉 Prisons, jails, and their officers;parole and probation officers

At time of strip search at city jail, Muslim pretrial detainee's alleged right to not be subject to visual strip search by officer of opposite sex was not clearly established, and thus officer was entitled to qualified immunity from detainee's free exercise claim brought under § 1983; strip search occurred after detainee's housing unit was locked down after fight, and there was no precedent establishing that detainee's religious rights outweighed jail's penological interest in observing inmates during emergency or exigent circumstances. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[21] Prisons
👉 Privacy in general

Prisons
👉 Particular violations, punishments, deprivations, and conditions

The Fourth Amendment protects individual privacy against certain kinds of governmental intrusion, and its protections extend to prisoners and pretrial detainees. U.S. Const. Amend. 4.

Cases that cite this headnote

[22] Prisons
👉 Search, Seizure, and Confiscation

Prisons
👉 Strip searches

Although the constitutional rights of inmates are restricted because of the considerations underlying the penal system, the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable; the reasonableness of a strip search, in turn, requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. U.S. Const. Amend. 4.

Cases that cite this headnote

[23] Prisons
👉 Strip searches

Courts deciding the constitutionality of a strip search of a prisoner must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. U.S. Const. Amend. 4.

Cases that cite this headnote

[24] Prisons
👉 Strip searches

A strip search is unconstitutional under the Fourth Amendment if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. U.S. Const. Amend. 4.

Cases that cite this headnote

**[25]** **Prisons**
🔑 Strip searches

Although, generally, the strip search of a male inmate in view of a female correction officer does not, by itself, rise to the level of a constitutional violation, strip searches conducted by members of the opposite sex constitute a heightened invasion of privacy and are thus subject to higher scrutiny than those conducted by members of the same sex. U.S. Const. Amend. 4.

Cases that cite this headnote

**[26]** **Civil Rights**
🔑 Prisons, jails, and their officers;parole and probation officers

There were no Supreme Court of Court of Appeals decisions establishing that, in emergency situation, inmates had Fourth Amendment right to be free from strip searches by officers of opposite sex, and thus any such right of pretrial detainee was not clearly established at time when female officer conducted visual strip search following stabbing in detainee's housing unit, and officer was entitled to qualified immunity from detainee's Fourth Amendment claim brought under § 1983 . U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[27]** **Prisons**
🔑 Strip searches

Officers do not need reasonable suspicion that an inmate may have a concealed weapon or other contraband in order to strip search him. U.S. Const. Amend. 4.

Cases that cite this headnote

**[28]** **Sentencing and Punishment**
🔑 Conditions of Confinement

**Sentencing and Punishment**

Deliberate indifference in general

To state a traditional Eighth Amendment claim, a prisoner must allege that: (1) the alleged deprivation is sufficiently serious under an objective standard, and (2) the charged officials acted, subjectively, with a sufficiently culpable state of mind. U.S. Const. Amend. 8.

Cases that cite this headnote

**[29]** **Constitutional Law**
🔑 Safety and security

For due process claims alleging excessive force against a pretrial detainee, the pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable, and need not demonstrate that the officer was subjectively aware that his use of force was unreasonable; in determining objective reasonableness, which depends on the facts and circumstances of each case, courts may consider a number of factors, including the relationship between the need for the use of force and the amount of force used, the extent of the detainee's injury, any effort made by the officer to temper or to limit the amount of force, the severity of the security problem at issue, the threat reasonably perceived by the officer, and whether the detainee was actively resisting. U.S. Const. Amend. 14.

Cases that cite this headnote

**[30]** **Sentencing and Punishment**
🔑 Searches and seizures

For challenges to strip searches, to state an Eighth Amendment violation, courts require that a plaintiff allege that the defendants engaged in egregious conduct. U.S. Const. Amend. 8.

Cases that cite this headnote

**[31]** **Constitutional Law**
🔑 Other particular conditions

**Prisons**

👉 Search, seizure, and confiscation

Correction officer's alleged verbal threat to pretrial detainee that there would be repercussions if he did not comply with her order to strip down and be searched, if proven, was not objectively unreasonable, and thus did not violate detainee's due process rights; threat did not result in any physical injury or damage, and alleged threat was made in response to detainee's initial refusal to comply with strip search. U.S. Const. Amend. 14.

Cases that cite this headnote

[32] **Sentencing and Punishment**
👉 Other particular conditions

Prisoner's allegations of threats or verbal harassment, without any injury or damage, do not state an Eighth Amendment claim under § 1983. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[33] **Constitutional Law**
👉 Other particular conditions

**Prisons**
👉 Search, seizure, and confiscation

Officer's strip search of pretrial detainee did not amount to sexual harassment in violation of detainee's due process rights; search was undertaken following stabbing in detainee's housing unit, search was not unnecessarily prolonged or repeated, officer did not physically contact detainee, and officer did not make any comments of sexual nature. U.S. Const. Amend. 14.

Cases that cite this headnote

[34] **Sentencing and Punishment**
👉 Searches and privacy

The subjective prong of a prisoner's Eighth Amendment sexual abuse claim requires a showing that the search was undertaken maliciously or for the purposes of sexually abusing an inmate, rather than in a good-faith

effort to maintain or restore discipline. U.S. Const. Amend. 8.

Cases that cite this headnote

[35] **Constitutional Law**
👉 Relationship to Other Constitutional Provisions;Incorporation

Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process. U.S. Const. Amend. 14.

1 Cases that cite this headnote

[36] **Constitutional Law**
👉 Procedural due process in general

To state a procedural due process claim, a plaintiff must establish: (1) that he possessed a liberty interest, and (2) that the defendants deprived him of that interest as a result of insufficient process. U.S. Const. Amend. 14.

1 Cases that cite this headnote

[37] **Constitutional Law**
👉 Conditions

**Constitutional Law**
👉 Conditions of confinement in general

Convicted prisoners seeking to establish a procedural due process claim must show that the liberty deprivation imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life; the "atypical and significant hardship" requirement does not apply to pretrial detainees. U.S. Const. Amend. 14.

Cases that cite this headnote

[38] **Constitutional Law**
👉 Imprisonment and Incidents Thereof

There is no federal due process liberty interest in having prison officials follow prison regulations. U.S. Const. Amend. 14.

Cases that cite this headnote

**[39]** **Civil Rights**
👉 Prisons

A § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[40]** **Constitutional Law**
👉 Imprisonment and Incidents Thereof

An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal due process claim under § 1983, because federal constitutional standards rather than state law define the requirements of procedural due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[41]** **Constitutional Law**
👉 Other particular conditions
**Prisons**
👉 Search, seizure, and confiscation

Correction officer's alleged violation of jail's internal policies during strip search of pretrial detainee, if proven, did not amount to violation of procedural due process redressable under § 1983. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[42]** **Civil Rights**
👉 Prisons

Correction officers can be held liable under § 1983 for not intervening to protect the constitutional rights of inmates from infringement by other officers. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[43]** **Civil Rights**
👉 Prisons

Liability under § 1983 for a prison officer's failure to intervene attaches only when: (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[44]** **Civil Rights**
👉 Prisons

If a court determines that a prison officer's conduct did not violate a constitutional right, the analysis into a failure-to-intervene claim under § 1983 against other officers ends. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[45]** **Civil Rights**
👉 Prisons, jails, and their officers;parole and probation officers

A prison officer is entitled to qualified immunity from a § 1983 failure-to-intervene claim unless his failure to intercede was under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate the plaintiff's rights. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[46]** **Civil Rights**
👉 Vicarious liability and respondeat superior in general;supervisory liability in general

Supervisors cannot be held liable in a § 1983 suit solely on a theory of respondeat superior. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

Cases that cite this headnote

**[47]** **Civil Rights**

&#128273; Vicarious liability and respondeat superior in general;supervisory liability in general

**Civil Rights**

&#128273; Complaint in general

To state a claim under § 1983, a plaintiff must allege the personal involvement of each defendant; conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[48]** **Civil Rights**

&#128273; Criminal law enforcement;prisons

A plaintiff in a § 1983 action alleging supervisory liability must show that the supervisor was personally involved in a constitutional violation by either: (1) directly participating in the violation; (2) failing to remedy the violation after learning of it through a report or appeal; (3) creating a custom or policy fostering the violation or allowing the custom or policy to continue after learning about it; (4) being grossly negligent in supervising the officers involved; or (5) exhibiting deliberate indifference to the constitutional rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[49]** **Civil Rights**

&#128273; Criminal law enforcement;prisons

Pretrial detainee failed to allege that prison supervisors were personally involved in officer's allegedly unconstitutional strip search, as required to state claim against supervisors under § 1983. 42 U.S.C.A. § 1983.

**[50]** **Civil Rights**

&#128273; Liability of Public Employees and Officials

A § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[51]** **Civil Rights**

&#128273; Governmental Ordinance, Policy, Practice, or Custom

To state a § 1983 claim against a municipality, a plaintiff must assert that the alleged violations were committed pursuant to an official policy, practice, or custom; a plaintiff can meet this requirement by identifying a particular decision or action by someone who is a final policymaker for the governmental entity being sued. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[52]** **Civil Rights**

&#128273; Lack of Control, Training, or Supervision;Knowledge and Inaction

Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[53]** **Civil Rights**

&#128273; Governmental Ordinance, Policy, Practice, or Custom

A custom or policy, as required for municipal liability under § 1983, cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality. 42 U.S.C.A. § 1983.

## [54] Civil Rights

↦ Governmental Ordinance, Policy, Practice, or Custom

A city cannot be liable under § 1983 pursuant to *Monell* where the plaintiff cannot establish a violation of his constitutional rights. 42 U.S.C.A. § 1983.

Cases that cite this headnote

## [55] Civil Rights

↦ Complaint in general

Conclusory allegations that a municipality failed to train and supervise its employees are insufficient to state a *Monell* claim under § 1983 absent supporting factual allegations. 42 U.S.C.A. § 1983.

Cases that cite this headnote

## [56] Civil Rights

↦ Criminal law enforcement;prisons

Pretrial detainee failed to allege that allegedly unconstitutional strip search at city jail occurred pursuant to official city policy, as required to state municipal liability claim under § 1983. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Rasheem M. Holland, Rosedale, NY, pro se.

Omar Javed Siddiqi, Theresa Jeanine D'Andrea, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

ANALISA TORRES, District Judge:

**\*1** Plaintiff *pro se*, Rasheem M. Holland, a practicing Muslim, brings this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City"), City Department of Correction officials, and individual correction officers, alleging that his constitutional rights were violated when, as a pretrial detainee at Rikers Island, he was subjected to a visual body cavity strip search by a female officer. Am. Compl., ECF No. 21; Def. Mem. 1, 3, ECF No. 34. Defendants move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motion is GRANTED.

## BACKGROUND

Holland alleges that while he was a pretrial detainee on Rikers Island, sometime between 10:00 a.m. and 3:00 p.m. on October 14, 2013, a "fight/cutting" occurred in his housing unit. Am. Compl. ¶¶ 34-35; Def. Mem. 1. The correction officer for Holland's housing area, identified as "Russell" (Shield #6677),[1] ordered that inmates be locked in their cells until further notice. Am. Compl. ¶¶ 36, 38. Hazel Jennings, the Deputy Warden of Security,[2] arrived shortly thereafter, with 20 correction officers, and ordered the inmates out of their cells for a "pat frisk." *Id.* ¶ 37. Led by Jennings, the officers escorted the inmates to the "intake area," where they waited in holding pens until Russell and Jennings returned with a list of names of individuals who "were not involved" in the fight, and called out eight names, including Holland's. *Id.* ¶¶ 37-38. Those eight inmates were taken out of the holding pens and escorted into the hallway, where they were lined up against the wall next to the strip search room. *Id.* ¶ 39.

Jennings then "conducted a strip search operation" along with Officers Claude Luly, Garfield Clarke, and John Louden, the correction officer defendants. *Id.* ¶40. Every male inmate was "subjected to a visual body cavity strip frisk search" conducted by Jennings, who is female. *Id.* ¶ 41. When it was Holland's turn to be searched, he "politely asked" Jennings to "please leave the strip search area due to the fact that [Holland is] a registered practicing [M]uslim and... [Muslims] don't strip down naked in front of inmates and especially in front of female officers." *Id.* ¶ 42. Jennings responded, "So what!!! [It's] not like you don't have anything I've never seen before." *Id.* ¶ 43. She ordered Holland to remove his clothing "or there [would] be some repercu[ss]ions." *Id.* Holland complied because he "feared

for his life." *Id.* ¶ 44. According to Holland, Jennings "is known... for sending her male officers that work under her command," including Luly, Clarke, and Louden, "to use force" if an inmate does not comply. *Id.* ¶ 45.

Following Jennings' orders, Holland disrobed in front of her, while the male correction officers looked on. *Id.* ¶ 46. Holland "tried to cover [his] private parts the best way [he] could but was told by [ ] Jennings to remove [his] hands from [his] private area." *Id.* Jennings then instructed Holland to "lift his testicles, turn around[,] lift his feet and bend over and spread his buttocks. *Id.* ¶ 47. Holland alleges that Jennings "was not satisfied enough with [him] bending down to spread his buttocks" and requested that he "do it again while coughing" *Id.* ¶ 48. Holland complied. *Id.*

## DISCUSSION

### I. Motion to Dismiss Standard

**\*2** To survive a motion to dismiss, a complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). On a Rule 12(b)(6) motion, a district court may consider only the complaint, documents attached to the complaint or incorporated in it by reference, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). A court must accept allegations contained in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

**[1]** **[2]** **[3]** A court will "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007) (internal quotation marks and citations omitted). "The policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (quoting *Traguth*

*v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Although courts are "obligated to draw the most favorable inferences that [a *pro se* plaintiff's] complaint supports, [courts] cannot invent factual allegations that he has not pled." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). Indeed, the pleadings must still contain factual allegations that raise a "right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

### II. Prison Litigation Reform Act

**[4]** **[5]** As a threshold matter, Defendants contend that, pursuant to the Prison Litigation Reform Act ("PLRA"), Holland's claims should be dismissed because he seeks only monetary relief and does not allege any physical harm. [3] Def. Mem. 21-22. Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a ... correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). However, although the PLRA bars compensatory damages "for mental or emotional injury," even absent physical injury, Holland may still recover "compensatory damages for the loss of a constitutional liberty interest." *Rosado v. Herard,* No. 12 Civ. 8943, 2014 WL 1303513, at \*13 (S.D.N.Y. Mar. 25, 2014) ("[C]ompensatory damages for intangible deprivations of [the plaintiff's] liberty and personal rights—as 'distinct from pain and suffering, mental anguish, and mental trauma'—are not barred by the PLRA." (citation omitted)); *see also Malik v. City of New York,* No. 11 Civ. 6062, 2012 WL 3345317, at \*16 (S.D.N.Y. Aug. 15, 201) ("[T]he PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations."), *report and recommendation adopted,* 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012). Such damages "are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering." *Rosado,* 2014 WL 1303513, at \*13 (quoting *Kerman v. City of New York,* 374 F.3d 93, 125 (2d Cir.2004)). Further, the PLRA does not bar Holland from recovering punitive or nominal damages. *See Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("Section 1997e(e) does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages.").

**\*3** Accordingly, the PLRA does not require dismissal of Holland's claims. [4]

### III. Section 1983 Claims

**[6]** **[7]** **[8]** "[W]hile persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). The constitutional claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349, 107 S.Ct. 2400. [5]

Holland claims that Defendants violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments when Jennings, a female, subjected him to a visual body cavity strip search. The Court addresses each claim in turn. Because Holland's claims against the correction officer defendants—Luly, Clarke, and Louden—are based on their alleged failure to intervene to protect Holland from Jennings' unconstitutional misconduct, the Court begins by addressing Holland's claims under each amendment as against Jennings only. The Court then turns to Holland's claims against the correction officer defendants based on their failure to intervene, against Schriro and Perrino based on their supervisory liability, and against the City based on its municipal liability.

#### A. First Amendment

**\*4** **[9]** **[10]** **[11]** **[12]** "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400 (citation omitted). "A prisoner's right to practice his religion is, however, not absolute." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). To assess a prisoner's free exercise claim, the Court "must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological

objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). Therefore, even assuming Holland can show that his religious beliefs are sincerely held and were infringed, Defendants' misconduct would be "excusable if [it] was supported by legitimate penological interests." [6] *Ford v. McGinnis,* 352 F.3d 582, 595 (2d Cir.2003); *see also O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987))). [7]

"The taboo in the Islamic faith concerning male nudity in the presence of women is well known," and the Court will not "second guess" Holland's allegation that being subjected to a visual cavity strip search by a female infringed upon this religious belief. *Jean–Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar. 19, 2013); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004) (explaining that a court must determine whether the refusal to accommodate a religious belief violates the First Amendment "without passing judgment on 'the centrality of different religious practices,' which is a misguided enterprise that the Supreme Court has called 'akin to the unacceptable business of evaluating the relative merits of differing religious claims' " (citation omitted)). Indeed, at the motion to dismiss stage, courts in this Circuit have found that the religious beliefs of Muslim inmates were infringed based on far less invasive conduct than Holland alleges here. *See, e.g., Jean–Laurent v. Lawrence,* 2013 WL 1129813, at *8 (declining to question Muslim inmate's allegation that being forced to stand in his underwear infringed upon his freedom of religion); *Woodward v. Perez,* No. 12 Civ. 8671, 2014 WL 4276416, at *5 (S.D.N.Y. Aug. 29, 2014) (finding Muslim inmate's religious beliefs infringed based on his "contention that showering in the presence of a female guard violated a central tenet of his religion"). [8]

**\*5** **[13]** **[14]** **[15]** **[16]** **[17]** **[18]** **[19]** Defendants, however, challenge Holland's sincerity. [9] *See* Def. Mem. 15-16. They also assert the defense of qualified immunity. *Id.* 20-21. Because the Court concludes that Holland's free exercise claim is precluded by qualified immunity, the Court need not reach the question of whether his religious beliefs are sincerely held, or whether the strip search was justified by legitimate penological interests. [10]

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A defendant will thus not be liable for damages 'if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law.' " *Pugh v. Goord,* 571 F.Supp.2d 477, 510 (S.D.N.Y.2008) (quoting *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004)). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *See Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (internal quotation marks omitted); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). For qualified immunity to bar suit at the motion to dismiss stage, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (internal quotation marks and citations omitted).

\*6  **[20]** Holland alleges that the strip search was conducted by Jennings, the Deputy Warden of Security, right after his housing unit was locked down due to a "fight/cutting" that had just taken place. It is clear, therefore, that this was a search conducted in response to an exigent situation, not a routine or scheduled search. The Court has not found any Supreme Court or Second Circuit precedent establishing the right of a Muslim inmate to not be subjected to a visual strip search by an officer of the opposite sex in such circumstances. Indeed, the courts in this Circuit—and other circuits—that have discussed the rights of Muslim inmates to not be viewed in the nude by the opposite sex suggest that emergency or exigent circumstances may provide a "legitimate penological interest" justifying the infringement upon the inmate's free exercise of religion. *See, e.g., Houston v. Schriro,* No. 11 Civ. 7374, 2014 WL 6694468, at \*13 (S.D.N.Y. Nov. 26, 2014) (noting that, in case involving Muslim inmate, the "[d]efendants do not argue that a female officer observing strip searches of a male inmate furthers a legitimate penological interest, particularly in non-emergency situations such as scheduled institutional searches where alternative staffing arrangements can be planned in advance"); *Canedy v. Boardman,* 91 F.3d 30, 34 (7th Cir.1996) (finding the defendants entitled to qualified immunity on Muslim inmate's claim that strip searches in the presence of female guards violated his First Amendment rights because "it was not at all clear" that the plaintiff's "interest in observing Islam's nudity taboos" outweighed the prison's "very strong interest in having its guards observe prisoners at all times and in all situations, and [its other] interest in providing equal employment opportunity to women").

Because the courts in this district, the Second Circuit, and the Supreme Court have not yet addressed the issue, the Court concludes that there was no clearly established rule that, during a lockdown or other exigent situation, a correction officer is prohibited from conducting a strip search and viewing the private parts of a Muslim inmate of the opposite sex, in the manner Holland describes. Therefore, Jennings could not have known whether she was violating Holland's constitutional rights, [11] and is entitled to qualified immunity to the extent that Holland asserts free exercise claims against her in her individual capacity. [12] *See Askins v. Doe No. 1,* 727 F.3d 248, 254 (2d Cir.2013) ("Qualified immunity is a defense available only to individuals sued in their individual capacity.").

\*7  Accordingly, Defendants' motion to dismiss Holland's First Amendment claim against Jennings in her individual capacity is GRANTED.

### B. Fourth Amendment

**[21]** The Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion," *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and it is well-established that its

protections extend to prisoners and pretrial detainees. *See Bell,* 441 U.S. at 545, 559, 99 S.Ct. 1861. More than twenty years ago, the Second Circuit recognized that inmates "do retain a limited right to bodily privacy," *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992), and more recently asserted that, "[r]egardless of who performs the search, a visual body cavity search is invasive: 'A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy.' " *Harris v. Miller,* 818 F.3d 49, 58 (2d Cir.2016) (quoting *Florence v. Bd. of Chosen Freeholders,* ----- U.S. -----, 132 S.Ct. 1510, 1526, 182 L.Ed.2d 566 (2012) (Breyer, J., dissenting); *see also Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir.1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy."); *Byrd v. Maricopa Cty. Sheriff's Dep't,* 629 F.3d 1135, 1143 (9th Cir.2011) (en banc) ("[W]e have consistently recognized the frightening and humiliating invasion occasioned by a strip search, even when conducted with all due courtesy." (internal quotation marks omitted)).

**[22]  [23]  [24]** Thus, although the constitutional rights of inmates are restricted because of the "considerations underlying our penal system," *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), *overruled on other grounds, McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable. *See Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983) (per curiam); *see also Florence,* 132 S.Ct. at 1517 ("[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities."). The reasonableness of a strip search, in turn, "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559, 99 S.Ct. 1861; *see also Harris,* 818 F.3d at 62–63. A strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Jean–Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006).

**[25]** Here, Holland concedes that the strip search procedures he was subjected to are "generally constitutionally permissible." Pl. Opp. 7-8, ECF No. 38.[13] What he objects to is that the strip search was conducted "by the opposite sex." *Id.* 8. Although, generally, the strip search of a male inmate in view of a female correction officer does not, by itself, rise to the level of a constitutional violation, *see Montgomery v. Hall,* No. 11 Civ. 4645, 2013 WL 1982920, at *4 (S.D.N.Y. May 15, 2013), *report and recommendation adopted,* 2013 WL 3816706 (S.D.N.Y. July 22, 2013), strip searches conducted by members of the opposite sex constitute a heightened invasion of privacy in this Circuit and are thus subject to higher scrutiny than those conducted by members of the same sex. *See, e.g., Little v. City of New York,* No. 13 Civ. 3813, 2014 WL 4783006, at *2 (S.D.N.Y. Sept. 25, 2014); *Forts v. Ward,* 621 F.2d 1210, 1217 (2d Cir.1980) ("The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex."); *see also Canedy,* 16 F.3d at 185 ("[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex."); *York v. Story,* 324 F.2d 450, 455 (9th Cir.1963) ("The desire to shield one's unclothed figure from views of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").

**\*8** "Recognizing that a strip search by an officer of the opposite sex involves a heightened invasion of privacy, courts in this Circuit have distinguished between 'regular' and 'close' viewing and 'incidental' and 'brief viewing of a naked prisoner,' " with the latter being found constitutional. *Little,* 2014 WL 4783006, at *2; *see also, e.g., Correction Officers Benevolent Ass'n v. Kralik,* No. 04 Civ. 2199, 2011 WL 1236135, at *11 (S.D.N.Y. Mar. 30, 2011) ("More recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex may be permissible, but that 'regular and close viewing' is prohibited."); *Baker v. Welch,* No. 03 Civ. 2267, 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) ("[T]he balance should be struck to allow incidental and obscured viewing but prohibit regular and close viewing."); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) (explaining that the Second Circuit's opinion in *Forts v. Ward* "merely emphasizes that in

order for inmates to show a violation of their privacy rights, they must show that the 'viewing' by guards of the opposite sex occurs on a regular basis" and distinguishing *Forts* from situations wherein "female guards ... only occasionally view[ ] male inmates undressed or using the shower and toilet facilities"). The Court does not read these cases to preclude the possibility, however, that a single search may also violate an inmate's right to privacy. *See, e.g., Hayes v. Marriott,* 70 F.3d 1144, 1145, 1147 (10th Cir.1995) (reversing dismissal of complaint where male inmate alleged "that he was subjected to a body cavity search in the presence of over 100 people, including female secretaries and case managers," and recognizing that, "[a]lthough we have stated that the frequency with which prison guards watch inmates of the opposite sex undressing, using toilet facilities, and showering is an important factor in assessing the constitutionality of prison practices, we have also concluded that a prisoner's right to privacy may be violated by a single search" (citations omitted)).

**[26]** **[27]** Here, although Jennings conducted the visual strip search from a distance of about three feet,[14] and Holland does not allege that she touched him, it is clear that the search was not "indirect," "incidental," or "brief," but rather an invasive search in which Jennings directly viewed the "most private portions" of Holland's body. *Harris,* 818 F.3d at 58. Holland's allegations also make clear, however, that the search took place in the context of an emergency, as part of a security response to a stabbing in Holland's housing unit.[15] For this reason, absent allegations that the search was unnecessarily prolonged or repeated, the Court concludes that Jennings is entitled to qualified immunity on this claim. As in the First Amendment context discussed above, there appear to be no Supreme Court or Second Circuit decisions establishing that, in an emergency situation, inmates have a Fourth Amendment right to be free from strip searches —even body cavity searches—by officers of the opposite sex. Courts in this Circuit and others consistently suggest that exigent circumstances may justify strip searches by officers of the opposite sex. *See, e.g., id.* at 63 ("[C]ross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon."); *Grummett v. Rushen,* 779 F.2d 491, 495–96 (9th Cir.1985) (holding that, "[e]ven if we conclude that such a situation represents an invasion of privacy rights," the "interest in prison security justifie[d]" female guards' observation of strip searches "in two or three emergency situations"); *Canedy,* 16 F.3d at 187 (recognizing holdings of federal courts "that pat-down searches and occasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy. But that right is violated where this observation is more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence."); *Letcher v. Turner,* 968 F.2d 508, 510 & n. (5th Cir.1992) (endorsing the principle "that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility," particularly where a "disturbance involving 18 or 19 inmates had just taken place"); *cf. Moore v. Carwell,* 168 F.3d 234, 237 (5th Cir.1999) (finding complaint sufficiently pleaded Fourth Amendment claim where male inmate alleged female officer conducted multiple strip and body cavity searches "despite the absence of emergency or extraordinary circumstances").[16] Jennings, therefore, is entitled to qualified immunity to the extent that Holland asserts Fourth Amendment claims against her in her individual capacity. *See Askins,* 727 F.3d at 254 ("Qualified immunity is a defense available only to individuals sued in their individual capacity.").

**\*9** Accordingly, Defendants' motion to dismiss Holland's Fourth Amendment claim against Jennings in her individual capacity is GRANTED.

### C. Eighth Amendment

**[28]** **[29]** **[30]** Holland also alleges that Jennings violated his Eighth Amendment right to be free from cruel and unusual punishment. Specifically, he alleges that Jennings used excessive force in forcing him to submit to the strip search. Am. Compl. ¶¶ 61, 63; Pl. Opp. 10. Because the Court assumes Holland was a pretrial detainee at the time of the search, *see supra* note 5, his claims under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Ordinarily, the standard applied under

either clause is identical. *See Caiozzo v. Koreman,* 581 F.3d 63, 69, 72 (2d Cir.2009). To state a traditional Eighth Amendment claim, a plaintiff must allege that (1) the alleged deprivation is "sufficiently serious" under an objective standard; and that (2) the charged officials acted, subjectively, with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Recently, however, the Supreme Court held that, for the excessive force claims of pretrial detainees in particular, "the appropriate standard ... is solely an objective one." *Kingsley,* 135 S.Ct. at 2473. For such claims, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," *id.* and "need not demonstrate that [the] officer was subjectively aware that his use of force was unreasonable," *Ross v. Correction Officers John & Jane Does 1–5,* 610 Fed.Appx. 75, 76 n. 1 (2d Cir.2015). In determining objective reasonableness, which depends on the facts and circumstances of each case, courts may consider a number of factors, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley,* 135 S.Ct. at 2473 (citing *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). For challenges to strip searches in particular, to state an Eighth Amendment violation, courts in this Circuit require that a plaintiff allege that the defendants engaged in egregious conduct. *See, e.g., Vaughn,* 2013 WL 3481413, at *3 (holding that "the alleged abuse caused by the visual cavity search was not severe enough to satisfy the objective seriousness requirement of Eighth Amendment analysis. As discussed, visual cavity searches have been consistently upheld as a legitimate penological restriction."); *see also Easley v. Pinnell,* No. 98–16536, 1999 WL 311390, at *1 (9th Cir. May 13, 1999) ("[V]isual anal cavity searches [of male prisoner] conducted within female prison officials' view does not amount to cruel and unusual punishment.").

**\*10**  **[31]**  **[32]**  Here, the only force Holland alleges is a verbal threat made by Jennings, namely that she

threatened that there would be "some repercu [ss]ions" if he did not comply with her order to strip down. Am. Compl. ¶ 43. Holland claims that her threat made him "fear[ ] for his life" because Jennings "is known... for sending her male officers that work under her command ... to use force" if an inmate does not comply. *Id.* ¶¶ 44-45. The Court concludes that Jennings' threat is insufficient to state a claim of excessive force. "Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983." *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)); *see also Vaughn,* 2013 WL 3481413, at *5 (holding Rikers guard's threat that inmates "shut the fuck up" or he would "place a shank on [them]," although "inappropriate and threatening if true, [does] not rise to the level of an Eighth Amendment violation"); *Harris v. Lord,* 957 F.Supp. 471, 475 (S.D.N.Y.1997) ("The law is clear that 'although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983.' " (citation omitted)); *Arnold v. Westchester Cty.,* No. 09 Civ. 3727, 2012 WL 336129, at *11 (S.D.N.Y. Feb. 3, 2012) (finding officer's instruction to inmate "to open his anus for a cavity inspection" did not violate the Eighth Amendment), *report and recommendation adopted,* 2012 WL 841484 (S.D.N.Y. Mar. 13, 2012); *Vaughn,* 2013 WL 3481413, at *3 ("Even where inmates allege aggressive or inappropriate behavior during strip searches, courts are reluctant to find that such activity rises to the objectively serious level of an Eighth Amendment violation."). Moreover, the complaint establishes that Jennings' threat was made in response to Holland's initial refusal to comply with the strip search. Am. Compl. ¶¶ 42-43. It cannot be said that her vague, verbal threat was a more than necessary use of force to obtain Holland's compliance. *See, e.g., Michenfelder v. Sumner,* 860 F.2d 328, 336 (9th Cir.1988) ("[T]he legitimate penological purpose of strip searches —to discover hidden weapons and contraband—justifies using force necessary to induce compliance by difficult inmates.").

**[33]**  **[34]**  In addition, insofar as Holland is also claiming sexual abuse or harassment by Jennings, the Second Circuit has concluded that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder,* 105 F.3d 857, 860–61 (2d Cir.1997). Although it is unclear whether,

post-*Kingsley,* the sexual abuse claims of a pretrial detainee must still meet both the objective and subjective prongs of the traditional Eighth Amendment analysis, [17] the Court holds that Holland's allegations fail to meet both. The subjective prong requires a showing that the search was "undertaken maliciously or for the purposes of sexually abusing an inmate," rather than "in a good-faith effort to maintain or restore discipline." *Crawford v. Cuomo,* 796 F.3d 252, 258 (2d Cir.2015). Given the exigent situation justifying the search, and the absence of any allegations that the search was unnecessarily prolonged or repeated, the complaint fails to make this showing. *See id.* at 257–58 ("[T]he principal inquiry is whether the [officer's conduct] is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate.").

Moreover, Holland does not allege any physical contact or even comments of a sexual nature. To date, in this Circuit, there has been "no case in which a plaintiff ha[s] established an actionable claim of sexual harassment under *Boddie* without having physical contact with the alleged perpetrator," *Vogelfang v. Capra,* 889 F.Supp.2d 489, 508 (S.D.N.Y.2012), or without, at the very least, alleging egregious sexual conduct, *see Smith v. Roberson*, No. 15 Civ. 930, 2016 WL 1056588, at *3 (N.D.N.Y. Mar. 16, 2016) (finding "sufficiently serious" to state an Eighth Amendment violation female detainee's allegations that a guard "chased her, exposed his genitalia to her and threatened her with sexual assault"). Even "significant but episodic physical contact has often been held insufficient to make out an Eighth Amendment claim for sexual harassment." *Vogelfang,* 889 F.Supp.2d at 508; *see also Boddie,* 105 F.3d at 859–61 (affirming as inadequate prisoner's allegations that female correction officer made a possible "pass" at him, "squeezed his hand, touched his penis," called him a "sexy black devil," pressed her breasts against his chest more than once, and pushed her "vagina against [his] penis"). Also, the Second Circuit has declined to find an Eighth Amendment violation where there are no allegations of physical contact, but the alleged verbal conduct is egregious. *See Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (affirming dismissal of Eighth Amendment claim where female prison employee asked the plaintiff "to have sex with her and to masturbate in front of her and other female staffers"), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), *as recognized in Berry v. Kerik,*

366 F.3d 85, 87–88 (2d Cir.2003). Therefore, Holland's Eighth Amendment claim fails on this ground as well.

**\*11** Accordingly, Defendants' motion to dismiss Holland's Eighth Amendment claim against Jennings is GRANTED.

### D. Due Process Under the Fourteenth Amendment

Finally, Holland alleges that Jennings violated his "right to freedom from deprivation of liberty without due process." Am. Compl. ¶ 56. Although it is unclear whether Holland is making a claim of procedural or substantive due process, or both, given his *pro se* status, the Court will consider his complaint to be making both claims.

#### 1. Substantive Due Process

**[35]** "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.' " *Kia P. v. McIntyre,* 235 F.3d 749, 757–58 (2d Cir.2000) (quoting *Conn. v. Gabbert,* 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)); *see also Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ( "[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). This is so because, as the Supreme Court has observed, "the guideposts for responsible decisionmaking" in the "unchartered area" of substantive due process "are scarce and open-ended." *Albright v. Oliver,* 510 U.S. 266, 271–72, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion). As a result, the Supreme Court has "always been reluctant to expand the concept of substantive due process" and has limited the availability of such claims to those which are not covered under other amendments. *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 842–43, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (internal quotation marks omitted)). The Court concludes, therefore, that because all of Holland's

constitutional claims are covered under either First, Fourth or Eighth Amendment standards, he does not have an additional substantive due process cause of action under the Fourteenth Amendment. *See Velez, 401 F.3d at 94* (holding that the "plaintiff's substantive due process claim is either subsumed in her more particularized allegations" raising First Amendment and Equal Protection Clause claims, "or must fail.").

Accordingly, to the extent that Holland raises a substantive due process claim, it is DISMISSED.

### 2. Procedural Due Process

**[36]** **[37]** Holland alleges that Jennings strip searched him in violation of prison policy, *see* Am. Compl. 2, which the Court construes as an attempt to assert a procedural due process claim. To state a procedural due process claim, Holland "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001). [18]

**\*12** **[38]** **[39]** **[40]** **[41]** The policy Holland claims Jennings violated is New York City Department of Correction Directive 4508, *see* Pl. Opp. 2, which provides that "only personnel of the same gender (meaning 'sex') as the inmate being searched and who are essential for security reasons shall be present during a Strip Frisk Without A Body Cavity Search. Whenever possible, a supervisory officer shall be present during such searches." *Id.*. Defendants contend that Directive 4508 was not in effect in 2013 at the time of the challenged strip search, but that, rather, another policy was in effect that contains nearly identical language but also adds the qualifier, "[a]*bsent an emergency,* only personnel of the same sex as the inmate ..." ECF No. 39-1 (emphasis added); *see* Def. Reply 3. Regardless of which policy applies, however, "there is no federal constitutional liberty interest in having ... prison officials follow prison regulations." *Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir.2003). Even assuming that Directive 4508 was in effect at the time of the search and Jennings violated it, such an allegation does not give rise to liability under Section 1983. It is well settled that "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002). An alleged violation of a prison policy,

directive, or regulation, in and of itself, does not give rise to a federal claim, because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990); *see also Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at \*6 (S.D.N.Y. Mar. 15, 2001) ("To the extent that [plaintiff] claims defendants failed to follow prison regulations, such as directives concerning the implementation of disturbance control plans ..., these state law violations are not cognizable under § 1983."); *Doe v. Conn. Dep't of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiffs] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983."); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997) ("A prison inmate does not have a viable § 1983 claim based solely on prison officials' failure to adhere to the requirements of prison regulations, directives or policy statements.").

Accordingly, to the extent that Holland raises a procedural due process claim, it is DISMISSED.

### E. Failure to Intervene

**[42]** **[43]** **[44]** **[45]** Holland alleges that Correction Officers Luly, Clarke, and Louden failed to intervene when they observed Jennings violating Holland's rights. Am. Compl. ¶¶ 20, 25, 30. Correction officers can be held liable under Section 1983 for not intervening to protect the constitutional rights of inmates from infringement by other officers. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). However, liability attaches only when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citing *O'Neill,* 839 F.2d at 11–12). "If the Court determines that the officer's conduct did not violate a constitutional right, however, the analysis ends." *Feinberg v. City of New York,* No. 99 Civ. 1127, 2004 WL 1824373, at \*4 (S.D.N.Y. Aug. 13, 2004) (citing *Saucier v. Katz,* 533 U.S. 194,

201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); *see also Usavage v. Port Auth. of New York & New Jersey,* 932 F.Supp.2d 575, 599 (S.D.N.Y.2013) ("Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim." (internal quotation marks omitted)). Thus, because the Court holds that Holland has failed to plead an Eighth Amendment violation, the correction officer defendants cannot be held liable for failing to intervene. Further, an officer is entitled to qualified immunity unless his failure to intercede was under "circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate [the plaintiff's] rights." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997). The Court's conclusion that Holland's First and Fourth Amendment claims against Jennings (in her individual capacity) are precluded by qualified immunity applies equally to Luly, Clarke, and Louden, because they too would not reasonably have known that Holland's constitutional rights were being violated. *See, e.g., Ricciuti,* 124 F.3d at 129 ("A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known." (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727)).

**\*13** Accordingly, Defendants' motion to dismiss Holland's failure to intervene claim against Luly, Clarke, and Louden is GRANTED.

### F. Claims Against Schriro and Perrino

**[46] [47] [48]** Holland also alleges constitutional violations by former Correction Commissioner Dora B. Schriro and Warden James Perrino, who were not present at the challenged strip search. It is well settled that supervisors cannot be held liable in a Section 1983 suit solely on a theory of *respondeat superior*. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (requiring "a showing of more than the linkage in the prison chain of command" to hold a prison official liable under Section 1983). To state a claim under Section 1983, a plaintiff must allege the personal involvement of each defendant. *See, e.g., Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation,

standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Kee v. Hasty,* No. 01 Civ. 2123, 2004 WL 807071, at \*12 (S.D.N.Y. Apr. 14, 2004) (internal citations omitted). Rather, a plaintiff in a Section 1983 action must show that the supervisor was personally involved in a constitutional violation by either (1) directly participating in the violation; (2) failing to remedy the violation after learning of it through a report or appeal; (3) creating a custom or policy fostering the violation or allowing the custom or policy to continue after learning about it; (4) being grossly negligent in supervising the officers involved; or (5) exhibiting deliberate indifference to the constitutional rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). In *Ashcroft v. Iqbal,* the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676, 129 S.Ct. 1937. The Second Circuit has not resolved whether *Iqbal* "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations." *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013); *see also Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012) (observing that the limitation on supervisory liability in *Iqbal* "has, of course, engendered conflict within our own Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*"). Regardless, the Court concludes that Holland has failed to plead the requisite personal involvement to sustain his claims against Schriro and Perrino. *See Grullon,* 720 F.3d at 139 (declining to resolve *Colon's* tension with *Iqbal* while affirming dismissal under *Colon* analysis).

**[49]** Holland's claims against Schriro and Perrino, which vaguely allege that they "pursued a policy and custom of deliberate indifference" in the "hiring, training and supervision of" Jennings and the correction officer defendants, Am. Compl. ¶¶ 67-68, [19] appear to fail under the third, fourth, and fifth *Colon* categories. Without more than the allegations related to the single strip search incident that forms the basis of the complaint, however, Holland's vague allegations as to Schriro and Perrino amount to "nothing more than a bare assertion" that they were supervisors of Jennings and the correction officer defendants, which is insufficient

to state a Section 1983 claim. *Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *see also Parris v. New York State Dep't Corr. Servs.,* 947 F.Supp.2d 354, 364 (S.D.N.Y.2013) ("Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983."); *Koehl v. Bernstein,* No. 10 Civ. 3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011) ("[C]onclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement."), *report and recommendation adopted,* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *Burgis v. Dep't of Sanitation City of New York,* No. 13 Civ. 1011, 2014 WL 1303447, at *6 (S.D.N.Y. Mar. 31, 2014) ("Courts have repeatedly held that including boilerplate language alleging the existence of a policy, without factual allegations to support it, is not enough at the pleading stage."). "To the extent that the complaint attempts to assert a failure-to-supervise claim, moreover, it lacks any hint that [Schriro and Perrino] acted with deliberate indifference to the possibility that [their] subordinates would violate [Holland's] constitutional rights." *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (affirming dismissal where conclusory allegations that corrections commissioner failed to supervise and train subordinates failed to establish the requisite personal involvement).

**\*14** Accordingly, Defendants' motion to dismiss Holland's Section 1983 claims against Schriro and Perrino is GRANTED.

### G. Claims Against Individual Defendants in Their Official Capacities

**[50]** To the extent that there are any remaining claims against Schriro, Perrino, Jennings, Luly, Clarke, and Louden in their official capacities, the Court concludes that those claims are redundant and duplicative of Holland's claims against the City and should, therefore, be dismissed. "[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 687 (2d Cir.2005); *see also Davis v. Stratton,* 360 Fed.Appx. 182, 183 (2d Cir.2010) ("The suit against the mayor and police chief in their official capacities is essentially a suit against the City... because in a suit against a public entity, naming officials of the public entity in their

official capacities 'add[s] nothing to the suit.' " (citation omitted)).

Accordingly, Defendants' motion to dismiss Holland's Section 1983 claims against Schriro, Perrino, Jennings, Luly, Clarke, and Louden in their official capacities is GRANTED.

### H. Claims Against the City

**[51]** **[52]** **[53]** Holland's Section 1983 claims against the City must also be dismissed. To state a Section 1983 claim against a municipality, a plaintiff must assert that the alleged violations were committed pursuant to an official policy, practice, or custom. *See Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff can meet this requirement by identifying a particular decision or action by someone who is a final policymaker for the governmental entity being sued. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir.2004) (internal quotation marks omitted). Generally, however, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." *Triano v. Town of Harrison,* 895 F.Supp.2d 526, 532 (S.D.N.Y.2012) (internal alteration omitted).

**[54]** **[55]** **[56]** As a threshold matter, "the City cannot be liable under *Monell* where [p]laintiff cannot establish a violation of his constitutional rights." *Askins,* 727 F.3d at 253 (internal quotation marks omitted). Thus, because the Court concludes that Holland has failed to plead an Eighth Amendment claim, the City cannot be held liable on that claim. By contrast, the Court's holding that Holland's First and Fourth Amendment claims against Jennings and the correction officer defendants in their individual capacities are precluded by qualified immunity does not bar <u>him</u> from pursuing those claims against the City. *See id.* at 254 ("[T]he entitlement of the individual municipal actors to qualified immunity ... is [ ] irrelevant

to the liability of the municipality. Qualified immunity is a defense available only to individuals sued in their individual capacity."); *Pinter v. City of New York*, 976 F.Supp.2d 539, 557 (S.D.N.Y.2013) (concluding that grant of qualified immunity to individual defendants "does not by itself bar [the plaintiff's] false arrest and malicious prosecution claims against the City"). However, Holland has pleaded no facts to support a *Monell* claim against the City. The only allegations Holland makes against the City are the same allegations he asserts against Schriro and Perrino—that the City "knew of the individual correctional officers['] tendencies to make unlawful searches," and that, "in the hiring, training and supervision of ... Luly, Louden, Clarke and Jennings," the city has "pursued a policy and custom of deliberate indifference to the rights of persons in City jails," which directly and proximately resulted in the violation of Holland's constitutional rights. Am. Compl. ¶¶ 9, 67-68. These allegations are entirely conclusory and must, therefore, be disregarded. Holland has not identified any specific municipal policy or custom that caused his injuries. Moreover, "conclusory allegations that a municipality failed to train and supervise its employees" are insufficient to state a *Monell* claim absent supporting factual allegations. *Davis v. City of New York,* No. 07 Civ. 1395, 2008 WL 2511734, at *6 (S.D.N.Y. June 19, 2008); *see also Oparaji v. City of New York,* No. 96 Civ. 6233, 1997 WL 139160, at *3 (E.D.N.Y. Mar. 21, 1997) (finding that the "complaint, even if read liberally, [did] not contain a single fact in support of [plaintiff's] conclusory allegation" where he alleged "only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights").

**\*15** Accordingly, Defendants' motion to dismiss Holland's Section 1983 claims against the City is GRANTED.

IV. Pendent State Law Claims

Holland also alleges violations of New York state law. *See, e.g.,* Am. Compl. 2. Though he does not specify which causes of action he is pursuing, at least one of his claims appears to be for negligent hiring and retention. Am. Compl. ¶¶ 7, 17, 22, 27, 32. Having dismissed his federal law claims, the Court declines to exercise supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(c). *See Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 727 (2d Cir.2013) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Powell v. Gardner,* 891 F.2d 1039, 1047 (2d Cir.1989) ("[I]n light of the proper dismissal of the § 1983 claim against the County, the district court should have declined to exercise pendent jurisdiction over [the plaintiff's] state-law claims against the County.").

Accordingly, Holland's state law claims are DISMISSED without prejudice to renewal in state court.

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to (1) mail a copy of this order and all unpublished decisions cited therein to Plaintiff *pro se* and (2) close the case.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2016 WL 3636249

Footnotes

1    Russell is not a defendant in this action.

2    Jennings' title has since changed to "Chief." *See* Def. Mem. 1; Def. Reply 2, ECF No. 39.

3    *See* Am. Compl. ¶¶ 58-59 (alleging Holland suffered unspecified "pain, anxiety attack[s]," "future psychological damage," "mental anguish," and "emotional distress" as a result of the strip search).

4    Indeed, Holland specifically seeks punitive damages and "[t]he abstract value of a constitutional right." Am. Compl. ¶¶ 65, 70.

5    Holland does not specify whether he was a pretrial detainee or a convicted prisoner at the time of the challenged strip search; for purposes of this motion, the Court adopts Defendants' assumption that he was a pretrial detainee. *See* Def.

Mem. 5 n.1. Although "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights ... enjoyed by convicted prisoners," *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court has held that the principles limiting the constitutional rights of incarcerated individuals "appl[y] equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546, 99 S.Ct. 1861; *see also id.* at 546 n. 28, 99 S.Ct. 1861 (finding "no reason" to "distinguish[ ] between pretrial detainees and convicted inmates in reviewing the challenged security practices .... There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order."); *but cf. Kingsley v. Hendrickson,* ------ U.S. ------, 135 S.Ct. 2466, 2473, 2475–76, 192 L.Ed.2d 416 (2015) (distinguishing between convicted prisoners and pretrial detainees in concluding that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," but acknowledging that its conclusion "may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners"); *Johnston v. Maha,* 460 Fed.Appx. 11, 14 (2d Cir.2012) (finding requirement that convicted prisoners asserting a procedural due process claim show an "atypical and significant hardship" does not apply to pretrial detainees).

6   Moreover, "once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these [penological] concerns were irrational." *Ford v. McGinnis*, 352 F.3d 582, 595 (2d Cir.2003) (internal quotation marks omitted); *see also Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) ( "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

7   The Second Circuit has acknowledged that, "[a]lthough *Turner* and *O'Lone* concerned the reasonableness of prison regulations,... the analysis is the same as to an individual decision to deny a prisoner the ability to engage in some requested religious practice." *Ford*, 352 F.3d at 595 n. 15. Thus, regardless of whether Holland's rights were violated pursuant to an individual decision or a prison rule, regulation or policy, the inquiry is the same. *Id.*; *see also Salahuddin v. Goord*, 467 F.3d 263, 274 n. 4 (2d Cir.2006) ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise.").

8   The Court notes that the continuing vitality of the "substantial burden" requirement for free exercise claims is in question. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir.2014) (citation omitted). In any event, the Court finds that Holland meets the substantial burden test, a "not [ ] particularly onerous task." *Fifth Ave. Presbyterian Church v. City of New York*, No. 01 Civ. 11493, 2004 WL 2471406, at *3 (S.D.N.Y. Oct. 29, 2004) (quoting *McEachin*, 357 F.3d at 202); *see Holland*, 758 F.3d at 221 (analyzing First Amendment claim with the substantial burden requirement because "even assuming the continued vitality of [this requirement], our precedent squarely dictates that [the plaintiff's] religious exercise was unconstitutionally burdened"); *Woodward*, 2014 WL 4276416, at *5 ("On a motion to dismiss, the court's inquiry on substantial burden 'turns on whether [being covered outside the presence of one's wife] 'is considered central or important to [the plaintiff's] practice of Islam.'' ... Based on [the plaintiff's] contention that showering in the presence of a female guard violated a central tenet of his religion, the Court finds that [the plaintiff] has met the 'not... particularly onerous task' of establishing a substantial burden at the motion to dismiss stage." (quoting *Covington v. Mountries*, No. 13 Civ. 343, 2014 WL 2095159, at *4 (S.D.N.Y. May 20, 2014))).

9   In free exercise cases, scrutiny of a plaintiff's sincerity "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984). Defendants contend that Holland's original complaint belies his claim of piety because in it he stated that the strip search conducted by Jennings "shattered" his "aspiration[s] of becoming a male nude artist" by making him "fearful[ ] of ever removing certain parts of [his] clothing in front of a female [ever]. Thus hindering [him] from this path of employment." Compl. at 5, ECF No. 1. Given these statements, Defendants argue that Holland "cannot plausibly allege that the practice asserted is a belief that is sincerely held by him." Def. Mem. 15. Holland, in turn, urges the Court to disregard the original complaint because the amended complaint "supersedes the earlier one, in effect starting thing[s] over." Pl. Opp. 14, ECF No. 38.

Although "[t]he liberality with which courts examine *pro se* pleadings does not require a court to 'accept as true allegations that conflict with a plaintiff's prior allegations,' " *Vaughn v. Strickland*, Nos. 12 Civ. 2696, 2013 WL 3481413, at *6 (S.D.N.Y. July 11, 2013), the Court notes that it may decline, at the motion to dismiss stage, to question the sincerity of Holland's beliefs on the basis of his prior pleading. "Prior inconsistent pleadings, though admissible against plaintiff in the case in which they were originally filed as well as in any subsequent litigation involving that party, are controvertible,

not conclusive, admissions." *The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 395 n. 5 (S.D.N.Y.1988) (citing *United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984)); *see also Dweck v. Pacificorp Capital, Inc.,* No. 91Civ. 2095, 1998 WL 88742, at *7 (S.D.N.Y. Mar. 2, 1998) ("It is well-established in the Second Circuit that superseded pleadings, while not judicial admissions *per se,* may be introduced as evidence and considered an admission."). "While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course." *Barris v. Hamilton,* No. 96 Civ. 9541, 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999) (citation omitted). In any event, the Court need not reach the question of Holland's sincerity given its conclusion that Defendants are entitled to qualified immunity on his free exercise claim.

10    Although the Court is permitted to determine whether a constitutional right exists before examining whether it was clearly established as part of the qualified immunity analysis, it declines to do so here. *See Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *see also Camreta v. Greene,* 563 U.S. 692, 707, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").

11    This conclusion does not, of course, excuse Jennings and other prison officials from their duty to "take care to avoid unnecessary humiliation" and to not conduct searches "with so little regard for human dignity and privacy as to be unreasonable." *Storms v. Coughlin,* 600 F.Supp. 1214, 1224 (S.D.N.Y.1984).

12    For the same reasons, any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.,* that could be construed from Holland's allegations, *see Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *17 & n. 7 (S.D.N.Y. Oct. 8, 2009) (construing complaint as asserting RLUIPA claim despite *pro se* plaintiff's failure to cite statute), would also fail. *See Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (finding the defendant prison employees entitled to qualified immunity with respect to inmate's First Amendment and RLUIPA claims because it had not been clearly established by the Second Circuit or Supreme Court that the challenged prison policy violated inmate's rights).

13    Cites to Holland's opposition papers refer to the page number assigned by ECF at the top of each page.

14    *See* Pl. Opp. 5 (admitting that, "during the strip frisk search defendant Jennin[gs] [was] approximately 3-feet away from Plaintiff").

15    Holland also alleges that he was chosen for the strip search from a list of names of inmates "that were not involved" in the fight, Am. Compl. ¶ 38, and reiterates in his opposition that he and those other inmates were "cleared of any wrong doing" after the fight and prior to the search, such that the strip search "was only conducted to humiliate him," and for "other sick reasons," Pl. Opp. 6. However, officers do not need reasonable suspicion that an inmate may have a concealed weapon or other contraband in order to strip search him. *See Florence,* 132 S.Ct. at 1519–22.

16    *See also Byrd,* 629 F.3d at 1142 (quoting the 2009 National Prison Rape Elimination Commission Report, which "determined that[,] '[t]o prevent abuse,... the [Commission's recommended] standard ... strictly prohibits non-medical staff from conducting cross-gender strip and visual body cavity searches—except in the case of emergency—because of their extraordinarily intrusive nature.' "); *id.* (quoting Standards for Adult Correctional Institutions § 4-4194 (2003), which sets forth the American Correctional Association's recommended standard for cross-gender strip searches, providing that, "except in emergency situations, visual inspections of inmate body cavities are conducted by officers of the same sex, in private").

17    *See Harry v. Suarez,* No. 10 Civ. 6756, 2012 WL 2053533, at *2 n. 3 (S.D.N.Y. June 4, 2012) (recognizing, pre-*Kingsley,* that for pretrial detainees, "the established Eighth Amendment framework for claims of sexual abuse by prison officials would still provide the appropriate standards for resolving plaintiff's claims").

18    Convicted prisoners must also show that the liberty deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472,484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In this Circuit, however, the "atypical and significant hardship" requirement does not apply to pretrial detainees. *See Johnston,* 460 Fed.Appx. at 14 ("The District Court erred in applying *Sandin* ... [to] a pretrial detainee."); *Iqbal v. Hasty,* 490 F.3d 143, 163 (2d Cir.2007) ("*Sandin* does not apply to pretrial detainees."), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Benjamin v. Kerik,* 102 F.Supp.2d 157, 172 (S.D.N.Y.2000) (concluding that *Sandin*'s "justification for limiting a convicted inmate's rights ... does not apply to pretrial detainees"), *aff'd sub nom. Benjamin v. Fraser,* 264 F.3d 175, 188–89 (2d Cir.2001).

19    *See also* Am. Compl. ¶¶ 17 (alleging that "defendant supervisors failed to train, supervise, discipline and control defendant Jenning[s]"), 9 (alleging that "Commissioner and Warden knew of the individual correctional officers['] tendencies to make unlawful searches").

---

     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3636249
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Rasheem M. Holland, Plaintiff,

v.

The City of New York, Commissioner of Correctional
Services, Dora B. Schriro, Deputy of Security Hazel
Jennings of R.N.D.C., Warden James Perrino
of R.N.D.C., Correctional Officers of R.N.D.C.,
Claude Luly Shield #3932, Garfield Clarke #14403,
John Louden #9250, each sued individually
and in his or her official capacity, Defendants.

14 Civ. 5517 (AT)
|
Signed June 24, 2016

**Synopsis**
**Background:** Muslim pretrial detainee, proceeding pro
se, brought § 1983 action against city, certain city
officials, and individual correction officers, alleging that
his constitutional rights were violated when he was
subjected to visual body cavity strip search by female
officer. Defendants moved to dismiss for failure to state
claim.

**Holdings:** The District Court, Analisa Torres, J., held that:

[1] female officer was entitled to qualified immunity from
detainee's free exercise claim;

[2] officer was entitled to qualified immunity from
detainee's Fourth Amendment claim;

[3] officer's alleged verbal threat to detainee, if proven, was
not objectively unreasonable;

[4] officer's strip search of detainee did not amount to
sexual harassment in violation of detainee's due process
rights;

[5] officer's alleged violation of jail's internal policies
during strip search, if proven, did not amount to violation
of procedural due process;

[6] detainee failed to allege that prison supervisors were
personally involved in officer's allegedly unconstitutional
strip search; and

[7] detainee failed to allege that allegedly unconstitutional
strip search occurred pursuant to official city policy.

Motion granted.

West Headnotes (56)

[1] **Attorney and Client**
👉 Rights of litigants to act in person or by
attorney
**Federal Civil Procedure**
👉 Pro Se or Lay Pleadings

A court will liberally construe pleadings
and briefs submitted by pro se litigants,
reading such submissions to raise the strongest
arguments they suggest.

Cases that cite this headnote

[2] **Attorney and Client**
👉 Rights of litigants to act in person or by
attorney

The policy of liberally construing pro se
submissions is driven by the understanding
that implicit in the right to self-representation
is an obligation on the part of the court
to make reasonable allowances to protect
pro se litigants from inadvertent forfeiture of
important rights because of their lack of legal
training.

Cases that cite this headnote

[3] **Federal Civil Procedure**
👉 Pro Se or Lay Pleadings

Although courts are obligated to draw the
most favorable inferences that a pro se
plaintiff's complaint supports, courts cannot
invent factual allegations that he has not
pled; the pleadings must still contain factual

allegations that raise a right to relief above the speculative level.

Cases that cite this headnote

[4]   **Civil Rights**
     🔑 Grounds and subjects;compensatory damages

   **Civil Rights**
     🔑 Mental suffering, emotional distress, humiliation, or embarrassment

Although the Prison Litigation Reform Act (PLRA) bars compensatory damages for mental or emotional injury, even absent physical injury, a plaintiff may still recover compensatory damages for the loss of a constitutional liberty interest; such damages are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(e).

Cases that cite this headnote

[5]   **Damages**
     🔑 Nominal or Substantial Damages

   **Damages**
     🔑 Injuries for Which Exemplary Damages May Be Awarded

The Prison Litigation Reform Act (PLRA) does not bar a plaintiff from recovering punitive or nominal damages. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(e).

Cases that cite this headnote

[6]   **Prisons**
     🔑 Status, rights, and disabilities in general

While persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights.

Cases that cite this headnote

[7]   **Prisons**
     🔑 Regulation and supervision in general; role of courts

   **Prisons**
     🔑 Discipline, security, and safety in general

   **Prisons**
     🔑 Rehabilitation and reformation

Limitations on the exercise of constitutional rights by prisoners arise both from the fact of incarceration and from valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security.

Cases that cite this headnote

[8]   **Prisons**
     🔑 Regulation and supervision in general; role of courts

The constitutional claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.

Cases that cite this headnote

[9]   **Constitutional Law**
     🔑 Prisons

   **Constitutional Law**
     🔑 Prisons and Pretrial Detention

Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion; a prisoner's right to practice his religion is, however, not absolute. U.S. Const. Amend. 1.

Cases that cite this headnote

[10]   **Constitutional Law**
     🔑 Prisons and Pretrial Detention

To assess a prisoner's free exercise claim, a court must determine: (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely

held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective. U.S. Const. Amend. 1.

Cases that cite this headnote

[11]　Prisons
　　　👉 Religious Practices and Materials

Even assuming a prisoner can show that his religious beliefs are sincerely held and were infringed, prison officials' misconduct would be excusable if it was supported by legitimate penological interests. U.S. Const. Amend. 1.

Cases that cite this headnote

[12]　Constitutional Law
　　　👉 Freedom of religion and conscience

Once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these penological concerns were irrational. U.S. Const. Amend. 1.

Cases that cite this headnote

[13]　Constitutional Law
　　　👉 Beliefs protected;inquiry into beliefs

In free exercise cases, scrutiny of a plaintiff's sincerity provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud. U.S. Const. Amend. 1.

Cases that cite this headnote

[14]　Evidence
　　　👉 Pleadings

Prior inconsistent pleadings, though admissible against plaintiff in the case in which they were originally filed as well as in any subsequent litigation involving that party, are controvertible, not conclusive, admissions.

Cases that cite this headnote

[15]　Evidence
　　　👉 Pleadings superseded, withdrawn, or abandoned

Federal Civil Procedure
　　　👉 Effect of amendment

While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course.

Cases that cite this headnote

[16]　Civil Rights
　　　👉 Good faith and reasonableness; knowledge and clarity of law;motive and intent, in general

Under the qualified immunity doctrine, government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

2 Cases that cite this headnote

[17]　Civil Rights
　　　👉 Good faith and reasonableness; knowledge and clarity of law;motive and intent, in general

A government official performing a discretionary function will not be liable for damages if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law.

Cases that cite this headnote

[18]　Civil Rights

👉 Good faith and reasonableness; knowledge and clarity of law;motive and intent, in general

A right is clearly established, as required to defeat a qualified immunity defense, if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Court of Appeals has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.

Cases that cite this headnote

[19] **Federal Civil Procedure**
👉 Immunity

For qualified immunity to bar suit at the motion to dismiss stage, not only must the facts supporting the defense appear on the face of the complaint, but, as with all motions to dismiss for failure to state a claim, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

[20] **Civil Rights**
👉 Prisons, jails, and their officers;parole and probation officers

At time of strip search at city jail, Muslim pretrial detainee's alleged right to not be subject to visual strip search by officer of opposite sex was not clearly established, and thus officer was entitled to qualified immunity from detainee's free exercise claim brought under § 1983; strip search occurred after detainee's housing unit was locked down after fight, and there was no precedent establishing that detainee's religious rights outweighed jail's penological interest in observing inmates during emergency or exigent circumstances. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[21] **Prisons**
👉 Privacy in general

**Prisons**
👉 Particular violations, punishments, deprivations, and conditions

The Fourth Amendment protects individual privacy against certain kinds of governmental intrusion, and its protections extend to prisoners and pretrial detainees. U.S. Const. Amend. 4.

Cases that cite this headnote

[22] **Prisons**
👉 Search, Seizure, and Confiscation

**Prisons**
👉 Strip searches

Although the constitutional rights of inmates are restricted because of the considerations underlying the penal system, the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable; the reasonableness of a strip search, in turn, requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. U.S. Const. Amend. 4.

Cases that cite this headnote

[23] **Prisons**
👉 Strip searches

Courts deciding the constitutionality of a strip search of a prisoner must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. U.S. Const. Amend. 4.

Cases that cite this headnote

[24] **Prisons**
👉 Strip searches

A strip search is unconstitutional under the Fourth Amendment if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. U.S. Const. Amend. 4.

Cases that cite this headnote

**[25]** **Prisons**

🔑 Strip searches

Although, generally, the strip search of a male inmate in view of a female correction officer does not, by itself, rise to the level of a constitutional violation, strip searches conducted by members of the opposite sex constitute a heightened invasion of privacy and are thus subject to higher scrutiny than those conducted by members of the same sex. U.S. Const. Amend. 4.

Cases that cite this headnote

**[26]** **Civil Rights**

🔑 Prisons, jails, and their officers;parole and probation officers

There were no Supreme Court of Court of Appeals decisions establishing that, in emergency situation, inmates had Fourth Amendment right to be free from strip searches by officers of opposite sex, and thus any such right of pretrial detainee was not clearly established at time when female officer conducted visual strip search following stabbing in detainee's housing unit, and officer was entitled to qualified immunity from detainee's Fourth Amendment claim brought under § 1983 . U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[27]** **Prisons**

🔑 Strip searches

Officers do not need reasonable suspicion that an inmate may have a concealed weapon or other contraband in order to strip search him. U.S. Const. Amend. 4.

Cases that cite this headnote

**[28]** **Sentencing and Punishment**

🔑 Conditions of Confinement

**Sentencing and Punishment**

🔑 Deliberate indifference in general

To state a traditional Eighth Amendment claim, a prisoner must allege that: (1) the alleged deprivation is sufficiently serious under an objective standard, and (2) the charged officials acted, subjectively, with a sufficiently culpable state of mind. U.S. Const. Amend. 8.

Cases that cite this headnote

**[29]** **Constitutional Law**

🔑 Safety and security

For due process claims alleging excessive force against a pretrial detainee, the pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable, and need not demonstrate that the officer was subjectively aware that his use of force was unreasonable; in determining objective reasonableness, which depends on the facts and circumstances of each case, courts may consider a number of factors, including the relationship between the need for the use of force and the amount of force used, the extent of the detainee's injury, any effort made by the officer to temper or to limit the amount of force, the severity of the security problem at issue, the threat reasonably perceived by the officer, and whether the detainee was actively resisting. U.S. Const. Amend. 14.

Cases that cite this headnote

**[30]** **Sentencing and Punishment**

🔑 Searches and seizures

For challenges to strip searches, to state an Eighth Amendment violation, courts require that a plaintiff allege that the defendants engaged in egregious conduct. U.S. Const. Amend. 8.

Cases that cite this headnote

**[31]** **Constitutional Law**

🔑 Other particular conditions

**Prisons**

👈 Search, seizure, and confiscation

Correction officer's alleged verbal threat to pretrial detainee that there would be repercussions if he did not comply with her order to strip down and be searched, if proven, was not objectively unreasonable, and thus did not violate detainee's due process rights; threat did not result in any physical injury or damage, and alleged threat was made in response to detainee's initial refusal to comply with strip search. U.S. Const. Amend. 14.

Cases that cite this headnote

**[32]** **Sentencing and Punishment**
👈 Other particular conditions

Prisoner's allegations of threats or verbal harassment, without any injury or damage, do not state an Eighth Amendment claim under § 1983. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[33]** **Constitutional Law**
👈 Other particular conditions

**Prisons**
👈 Search, seizure, and confiscation

Officer's strip search of pretrial detainee did not amount to sexual harassment in violation of detainee's due process rights; search was undertaken following stabbing in detainee's housing unit, search was not unnecessarily prolonged or repeated, officer did not physically contact detainee, and officer did not make any comments of sexual nature. U.S. Const. Amend. 14.

Cases that cite this headnote

**[34]** **Sentencing and Punishment**
👈 Searches and privacy

The subjective prong of a prisoner's Eighth Amendment sexual abuse claim requires a showing that the search was undertaken maliciously or for the purposes of sexually abusing an inmate, rather than in a good-faith

effort to maintain or restore discipline. U.S. Const. Amend. 8.

Cases that cite this headnote

**[35]** **Constitutional Law**
👈 Relationship to Other Constitutional Provisions;Incorporation

Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[36]** **Constitutional Law**
👈 Procedural due process in general

To state a procedural due process claim, a plaintiff must establish: (1) that he possessed a liberty interest, and (2) that the defendants deprived him of that interest as a result of insufficient process. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[37]** **Constitutional Law**
👈 Conditions

**Constitutional Law**
👈 Conditions of confinement in general

Convicted prisoners seeking to establish a procedural due process claim must show that the liberty deprivation imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life; the "atypical and significant hardship" requirement does not apply to pretrial detainees. U.S. Const. Amend. 14.

Cases that cite this headnote

**[38]** **Constitutional Law**
👈 Imprisonment and Incidents Thereof

There is no federal due process liberty interest in having prison officials follow prison regulations. U.S. Const. Amend. 14.

Cases that cite this headnote

[39]   Civil Rights
          Prisons

A § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[40]   Constitutional Law
          Imprisonment and Incidents Thereof

An alleged violation of a prison policy, directive, or regulation, in and of itself, does not give rise to a federal due process claim under § 1983, because federal constitutional standards rather than state law define the requirements of procedural due process. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[41]   Constitutional Law
          Other particular conditions
       Prisons
          Search, seizure, and confiscation

Correction officer's alleged violation of jail's internal policies during strip search of pretrial detainee, if proven, did not amount to violation of procedural due process redressable under § 1983. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[42]   Civil Rights
          Prisons

Correction officers can be held liable under § 1983 for not intervening to protect the constitutional rights of inmates from infringement by other officers. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[43]   Civil Rights
          Prisons

Liability under § 1983 for a prison officer's failure to intervene attaches only when: (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[44]   Civil Rights
          Prisons

If a court determines that a prison officer's conduct did not violate a constitutional right, the analysis into a failure-to-intervene claim under § 1983 against other officers ends. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[45]   Civil Rights
          Prisons, jails, and their officers;parole and probation officers

A prison officer is entitled to qualified immunity from a § 1983 failure-to-intervene claim unless his failure to intercede was under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate the plaintiff's rights. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[46]   Civil Rights
          Vicarious liability and respondeat superior in general;supervisory liability in general

Supervisors cannot be held liable in a § 1983 suit solely on a theory of respondeat superior. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

Cases that cite this headnote

**[47]** **Civil Rights**

🔑 Vicarious liability and respondeat superior in general;supervisory liability in general

**Civil Rights**

🔑 Complaint in general

To state a claim under § 1983, a plaintiff must allege the personal involvement of each defendant; conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[48]** **Civil Rights**

🔑 Criminal law enforcement;prisons

A plaintiff in a § 1983 action alleging supervisory liability must show that the supervisor was personally involved in a constitutional violation by either: (1) directly participating in the violation; (2) failing to remedy the violation after learning of it through a report or appeal; (3) creating a custom or policy fostering the violation or allowing the custom or policy to continue after learning about it; (4) being grossly negligent in supervising the officers involved; or (5) exhibiting deliberate indifference to the constitutional rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[49]** **Civil Rights**

🔑 Criminal law enforcement;prisons

Pretrial detainee failed to allege that prison supervisors were personally involved in officer's allegedly unconstitutional strip search, as required to state claim against supervisors under § 1983. 42 U.S.C.A. § 1983.

**[50]** **Civil Rights**

🔑 Liability of Public Employees and Officials

A § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[51]** **Civil Rights**

🔑 Governmental Ordinance, Policy, Practice, or Custom

To state a § 1983 claim against a municipality, a plaintiff must assert that the alleged violations were committed pursuant to an official policy, practice, or custom; a plaintiff can meet this requirement by identifying a particular decision or action by someone who is a final policymaker for the governmental entity being sued. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[52]** **Civil Rights**

🔑 Lack of Control, Training, or Supervision;Knowledge and Inaction

Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[53]** **Civil Rights**

🔑 Governmental Ordinance, Policy, Practice, or Custom

A custom or policy, as required for municipal liability under § 1983, cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[54]** **Civil Rights**

⮬ Governmental Ordinance, Policy, Practice, or Custom

A city cannot be liable under § 1983 pursuant to *Monell* where the plaintiff cannot establish a violation of his constitutional rights. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[55]** **Civil Rights**

⮬ Complaint in general

Conclusory allegations that a municipality failed to train and supervise its employees are insufficient to state a *Monell* claim under § 1983 absent supporting factual allegations. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[56]** **Civil Rights**

⮬ Criminal law enforcement; prisons

Pretrial detainee failed to allege that allegedly unconstitutional strip search at city jail occurred pursuant to official city policy, as required to state municipal liability claim under § 1983. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Rasheem M. Holland, Rosedale, NY, pro se.

Omar Javed Siddiqi, Theresa Jeanine D'Andrea, New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

ANALISA TORRES, District Judge:

**\*1** Plaintiff *pro se*, Rasheem M. Holland, a practicing Muslim, brings this action pursuant to 42 U.S.C. § 1983 against the City of New York (the "City"), City Department of Correction officials, and individual correction officers, alleging that his constitutional rights were violated when, as a pretrial detainee at Rikers Island, he was subjected to a visual body cavity strip search by a female officer. Am. Compl., ECF No. 21; Def. Mem. 1, 3, ECF No. 34. Defendants move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motion is GRANTED.

**BACKGROUND**

Holland alleges that while he was a pretrial detainee on Rikers Island, sometime between 10:00 a.m. and 3:00 p.m. on October 14, 2013, a "fight/cutting" occurred in his housing unit. Am. Compl. ¶¶ 34-35; Def. Mem. 1. The correction officer for Holland's housing area, identified as "Russell" (Shield #6677),[1] ordered that inmates be locked in their cells until further notice. Am. Compl. ¶¶ 36, 38. Hazel Jennings, the Deputy Warden of Security,[2] arrived shortly thereafter, with 20 correction officers, and ordered the inmates out of their cells for a "pat frisk." *Id.* ¶ 37. Led by Jennings, the officers escorted the inmates to the "intake area," where they waited in holding pens until Russell and Jennings returned with a list of names of individuals who "were not involved" in the fight, and called out eight names, including Holland's. *Id.* ¶¶ 37-38. Those eight inmates were taken out of the holding pens and escorted into the hallway, where they were lined up against the wall next to the strip search room. *Id.* ¶ 39.

Jennings then "conducted a strip search operation" along with Officers Claude Luly, Garfield Clarke, and John Louden, the correction officer defendants. *Id.* ¶40. Every male inmate was "subjected to a visual body cavity strip frisk search" conducted by Jennings, who is female. *Id.* ¶ 41. When it was Holland's turn to be searched, he "politely asked" Jennings to "please leave the strip search area due to the fact that [Holland is] a registered practicing [M]uslim and... [Muslims] don't strip down naked in front of inmates and especially in front of female officers." *Id.* ¶ 42. Jennings responded, "So what!!! [It's] not like you don't have anything I've never seen before." *Id.* ¶ 43. She ordered Holland to remove his clothing "or there [would] be some repercu[ss]ions." *Id.* Holland complied because he "feared

for his life." *Id.* ¶ 44. According to Holland, Jennings "is known... for sending her male officers that work under her command," including Luly, Clarke, and Louden, "to use force" if an inmate does not comply. *Id.* ¶ 45.

Following Jennings' orders, Holland disrobed in front of her, while the male correction officers looked on. *Id.* ¶ 46. Holland "tried to cover [his] private parts the best way [he] could but was told by [ ] Jennings to remove [his] hands from [his] private area." *Id.* Jennings then instructed Holland to "lift his testicles, turn around[,] lift his feet and bend over and spread his buttocks." *Id.* ¶ 47. Holland alleges that Jennings "was not satisfied enough with [him] bending down to spread his buttocks" and requested that he "do it again while coughing" *Id.* ¶ 48. Holland complied. *Id.*

## DISCUSSION

### I. <u>Motion to Dismiss Standard</u>

**\*2** To survive a motion to dismiss, a complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). On a Rule 12(b)(6) motion, a district court may consider only the complaint, documents attached to the complaint or incorporated in it by reference, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002). A court must accept allegations contained in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

**[1]** **[2]** **[3]** A court will "liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007) (internal quotation marks and citations omitted). "The policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007) (quoting *Traguth*

*v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). Although courts are "obligated to draw the most favorable inferences that [a *pro se* plaintiff's] complaint supports, [courts] cannot invent factual allegations that he has not pled." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). Indeed, the pleadings must still contain factual allegations that raise a "right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

### II. <u>Prison Litigation Reform Act</u>

**[4]** **[5]** As a threshold matter, Defendants contend that, pursuant to the Prison Litigation Reform Act ("PLRA"), Holland's claims should be dismissed because he seeks only monetary relief and does not allege any physical harm. [3] Def. Mem. 21-22. Under the PLRA, "[n]o Federal civil action may be brought by a prisoner confined in a ... correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). However, although the PLRA bars compensatory damages "for mental or emotional injury," even absent physical injury, Holland may still recover "compensatory damages for the loss of a constitutional liberty interest." *Rosado v. Herard,* No. 12 Civ. 8943, 2014 WL 1303513, at \*13 (S.D.N.Y. Mar. 25, 2014) ("[C]ompensatory damages for intangible deprivations of [the plaintiff's] liberty and personal rights—as 'distinct from pain and suffering, mental anguish, and mental trauma'—are not barred by the PLRA." (citation omitted)); *see also Malik v. City of New York,* No. 11 Civ. 6062, 2012 WL 3345317, at \*16 (S.D.N.Y. Aug. 15, 201) ("[T]he PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations."), *report and recommendation adopted,* 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012). Such damages "are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering." *Rosado,* 2014 WL 1303513, at \*13 (quoting *Kerman v. City of New York,* 374 F.3d 93, 125 (2d Cir.2004)). Further, the PLRA does not bar Holland from recovering punitive or nominal damages. *See Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("Section 1997e(e) does not limit the availability of nominal damages for the violation of a constitutional right or of punitive damages.").

**\*3** Accordingly, the PLRA does not require dismissal of Holland's claims. [4]

### III. Section 1983 Claims

**[6]** **[7]** **[8]** "[W]hile persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). The constitutional claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* at 349, 107 S.Ct. 2400. [5]

Holland claims that Defendants violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments when Jennings, a female, subjected him to a visual body cavity strip search. The Court addresses each claim in turn. Because Holland's claims against the correction officer defendants—Luly, Clarke, and Louden —are based on their alleged failure to intervene to protect Holland from Jennings' unconstitutional misconduct, the Court begins by addressing Holland's claims under each amendment as against Jennings only. The Court then turns to Holland's claims against the correction officer defendants based on their failure to intervene, against Schriro and Perrino based on their supervisory liability, and against the City based on its municipal liability.

### A. First Amendment

**\*4** **[9]** **[10]** **[11]** **[12]** "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400 (citation omitted). "A prisoner's right to practice his religion is, however, not absolute." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). To assess a prisoner's free exercise claim, the Court "must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological

objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). Therefore, even assuming Holland can show that his religious beliefs are sincerely held and were infringed, Defendants' misconduct would be "excusable if [it] was supported by legitimate penological interests." [6] *Ford v. McGinnis,* 352 F.3d 582, 595 (2d Cir.2003); *see also O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987))). [7]

"The taboo in the Islamic faith concerning male nudity in the presence of women is well known," and the Court will not "second guess" Holland's allegation that being subjected to a visual body cavity strip search by a female infringed upon this religious belief. *Jean–Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar. 19, 2013); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004) (explaining that a court must determine whether the refusal to accommodate a religious belief violates the First Amendment "without passing judgment on 'the centrality of different religious practices,' which is a misguided enterprise that the Supreme Court has called 'akin to the unacceptable business of evaluating the relative merits of differing religious claims' " (citation omitted)). Indeed, at the motion to dismiss stage, courts in this Circuit have found that the religious beliefs of Muslim inmates were infringed based on far less invasive conduct than Holland alleges here. *See, e.g., Jean–Laurent v. Lawrence,* 2013 WL 1129813, at *8 (declining to question Muslim inmate's allegation that being forced to stand in his underwear infringed upon his freedom of religion); *Woodward v. Perez,* No. 12 Civ. 8671, 2014 WL 4276416, at *5 (S.D.N.Y. Aug. 29, 2014) (finding Muslim inmate's religious beliefs infringed based on his "contention that showering in the presence of a female guard violated a central tenet of his religion"). [8]

**\*5** **[13]** **[14]** **[15]** **[16]** **[17]** **[18]** **[19]** Defendants, however, challenge Holland's sincerity. [9] *See* Def. Mem. 15-16. They also assert the defense of qualified immunity. *Id.* 20-21. Because the Court concludes that Holland's free exercise claim is precluded by qualified immunity, the Court need not reach the question of whether his religious beliefs are sincerely held, or whether the strip search was justified by legitimate penological interests. [10]

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A defendant will thus not be liable for damages 'if he did not violate clearly established law or if it was objectively reasonable for him to believe that he was not violating clearly established law.' " *Pugh v. Goord,* 571 F.Supp.2d 477, 510 (S.D.N.Y.2008) (quoting *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004)). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *See Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (internal quotation marks omitted); *see also Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). For qualified immunity to bar suit at the motion to dismiss stage, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (internal quotation marks and citations omitted).

**\*6** **[20]** Holland alleges that the strip search was conducted by Jennings, the Deputy Warden of Security, right after his housing unit was locked down due to a "fight/cutting" that had just taken place. It is clear, therefore, that this was a search conducted in response to an exigent situation, not a routine or scheduled search. The Court has not found any Supreme Court or Second Circuit precedent establishing the right of a Muslim inmate to not be subjected to a visual strip search by an officer of the opposite sex in such circumstances. Indeed, the courts in this Circuit—and other circuits—that have discussed the rights of Muslim inmates to not be viewed in the nude by the opposite sex suggest that emergency or exigent circumstances may provide a "legitimate penological interest" justifying the infringement upon the inmate's free exercise of religion. *See, e.g., Houston v. Schriro,* No. 11 Civ. 7374, 2014 WL 6694468, at \*13 (S.D.N.Y. Nov. 26, 2014) (noting that, in case involving Muslim inmate, the "[d]efendants do not argue that a female officer observing strip searches of a male inmate furthers a legitimate penological interest, particularly in non-emergency situations such as scheduled institutional searches where alternative staffing arrangements can be planned in advance"); *Canedy v. Boardman,* 91 F.3d 30, 34 (7th Cir.1996) (finding the defendants entitled to qualified immunity on Muslim inmate's claim that strip searches in the presence of female guards violated his First Amendment rights because "it was not at all clear" that the plaintiff's "interest in observing Islam's nudity taboos" outweighed the prison's "very strong interest in having its guards observe prisoners at all times and in all situations, and [its other] interest in providing equal employment opportunity to women").

Because the courts in this district, the Second Circuit, and the Supreme Court have not yet addressed the issue, the Court concludes that there was no clearly established rule that, during a lockdown or other exigent situation, a correction officer is prohibited from conducting a strip search and viewing the private parts of a Muslim inmate of the opposite sex, in the manner Holland describes. Therefore, Jennings could not have known whether she was violating Holland's constitutional rights, [11] and is entitled to qualified immunity to the extent that Holland asserts free exercise claims against her in her individual capacity. [12] *See Askins v. Doe No. 1,* 727 F.3d 248, 254 (2d Cir.2013) ("Qualified immunity is a defense available only to individuals sued in their individual capacity.").

**\*7** Accordingly, Defendants' motion to dismiss Holland's First Amendment claim against Jennings in her individual capacity is GRANTED.

### B. Fourth Amendment

**[21]** The Fourth Amendment "protects individual privacy against certain kinds of governmental intrusion," *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and it is well-established that its

protections extend to prisoners and pretrial detainees. *See Bell,* 441 U.S. at 545, 559, 99 S.Ct. 1861. More than twenty years ago, the Second Circuit recognized that inmates "do retain a limited right to bodily privacy," *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir.1992), and more recently asserted that, "[r]egardless of who performs the search, a visual body cavity search is invasive: 'A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy.' " *Harris v. Miller,* 818 F.3d 49, 58 (2d Cir.2016) (quoting *Florence v. Bd. of Chosen Freeholders,* ——— U.S. ——, 132 S.Ct. 1510, 1526, 182 L.Ed.2d 566 (2012) (Breyer, J., dissenting); *see also Canedy v. Boardman,* 16 F.3d 183, 185 (7th Cir.1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy."); *Byrd v. Maricopa Cty. Sheriff's Dep't,* 629 F.3d 1135, 1143 (9th Cir.2011) (en banc) ("[W]e have consistently recognized the frightening and humiliating invasion occasioned by a strip search, even when conducted with all due courtesy." (internal quotation marks omitted)).

**[22]** **[23]** **[24]** Thus, although the constitutional rights of inmates are restricted because of the "considerations underlying our penal system," *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), *overruled on other grounds, McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), the Fourth Amendment still requires all searches conducted within a prison, including strip searches, to be reasonable. *See Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983) (per curiam); *see also Florence,* 132 S.Ct. at 1517 ("[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities."). The reasonableness of a strip search, in turn, "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559, 99 S.Ct. 1861; *see also Harris,* 818 F.3d at 62–63. A strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Jean–Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006).

**[25]** Here, Holland concedes that the strip search procedures he was subjected to are "generally constitutionally permissible." Pl. Opp. 7-8, ECF No. 38.[13] What he objects to is that the strip search was conducted "by the opposite sex." *Id.* 8. Although, generally, the strip search of a male inmate in view of a female correction officer does not, by itself, rise to the level of a constitutional violation, *see Montgomery v. Hall,* No. 11 Civ. 4645, 2013 WL 1982920, at *4 (S.D.N.Y. May 15, 2013), *report and recommendation adopted,* 2013 WL 3816706 (S.D.N.Y. July 22, 2013), strip searches conducted by members of the opposite sex constitute a heightened invasion of privacy in this Circuit and are thus subject to higher scrutiny than those conducted by members of the same sex. *See, e.g., Little v. City of New York,* No. 13 Civ. 3813, 2014 WL 4783006, at *2 (S.D.N.Y. Sept. 25, 2014); *Forts v. Ward,* 621 F.2d 1210, 1217 (2d Cir.1980) ("The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex."); *see also Canedy,* 16 F.3d at 185 ("[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex."); *York v. Story,* 324 F.2d 450, 455 (9th Cir.1963) ("The desire to shield one's unclothed figure from views of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").

**\*8** "Recognizing that a strip search by an officer of the opposite sex involves a heightened invasion of privacy, courts in this Circuit have distinguished between 'regular' and 'close' viewing and 'incidental' and 'brief viewing of a naked prisoner,' " with the latter being found constitutional. *Little,* 2014 WL 4783006, at *2; *see also, e.g., Correction Officers Benevolent Ass'n v. Kralik,* No. 04 Civ. 2199, 2011 WL 1236135, at *11 (S.D.N.Y. Mar. 30, 2011) ("More recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex may be permissible, but that 'regular and close viewing' is prohibited."); *Baker v. Welch,* No. 03 Civ. 2267, 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) ("[T]he balance should be struck to allow incidental and obscured viewing but prohibit regular and close viewing."); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) (explaining that the Second Circuit's opinion in *Forts v. Ward* "merely emphasizes that in

order for inmates to show a violation of their privacy rights, they must show that the 'viewing' by guards of the opposite sex occurs on a regular basis" and distinguishing *Forts* from situations wherein "female guards ... only occasionally view[ ] male inmates undressed or using the shower and toilet facilities"). The Court does not read these cases to preclude the possibility, however, that a single search may also violate an inmate's right to privacy. *See, e.g., Hayes v. Marriott,* 70 F.3d 1144, 1145, 1147 (10th Cir.1995) (reversing dismissal of complaint where male inmate alleged "that he was subjected to a body cavity search in the presence of over 100 people, including female secretaries and case managers," and recognizing that, "[a]lthough we have stated that the frequency with which prison guards watch inmates of the opposite sex undressing, using toilet facilities, and showering is an important factor in assessing the constitutionality of prison practices, we have also concluded that a prisoner's right to privacy may be violated by a single search" (citations omitted)).

**[26]** **[27]** Here, although Jennings conducted the visual strip search from a distance of about three feet, [14] and Holland does not allege that she touched him, it is clear that the search was not "indirect," "incidental," or "brief," but rather an invasive search in which Jennings directly viewed the "most private portions" of Holland's body. *Harris,* 818 F.3d at 58. Holland's allegations also make clear, however, that the search took place in the context of an emergency, as part of a security response to a stabbing in Holland's housing unit. [15] For this reason, absent allegations that the search was unnecessarily prolonged or repeated, the Court concludes that Jennings is entitled to qualified immunity on this claim. As in the First Amendment context discussed above, there appear to be no Supreme Court or Second Circuit decisions establishing that, in an emergency situation, inmates have a Fourth Amendment right to be free from strip searches —even body cavity searches—by officers of the opposite sex. Courts in this Circuit and others consistently suggest that exigent circumstances may justify strip searches by officers of the opposite sex. *See, e.g., id.* at 63 ("[C]ross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon."); *Grummett v. Rushen,* 779 F.2d 491, 495–96 (9th Cir.1985) (holding that, "[e]ven if we conclude that such a situation represents an invasion of privacy rights," the "interest in prison security justifie[d]" female guards' observation of strip searches "in two or three emergency situations"); *Canedy,* 16 F.3d at 187 (recognizing holdings of federal courts "that pat-down searches and occasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy. But that right is violated where this observation is more intrusive (like a strip search, in the absence of an emergency) or a regular occurrence."); *Letcher v. Turner,* 968 F.2d 508, 510 & n. (5th Cir.1992) (endorsing the principle "that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female guards is required to protect a legitimate government interest such as maintaining security at a correctional facility," particularly where a "disturbance involving 18 or 19 inmates had just taken place"); *cf. Moore v. Carwell,* 168 F.3d 234, 237 (5th Cir.1999) (finding complaint sufficiently pleaded Fourth Amendment claim where male inmate alleged female officer conducted multiple strip and body cavity searches "despite the absence of emergency or extraordinary circumstances"). [16] Jennings, therefore, is entitled to qualified immunity to the extent that Holland asserts Fourth Amendment claims against her in her individual capacity. *See Askins,* 727 F.3d at 254 ("Qualified immunity is a defense available only to individuals sued in their individual capacity.").

**\*9** Accordingly, Defendants' motion to dismiss Holland's Fourth Amendment claim against Jennings in her individual capacity is GRANTED.

### C. Eighth Amendment

**[28]** **[29]** **[30]** Holland also alleges that Jennings violated his Eighth Amendment right to be free from cruel and unusual punishment. Specifically, he alleges that Jennings used excessive force in forcing him to submit to the strip search. Am. Compl. ¶¶ 61, 63; Pl. Opp. 10. Because the Court assumes Holland was a pretrial detainee at the time of the search, *see supra* note 5, his claims under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Ordinarily, the standard applied under

either clause is identical. *See Caiozzo v. Koreman,* 581 F.3d 63, 69, 72 (2d Cir.2009). To state a traditional Eighth Amendment claim, a plaintiff must allege that (1) the alleged deprivation is "sufficiently serious" under an objective standard; and that (2) the charged officials acted, subjectively, with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Recently, however, the Supreme Court held that, for the excessive force claims of pretrial detainees in particular, "the appropriate standard ... is solely an objective one." *Kingsley,* 135 S.Ct. at 2473. For such claims, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," *id.* and "need not demonstrate that [the] officer was subjectively aware that his use of force was unreasonable," *Ross v. Correction Officers John & Jane Does 1–5,* 610 Fed.Appx. 75, 76 n. 1 (2d Cir.2015). In determining objective reasonableness, which depends on the facts and circumstances of each case, courts may consider a number of factors, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley,* 135 S.Ct. at 2473 (citing *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). For challenges to strip searches in particular, to state an Eighth Amendment violation, courts in this Circuit require that a plaintiff allege that the defendants engaged in egregious conduct. *See, e.g., Vaughn,* 2013 WL 3481413, at *3 (holding that "the alleged abuse caused by the visual cavity search was not severe enough to satisfy the objective seriousness requirement of Eighth Amendment analysis. As discussed, visual cavity searches have been consistently upheld as a legitimate penological restriction."); *see also Easley v. Pinnell,* No. 98–16536, 1999 WL 311390, at *1 (9th Cir. May 13, 1999) ("[V]isual anal cavity searches [of male prisoner] conducted within female prison officials' view does not amount to cruel and unusual punishment.").

**\*10** **[31]** **[32]** Here, the only force Holland alleges is a verbal threat made by Jennings, namely that she

threatened that there would be "some repercu [ss]ions" if he did not comply with her order to strip down. Am. Compl. ¶ 43. Holland claims that her threat made him "fear[ ] for his life" because Jennings "is known... for sending her male officers that work under her command ... to use force" if an inmate does not comply. *Id.* ¶¶ 44-45. The Court concludes that Jennings' threat is insufficient to state a claim of excessive force. "Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983." *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)); *see also Vaughn,* 2013 WL 3481413, at *5 (holding Rikers guard's threat that inmates "shut the fuck up" or he would "place a shank on [them]," although "inappropriate and threatening if true, [does] not rise to the level of an Eighth Amendment violation"); *Harris v. Lord,* 957 F.Supp. 471, 475 (S.D.N.Y.1997) ("The law is clear that 'although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983.' " (citation omitted)); *Arnold v. Westchester Cty.,* No. 09 Civ. 3727, 2012 WL 336129, at *11 (S.D.N.Y. Feb. 3, 2012) (finding officer's instruction to inmate "to open his anus for a cavity inspection" did not violate the Eighth Amendment), *report and recommendation adopted,* 2012 WL 841484 (S.D.N.Y. Mar. 13, 2012); *Vaughn,* 2013 WL 3481413, at *3 ("Even where inmates allege aggressive or inappropriate behavior during strip searches, courts are reluctant to find that such activity rises to the objectively serious level of an Eighth Amendment violation."). Moreover, the complaint establishes that Jennings' threat was made in response to Holland's initial refusal to comply with the strip search. Am. Compl. ¶¶ 42-43. It cannot be said that her vague, verbal threat was a more than necessary use of force to obtain Holland's compliance. *See, e.g., Michenfelder v. Sumner,* 860 F.2d 328, 336 (9th Cir.1988) ("[T]he legitimate penological purpose of strip searches —to discover hidden weapons and contraband—justifies using force necessary to induce compliance by difficult inmates.").

**[33]** **[34]** In addition, insofar as Holland is also claiming sexual abuse or harassment by Jennings, the Second Circuit has concluded that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder,* 105 F.3d 857, 860–61 (2d Cir.1997). Although it is unclear whether,

post-*Kingsley,* the sexual abuse claims of a pretrial detainee must still meet both the objective and subjective prongs of the traditional Eighth Amendment analysis, [17] the Court holds that Holland's allegations fail to meet both. The subjective prong requires a showing that the search was "undertaken maliciously or for the purposes of sexually abusing an inmate," rather than "in a good-faith effort to maintain or restore discipline." *Crawford v. Cuomo,* 796 F.3d 252, 258 (2d Cir.2015). Given the exigent situation justifying the search, and the absence of any allegations that the search was unnecessarily prolonged or repeated, the complaint fails to make this showing. *See id.* at 257–58 ("[T]he principal inquiry is whether the [officer's conduct] is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate.").

Moreover, Holland does not allege any physical contact or even comments of a sexual nature. To date, in this Circuit, there has been "no case in which a plaintiff ha[s] established an actionable claim of sexual harassment under *Boddie* without having physical contact with the alleged perpetrator," *Vogelfang v. Capra,* 889 F.Supp.2d 489, 508 (S.D.N.Y.2012), or without, at the very least, alleging egregious sexual conduct, *see Smith v. Roberson*, No. 15 Civ. 930, 2016 WL 1056588, at *3 (N.D.N.Y. Mar. 16, 2016) (finding "sufficiently serious" to state an Eighth Amendment violation female detainee's allegations that a guard "chased her, exposed his genitalia to her and threatened her with sexual assault"). Even "significant but episodic physical contact has often been held insufficient to make out an Eighth Amendment claim for sexual harassment." *Vogelfang,* 889 F.Supp.2d at 508; *see also Boddie,* 105 F.3d at 859–61 (affirming as inadequate prisoner's allegations that female correction officer made a possible "pass" at him, "squeezed his hand, touched his penis," called him a "sexy black devil," pressed her breasts against his chest more than once, and pushed her "vagina against [his] penis"). Also, the Second Circuit has declined to find an Eighth Amendment violation where there are no allegations of physical contact, but the alleged verbal conduct is egregious. *See Morales v. Mackalm,* 278 F.3d 126, 132 (2d Cir.2002) (affirming dismissal of Eighth Amendment claim where female prison employee asked the plaintiff "to have sex with her and to masturbate in front of her and other female staffers"), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), *as recognized in Berry v. Kerik,*

366 F.3d 85, 87–88 (2d Cir.2003). Therefore, Holland's Eighth Amendment claim fails on this ground as well.

**\*11** Accordingly, Defendants' motion to dismiss Holland's Eighth Amendment claim against Jennings is GRANTED.

### D. Due Process Under the Fourteenth Amendment

Finally, Holland alleges that Jennings violated his "right to freedom from deprivation of liberty without due process." Am. Compl. ¶ 56. Although it is unclear whether Holland is making a claim of procedural or substantive due process, or both, given his *pro se* status, the Court will consider his complaint to be making both claims.

#### 1. Substantive Due Process

**[35]** "[W]here another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.' " *Kia P. v. McIntyre,* 235 F.3d 749, 757–58 (2d Cir.2000) (quoting *Conn. v. Gabbert,* 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)); *see also Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ( "[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). This is so because, as the Supreme Court has observed, "the guideposts for responsible decisionmaking" in the "unchartered area" of substantive due process "are scarce and open-ended." *Albright v. Oliver,* 510 U.S. 266, 271–72, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion). As a result, the Supreme Court has "always been reluctant to expand the concept of substantive due process" and has limited the availability of such claims to those which are not covered under other amendments. *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 842–43, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (internal quotation marks omitted)). The Court concludes, therefore, that because all of Holland's

constitutional claims are covered under either First, Fourth or Eighth Amendment standards, he does not have an additional substantive due process cause of action under the Fourteenth Amendment. *See Velez, 401 F.3d at 94* (holding that the "plaintiff's substantive due process claim is either subsumed in her more particularized allegations" raising First Amendment and Equal Protection Clause claims, "or must fail.").

Accordingly, to the extent that Holland raises a substantive due process claim, it is DISMISSED.

### 2. Procedural Due Process

**[36]** **[37]** Holland alleges that Jennings strip searched him in violation of prison policy, *see* Am. Compl. 2, which the Court construes as an attempt to assert a procedural due process claim. To state a procedural due process claim, Holland "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001). [18]

**\*12** **[38]** **[39]** **[40]** **[41]** The policy Holland claims Jennings violated is New York City Department of Correction Directive 4508, *see* Pl. Opp. 2, which provides that "only personnel of the same gender (meaning 'sex') as the inmate being searched and who are essential for security reasons shall be present during a Strip Frisk Without A Body Cavity Search. Whenever possible, a supervisory officer shall be present during such searches." *Id.*. Defendants contend that Directive 4508 was not in effect in 2013 at the time of the challenged strip search, but that, rather, another policy was in effect that contains nearly identical language but also adds the qualifier, "[*a*]*bsent an emergency,* only personnel of the same sex as the inmate ..." ECF No. 39-1 (emphasis added); *see* Def. Reply 3. Regardless of which policy applies, however, "there is no federal constitutional liberty interest in having ... prison officials follow prison regulations." *Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir.2003). Even assuming that Directive 4508 was in effect at the time of the search and Jennings violated it, such an allegation does not give rise to liability under Section 1983. It is well settled that "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002). An alleged violation of a prison policy,

directive, or regulation, in and of itself, does not give rise to a federal claim, because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990); *see also Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at \*6 (S.D.N.Y. Mar. 15, 2001) ("To the extent that [plaintiff] claims defendants failed to follow prison regulations, such as directives concerning the implementation of disturbance control plans ..., these state law violations are not cognizable under § 1983."); *Doe v. Conn. Dep't of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiffs] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson v. Coughlin,* 761 F.2d 886, 891 (2d Cir.1985) ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983."); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997) ("A prison inmate does not have a viable § 1983 claim based solely on prison officials' failure to adhere to the requirements of prison regulations, directives or policy statements.").

Accordingly, to the extent that Holland raises a procedural due process claim, it is DISMISSED.

### E. Failure to Intervene

**[42]** **[43]** **[44]** **[45]** Holland alleges that Correction Officers Luly, Clarke, and Louden failed to intervene when they observed Jennings violating Holland's rights. Am. Compl. ¶¶ 20, 25, 30. Correction officers can be held liable under Section 1983 for not intervening to protect the constitutional rights of inmates from infringement by other officers. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). However, liability attaches only when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citing *O'Neill,* 839 F.2d at 11–12). "If the Court determines that the officer's conduct did not violate a constitutional right, however, the analysis ends." *Feinberg v. City of New York,* No. 99 Civ. 11127, 2004 WL 1824373, at \*4 (S.D.N.Y. Aug. 13, 2004) (citing *Saucier v. Katz,* 533 U.S. 194,

201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)); *see also Usavage v. Port Auth. of New York & New Jersey,* 932 F.Supp.2d 575, 599 (S.D.N.Y.2013) ("Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim." (internal quotation marks omitted)). Thus, because the Court holds that Holland has failed to plead an Eighth Amendment violation, the correction officer defendants cannot be held liable for failing to intervene. Further, an officer is entitled to qualified immunity unless his failure to intercede was under "circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate [the plaintiff's] rights." *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997). The Court's conclusion that Holland's First and Fourth Amendment claims against Jennings (in her individual capacity) are precluded by qualified immunity applies equally to Luly, Clarke, and Louden, because they too would not reasonably have known that Holland's constitutional rights were being violated. *See, e.g., Ricciuti,* 124 F.3d at 129 ("A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known." (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727)).

**\*13** Accordingly, Defendants' motion to dismiss Holland's failure to intervene claim against Luly, Clarke, and Louden is GRANTED.

### F. Claims Against Schriro and Perrino

**[46]** **[47]** **[48]** Holland also alleges constitutional violations by former Correction Commissioner Dora B. Schriro and Warden James Perrino, who were not present at the challenged strip search. It is well settled that supervisors cannot be held liable in a Section 1983 suit solely on a theory of *respondeat superior. See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (requiring "a showing of more than the linkage in the prison chain of command" to hold a prison official liable under Section 1983). To state a claim under Section 1983, a plaintiff must allege the personal involvement of each defendant. *See, e.g., Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation,

standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Kee v. Hasty,* No. 01 Civ. 2123, 2004 WL 807071, at \*12 (S.D.N.Y. Apr. 14, 2004) (internal citations omitted). Rather, a plaintiff in a Section 1983 action must show that the supervisor was personally involved in a constitutional violation by either (1) directly participating in the violation; (2) failing to remedy the violation after learning of it through a report or appeal; (3) creating a custom or policy fostering the violation or allowing the custom or policy to continue after learning about it; (4) being grossly negligent in supervising the officers involved; or (5) exhibiting deliberate indifference to the constitutional rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). In *Ashcroft v. Iqbal,* the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676, 129 S.Ct. 1937. The Second Circuit has not resolved whether *Iqbal* "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations." *Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013); *see also Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012) (observing that the limitation on supervisory liability in *Iqbal* "has, of course, engendered conflict within our own Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*"). Regardless, the Court concludes that Holland has failed to plead the requisite personal involvement to sustain his claims against Schriro and Perrino. *See Grullon,* 720 F.3d at 139 (declining to resolve *Colon's* tension with *Iqbal* while affirming dismissal under *Colon* analysis).

**[49]** Holland's claims against Schriro and Perrino, which vaguely allege that they "pursued a policy and custom of deliberate indifference" in the "hiring, training and supervision of" Jennings and the correction officer defendants, Am. Compl. ¶¶ 67-68, [19] appear to fail under the third, fourth, and fifth *Colon* categories. Without more than the allegations related to the single strip search incident that forms the basis of the complaint, however, Holland's vague allegations as to Schriro and Perrino amount to "nothing more than a bare assertion" that they were supervisors of Jennings and the correction officer defendants, which is insufficient

to state a Section 1983 claim. *Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *see also Parris v. New York State Dep't Corr. Servs.,* 947 F.Supp.2d 354, 364 (S.D.N.Y.2013) ("Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983."); *Koehl v. Bernstein,* No. 10 Civ. 3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011) ("[C]onclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement."), *report and recommendation adopted,* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *Burgis v. Dep't of Sanitation City of New York,* No. 13 Civ. 1011, 2014 WL 1303447, at *6 (S.D.N.Y. Mar. 31, 2014) ("Courts have repeatedly held that including boilerplate language alleging the existence of a policy, without factual allegations to support it, is not enough at the pleading stage."). "To the extent that the complaint attempts to assert a failure-to-supervise claim, moreover, it lacks any hint that [Schriro and Perrino] acted with deliberate indifference to the probability that [their] subordinates would violate [Holland's] constitutional rights." *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (affirming dismissal where conclusory allegations that corrections commissioner failed to supervise and train subordinates failed to establish the requisite personal involvement).

**\*14** Accordingly, Defendants' motion to dismiss Holland's Section 1983 claims against Schriro and Perrino is GRANTED.

### G. Claims Against Individual Defendants in Their Official Capacities

**[50]** To the extent that there are any remaining claims against Schriro, Perrino, Jennings, Luly, Clarke, and Louden in their official capacities, the Court concludes that those claims are redundant and duplicative of Holland's claims against the City and should, therefore, be dismissed. "[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 687 (2d Cir.2005); *see also Davis v. Stratton,* 360 Fed.Appx. 182, 183 (2d Cir.2010) ("The suit against the mayor and police chief in their official capacities is essentially a suit against the City... because in a suit against a public entity, naming officials of the public entity in their

official capacities 'add[s] nothing to the suit.' " (citation omitted)).

Accordingly, Defendants' motion to dismiss Holland's Section 1983 claims against Schriro, Perrino, Jennings, Luly, Clarke, and Louden in their official capacities is GRANTED.

### H. Claims Against the City

**[51]** **[52]** **[53]** Holland's Section 1983 claims against the City must also be dismissed. To state a Section 1983 claim against a municipality, a plaintiff must assert that the alleged violations were committed pursuant to an official policy, practice, or custom. *See Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A plaintiff can meet this requirement by identifying a particular decision or action by someone who is a final policymaker for the governmental entity being sued. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir.2004) (internal quotation marks omitted). Generally, however, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." *Triano v. Town of Harrison,* 895 F.Supp.2d 526, 532 (S.D.N.Y.2012) (internal alteration omitted).

**[54]** **[55]** **[56]** As a threshold matter, "the City cannot be liable under *Monell* where [p]laintiff cannot establish a violation of his constitutional rights." *Askins,* 727 F.3d at 253 (internal quotation marks omitted). Thus, because the Court concludes that Holland has failed to plead an Eighth Amendment claim, the City cannot be held liable on that claim. By contrast, the Court's holding that Holland's First and Fourth Amendment claims against Jennings and the correction officer defendants in their individual capacities are precluded by qualified immunity does not bar <u>him</u> from pursuing those claims against the City. *See id.* at 254 ("[T]he entitlement of the individual municipal actors to qualified immunity ... is [ ] irrelevant

to the liability of the municipality. Qualified immunity is a defense available only to individuals sued in their individual capacity."); *Pinter v. City of New York*, 976 F.Supp.2d 539, 557 (S.D.N.Y.2013) (concluding that grant of qualified immunity to individual defendants "does not by itself bar [the plaintiff's] false arrest and malicious prosecution claims against the City"). However, Holland has pleaded no facts to support a *Monell* claim against the City. The only allegations Holland makes against the City are the same allegations he asserts against Schriro and Perrino—that the City "knew of the individual correctional officers['] tendencies to make unlawful searches," and that, "in the hiring, training and supervision of ... Luly, Louden, Clarke and Jennings," the city has "pursued a policy and custom of deliberate indifference to the rights of persons in City jails," which directly and proximately resulted in the violation of Holland's constitutional rights. Am. Compl. ¶¶ 9, 67-68. These allegations are entirely conclusory and must, therefore, be disregarded. Holland has not identified any specific municipal policy or custom that caused his injuries. Moreover, "conclusory allegations that a municipality failed to train and supervise its employees" are insufficient to state a *Monell* claim absent supporting factual allegations. *Davis v. City of New York,* No. 07 Civ. 1395, 2008 WL 2511734, at *6 (S.D.N.Y. June 19, 2008); *see also Oparaji v. City of New York,* No. 96 Civ. 6233, 1997 WL 139160, at *3 (E.D.N.Y. Mar. 21, 1997) (finding that the "complaint, even if read liberally, [did] not contain a single fact in support of [plaintiff's] conclusory allegation" where he alleged "only that the City had a policy, practice or custom of failing to adequately screen, hire and train police officers which resulted in the violation of his constitutional rights").

**\*15** Accordingly, Defendants' motion to dismiss Holland's Section 1983 claims against the City is GRANTED.

IV. Pendent State Law Claims

Holland also alleges violations of New York state law. *See, e.g.,* Am. Compl. 2. Though he does not specify which causes of action he is pursuing, at least one of his claims appears to be for negligent hiring and retention. Am. Compl. ¶¶ 7, 17, 22, 27, 32. Having dismissed his federal law claims, the Court declines to exercise supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(c). *See Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 727 (2d Cir.2013) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Powell v. Gardner,* 891 F.2d 1039, 1047 (2d Cir.1989) ("[I]n light of the proper dismissal of the § 1983 claim against the County, the district court should have declined to exercise pendent jurisdiction over [the plaintiff's] state-law claims against the County.").

Accordingly, Holland's state law claims are DISMISSED without prejudice to renewal in state court.

**CONCLUSION**

For the reasons stated above, Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to (1) mail a copy of this order and all unpublished decisions cited therein to Plaintiff *pro se* and (2) close the case.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2016 WL 3636249

Footnotes

1    Russell is not a defendant in this action.

2    Jennings' title has since changed to "Chief." *See* Def. Mem. 1; Def. Reply 2, ECF No. 39.

3    *See* Am. Compl. ¶¶ 58-59 (alleging Holland suffered unspecified "pain, anxiety attack[s]," "future psychological damage," "mental anguish," and "emotional distress" as a result of the strip search).

4    Indeed, Holland specifically seeks punitive damages and "[t]he abstract value of a constitutional right." Am. Compl. ¶¶ 65, 70.

5    Holland does not specify whether he was a pretrial detainee or a convicted prisoner at the time of the challenged strip search; for purposes of this motion, the Court adopts Defendants' assumption that he was a pretrial detainee. *See* Def.

Mem. 5 n.1. Although "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights ... enjoyed by convicted prisoners," *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court has held that the principles limiting the constitutional rights of incarcerated individuals "appl[y] equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546, 99 S.Ct. 1861; *see also id.* at 546 n. 28, 99 S.Ct. 1861 (finding "no reason" to "distinguish[ ] between pretrial detainees and convicted inmates in reviewing the challenged security practices .... There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order."); *but cf. Kingsley v. Hendrickson,* —— U.S. ——, 135 S.Ct. 2466, 2473, 2475–76, 192 L.Ed.2d 416 (2015) (distinguishing between convicted prisoners and pretrial detainees in concluding that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one," but acknowledging that its conclusion "may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners"); *Johnston v. Maha*, 460 Fed.Appx. 11, 14 (2d Cir.2012) (finding requirement that convicted prisoners asserting a procedural due process claim show an "atypical and significant hardship" does not apply to pretrial detainees).

6 Moreover, "once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these [penological] concerns were irrational." *Ford v. McGinnis*, 352 F.3d 582, 595 (2d Cir.2003) (internal quotation marks omitted); *see also Overton v. Bazzetta*, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) ( "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

7 The Second Circuit has acknowledged that, "[a]lthough *Turner* and *O'Lone* concerned the reasonableness of prison regulations,... the analysis is the same as to an individual decision to deny a prisoner the ability to engage in some requested religious practice." *Ford*, 352 F.3d at 595 n. 15. Thus, regardless of whether Holland's rights were violated pursuant to an individual decision or a prison rule, regulation or policy, the inquiry is the same. *Id.*; *see also Salahuddin v. Goord*, 467 F.3d 263, 274 n. 4 (2d Cir.2006) ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise.").

8 The Court notes that the continuing vitality of the "substantial burden" requirement for free exercise claims is in question. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (citation omitted). In any event, the Court finds that Holland meets the substantial burden test, a "not [ ] particularly onerous task." *Fifth Ave. Presbyterian Church v. City of New York*, No. 01 Civ. 11493, 2004 WL 2471406, at *3 (S.D.N.Y. Oct. 29, 2004) (quoting *McEachin*, 357 F.3d at 202); *see Holland*, 758 F.3d at 221 (analyzing First Amendment claim with the substantial burden requirement because "even assuming the continued vitality of [this requirement], our precedent squarely dictates that [the plaintiff's] religious exercise was unconstitutionally burdened"); *Woodward*, 2014 WL 4276416, at *5 ("On a motion to dismiss, the court's inquiry on substantial burden 'turns on whether [being covered outside the presence of one's wife] 'is considered central or important to [the plaintiff's] practice of Islam.'' ... Based on [the plaintiff's] contention that showering in the presence of a female guard violated a central tenet of his religion, the Court finds that [the plaintiff] has met the 'not... particularly onerous task' of establishing a substantial burden at the motion to dismiss stage." (quoting *Covington v. Mountries*, No. 13 Civ. 343, 2014 WL 2095159, at *4 (S.D.N.Y. May 20, 2014))).

9 In free exercise cases, scrutiny of a plaintiff's sincerity "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984). Defendants contend that Holland's original complaint belies his claim of piety because in it he stated that the strip search conducted by Jennings "shattered" his "aspiration[s] of becoming a male nude artist" by making him "fearful[ ] of ever removing certain parts of [his] clothing in front of a female [ever]. Thus hindering [him] from this path of employment." Compl. at 5, ECF No. 1. Given these statements, Defendants argue that Holland "cannot plausibly allege that the practice asserted is a belief that is sincerely held by him." Def. Mem. 15. Holland, in turn, urges the Court to disregard the original complaint because the amended complaint "supersedes the earlier one, in effect starting thing[s] over." Pl. Opp. 14, ECF No. 38.

Although "[t]he liberality with which courts examine *pro se* pleadings does not require a court to 'accept as true allegations that conflict with a plaintiff's prior allegations,' " *Vaughn v. Strickland*, Nos. 12 Civ. 2696, 2013 WL 3481413, at *6 (S.D.N.Y. July 11, 2013), the Court notes that it may decline, at the motion to dismiss stage, to question the sincerity of Holland's beliefs on the basis of his prior pleading. "Prior inconsistent pleadings, though admissible against plaintiff in the case in which they were originally filed as well as in any subsequent litigation involving that party, are controvertible,

not conclusive, admissions." *The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 395 n. 5 (S.D.N.Y.1988) (citing *United States v. McKeon,* 738 F.2d 26, 31 (2d Cir.1984)); *see also Dweck v. Pacificorp Capital, Inc.,* No. 91Civ. 2095, 1998 WL 88742, at *7 (S.D.N.Y. Mar. 2, 1998) ("It is well-established in the Second Circuit that superseded pleadings, while not judicial admissions *per se,* may be introduced as evidence and considered an admission."). "While there may be a rare occasion to disregard the contradictory and manipulated allegations of an amended pleading, the more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course." *Barris v. Hamilton,* No. 96 Civ. 9541, 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999) (citation omitted). In any event, the Court need not reach the question of Holland's sincerity given its conclusion that Defendants are entitled to qualified immunity on his free exercise claim.

10  Although the Court is permitted to determine whether a constitutional right exists before examining whether it was clearly established as part of the qualified immunity analysis, it declines to do so here. *See Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *see also Camreta v. Greene,* 563 U.S. 692, 707, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").

11  This conclusion does not, of course, excuse Jennings and other prison officials from their duty to "take care to avoid unnecessary humiliation" and to not conduct searches "with so little regard for human dignity and privacy as to be unreasonable." *Storms v. Coughlin,* 600 F.Supp. 1214, 1224 (S.D.N.Y.1984).

12  For the same reasons, any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.,* that could be construed from Holland's allegations, *see Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *17 & n. 7 (S.D.N.Y. Oct. 8, 2009) (construing complaint as asserting RLUIPA claim despite *pro se* plaintiff's failure to cite statute), would also fail. *See Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (finding the defendant prison employees entitled to qualified immunity with respect to inmate's First Amendment and RLUIPA claims because it had not been clearly established by the Second Circuit or Supreme Court that the challenged prison policy violated inmate's rights).

13  Cites to Holland's opposition papers refer to the page number assigned by ECF at the top of each page.

14  *See* Pl. Opp. 5 (admitting that, "during the strip frisk search defendant Jennings[s] [was] approximately 3-feet away from Plaintiff").

15  Holland also alleges that he was chosen for the strip search from a list of names of inmates "that were not involved" in the fight, Am. Compl. ¶ 38, and reiterates in his opposition that he and those other inmates were "cleared of any wrong doing" after the fight and prior to the search, such that the strip search "was only conducted to humiliate him," and for "other sick reasons," Pl. Opp. 6. However, officers do not need reasonable suspicion that an inmate may have a concealed weapon or other contraband in order to strip search him. *See Florence,* 132 S.Ct. at 1519–22.

16  *See also Byrd,* 629 F.3d at 1142 (quoting the 2009 National Prison Rape Elimination Commission Report, which "determined that[,] '[t]o prevent abuse,... the [Commission's recommended] standard ... strictly prohibits non-medical staff from conducting cross-gender strip and visual body cavity searches—except in the case of emergency—because of their extraordinarily intrusive nature.' "); *id.* (quoting Standards for Adult Correctional Institutions § 4-4194 (2003), which sets forth the American Correctional Association's recommended standard for cross-gender strip searches, providing that, "except in emergency situations, visual inspections of inmate body cavities are conducted by officers of the same sex, in private").

17  *See Harry v. Suarez,* No. 10 Civ. 6756, 2012 WL 2053533, at *2 n. 3 (S.D.N.Y. June 4, 2012) (recognizing, pre-*Kingsley,* that for pretrial detainees, "the established Eighth Amendment framework for claims of sexual abuse by prison officials would still provide the appropriate standards for resolving plaintiff's claims").

18  Convicted prisoners must also show that the liberty deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472,484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In this Circuit, however, the "atypical and significant hardship" requirement does not apply to pretrial detainees. *See Johnston,* 460 Fed.Appx. at 14 ("The District Court erred in applying *Sandin* ... [to] a pretrial detainee."); *Iqbal v. Hasty,* 490 F.3d 143, 163 (2d Cir.2007) ("*Sandin* does not apply to pretrial detainees."), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Benjamin v. Kerik,* 102 F.Supp.2d 157, 172 (S.D.N.Y.2000) (concluding that *Sandin*'s "justification for limiting a convicted inmate's rights ... does not apply to pretrial detainees"), *aff'd sub nom. Benjamin v. Fraser,* 264 F.3d 175, 188–89 (2d Cir.2001).

19    *See also* Am. Compl. ¶¶ 17 (alleging that "defendant supervisors failed to train, supervise, discipline and control defendant Jenning[s]"), 9 (alleging that "Commissioner and Warden knew of the individual correctional officers['] tendencies to make unlawful searches").

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 689028
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jamel KING, Plaintiff,
v.
C.O. McINTYER; Lt. McDermott; C.O. Stevens;
Sgt. Young; C.O. Kane; C.O. Hessle; C.O. Doty;
C.O. Catlin; Dept. C. Miller; Comm. Brian
Fischer; and Sup. Martuscello,[1] Defendants.

No. 9:11–CV–1457.
|
Feb. 20, 2014.

**Attorneys and Law Firms**

Jamel King, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Douglas J. Goglia, Esq.,
Ass't Attorney General, of Counsel, Albany, NY, for
Defendants.

***DECISION and ORDER***

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Jamel King brought this action
pursuant to 42 U.S.C. § 1983. On December 31, 2013,
the Honorable Thérèse Wiley Dancks, United States
Magistrate Judge, advised by Report–Recommendation
that defendants' motion to dismiss for failure to state a
claim pursuant to Federal Rule of Civil Procedure 12(b)
(6) be granted in part and denied in part. No objections to
the Report–Recommendation were filed.[2]

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report–
Recommendation is accepted in whole. *See* 28 U.S.C. §
636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss for failure to state a claim
pursuant to Federal Rule of Civil Procedure 12(b)(6) is
GRANTED in part and DENIED in part;

2. Plaintiff's official capacity claims for damages against
all defendants are DISMISSED;

3. Plaintiff's claim for injunctive relief in the form
of stopping harassment at the Coxsackie Correctional
Facility is DISMISSED;

4. Plaintiff's claims against defendant Doty are sua sponte
DISMISSED without prejudice for failure to serve that
defendant; and

5. The remaining defendants C.O. McIntyer; Lt.
McDermott; C.O. Stevens; Sgt. Young; C.O. Kane; C.O.
Hessle; C.O. Catlin; Dept. C. Miller; Comm. Brian
Fischer; and Sup. Martuscello are directed to respond to
the complaint as provided for in the Federal Rules of Civil
Procedure.

The Clerk is directed to serve a copy of this Decision and
Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION and ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

This pro se prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable David
N. Hurd, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jamel
King alleges that unnamed Correctional Officer John Doe
requested that Plaintiff assault another inmate and that,
based on Plaintiff's refusal to do so, the named Defendants
retaliated against Plaintiff by: 1) placing Plaintiff on
keeplock; 2) issuing false misbehavior reports; 3) finding
Plaintiff guilty in disciplinary hearings; and 4) affirming
Plaintiff's guilt on appeal. (Dkt. No. 9.) Currently pending
before the Court is Defendants' motion to dismiss for
failure to state a claim pursuant to Federal Rule of Civil
Procedure 12(b)(6). (Dkt. No. 58.) For the reasons that

follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND
The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007).

Plaintiff alleges that in November 2010, while incarcerated at Coxsackie Correctional Facility, Correctional Officer ("C.O.") John Doe requested that Plaintiff assault another inmate. (Dkt. No. 9 ¶ 7.) C.O. John Doe stated, "We have someone who like [sic] to touch kids, and if you will like to beat him up I would not see nothing." *Id.* Plaintiff refused to assault the other inmate, telling C.O. John Doe, "I'm not down with that and can you please not approach me with something like that." *Id.* C.O. John Doe stated, "[I]f you're not going to beat him up, then you must be down with touching kids to [sic]." *Id.* Plaintiff replied to C .O. John Doe, "No you have that wrong, you are the one that touch [sic] kids." *Id.* ¶ 8. C.O. John Doe became upset and stated, "Your ass is going to cellblock C or D, the house of pain so pack your things and I will let my pals up their [sic] know that you are an asshole." *Id.*

**\*2** Plaintiff alleges that he was moved to Cellblock D–3 and placed on keeplock by Defendant Hessle. (Dkt. No. 9 ¶ 9.) When Plaintiff asked Defendant Hessle why he was on keeplock, Defendant Hessle responded, "[B]ecause you wouldn't take care of business over in cellblock B–1 for my pal so you're [an] asshole." *Id.*

Plaintiff alleges that he was then moved to Cellblock F–3, where Defendant McDermott found Plaintiff guilty and sentenced him to fifteen days of keeplock confinement. (Dkt. No. 9 ¶ 10.) After the completion of his keeplock confinement, Plaintiff was put on hold until another cell became available and was then moved to Cellblock C–2. *Id.* ¶ 11.

Plaintiff alleges that upon arriving at Cellblock C–2, Defendant McIntyer started harassing Plaintiff. (Dkt. No. 9 ¶ 12.) Plaintiff wrote a complaint to Defendant Fischer regarding Defendant McIntyer's conduct. *Id.* As a result of Plaintiff's complaint, Defendant McIntyer wrote three false misbehavior reports in retaliation. (Dkt. No. 9 ¶ 13.)

Plaintiff alleges that on or about January 12, 2011, Plaintiff attended a disciplinary hearing before Defendant McDermott. (Dkt. No. 9 ¶ 14.) At the disciplinary hearing, Plaintiff submitted to Defendant McDermott documentary evidence in the form of the complaints Plaintiff lodged against Defendant McIntyer. *Id.* Plaintiff explained to Defendant McDermott the circumstances of the misbehavior reports lodged against Plaintiff. *Id.* Plaintiff explained to Defendant McDermott that the misbehavior reports were motivated by Plaintiff's refusal to comply with C.O. John Doe's request that Plaintiff assault another inmate. *Id.*

Plaintiff alleges that Defendant McDermott took Plaintiff's letters of complaint and refused to give them back. (Dkt. No. 9 ¶ 15.) Defendant McDermott stated, "[D]o you think I will take your word over my officer's[?] No [ ]one write[s] complaint[ ]s against my officer[ ]s in my jail and walk[ ]s away." *Id.* Defendant McDermott then found Plaintiff guilty on all charges and sentenced Plaintiff to forty-five days keeplock. *Id.* Subsequently, Plaintiff was moved back to Cellblock F–3. (Dkt. No. 9 ¶ 16.)

Plaintiff appealed Defendant McDermott's finding of guilt to Defendant Martuscello and Defendant Miller. *Id.* Defendant Martuscello and Defendant Miller affirmed Defendant McDermott's finding of guilt. *Id.*

Plaintiff alleges that on or about January 12, 2011, while he was on keeplock, Plaintiff wrote a complaint to Defendant Fischer complaining about the "constant harassment" by the staff at the Coxsackie Correctional Facility. (Dkt. No. 9 ¶ 16.)

Plaintiff alleges that on or about March 27, 2011, prior to being released from keeplock confinement, Plaintiff wrote another letter to Defendant Fischer complaining about the present harassment and future harassment. (Dkt. No. 9 ¶ 17.) In the letter, Plaintiff stated in part, "[T]he way things are looking, I will be in SHU or keeplock within a week." *Id.*

**\*3** Plaintiff alleges that after writing the letter, he was released from keeplock confinement and moved back to Cellblock C–3 where he "became a target of harassment" by Defendant McIntyer. (Dkt. No. 9 ¶ 18.)

Plaintiff alleges that on or about March 28, 2011, Plaintiff returned to Cellblock C–3 from the prison law library. (Dkt. No. 9 ¶ 19.) Defendant McIntyer saw Plaintiff and stated to Defendant Catlin, "King like[ ]s to write complaint[ ]s against officer[ ]s in Coxsackie and you know what we do to people like him." *Id.* Defendant Catlin smiled and stated, "[Y]es, we do like we always do, jump on them and write tickets." *Id.*

Plaintiff alleges that on or about March 28, 2011, Defendant Catlin wrote Plaintiff a false misbehavior report and stated, "[T]his is only the beginning, you will be seeing move [sic] from my pal[ ]s soon." (Dkt. No. 9 ¶ 20.)

Plaintiff alleges that on or about April 5, 2011, Defendant Stevens stated to Plaintiff, "I heard that you like to write complaint[ ]s against staff. Well you pick[ed] the wrong one this time." (Dkt. No. 9 ¶ 21.)

Plaintiff alleges that on or about April 5, 2011, upon returning to his cell from a program, Plaintiff's cell had been searched and he had received a misbehavior report issued by Defendant Stevens. (Dkt. No. 9 ¶ 22.)

Plaintiff alleges that on or about April 6, 2011, he attended a disciplinary hearing before Defendant McDermott. (Dkt. No. 9 ¶ 23 .) Plaintiff explained to Defendant McDermott that the misbehavior report was motivated by his complaints against staff. *Id.* Plaintiff explained to Defendant McDermott that he had been threatened in response to his complaints. *Id.* Plaintiff explained that there was another misbehavior report pending against him written by Defendant Stevens on April 5, 2011. *Id.*

Plaintiff alleges that Defendant McDermott found Plaintiff guilty and sentenced him to thirty days keeplock and suspended the time for thirty days. (Dkt. No. 9 ¶ 23.) After Plaintiff's disciplinary hearing concluded, Defendant McDermott turned off the tape recorder and stated, "[Y]ou picked the wrong one to write a complaint against, Officer McIntyer is my brother in law." *Id.*

Plaintiff alleges that on April 9, 2011, Defendant Young had Plaintiff brought to the dayroom area of Cellblock C–1. (Dkt. No. 9 ¶ 24.) In the presence of approximately five other officers, Defendant Young threatened Plaintiff. *Id.* Defendant Young told Plaintiff to "drop [Plaintiff's] complaints and the problems will stop." *Id.* Defendant Young stated that if Plaintiff continued to

write complaints, that Plaintiff would "have a hard time here in Coxsackie." *Id.*

Plaintiff alleges that he refused to drop his complaint and was returned to his cell. (Dkt. No. 9 ¶ 24.) Upon returning to his cell, Defendant Doty stated to Plaintiff, "I just got a [call] from down stairs about you and you will not be getting recreation today." *Id.* Defendant Doty then issued Plaintiff a false misbehavior report. *Id.*

**\*4** Plaintiff alleges that on or about April 9, 2011, Defendant Stevens searched Plaintiff's cell and issued Plaintiff another misbehavior report. (Dkt. No. 9 ¶ 25.)

Plaintiff alleges that on or about April 13, 2011, Defendant Stevens stated to Plaintiff, "[Y]ou [are] still here, you're not [on] keeplock. Well I will take care of that." (Dkt. No. 9 ¶ 25.)

Plaintiff alleges that on or about April 15, 2011, Plaintiff attended three disciplinary hearings before Defendant McDermott. (Dkt. No. 9 ¶ 26.) Plaintiff explained to Defendant McDermott that the misbehavior reports were false and that they were motivated by retaliation for Plaintiff having written complaints against prison staff concerning Plaintiff's refusing C.O. John Doe's request to assault another inmate. *Id.*

Plaintiff alleges that Defendant McDermott stated that he did not care about Plaintiff's defense and that Plaintiff picked the wrong person to complain about. (Dkt. No. 9 ¶ 26.) Defendant McDermott stated that Plaintiff should have done what the correctional officers wanted and that doing so would have saved him from all of his problems. *Id.*

Plaintiff alleges that Defendant McDermott found Plaintiff guilty and imposed a sentence totaling ninety days keeplock with restrictions on Plaintiff's access to commissary, phones, and packages. (Dkt. No. 9 ¶ 27.)

Plaintiff alleges that on or about April 16, 2011, Plaintiff appealed Defendant McDermott's decision to Defendant Martuscello. (Dkt. No. 9 ¶ 28.) Plaintiff explained to Defendant Martuscello the circumstances behind all of the misbehavior reports. *Id.* On or about May 17, 2011, and June 20, 2011, Defendant Miller affirmed Defendant McDermott's decision. *Id.*

Plaintiff alleges that when he was moved back to Cellblock F–1, Defendant Young told Defendant Kane that Plaintiff likes to write complaints and to make sure that Plaintiff gets "the special treatment" while on keeplock. (Dkt. No. 9 ¶ 29.)

Plaintiff alleges that on or about June 6, 2011, Defendant Kane made sure that Plaintiff was separated from the rest of the inmates during keeplock recreation as retaliation for the complaints Plaintiff wrote against Defendants concerning the harassment Plaintiff was receiving. (Dkt. No. 9 ¶ 29.)

Plaintiff filed his original complaint in this action on December 14, 2011. (Dkt. No. 1.) Plaintiff amended his complaint on January 5, 2012. (Dkt. No. 9.) Defendants filed a motion for partial summary judgment on April 9, 2013. (Dkt. No. 58.) On July 23, 2013, Defendants requested that the Court treat their motion for summary judgment as a motion to dismiss, which the Court granted. (Dkt.Nos.68–69.)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*5** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

## III. ANALYSIS

### A. Official Capacity

Plaintiff has sued Defendants in their official capacities. (Dkt. No 9 ¶ 6–c.) Defendants McIntyer, McDermott, Stevens, Young, Kane, Hessle, Catlin, Miller, Fischer, and Martuscello move to dismiss the official capacity claims against them. (Dkt. No. 58–3 at 3–4.) Defendants argue that, under the Eleventh Amendment, they are immune from suit in their official capacities for money damages and injunctive relief. *Id.* Defendants are correct that, under the Eleventh Amendment, they are immune from suit for money damages. However, Defendants are incorrect that the Eleventh Amendment provides them immunity from suit for injunctive relief.

#### 1. Claim for Damages

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities."). All DOCCS [1] employees are state officials for the purposes of the Eleventh Amendment. *See, e.g., Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Corr. Officers,* No. 99 CIV 9555, 2000 U.S. Dist. LEXIS 11531, at \*7, 2000 WL 1154311, at \*2 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). [2] Here, Defendants are all DOCCS employees. (Dkt. No 9 ¶¶ 6–d, 24.) Thus, the Eleventh Amendment bars claims for damages against them in their official capacities. [3] Therefore, I recommend that the Court grant Defendants'

motion to dismiss Plaintiff's official capacity claims for damages.

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted). Here, better pleading would not cure the substantive problem with Plaintiff's claims for damages against Defendants in their official capacities. Therefore, I recommend that the Court dismiss these claims without leave to amend.

## 2. Claims for Injunctive Relief

**\*6** The Eleventh Amendment does not, however, bar Plaintiff's claims for injunctive relief against Defendants in their official capacities. Under the doctrine established in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "[a] plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) alleges an ongoing violation of federal law; and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007) (punctuation omitted).

It is well established that § 1983 actions against state officials in which the plaintiff requests prospective injunctive relief are not barred by the Eleventh Amendment. *See Quern v. Jordan,* 440 U.S. 332, 338, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (in a § 1983 action a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief). Therefore, Defendants' assertion that the Eleventh Amendment bars Plaintiff's claim for injunctive relief is incorrect.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002) (punctuation omitted). As to the first prong, in determining whether an "ongoing violation" exists, the court asks, "does the enforcement of the law amount to a continuous violation of plaintiffs['] constitutional rights or a single act that continues to have negative consequences for plaintiffs." *Roberts v. New York,* 911 F.Supp.2d 149, 161 (N.D.N.Y.2012). As to the second prong, where the relief requested by a plaintiff is an injunction against state officials, this satisfies the requirement that the relief sought be prospective in nature. *See In re Deposit Agency,* 482 F.3d at 618–19 (finding that "it is undisputed that the injunctive relief sought ... is prospective in nature.").

Here, Plaintiff alleges two categories of violation for which he seeks injunctive relief: 1) harassment by Defendants (Dkt. No. 9 ¶¶ 7–9, 12, 19, 21, 25, 29, 31); and 2) the issuance of false misbehavior reports (Dkt. No. 9 ¶¶ 13, 20, 22, 24, 25). Plaintiff requests that injunctive relief be granted as to these violations, respectively, by: 1) stopping the harassment and retaliation against Plaintiff; and 2) expunging the false misbehavior reports from Plaintiff's record. (Dkt. No. 9 at 8.) Plaintiff meets the requirements of *Ex parte Young* for both claims of injunctive relief.

Plaintiff's claim for injunctive relief in the form of enjoining Defendants from harassing Plaintiff meets the requirements of *Ex parte Young* and therefore avoids the Eleventh Amendment bar to suit against state officials. Plaintiff sufficiently "(a) alleges an ongoing violation of federal law; and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency,* 482 F.3d at 618.

**\*7** First, in addition to the approximately six incidents of harassment that Plaintiff alleges (Dkt. No 9 ¶¶ 7–9, 12, 19, 21, 25, 29), Plaintiff states that he "has been constantly writing the defendant[ ]s for help with the everyday harassment. Each time plaintiff sees defendant[ ]s McIntyer and Kane they point plaintiff out to other officer[ ]s and mak[e] threaten[ing] comments." (Dkt. No. 9 ¶ 31.) These statements by Plaintiff are sufficient to allege an ongoing violation of federal law. Plaintiff's allegation that he "has been *constantly* writing the defendant[ ]s for help with the *everyday* harassment" (Dkt. No 9 ¶ 3 1) (emphasis added) is sufficient to "amount to a continuous violation," *Roberts,* 911 F.Supp. at 161, of Plaintiff's constitutional rights so as to constitute an ongoing violation. Second, Plaintiff seeks relief properly characterized as prospective by requesting that Defendants be enjoined from continuing the

harassment. Plaintiff's request that Defendants' be enjoined from performing certain conduct necessarily concerns Defendants' future actions and is therefore, by definition, prospective in nature. Thus, Plaintiff's claim for injunctive relief as to the harassment meets the requirements of *Ex Parte Young* and avoids the Eleventh Amendment's bar to suit against Defendants.

Plaintiff's claim for injunctive relief in the form of expunging the false misbehavior reports issued against him likewise meets the requirements of *Ex parte Young* and therefore avoids the Eleventh Amendment bar to suit against state officials. Relief in the form of expunging disciplinary actions from a plaintiff's record is not barred by the Eleventh Amendment. *Sowell v. Weed,* No. 07–CV–6355(MAT), 2013 U.S. Dist. LEXIS 92866, at *17, 2013 WL 3324049, at *6 (W.D.N.Y. July 1, 2013) (holding that expungement of Department of Corrections' findings of guilt was form of relief not barred by Eleventh Amendment); *see also Nevarez v. Hunt,* 770 F.Supp.2d 565, 568 (W.D.N.Y.2011) (holding that expungement of disciplinary tickets was equitable relief not barred by Eleventh Amendment); *Jackson v. Johnson,* 30 F.Supp.2d 613, 618–19 (S.D.N.Y.1998). Here, Plaintiff requests that the false misbehavior reports issued against him be expunged from his record. (Dkt. No. 9 at 8.) Thus, Plaintiff's claim for injunctive relief meets the requirements of *Ex parte Young* and avoids the Eleventh Amendment's bar to suit against Defendants.

### B. Mootness

Defendants argue that because Plaintiff is no longer incarcerated at Coxsackie Correctional Facility, his claims for injunctive relief are moot and should be dismissed. (Dkt. No. 58–3 at 5–6). Defendants are correct as to only a portion of Plaintiff's claims for injunctive relief. As discussed above, Plaintiff alleges two categories of violation for which he seeks injunctive relief: 1) harassment by Defendants (Dkt. No. 9 ¶¶ 7–9, 12, 19, 21, 25, 29, 31); and 2) the issuance of false misbehavior reports (Dkt. No. 9 ¶¶ 13, 20, 22, 24, 25). Plaintiff requests that injunctive relief be granted as to these violations, respectively, by: 1) stopping the harassment and retaliation against Plaintiff; and 2) expunging the false misbehavior reports from Plaintiff's record. (Dkt. No. 9 at 8.) Defendants are correct that the first category of alleged violation, harassment, is moot; however, Defendants are incorrect that the second category, false misbehavior reports, is moot.

**\*8** As to the first category, harassment, Plaintiff's claim for injunctive relief is moot because he is no longer incarcerated at Coxsackie Correctional Facility. "[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006). Here, after filing his complaint, Plaintiff was transferred from Coxsackie to three different correctional facilities and is presently incarcerated at Elmira Correctional Facility. (Dkt. Nos. 47, 55, 66 .) Thus, Plaintiff's claim for injunctive relief in the form of stopping harassment and retaliation by Defendants is moot. Plaintiff would not be able to overcome the substantive problem posed by his transfer to a different correctional facility. Therefore, I recommend that the Court grant the motion to dismiss with respect to the claim for injunctive relief in the form of stopping the harassment at the Coxsackie Correctional Facility without leave to amend.

As to the second category of violation that Plaintiff alleges, the issuance of false misbehavior reports, Plaintiff's request for injunctive relief is not moot. As a remedy to this violation, Plaintiff requests that his record be expunged of all false misbehavior reports. (Dkt. No. 9 at 8). "[A] complaint should not be dismissed as moot if some injunctive relief could be granted, such as an order that material be expunged from an inmate's records." *Bass v. Grottoli,* No. 94 Civ. 3220(MGC), 1995 U.S. Dist. LEXIS 13916, at *19, 1995 WL 565979 at *6, (S.D.N.Y. Sept.25, 1995) (citing *Washington v. James,* 782 F.2d 1134, 1137 (2d Cir.1986)) (holding that while plaintiff was transferred to another prison and therefore most of injunctive relief sought was moot, injunctive relief in the form of requiring prison officials to remove from plaintiff's record any mention of the suit could still be granted). Even though Plaintiff has been transferred from Coxsackie to another correctional facility, injunctive relief can still be granted in the form of expunging from Plaintiff's record the allegedly false misbehavior reports. Thus, Plaintiffs' claim for injunctive relief in the form of expungement is not moot. Therefore, I recommend that the Court deny Defendants' motion to dismiss with respect to Plaintiff's official capacity claims for injunctive relief in the form of expungement.

### C. Personal Involvement

Defendants argue that Plaintiff has failed to allege facts sufficient to support a finding that Defendants Fischer, Miller, and Martuscello were personally involved in the alleged constitutional deprivations. (Dkt. No. 58–3 at 7.) Defendants do not argue that Defendants McIntyer, McDermott, Stevens, Young, Kane, Hessle, or Catlin lacked personal involvement. Therefore, the Court will address the issue of personal involvement only as to Defendants Fischer, Miller, and Martuscello.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: 1) directly participated in the violation; 2) failed to remedy that violation after learning of it through a report or appeal; 3) created, or allowed to continue, a policy or custom under which the violation occurred; 4) had been grossly negligent in managing subordinates who caused the violation; or 5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). [4]

### 1. Defendant Fischer's Personal Involvement

**\*9** Defendants assert that Defendant Fischer lacked personal involvement in the alleged constitutional deprivations. In support of this assertion, Defendants rely on two arguments. First, Defendants submit that liability

against a supervisory official for an alleged constitutional violation cannot be based on the doctrine of respondeat superior, citing *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999). (Dkt. No. 58–3 at 6.) Second, Defendants argue, "just because a prisoner writes to supervisory officials about instances of alleged mistreatment does not, alone, justify holding those supervisory officials liable under Section 1983," citing *Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004). *Id.* Defendants are correct as to their first argument concerning respondeat superior. However, Defendants' argument concerning the effect that a prisoner writing to a supervisor has on that supervisor's personal involvement is abrogated by *Grullon v. City of New Haven,* 720 F.3d 133 (2d Cir.2013).

District courts in this circuit have routinely held that a prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Similarly, district courts have held that "an allegation that an official ignored a prisoner's letter of protest and request for investigation of allegations made therein is insufficient to hold that official liable for the alleged violations ." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002). However, the Second Circuit has recently cautioned courts against dismissing claims at the 12(b)(6) stage for failure to allege personal involvement where the plaintiff alleges that an official failed to respond to a letter of complaint. *Grullon,* 720 F.3d at 141 ("At the pleading stage, even if Grullon had no knowledge or information as to what became of his Letter after he sent it, he would be entitled to have the court draw the reasonable inference ... that the Warden in fact received the Letter, read it, and thereby became aware of the alleged conditions of which Grullon complained.").

Here, like the procedural posture in *Grullon,* Defendants challenge, *inter alia,* Plaintiff's claim of personal involvement as to Defendant Fischer in a motion to dismiss. [5] Thus, based on the holding in *Grullon,* Plaintiff is entitled to have the Court draw the reasonable inference from Plaintiff's pleadings that Defendant Fischer in

fact received the three letters of complaint that Plaintiff described in his operative complaint. Based on this inference, Plaintiff has alleged facts sufficient to support a finding of Defendant Fischer's personal involvement. Therefore, I recommend that the Court deny Defendants' motion to dismiss with respect to Plaintiff's individual capacity claim against Defendant Fischer.

### 2. Defendant Miller's Personal Involvement

**\*10** Defendants assert that Defendant Miller lacked personal involvement in the alleged constitutional deprivations. In support of this assertion, Defendants point out that Plaintiff's allegations against Defendant Miller are that Defendant Miller affirmed two disciplinary hearing findings of guilt. (Dkt. No. 58–3 at 6.)

District courts in the Second Circuit disagree about whether simply affirming an allegedly unconstitutional disciplinary decision constitutes personal involvement. Courts declining to find personal involvement conclude that there is no "ongoing" violation for the supervisory official to "remedy" in such a situation. *See Jamison v. Fischer,* No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, at \*14–15, 2012 WL 4767173, at \*5 (S.D.N.Y. Sept.27, 2012) ("Despite the fact that Plaintiff continued to be housed in the SHU, Bezio's involvement and review of the matter was distinct from whatever took place at the hearing, and he cannot be held liable ... for violations that occurred at the hearing and were not ongoing."). *See also Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009); *Chavis v. vonHagn,* No. 02–CV–0119, 2009 U.S. Dist. LEXIS 6871, at \*198–99, 2009 WL 236060, at \*68 (W.D.N.Y. Jan.30, 2009); *Odom v. Calero,* No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, at \*16–20, 2008 WL 2735868, at \*6–7 (S.D.N.Y. July 10, 2008); *Ramsey v. Goord,* No. 05–CV–47A, 2005 U .S. Dist. LEXIS 42953, at \*18–20, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug.13, 2005).

Other district courts in this circuit have found personal involvement where a supervisory official affirms an allegedly constitutionally infirm hearing decision. *See Thomas v. Calero,* 824 F.Supp.2d 488, 509–10 (S.D.N.Y.2011); *Holmes v. Fischer,* 764 F.Supp.2d 523, 540 (W.D.N.Y.2011); *Rodriguez v. Selsky,* No. 9:07–CV–0432, 2010 U.S. Dist. LEXIS 23813, 2010 WL 980273, at \*6 (N.D.N.Y. Mar.15, 2010); *Baez v. Harris,* No. 9:01–CV–807, 2007 U.S. Dist. LEXIS 8728, 2007 WL 446015, at \*2 (N.D.N.Y. Feb.7, 2007); *Johnson v. Coombe,* 156

F.Supp.2d 273, 278 (S.D.N.Y.2001) These courts find that there is an "ongoing" violation because having the power to vacate an allegedly unconstitutional decision, refusing to do so, and allowing an inmate to remain in the SHU "knowingly continu[es] a deprivation of liberty without due process of law." *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 U.S. Dist. LEXIS 51917, at \*27, 2011 WL 1842294, at \*9 (S.D.N.Y. May 9, 2011).

I agree with Magistrate Judge David E. Peebles that the cases finding personal involvement in such situations "appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement." *Bennett v. Fischer,* No. 9:09–CV1236, 2010 U.S. Dist. LEXIS 139587, at \*38–39, 2010 WL 5525368, at \*12 (N.D.N.Y. Aug.17, 2010).

Here, Plaintiff alleges that Defendant Miller affirmed two disciplinary findings of Plainitiff's guilt. (Dkt. No. 9 ¶¶ 16, 28.) Accordingly, under the reasoning articulated in *Bennett, supra,* Plaintiff's allegations that Defendant Miller affirmed two disciplinary findings are sufficient to support the finding that Defendant Miller was personally involved in the alleged constitutional deprivations. Therefore, I recommend that the Court deny Defendants' motion to dismiss with respect to Plaintiff's individual capacity claim against Defendant Miller.

### 3. Defendant Martuscello's Personal Involvement

**\*11** Defendants state that "plaintiff's allegations against defendant Martuscello ... are that plaintiff appealed two disciplinary guilty findings to defendant Martuscello." (Dkt. 58–3 at 5.) This characterization of Plaintiff's allegations against Defendant Martuscello is partially incorrect.

In his operative complaint, Plaintiff does, as Defendants assert, allege that he appealed two disciplinary findings of guilt to Defendant Martuscello. (Dkt. 9 ¶¶ 16, 28.) However, in describing the first of these two appeals to Defendant Martuscello, Plaintiff goes further and alleges that Defendant Martuscello also affirmed one of these two disciplinary findings. Plaintiff states, "Plaintiff appealed defendant[ ] McDermott's decision to defendant Martuscello and defendant Miller who affirmed defendant McDermott's decision." (Dkt. 9 ¶ 16.)

This statement is ambiguous. On the one hand, it could be interpreted to mean Plaintiff appealed the

decision to Defendant Martuscello and subsequently Defendant Miller affirmed the decision. On the other hand, the statement could be interpreted to mean Plaintiff appealed the decision to both Defendants Martuscello and Miller and both of them affirmed the decision. Courts are "obligated to construe a pro se complaint liberally." *Harris,* 572 F.3d at 72 (citation omitted). Accordingly, the Court interprets Plaintiff's statement that he "appealed defendant[ ] McDermott's decision to defendant Martuscello and defendant Miller who affirmed defendant McDermott's decision" (Dkt. 9 ¶ 16) as asserting that Defendant Martuscello, in addition to Defendant Miller, affirmed Defendant McDermott's disciplinary finding of guilt. Therefore, in discussing Defendants' personal involvement, *infra,* the Court will treat Plaintiff's complaint as alleging, *inter alia,* that Defendant Martuscello affirmed one of Plaintiff's two disciplinary appeals.

As discussed above, a correctional officer's affirmance of a prisoner's disciplinary finding of guilt constitutes the correctional officer's personal involvement in the alleged constitutional deprivation. Accordingly, having interpreted Plaintiff's complaint to allege that Defendant Martuscello affirmed one of Plaintiff's two disciplinary findings of guilt, Plaintiff's allegation is sufficient to support the finding that Defendant Martuscello was personally involved in Plaintiff's alleged deprivation. Therefore, I recommend that the Court deny Defendant's motion to dismiss with respect to Plaintiff's individual capacity claim against Defendant Martuscello.

### D. Defendant Doty

Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days after the filing of the complaint. Fed.R.Civ.P. 4(m). This 120–day service period is shortened, or "expedited," by the Court's Local Rules of Practice, which provide that all defendants must be served with the summons and complaint within sixty days of the filing of the complaint. L.R. 4.1(b). Here, more than 120 days have elapsed since the filing of the complaint and Defendant Doty has not been served. (Dkt. No. 51.) As a result, Plaintiff is currently in violation of both the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court. It is therefore recommended that the Court dismiss the claims against Defendant Doty without prejudice unless Plaintiff serves Defendant Doty

within thirty days of any Order adopting this Report–Recommendation.

**\*12 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 58) be ***GRANTED IN PART AND DENIED IN PART.*** Specifically, the Court recommends that Defendant's motion to dismiss be granted as to:

1. Plaintiff's official capacity claims for damages against all Defendants; and

2. Plaintiff's claim for injunctive relief in the form of stopping harassment at the Coxsackie Correctional Facility.

The Court further recommends that Defendant's motion to dismiss be denied as to:

1. Plaintiff's claim of injunctive relief in the form of expunging from his records false misbehavior reports;

2. Plaintiff's claim of Defendant Fischer's personal involvement;

3. Plaintiff's claim of Defendant Miller's personal involvement; and

4. Plaintiff's claim of Defendant Martuscello's personal involvement; and it is further

**RECOMMENDED** that the Court *sua sponte* dismiss Plaintiff's claims against Defendant Doty without prejudice for failure to serve that Defendant; and it is further

**RECOMMENDED** that Defendants be directed to respond to the complaint as provided in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that the Clerk of the Court provide Plaintiff with a copy of the following unpublished decisions:

1. *Tolliver v. N. Y. State Corr. Officers,* No. 99 CIV 9555, 2000 U.S. Dist. LEXIS 11531, at \*7, 2000 WL 1154311, at \*2 (S.D.N.Y. Aug.14, 2000);

2. *Sowell v. Weed,* No. 07–CV–6355(MAT), 2013 U.S. Dist. LEXIS 92866, at *17, 2013 WL 3324049, at *6 (W.D.N.Y. July 1, 2013);

3. *Bass v. Grottoli,* No. 94 Civ. 3220(MGC), 1995 U.S. Dist. LEXIS 13916, at *19, 1995 WL 565979 at *6, (S.D.N.Y. Sept.25, 1995);

4. *Jamison v. Fischer,* No. 11 Civ. 4697 RJS, 2012 U.S. Dist. LEXIS 144307, at *14–15, 2012 WL 4767173, at *5 (S.D.N.Y. Sept.27, 2012);

5. *Chavis v. vonHagn,* No. 02–CV–0119, 2009 U.S. Dist. LEXIS 6871, at *198–99, 2009 WL 236060, at *68 (W.D.N.Y. Jan.30, 2009);

6. *Odom v. Calero,* No. 06 Civ. 15527, 2008 U.S. Dist. LEXIS 52408, at *16–20, 2008 WL 2735868, at *6–7 (S.D.N.Y. July 10, 2008);

7. *Ramsey v. Goord,* No. 05–CV–47A, 2005 U.S. Dist. LEXIS 42953, at *18–20, 2005 WL 2000144, at *6 (W.D.N.Y. Aug.13, 2005);

8. *Rodriguez v. Selsky,* No. 9:07–CV–0432, 2010 U.S. Dist. LEXIS 23813, 2010 WL 980273, at *6 (N.D.N.Y. Mar.15, 2010);

9. *Delgado v. Bezio,* No. 09 Civ. 6899(LTS), 2011 U.S. Dist. LEXIS 51917, at *27, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011)

10. *Bennett v. Fischer,* No. 9:09–CV–1236, 2010 U.S. Dist. LEXIS 139587, at *38–39, 2010 WL 5525368, at *12 (N.D.N.Y. Aug.17, 2010)

11. *Baez v. Harris,* No. 9:01–CV–807, 2007 U.S. Dist. LEXIS 8728, 2007 WL 446015, at *2 (N.D.N.Y. Feb.7, 2007); and it is further

**ORDERED** that the Clerk correct the caption to list Defendant "Sup. Matsucell" as "Sup. Martuscello."

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 689028

Footnotes

1   This defendant is currently listed in the caption and throughout the docket as "Matsucello." In his operative complaint, Plaintiff refers to this defendant as "Martuscello" (Dkt. 9 ¶¶ 16, 28), and in their Motion for Partial Summary Judgment, Defendants refer to this defendant as "Martuscello" (Dkt. No. 58–3 at 2, 3, 5, 6). The Clerk is directed to correct the caption to list this defendant as "Martuscello."

2   Plaintiff requested an extension of time to file objections to the Report–Recommendation and was granted until February 7, 2014 to do so.

1   On April 1, 2011, the New York State Department of Correctional Services and Division of Parole merged into one comprehensive agency entitled the New York State Department of Corrections and Community Supervision, referred to as "DOCCS."

2   The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

3   Defendants are not, however, entitled to Eleventh Amendment immunity for the damages claims against them in their individual capacities. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity.").

4   In *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have

determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

5    The Court granted Defendants' motion to treat their motion for summary judgment as a motion to dismiss. (Dkt. No. 69.)

---

**End of Document**                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Bailey v. Pataki, S.D.N.Y., July 6, 2010

2009 WL 3074344
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Warren LANE, Plaintiff,

v.

Sharon E. CARPINELLO, Commissioner, New
York State Office of Mental Health; Donald
Sawyer, Director; Sharon Barboza, M.D.; Jeffrey
Nowicki, Social Worker; Anthony Lucenti, Social
Worker; J. Crociata, Nurse; Michael Babula,
Treatment Assistant; Frank Menz, Treatment
Assistant; Stephen Coppola, Treatment Assistant
Central New York Psychiatric Center; and Barbara
Bebe, Facility Review Specialist, New York State
Commission for Quality of Care, Defendants.

Civil Action No. 9:07–cv–751 (GLS/DEP).
|
Sept. 24, 2009.

West KeySummary

1    Civil Rights
     👉 Physical access and mobility;carriers

A visually impaired sex offender failed to state
a discrimination claim under the Americans
with Disabilities Act against employees who
worked in his sex offender treatment program.
The sex offender alleged that the employees
failed to provide him with a reasonable
accommodation after taking his cane. The
cane was confiscated because sex offenders
were not permitted to have such items in the
treatment facility and the confiscation of the
cane did not exclude the sex offender from
participating in the program or of the benefits
of the services, programs, or activities of the
sex offender treatment program. Americans
with Disabilities Act of 1990, § 2 et seq., 42
U.S.C.A. § 12101 et seq.

11 Cases that cite this headnote

**Attorneys and Law Firms**

Warren Lane, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Dean J. Higgins, Assistant Attorney
General, of Counsel, Albany, NY, for the Defendants.

*ORDER*

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate
Judge David E. Peebles, duly filed August 31, 2009.
Following ten days from the service thereof, the Clerk has
sent the file, including any and all objections filed by the
parties herein.

No objections having been filed, and the court
having reviewed the Magistrate Judge's Report–
Recommendation for clear error, it is hereby

ORDERED, that the Report–Recommendation of
Magistrate Judge David E. Peebles filed August 31, 2009
is ACCEPTED in its entirety for the reasons state therein,
and it is further

ORDERED, that the plaintiff's motion for partial
summary judgment (Dkt. No. 57) is DENIED,
defendants' cross-motion for summary judgment (Dkt.
No. 79) is GRANTED, and the plaintiff's complaint is
DISMISSED in its entirety, and it is further

ORDERED, that the Clerk of the court serve a copy of
this order upon the parties in accordance with this court's
local rules.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Warren Lane, a former New York State prison inmate who alleges that he is "legally blind", has commenced this civil rights action pursuant to 42 U.S.C. §§ 1983, 1984, 1985 and 12,101 against ten defendants, eight of whom are employed at the Central New York Psychiatric Center ("CNYPC"), alleging various constitutional and statutory violations committed by the defendants during the period of his confinement in CNYPC. In his complaint, plaintiff asserts claims relating to his involuntary confinement at CNYPC in 2006, commencing upon his conditional release date from prison. Plaintiff maintains that he was transferred into CNYPC in violation of his constitutional right to due process, and that while there he was subjected to further violations, including discrimination based upon his disability, excessive force, failure to intervene to protect him from harm, indifference to his medical needs, and retaliation. Plaintiff requests redress in the form of compensatory and punitive damages as well as declaratory relief.

Currently pending before the court in connection with this action are two motions. Plaintiff initiated the motion process by seeking partial summary judgment with respect to his claim that he was denied due process with regard to his commitment to CNYPC and for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12,101 *et seq.,* while he was held there. Defendants responded in opposition and cross-moved for summary judgment requesting dismissal of plaintiffs complaint in its entirety. Having carefully reviewed the extensive record now before the court, I recommend that plaintiff's motion for partial summary judgment be denied, defendants' motion for summary judgment be granted, and plaintiff's complaint be dismissed in its entirety.

## I. *BACKGROUND* [1]

Plaintiff, who is visually impaired, was incarcerated by the New York State Department of Correctional Services ("DOCS") for approximately twenty-five years following his conviction for multiple sex offenses. [2] Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4) p. 1. Prior to his DOCS conditional custody release date, plaintiff was evaluated by two physicians from the New York State Office of Mental Health ("OMH"); based upon their evaluations, on September 12, 2006, on application of the superintendent of the Sullivan

Correctional Facility made pursuant to section 9.27 of the New York Mental Hygiene Law ("MHL"), plaintiff was admitted involuntarily into CNYPC under close observation for participation in the sex offender treatment program ("SOTP"). [3] Lane Aff. (Dkt. No. 57–2) ¶¶ 1–5. Although his stay at the CNYPC lasted for less than two months, plaintiff's many complaints regarding his commitment and treatment at that facility give rise to this suit.

**\*2** Admission records reflect that upon being admitted to CNYPC, plaintiff was "very agitated due to his admission to the SOTP and was making statements that he would due [sic] whatever it took to violate and get sent back to prison." Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 92. [4] When admitted to CNYPC, plaintiff's mobility cane, which he claims to require when he is outdoors or in an unfamiliar environment, was confiscated by defendant Steven Coppola, a treatment assistant at the facility. Complaint (Dkt. No. 1) p. 6. According to defendants, plaintiff's cane was taken pursuant to a CNYPC safety and security policy that precludes any resident of the center from possessing such an item. Nowicki Aff. (Dkt. No. 79–5) ¶ 7. Plaintiff alleges that thereafter he was denied reasonable accommodations for his blindness despite his numerous requests. Complaint (Dkt. No. 1) p. 6. Defendant Jeffrey Nowicki, who was at all times relevant to plaintiff's complaint the Team Leader of the SOTP at CNYPC and is currently the Chief of Mental Health Treatment Services of the SOTP, explains that while plaintiff's cane was confiscated, he was offered a wheelchair or walker, both of which plaintiff refused. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 1, 7–8. Nowicki states further that staff at CNYPC were aware of plaintiff's left eye prosthesis and that plaintiff was given medical support for this condition. *Id.* ¶ 10. Plaintiff's in-patient nursing assessment conducted on September 12, 2006, upon his admission to CNYPC, reflects plaintiff's mobility status as fully independent without any notations that a cane or walker was needed. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 38.

On October 13, 2006, one month after his transfer into CNYPC, plaintiff wrote a letter to defendant Donald Sawyer, director of the facility, demanding compliance with the ADA and that he be provided with reasonable accommodations for his disability, including a laptop computer with zoom text, a scanner and inkjet color printer, a 7x magnifier, books on tape, a high intensity

lamp and 20/20 pens. Complaint (Dkt. No. 1) p. 9; Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4) Exh. C; *see also* Defendants' Response to Plaintiff's Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 78) ¶ 5. Plaintiff claims that, in response, defendant Nowicki told him that accommodations were unnecessary because plaintiff "would not remain at CNYPC for much longer." Complaint (Dkt. No. 1) p. 9. Feeling threatened by Nowicki's statement, Lane sent a letter to defendant Sharon Carpinello, Commissioner of the OMH, requesting that she place him into protective custody and transfer him from CNYPC. *Id.* Plaintiff did not receive a response to that letter. *Id.*

Plaintiff claims to have been subjected to three separate attacks during his stay at CNYPC. On September 18, 2006, while in the recreation yard, plaintiff was struck by a football and subsequently attacked by a fellow patient, suffering injury to his face, nose and jaw. [5] Complaint (Dkt. No. 1) p. 7; Plaintiffs Deposition Transcript ("Tr.") pp. 27–33. [6] Plaintiff claims that upon requesting medical attention he was told by defendant J. Crociata, a nurse at CNYPC, "[t]here's nothing wrong with you," and denied treatment. Complaint (Dkt. No. 1) p. 7. Plaintiff's CNYPC records contradict his version of the events, instead reflecting that defendant Crociata witnessed plaintiff arguing with another patient near the recreation yard door entrance and tried to intervene. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 114. When Crociata approached Lane and inquired if he was injured, Lane stated that he was not touched and became angry when Crociata asked what had happened, accusing Crociata of being a racist. *Id.* Plaintiff was visited by a doctor later that evening during rounds; although the doctor offered to see him, plaintiff again said he was "okay" and declined any treatment. *Id.*

**\*3** Following the September 18, 2009 incident, plaintiff demanded that he be permitted to file criminal charges against the patient who assaulted him, but was allegedly denied the opportunity to contact law enforcement authorities by Nowicki and defendants Michael Babula and Frank Menz, both of whom are treatment assistants at CNYPC. Complaint (Dkt. No. 1) p. 7. Nowicki informed plaintiff that mediation was available to handle such disputes, making it unnecessary to contact the State Police. [7] *Id.* Plaintiff claims defendant Nowicki then threatened that if he insisted on filing criminal charges,

Nowicki would have his parole violated. *Id.* As a result of the September 18 attack plaintiff no longer felt safe, particularly in light of his blindness, and was fearful of losing his remaining ability to see in another altercation. *Id.* Plaintiff requested that Nowicki either transfer him to another facility or place him in protective custody. [8] *Id.* After both requests were denied, plaintiff subsequently sent a written request to defendants Sawyer and Sharon Barboza, Director of the SOTP at CNYPC, again asking for protective custody and transfer. *Id.* Plaintiff received no response from either Sawyer or Barboza. *Id.*

Plaintiff's CNYPC records show that a call was placed to the New York State Police when plaintiff indicated that he wanted to pursue criminal charges, and that plaintiff became belligerent and threatening after the incident, touting his lengthy disciplinary record in prison and warning not only that he would "kick the shit" out of the other patient with whom he had the problem, but also that he would soon be running the ward. [9] Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 116–19. Plaintiff did contact his parole officer regarding the incident and also filed a complaint with Nowicki. *Id.*

The next relevant incident occurred on September 22, 2006 when, plaintiff claims, defendant Nowicki called him to a hallway and ordered defendants Menz and Coppola to "take him down" after Lane refused to speak with Nowicki. Complaint (Dkt. No. 1) p. 8. As a result, plaintiff was thrown to the floor and kicked and punched, put in restraints, and placed on a gurney, even though he claims he did not resist. [10] *Id.* Plaintiff alleges that he was denied medical treatment for the shoulder, lower back, and face injuries that he sustained and was instead held captive in a room for two to three days, forced to sleep on the floor, and provided only one meal during that time period. Complaint (Dkt. No. 1) p. 8; Tr. p. 55.

Once again, defendants' version of what occurred on that occasion is markedly different. Defendant Nowicki states that on September 22, 2006 plaintiff became hostile toward both staff and the residents, and threatened to instigate a riot. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 21–30; *see also* Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 139–50. Nowicki attempted to counsel Lane in the "side room"; plaintiff rebuffed those efforts and instead attempted to re-enter the day room. Nowacki Aff. (Dkt. No. 79–5) ¶¶ 23–24. As a result, plaintiff was placed in four point

restraints, pursuant to a doctor's orders, for a period of seven minutes and physically removed to the side room. *Id.* ¶ 25. When plaintiff's threats continued, he was left in the side room under supervision, consistent with hospital policy, from September 22, 2006 at 1:00 p.m. until September 25 at 9:30 a.m., during which time he was provided food, a mattress and a chair. *Id.* ¶¶ 26–30. When plaintiff was visited by a psychiatrist, he stated that he was upset because he felt that he was being treated differently than other patients with respect to unit policies, and denied any intention to hurt anyone, despite his threats. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 150. Detailed CNYPC progress notes recording plaintiff's status at fifteen minute intervals show that Lane was provided and ate all of his meals during the time he was confined to the side room. *Id.* pp. 153–81. Plaintiffs parole officer was called to CNYPC, but found that there was insufficient evidence to bring parole violation charges against plaintiff. *Id.* p. 186; *see also* Nowicki Aff. (Dkt. No. 79–5) ¶ 27 (reflecting that the parole officer was summoned at plaintiff's request).

**\*4** Following the events of September 18 and 22, 2006, plaintiff and his wife made several written complaints and placed telephone calls to various New York and federal agencies and officials. Complaint (Dkt. No. 1) p. 8. Plaintiff complains that neither he nor his wife were ever contacted by New York State Mental Hygiene Legal Services, that Prisoners Legal Services declined to represent him because he was no longer incarcerated, and that defendant Beebe, the person with the New York State Commission for Quality Care of Persons with Disabilities, assigned to investigate plaintiff's complaint, never visited CNYPC while Lane was there, and failed to interview plaintiff or his wife. *Id.* Defendants, by contrast, contend that defendant Beebe had either personal telephone conversations or exchanged voice mail messages with plaintiff's wife, Denise Lane, on October 1, October 23, November 1, November 3, and November 7, 2006. Defendants' Response to Plaintiffs Request for Admissions (Dkt. No. 62–3) ¶ 8. Defendant Beebe also visited CNYPC on November 21, 2006 to investigate plaintiff's complaints. Higgins Aff. (Dkt. No. 79–4) Exh. E, pp. 32–33.

Plaintiff asserts that in early October of 2006, he was again "attacked" by another patient whom, he maintains, has a history of assaultive behavior. Complaint (Dkt. No. 1) p. 9; Tr. p. 39. While plaintiff admits that there was

no physical contact between the two, he states that out of fear he immediately requested placement in protective custody, a request that was once again denied. *Id.* After the incident, plaintiff was brought to the side room and is reported to have said that the fellow patient kept threatening him, and that he would take matters into his own hands if required. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 214. It was noted that CNYPC staff members were becoming increasingly concerned regarding plaintiff's menacing behavior and his apparent attempts to control and rally other patients, and that Lane stated that he felt like killing the other patient. *Id.,* pp. 214, 220.

The final incident of which plaintiff complains occurred on October 31, 2006, when Lane, upset after seeing another patient attacked, requested and was given permission to return to his room instead of remaining queued with the other patients proceeding to the dining room. Complaint (Dkt. No. 1) p. 9. After returning to his room plaintiff was approached by defendant Lucenti regarding the incident; responding to Lucenti, Lane said, "[w]hat are you people waiting for someone to get stabbed?" Complaint (Dkt. No. 1) p. 9. When plaintiff left his room later that day he was confronted by defendants Nowicki, Lucenti, Menz, Coppola and Babula, at which time Nowicki allegedly stated, "[w]e got you now." Complaint (Dkt. No. 1) p. 10. Plaintiff appears to have interpreted this statement to mean that defendants falsified documents to make it seem that plaintiff had threatened defendant Lucenti. *Id.;* Tr. pp. 43–44. As a result of the incident plaintiff's parole status was revoked, and he was removed that day from CNYPC and transferred into the Oneida County Jail. Nowicki Aff (Dkt. No. 78–2) ¶¶ 6, 19; Tr. p. 18.

**\*5** According to defendants the events of October 31, 2006 were precipitated by plaintiff's refusal to stay in line and his subsequent threat, when approached regarding the incident, to put a knife to the neck of one of the CNYPC staff members. Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 296–301. According to defendant Lucenti, when he went to speak with the plaintiff about getting out of line,

> Mr. Lane then got in my face, he said he was going to put a knife in a TA's [treatment assistant's] neck, a knife or something in a TA's neck. He said I am serious, I will put a knife in one of their necks, I will lay them out cold. You better call parole. I'm

tired of all this, I am going to the side room.

Parole Hearing Tr. (Dkt. No. 84–5) p. 32; Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 296. Lucenti considered this to be a serious threat. Parole Hearing Tr. (Dkt. No. 84–5) p. 32. Plaintiff demanded that he be moved to the side room and returned to prison, and was informed that arrangements were being made to return him to the custody of the DOCS as soon as possible; plaintiff went to the side room, his parole officer was called, a violation was issued, and Lane was returned to prison. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 19, 2007, and was thereafter granted leave to proceed *in forma pauperis* on August 1, 2007. Dkt. Nos. 1,4. In his complaint plaintiff names ten defendants, including Sharon E. Carpinello, the Commissioner of the OMH; Barbara Beebe, [11] a facility review specialist from the State of New York Commission on Quality of Care for Persons with Disabilities; Donald Sawyer, the Director of the CNYPC; Sharon E. Barboza, M.D., the Director of the SOTP at CNYPC; Jeffrey Nowicki, a team leader of the SOTP at CNYPC; and Anthony Lucenti, Michael Babula, Frank Menz, Steven Coppola, and J. Crociata, all staff members at the facility. Alleging violations of the ADA as well as the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, plaintiff's complaint asserts ten enumerated causes of action, including denial of due process, failure to provide reasonable accommodations for his disability, excessive use of force, deliberate indifference to his medical needs, failure to intervene and/or protect, retaliation, conspiracy and failure to investigate his complaints. *Id.*

On October 2, 2008, following joinder of issue and the close of discovery, plaintiff moved for partial summary judgment on his due process claim as it relates to his commitment to CNYPC as well as his claims under the ADA. Dkt. No. 57. In support of his motion, relying on the doctrines of *res judicata* and collateral estoppel, plaintiff asserts that the procedures under which he was involuntarily committed to CNYPC were determined to be unconstitutional by the New York State Court of Appeals in *Harkavy v. Consilvio,* 7 N.Y.3d 610, 825 N.Y.S.2d 702 (2006), that he was unlawfully denied a mobility guide for his blindness, and that his parole violation was "fruit of a poisonous tree" and would not

have occurred had he not been unlawfully detained at CNYPC in violation of the Fourth Amendment. Dkt. No. 57.

**\*6** Defendants opposed plaintiff's motion and cross-moved for summary judgment, advancing several grounds for rejection of all of plaintiff's claims, including that 1) plaintiff's section 1983 claims against defendants, acting in their official capacities, are barred by the Eleventh Amendment; 2) plaintiff has failed to establish a valid cause of action under the ADA, and defendants cannot be held individually liable for damages under that Act; 3) plaintiff has not established claims of failure to protect, deliberate indifference to his medical needs, denial of access to courts, retaliation, excessive use of force, or conspiracy; 4) plaintiff has failed to demonstrate the requisite personal involvement by defendants Carpinello and Sawyer to support a finding of liability against them; 5) plaintiff has no cognizable constitutional interest in filing a criminal complaint, or in the pursuit of an investigation regarding his complaints made while housed at CNYPC; 6) defendants are not bound by the Court of Appeals decision in *Harkavy,* which was decided after plaintiff was released from CNYPC, and that decision does not create a constitutional right that is redressable in this court; and 7) in any event, defendants are shielded from suit by the doctrine of qualified immunity. Dkt. No. 79–3. Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 84.

Both of the pending summary judgment motions, which are now ripe for determination, have been referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–

10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed.R.Civ.P. 56(e); Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, to successfully resist summary judgment they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*7** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there

can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

*B. Fourteenth Amendment Procedural Due Process Claim*
Plaintiff challenges his involuntary commitment to CNYPC as violative of his right to due process and moves for summary judgment on this claim, arguing that the New York State Court of Appeals decision in *Harkavy,* should be given res judicata or collateral estoppel effect in this action. In *Harkavy,* the Court of Appeals held that the DOCS' resort to Article 9 of the MHL to institute commitment procedures for sex offenders in its custody was improper, observing that

> in the absence of a clear legislative directive in regard to inmates nearing their release from incarceration, we believe that [New York] Correction Law § 402 is the appropriate method for evaluating an inmate for postrelease involuntary commitment to a mental facility.

*Harkavy,* 7 N.Y.3d at 614, 825 N.Y.S.2d 702, 859 N.E.2d 508. [12] Having been committed to CNYPC under MHL § 9.27, plaintiff now argues that *Harkavy* renders his commitment unconstitutional, and that defendants are bound by that decision. Defendants counter that since plaintiff was already removed from CNYPC and returned to prison by the time *Harkavy* was decided, the case has no bearing on his circumstances.

### 1. *Res Judicata*
Under the doctrine of *res judicata,* known also as "claim preclusion," a final judgment on the merits of an action precludes the parties, or those in privity with the parties, from relitigating issues that were or could have been raised in that action. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Jacobson v. Fireman's Fund Insurance Co.,* 111 F.3d 261, 265 (2d Cir.1997); *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994). "It is a cardinal principle of *res judicata* that 'the first suit and the subsequent case must involve the

same cause of action[,]' otherwise, *res judicata* will not bar the second action." *Thompson v. County Franklin,* No. 92–CV–1258, 1996 WL 341988, at *3 (June 18, 1996) (McCurn, S.J.) (quoting *Bloomquist v. Brady,* 894 F.Supp. 108, 114 (W.D.N.Y.1995)). In the Second Circuit, there are three separate but related factors which together inform the analysis of the preclusive effect to be given a prior judgment, including "[w]hether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." [13] *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (quoting *NLRB v. United Technologies,* 706 F.2d 1254, 1260 (2d Cir.1983) (internal quotations omitted)).

**\*8** Neither Lane nor the defendants were parties to *Harkavy.* That lawsuit was a habeas corpus proceeding filed against the DOCS by the New York Mental Hygiene Legal Services seeking the immediate release of certain individuals whose prison terms had expired and were being held at the Manhattan Psychiatric Center. While it is arguable that defendants in this action are in privity with the DOCS, *see Browdy v. Lantz,* 3:03CV1981, 2006 WL 2711753, at *5 (D.Conn. Sept.21, 2006), plaintiff, who had been released from CNYPC at the time *Harkavy* had been decided, was not a party to that action, does not allege any privity with the petitioners in *Harkavy,* and was never held in the Manhattan Psychiatric Center. Accordingly, the two actions do not arise from the same core of operative facts, nor would they involve the same evidence. In addition, although both *Harkavy* and this action involve MHL § 9.27, *Harkavy* did not determine the constitutionality of the DOCS' use of MHL § 9.27 to commit sex offenders leaving their custody. Rather, the issue presented and addressed by the New York Court of Appeals in that case was whether the DOCS' use of the MHL procedure, as distinct from that set forth in Correction Law § 402, was proper, and the court held only that it was not. *Harkavy,* 7 N.Y.3d at 610, 825 N.Y.S.2d 702, 859 N.E.2d 508. For these reasons, the *Harkavy* decision does implicate the doctrine of *res judicata* in this action.

### 2. *Collateral Estoppel*

The doctrine of collateral estoppel, or claim preclusion, is equally inapplicable in this case. Once a court has decided an issue of fact or law necessary to its judgment,

a party to the first action, or one in privity with the party, cannot relitigate that specific issue in a subsequent lawsuit. *Allen,* 449 U.S. at 94; *Burgos,* 14 F.3d at 792; *Ryan v. N.Y. Telephone Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984). Under New York law, collateral estoppel applies only if 1) the issue in question was necessarily decided in the prior proceeding and is decisive of the present proceeding; and 2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. *Burgos,* 14 F.3d at 792; *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991). The party asserting collateral estoppel has the burden of showing that the identical issue was previously decided, while the party opposing estoppel must show the absence of a full and fair opportunity to litigate in the prior proceeding. *Burgos,* 14 F.3d at 792. Because the issue decided in *Harkavy* was not identical to the issue raised in this lawsuit, collateral estoppel does not preclude litigation of the constitutionality of defendants' actions in this case.

### 3. *Due Process*

Turning to the merits of plaintiff's due process claim, I begin by noting that to successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul v. Matiyn v. Pataki,* 9:06–CV–1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at * 5 (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521

U.S. 346, 371, 117S, —— S.Ct. ——, ——, ——S, —— L.Ed.2d ——, ——, ——S.Ct. 2072, 2086(1997)).

**\*9** Plaintiff was committed to CNYPC by way of the procedures set out in MHL § 9.27, rather than Correction Law § 402. Lane was not afforded notice and an opportunity to be heard before, or even after, his transfer to that facility. In light of these facts, and for the reasons underpinning the Court of Appeals' decision in *Harkavy,* it appears that plaintiff's due process rights were violated in connection with his commitment. *Abdul,* 2008 WL 974409, at \*10; *see also Wheeler v. Pataki,* No. 9:07–CV–0892, 2009 WL 674152, at \*6–7 (N.D.N.Y. March 11, 2009) (McAvoy, S.J. and Lowe, M.J.). I therefore recommend denial of defendants' motion for summary judgment dismissing plaintiff's due process claim to the extent that defendants' basis for dismissal is addressed to the merits of that cause of action. [14]

### 4. *"Fruit of the Poisonous Tree"*

In an apparent effort to make a claim for violation of his Fourth Amendment rights, plaintiff next argues that if he had not been committed to CNYPC under the MHL, he would not have been "illegally" confined and therefore would not have threatened defendant Lucenti and violated his parole. In a creative attempt to draw upon principles that do not translate well into this setting, Lane argues that the conduct giving rise to his parole revocation is "tainted" under the "fruit of the poisonous tree" principles.

"The fruit of the poisonous tree doctrine excludes evidence obtained from or as a consequence of lawless official acts." *Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir.1999) (quoting *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961)). It does not apply in this context where plaintiff apparently objects to use of evidence of his threats as a basis for a parole revocation. *See Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at \*7 (N.D.N.Y. Apr.24, 1998) (Pooler, J.) ("This doctrine applies to evidence that is obtained during a criminal investigation as a result of an unconstitutional search; it does not apply to prison disciplinary hearings."). Simply stated, the fruit of the poisonous tree doctrine cannot link the conduct allegedly violating plaintiff's Fourth Amendment rights to his return to prison and establish an actionable claim, since this evidentiary doctrine is inapplicable in a civil section 1983 setting. *Townes,* 176 F.3d at145.

### C. *Qualified Immunity*

As one of the bases for their summary judgment motion, defendants assert their entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143,152 (2d Cir.2007), *rev'd on other grounds, sub. nom. Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (May 18, 2009). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> **\*10** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211–12 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining

whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id.; Gilles v. Repicky,* 511 F.3d 239, 243–44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay,* 323 F.3d at 211; Poe, 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 —— U.S. ——, 129 S.Ct. 808, 820, 172 L.Ed.2d 565 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at 818. The inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by Saucier may serve to defeat this goal by requiring the parties "to endure additional burdens of suit—such as the cost of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted).

**\*11** As a result of its reflection on the matter, the *Pearson* Court concluded that because "the judges of the district courts and courts of appeals are in the best position to determine the order of decision making [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs

of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Id.* (quoting *Pearson,* 129 S.Ct. at 818).

The question is whether "upon viewing the allegations of the complaint in the light most favorable to the plaintiff and drawing all inferences favorable to the plaintiff, [a] reasonable jury *could* conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did *not* violate an established federally protected right," in which case the motion to dismiss must be denied. *Quartararo v. Catterson,* 917 F.Supp. 919, 959 (E.D.N.Y.1996) (quoting *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d. Cir.1993); *see also Schwartz v. Dennison,* 518 F.Supp.2d 560, 571 (S.D.N.Y.2007), *aff'd* 2009 WL 2172510 (2d Cir. July 22, 2009).

Although I have determined that plaintiff's right to due process was violated when he was involuntarily committed to CNYPC, I also find that the inability of state officials, including defendants and any DOCS official that may have been involved, to rely on MHL § 9.27 was not clearly established at that time. At the time of plaintiff's commitment the Court of Appeals had not yet decided *Harkavy.* Indeed, before plaintiff's commitment, the New York State Supreme Court Appellate Division, First Department, in that case had endorsed the DOCS' ability to utilize MHL § 9.27, finding that provision to be consonant with the petitioners' Fourteenth Amendment rights to due process. *Harkavy v. Consilvio,* 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006). In addition to the unsettled state of the law in New York, it appears that no federal court decision had been issued forecasting the ultimate finding in *Harkavy* before plaintiff's confinement to CNYPC. In fact, prior to *Harkavy,* the Second Circuit had generally approved of MHL § 9 .27 as meeting both substantive and procedural due process requirements. *See,*

*e.g., Project Release v. Provost,* 722 F.2d 950, 972–975 (2d Cir.1983). Accordingly, I conclude that the parameters of plaintiff's constitutional right to due process were not clearly established at the time of his commitment and that, as a matter of law, it was objectively reasonable for defendants, as well as the DOCS, to rely on MHL § 9.27 in committing plaintiff to CNYPC. I therefore recommend a finding that, to the extent that any of the defendants were involved in the decision to commit plaintiff to CNYPC on his parole release date, they are entitled to qualified immunity with respect to plaintiff's claims for violation of his Fourteenth Amendment rights to due process, in light of the fact that it was objectively reasonable for them to believe that they were acting in a manner that did not violate any of plaintiff's protected rights.

### D. *Eleventh Amendment*

**\*12** Although not specifically stated, plaintiff's claims in this action appear to be asserted against defendants both individually and in their official capacities as state employees. Complaint (Dkt. No. 1) ¶ 3. Defendants contend that plaintiff's claims against them in their official capacities are subject to dismissal on the basis of the immunity that the Eleventh Amendment affords.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity, which states enjoy under the Eleventh Amendment, extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. [15] *Richards v. State of New York Appellate Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Eleventh Amendment immunity does not extend, however, to employees who are sued in their personal or individual capacity. *Schwartz,* 518 F.Supp.2d at 570 (citing *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988)).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, in part, and that all damage claims, except for those asserted against the defendants in their official capacities under the ADA, be dismissed. [16]

### E. *Failure to Provide Reasonable Accommodations Under the ADA*

Plaintiff asserts that defendants knew, or should have known, that he is legally blind and that their refusal to provide him with reasonable accommodations for this alleged disability was in contravention of the ADA. Lane now moves for summary judgment in his favor on this claim, apparently on the grounds that his legal blindness constitutes a disability as a matter of law and that he has sufficiently demonstrated defendants' denial of reasonable accommodation for this disability. Defendants respond that they are entitled to dismissal of this claim because plaintiff has failed to allege that his legal blindness substantially limits a major life activity and also has failed to prove that he was excluded from participation in, or denied benefits of, some service or program. Defendants argue further that the taking of plaintiff's cane was not motivated by discriminatory animus. Finally, defendants contend that plaintiffs' claims against them in their individual capacities are not permitted under the ADA and damages against them in their official capacities are barred by the Eleventh Amendment.

**\*13** The ADA provides that

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1990). CNYPC, operated by the New York OMH, is considered a public entity for the purposes of the ADA, and as such is required to

provide "reasonable modifications to rules, policies, or practices ..." *See* 42 U.S.C.A. § 12131(1)(B) & 42 U.S.C.A. § 12131(2). Public entities are not required to provide substantively different services to the disabled under the disability statutes, but instead must provide " 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000).

It is well established that under the ADA, suits against defendants in their individual capacities as state officials are barred. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases). Accordingly, I recommend dismissal of plaintiff's ADA claim to the extent that it seeks recovery of damages against defendants as individuals. The issue of whether defendants are immune in their official capacities is significantly more complicated.

### 1. *Eleventh Amendment: ADA Claims*

In *Henrietta D. v. Bloomberg,* the Second Circuit held that under *Ex Parte Young* an ADA plaintiff can assert a prospective claim for injunctive relief against a state official in his or her official capacity, as opposed to against the state directly. 331 F.3d 261, 287 (2d Cir.2003), *cert. denied,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004) (citing *Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)). That court has not explicitly held likewise for ADA plaintiffs who seek money damages. Nonetheless, a request for monetary damages from state officials in their official capacities is the functional equivalent of a claim for damages directly from the State of New York, and Eleventh Amendment sovereign immunity therefore ordinarily protects a defendant in his or her official capacity to the same extent that it protects the State. *See, e.g., Garcia,* 280 F.3d at 107 (citing *inter alia, Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)).

It is well settled under Eleventh Amendment jurisprudence that neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity. *See, e.g., Kilcullen v. N.Y. State Dep't of Labor,* 205 F.3d 77, 79 (2d Cir.2000), *implicitly overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 368, 121 S.Ct. 955, 965, 148

L.Ed.2d 866 (2001); *Hallett v. N.Y. State DOCS,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000) (citations omitted). In this respect, the Eleventh Amendment, while not directly controlling, confirms the broader, " 'background principle of sovereign immunity[.]' " *Garcia,* 280 F.3d at 107 (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996)). When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of constitutional authority. *Garrett,* 531 U.S. at 363, 121 S.Ct. at 962 (citing, *inter alia, Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122); *Garcia,* 280 F.3d at 108 (citations omitted). The pivotal question, in determining whether defendants are entitled to protection under the Eleventh Amendment when sued in their official capacities, is whether, and if so to what extent, that amendment protects the states from liability under Title II of the ADA. [17]

**\*14** The question of whether the Eleventh Amendment bars ADA claims under Title II against a state is an unsettled question among the circuits. In *Garrett,* the Supreme Court held that Congress had failed to validly abrogate state sovereign immunity under Title I of the ADA. 531 U.S. at 374, 121 S.Ct. at 967–68. In doing so, the Court was careful to distinguish Title II from its analysis, inasmuch as the issue had not been briefed by the parties, but did note that the remedial scheme of Title II is very different from that of Title I. *Id.* at 360 n. 1, 121 S.Ct. at 960 n. 1. The courts appear to be divided as to whether Garrett should extend to Title II of the ADA, especially since *Pennsylvania Dep't of Corr. v. Yeskey*—which held that Title II of the ADA applies to prisons—had been decided in the term previous to *Garrett,* but did not address sovereign immunity. 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *compare, e.g., Popovich v. Cuyahoga Cty. Ct. of Common Pleas,* 276 F.3d 808, 813–16 (6th Cir.2002) (holding that sovereign immunity validly abrogated by Congress as to the Due Process Clause), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72 (2002), with *Alsbrook v. City of Manuelle,* 184 F.3d 999, 1007 (8th Cir.1999), *cert. dismissed* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000) (finding that Congress exceeded authority by extending Title II of the ADA to the states and therefore did not validly abrogate sovereign immunity).

The Second Circuit has taken a slightly different approach than various other federal courts in addressing this question. In *Muller v. Costello,* decided before the

Supreme Court issued its opinion in *Garrett,* the Second Circuit found that Congress had validly abrogated sovereign immunity within its authority under section five of the Fourteenth Amendment, subjecting states to potential monetary liability under the ADA. [18] 187 F.3d 298, 310 (2d Cir.1999). More recently, however, in *Garcia v. S.U.N.Y. Health Sciences Ctr.,* the Second Circuit found that *Garrett* had "implicitly abrogated" its prior position that the states were not immune from ADA claims. 280 F.3d at 113 n. 3.

In *Garcia,* the Second Circuit found that Congress could not validly abrogate sovereign immunity under the Commerce Clause, one of the two empowering provisions cited in support of its enactment of Title II. *Garcia,* 280 F.3d at 108. The circuit court went on to find, however, that Congress could exercise its authority under section five of the Fourteenth Amendment—the "sweep of congressional authority" allowing Congress to "enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities"—when enacting Title II of the ADA, as a whole, though it found the power to have been exceeded through enactment of Title II, since that provision conferred upon Congress the right to abrogate sovereign immunity and allow for private parties to sue non-consenting states for money damages. *Garcia,* 280 F.3d at 108–10.

**\*15** Turning to the specific question of whether Congress, through proper invocation of its section five powers, effectively abrogated sovereign immunity in the case of private damage suits under Title II, however, the Second Circuit found that the ADA's broad remedial scheme, borrowed from the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, included a judicially implied private cause of action, thus allowing that court latitude to shape a remedy. *Id.* at 110–112. Specifically, in *Garcia* the Second Circuit concluded that Title II claims against the states for monetary damages and injunctive relief could be reconciled with the prohibitions of the Eleventh Amendment if permitted in limited circumstances—that is, in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability. *Garcia,* 280 F.3d at 111; *see Doe v. Goord,* No. 04–CV–0570, 2004 WL 2829876, at *15 (S.D.N.Y. Dec. 10, 2004); *Lighthall v. Vadlamudi,* No. 9:04–CV–0721, 2006 WL 721568, at *18 (N.D.N.Y. Mar.17, 2006) (Mordue,

C.J.). In other words, defendants' conduct must be "based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia,* 280 F.3d at 111. Since I find defendants' are not immune from suit under the Eleventh Amendment in their official capacities for alleged violations of the ADA, it is necessary to evaluate the merits of plaintiff's claim under that provision.

### 2. *McDonnell Douglas Analysis*

The court in *Garcia* conceded that it may be a difficult burden for a plaintiff to establish that an ADA violation resulted from discrimination, or ill will, and held that a plaintiff can rely on the *McDonnell Douglas* burden-shifting technique, or a motivating factor analysis under *Price Waterhouse,* to establish such a claim. *Garcia,* 280 F.3d at 112.

Under the *McDonnell Douglas* protocol, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 76 (2d Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)). Upon establishment of a *prima facie* case, the burden of production shifts to the defendant, who at that juncture must come forward and articulate a legitimate, non-discriminatory reason for the adverse action in issue. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Holtz,* 258 F.3d at 77 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)); *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003). Once the defendant has successfully shouldered this burden, the focus then reverts to the plaintiff, who must establish that the alleged, non-discriminatory rationale offered did not genuinely prompt the adverse action, but instead is a mere pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000) (citing *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir.1996), *cert. denied,* 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996)). While under the *McDonnell Douglas* paradigm the burden of production alternates back and forth between the parties, a plaintiff claiming intentional discrimination is tasked ultimately with establishing discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207

(1981); *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir.2008).

**\*16** Under *Price Waterhouse,* if the plaintiff can establish that the prohibited discrimination played "a motivating part" in the adverse action, the defendant must then demonstrate that he or she "would have made the same decision in the absence of discrimination ." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252–53, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989). A party seeking the benefit of this defense bears the burden of establishing by a preponderance of the evidence that it would have taken the same action, irrespective of the plaintiff's disability. *See Bookman v. Merrill Lynch,* No. 02 CIV. 1108, 2009 WL 1360673, at \*10–16 (S.D.N.Y. May 14, 2009).

To state a valid violation of the ADA, a plaintiff must show "1) [he is a] 'qualified [individual]' with a disability; 2) that the defendants are subject to the ADA; and 3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d at 272 (citing *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998)).

### a. *Plaintiff's Disability*

A person is considered to have a disability if he or she has "a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or C) [is] regarded as having such impairment." 42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U .S.C. § 12102(2)(A).

In support of his motion, plaintiff has presented evidence of an eye examination performed on July 22, 2005, while Lane was incarcerated at Sullivan Correctional Facility, diagnosing him as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4) Exh. B. Defendants admit their awareness of plaintiff's sight limitations, though they question his allegations regarding the severity of the vision impairment of his right eye. Notably, in and of itself, "monocular vision" is not a *per se* disability within the meaning of

the ADA. *Hoehn v. Int'l Sec. Services & Investigations, Inc.,* 244 F.Supp.2d 159, 167 (W.D.N.Y.2002) (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 556, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999). "[R]ather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case by case basis and in terms of the impairment's impact on the individual." *Id.; see also Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 405 (N.D.N.Y.2000). To determine the particular impact of monocular vision upon a plaintiff, for purposes of the ADA disability calculus, the court should consider "1) the degree of visual acuity in the weaker eye; 2) the age at which the vision loss occurred; 3) the extent of the individual's compensating adjustments in visual techniques; and, 4) the ultimate scope of the restrictions on the individual's abilities ." *Hoehn,* 244 F.Supp.2d at 167 (citing *Kirkingburg,* 527 U.S. at 566, 119 S.Ct. at 2169). Even though most people with monocular vision will meet the ADA'S definition of disability, they are still required to prove their loss is substantial. *Id.; see also, Gibbs v. City of New York,* No. 02–CV–2424–LB, 2005 WL 497796, at \*5 (S.D.N.Y. Jan.21, 2005). Moreover, the fact that one can be characterized as "legally blind" does not, as a matter of law, establish a disability within the meaning of the ADA. *See Rivera v. Apple Indus. Corp.,* 148 F.Supp.2d 202, 207, 213 (E.D.N.Y.2001); *Hoehn,* 244 F.Supp.2d at 162, 171; *EEOC v. United Parcel Serv., Inc.,* 306 F.3d 794, 799, 803 (9th Cir.2002).

**\*17** Plaintiff has failed to come forward with sufficient evidence to establish that he is disabled as a matter of law. While plaintiff states that, in addition to a left eye prosthesis, he has glaucoma and increasing myopia of the right eye, the evidence as to the actual restrictions that he suffers and whether such restrictions affect a major life activity is equivocal, at best. Plaintiff contends that he is unable to read without the use of a magnifier and cannot participate in recreation without sports goggles and ankle braces. Defendants, on the other hand, assert that while housed at CNYPC, plaintiff demonstrated no signs of difficulty relating to his ability to write, read, or use a calculator without any supplemental aids or services, and that he was able to fully participate in his treatment programs. Affording defendants the benefit of all inferences, it appears that material questions of fact exist as to whether plaintiff is disabled within the meaning of the ADA, thus precluding the entry of summary

judgment in his favor on the ADA cause of action set forth in his complaint.

#### b. *Plaintiff's Participation*

Even assuming that plaintiff sufficiently established that he suffers from a cognizable disability, his motion for summary judgment on his ADA claim nonetheless must fail. Plaintiff easily satisfies the second applicable requirement; since CNYPC and OMH are agencies of the State, defendants are required to adhere to the ADA. *See* 42 U.S.C. § 12131(1)(B). The third prong of the ADA analysis, however, entails analysis of whether Lane was denied the opportunity to participate in services, programs, or activities as a result of his alleged disability; again, this issue presents questions of fact not susceptible to resolution on the motion for summary judgment. Plaintiff argues that as a result of not receiving reasonable accommodations, he was unable to participate in recreation without his requested sport goggles and ankle braces, and he was unable to read until his family provided him with a magnifier. Tr. p. 62–63. Plaintiff also claims that after his mobility cane was taken upon admittance to CNYPC, he was never offered another means of assistance and instead was told to by defendant Coppola to "crawl or feel his way". Lane Aff. (Dkt. No. 84–2) ¶ 6. In contrast, defendants contend that throughout plaintiff's stay at CNYPC, he demonstrated no signs of difficulty in his ability to write, read, or use a calculator without any supplemental aids or services and that he was able to fully participate in his treatment groups. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 11, 12, 14. From these competing claims, it is readily apparent that questions of fact preclude a finding in favor of plaintiff on the issue of whether he was denied reasonable accommodations.

#### c. *Discriminatory Animus*

If the plaintiff is able to establish a *prima facie* claim under the ADA at trial, the burden will shift to defendants to come forward with a legitimate non-discriminatory reason for their conduct. While denying their awareness that plaintiff required accommodations for his visual impairment, defendant Nowicki asserts that upon being admitted to CNYPC, plaintiff's mobility cane was confiscated for safety and security purposes, and that plaintiff was immediately offered a wheelchair or walker, both of which he refused. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 7–8. Defendants contend further that plaintiff's records did not indicate that he experienced mobility problems,

and that he indicated that he could read and write, a fact that became evident to them as result of Lane's active participation in the program. *Id.* at ¶¶ 9–12.

**\*18** Defendants have thus articulated legitimate non-discriminatory reasons for their actions. In response, plaintiff has neither offered evidence of pretext, nor has he produced evidence of discriminatory animus. Indeed, plaintiff's complaint is devoid of any allegation that defendants actions were motivated by irrational discriminatory animus or ill will based upon his visual impairment, and Lane has produced no evidence that would support such a claim. *See Garcia,* 280 F.3d at 112.

In view of the foregoing, I recommend denial of plaintiff's motion for summary judgment on his ADA claim. And, based upon plaintiff's failure to produce any evidence of discriminatory animus, I further recommend that defendants' motion for summary judgment dismissing plaintiff's ADA claim against defendants in their official capacities be granted.

### F. *Fourteenth Amendment Substantive Due Process Claims*

Several claims alleged in plaintiff's complaint are predicated upon alleged violations of the Eighth Amendment, although plaintiff also makes reference to the Fourteenth Amendment throughout his complaint. When plaintiff was released by the DOCS to CNYPC, he had served his prison term, subject to release on parole, and was no longer a prison inmate. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). Because plaintiff was not a prison inmate at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at \* 7 (S.D.N.Y. March 15, 2007) (citing cases).

Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe

conditions." *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458. "The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Plaintiff's claims of failure to protect, excessive force, and medical indifference, all framed as arising under the Eighth Amendment, relate to allegedly unsafe conditions while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

### 1. *Failure to Protect*

The Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter. The Supreme Court "established [in *Youngberg* ] that involuntarily committed mental patients have substantive due process rights, ... [and] ... held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y. Sept.20, 2005) (quoting *Youngberg,* 457 U.S. at 323). In *Vallen,* the court examined *Youngberg* and whether the substantial departure standard evolving from that decision should be applied where the plaintiff, who was a patient involuntarily committed to the Mid–Hudson Forensic Psychiatric Facility, alleged that he was subjected to violence and that the defendants, security hospital treatment assistants, failed to prevent those incidents. Distinguishing *Youngberg,* the court stated that

> **\*19** [u]nlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible

> to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

*Vallen,* 2005 WL 2296620, at *8. The court went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level". *Id.* (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed. *Vallen,* 2005 WL 2296620, at *9. Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit. *Id .* at *9 (citing *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004)).[19]

In *Dove v. City of New York,* a claim similar to that raised by Lane was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard. *Dove,* 2007 WL 805786, at *8. Citing *Vallen,* the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiffs constitutional rights. *Id.*

I tend to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference' " best accommodates constitutional concerns in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights.[20] *Vallen,* 2005 WL 2296620, at * 9. Deliberate indifference,

under the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 1979, 128 L.Ed.2d 811 (1994); *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same). "In *Lewis,* the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore,* 381 F.3d at 774 (citing *Lewis,* 523 U.S. at 849–40, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

**\*20** As in *Vallen* and *Dove,* however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the potentially applicable standards plaintiff's claim of failure to protect must fail. Plaintiff's complaint describes two occasions on which he was allegedly assaulted or attacked by other patients during his commitment at the CNYPC. The first incident occurred on September 18, 2006, shortly after plaintiff was admitted. Complaint (Dkt. No. 1) p. 7. Lane concedes that he was first struck by a football and then became involved in an altercation with a fellow patient, as a result of which he claims to have suffered injury to his face, nose and jaw. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27–33. Plaintiff also admits that he is unable to distinguish between the injuries that he received from being hit by the football and those resulting from the ensuing altercation. *See* Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 84). The only treatment that was required for plaintiff's resulting injuries was pain medication for his discomfort.

According to plaintiff's CNYPC records, upon observing the altercation defendant Crociata attempted to intervene by getting between the two patients and preventing further contact. Higgins Decl. (Dkt. No. 75–4) Exh. D, p. 114. Immediately after the other patient was escorted away from the area, Crociata approached plaintiff to see if he was hurt. *Id.* Plaintiff told Crociata that he had not been touched, and refused to let Crociata speak to him any further. *Id.* While plaintiff disputes telling Crociata that he was not touched, he does admit that after the incident Crociata approached him and asked him what had happened; Lane claims, however, that Crociata saw

everything and states that he was angered by Crociata's question, apparently interpreting it as racist. Complaint (Dkt. No. 1) p. 7; *see also* Tr. pp. 31–32. Plaintiff also admits that Crociata saw him for his injuries, but alleges Crociata did not examine him. Tr. pp. 27–33.

Significantly, plaintiff does not allege that he had any previous difficulties with the patient with whom he was involved in the altercation, or that the defendants had reason to know of the danger in exposing the two to each other. In fact, plaintiff states that he had "absolutely no" prior interaction with that patient. Tr. p. 28. Additionally, plaintiff has failed to allege that any other defendant had any involvement in this incident. Based on these facts, no reasonable factfinder could conclude that any of the defendants engaged in conduct that shocked the conscience, substantially departed from accepted professional judgment, practices or standards, or was deliberately indifferent to plaintiff's safety. Simply stated, the record discloses that the September 18, 2006 encounter stemmed from an unforseen accident that escalated into an altercation and that CNYPC staff immediately intervened and took appropriate action to secure both individuals involved.

**\*21** The second alleged incident occurred somewhere in the beginning of October, when plaintiff claims he was "attacked" by another patient. Complaint (Dkt. No. 1) p. 9. Plaintiff does not identify a specific date or recount the circumstances surrounding the alleged attack, nor does he claim to have suffered any injury. The record suggests an incident occurred between plaintiff and another patient on October 3, 2006 in which he and the other patient "had words." Higgins Decl. (Dkt. No. 75–4) Exh. D, p. 214. There is no evidence in the record that plaintiff was physically touched or in any way injured as a result of this incident. To the contrary, plaintiff admits that the only incident in which he received physical injury occurred on September 18. Tr. p. 44. With regard to the October instance, I find that plaintiff has failed to establish a sufficiently serious deprivation to show that he was subjected to an unreasonably unsafe condition and trigger the Fourteenth Amendment's protections.

In view of the foregoing, I find that plaintiff has failed to establish a Fourteenth Amendment claim for failure to protect and/or intervene and, accordingly, I recommend defendants' motion for summary judgment relating to this claim be granted.

## 2. Medical Care

"Courts have consistently held, in a variety of contexts, that the due process rights of persons in a nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners." *Haitian Centers Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993) (citing cases); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd* 60 F.3d 812 (2d Cir.1995) (citing cases). "Persons in nonpunitive detention have a right to 'reasonable medical care,' a standard demonstrably higher than the Eighth Amendment standard that protects prisoners: 'deliberate indifference to serious medical needs.' " *Owens,* 860 F.Supp. at 974 (quoting *Haitian Centers Council,* 823 F.Supp. at 1043–44). At a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed. *Haitian Centers Council,* 823 F.Supp. at 1044.

Plaintiff's medical indifference claim has as it genesis the now familiar September 18, 2006 incident. Plaintiff claims that after being struck by a football and subsequently attacked by a fellow patient on that date, he sought medical treatment from defendant Crociata; Lane also alleges that he suffered back pain as a result of the events of that day. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27–33. As was previously noted, plaintiff was unable to distinguish the injuries sustained from being hit by the football from those allegedly resulting from the altercation, if any. Tr. pp. 29–30. Lane alleges that when defendant Crociata saw him, Crociata told him, "[t]here's nothing wrong with you" and failed to perform an actual examination. Complaint (Dkt. No. 1) p. 7.

Plaintiff's CNYPC records contradict plaintiff's version, revealing that Crociata approached plaintiff immediately after the altercation to see if he was hurt, at which time plaintiff told him "I wasn't touched," and refused to let Crociata speak to him any further. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 114. Later in the day, plaintiff apologized to Crociata for his behavior, and complained of general discomfort. *Id.* As a result, Crociata promptly prescribed 600 milligrams of Motrin for plaintiff's pain. *Id.* A follow-up note by Nurse Jane Helfert shows that after receiving the Motrin plaintiff slept through the night, and made no further complaints about his pain. *Id.* p. 115.

***22** Plaintiff himself acknowledges that he did not report his injuries to Crociata, never complained to anyone that his back was hurting, and did not request any sort of pain medication for his alleged injuries. Tr. pp. 32–33, 35–36. Plaintiff also concedes that he was provided with ibuprofen and other pain medication when requested, including the day after the altercation. Tr. p. 34. Moreover, plaintiff is unable to articulate what follow up treatment he believes was constitutionally required. [21] *Id.* at 38.

Based upon these facts, I have determined that no reasonable factfinder could conclude that there was an unreasonable or deliberately indifferent "denial" or delay in treatment of plaintiff on September 18, 2006. I therefore recommend that defendants' motion to dismiss plaintiff's medical indifference claim be granted. [22]

## 3. Excessive Force

Plaintiff claims that on September 22, 2006, as a result of his refusal to talk to defendant Nowicki, he was beaten and held in restraints and thereby subjected to excessive force. Complaint (Dkt. No. 1) p. 8. As with plaintiff's failure to protect claim, the proper framework for analysis of this claim is the Fourteenth, and not the Eighth, Amendment. *Youngberg,* 457 U.S. at 312, 102 S.Ct. at 2456. "It bears remembering ... that not all bodily harm caused by a government actor is actionable as a constitutional violation." *West v. Whitehead,* No. 04–CV–9283, 2008 WL 4201130, at *14 (S.D.N.Y. Sept. 11, 2008) (citations omitted). "Only when bodily harm is caused by government action 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' will a constitutional violation result." *Id.* (quoting *Lombardi v. Whitman,* 485 F.3d 73, 81 (2d Cir.2007)).

In the Second Circuit, it is recognized that individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians. *See Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) (citing *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995)). Factors to be considered in examining excessive force claims include: "the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at

251–52 (quoting *Metzger v. Osbeck,* 841 F.2d 518, 520 (3d Cir.1988)). With respect to the last factor, the Second Circuit has explained that

> [i]f the force was 'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, the conduct is presumptively unconstitutional .... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury, and serve no legitimate purpose unquestionably shock the conscience ... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*23 *Id.* at 252 (citations omitted). "Whether conduct rises to the level of unconstitutional excessive force depends on the totality of circumstances." West, 2008 WL 4201130, at * 15 (citing *Johnson,* 239 F.3d at 254).[23] This analysis was found applicable by the court in *West* to an excessive use of force claim asserted under section 1983 by a profoundly mentally retarded individual committed to a state-operated facility for developmentally disabled individuals. *West,* 2008 WL 4201130, at *14–15.

Plaintiff claims that on September 22, 2006 he was called from the day room by Nowicki, who said that he wanted to talk to plaintiff in the side room. Tr. p. 45. Plaintiff responded by stating that he did not have anything to say to Nowicki, at which point, plaintiff claims, Nowicki directed the twenty treatment assistants that were standing there to "take him down." Tr. p. 46. Plaintiff claims that he was then kicked and struck about his body, placed in restraints and transported by gurney to some other location where he was kept without being given food for two to three days, except for a sausage sandwich; plaintiff admits being offered drinks but states that he refused. Tr. pp. 45–61.

According to defendants, on the day of the alleged incident plaintiff had been hostile toward staff and residents, threatened to start a riot, and refused counseling by Nowicki in the side room. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 22–23. Plaintiff was recorded as saying "[d]on't try to take me to the side room or try to shoot me up, because when I come out of it, there will be trouble. That's a promise, not a threat." Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 146. Because plaintiff attempted to return

from the hallway to the day room, he was placed into a four point restraint for seven minutes, pursuant to doctor's orders, and transported to the side room "without injury or physical altercation". Nowicki Aff. (Dkt. No. 79–5) ¶¶ 24–25; Higgins Decl. (Dkt. No. 79–4), Exh. D, p. 146.

Nowicki states that after being restrained plaintiff continued to make threats and, consistent with hospital policy, remained in the side room with one-to-one supervision from 1:00 p.m. September 22, 2006 until 9:30 a.m. on September 25, 2006, during which time he was provided food and a mattress, slept and ate, and attended to his own daily self-care activities. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 24–29. Plaintiff's CNYPC records also indicate that plaintiff's activity was monitored at fifteen minute intervals and that plaintiff was provided meals, saw a psychiatrist and was permitted to meet with his parole officer. Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 146–80. The record also reveals, and plaintiff admits, that at various times over this three-day period Lane refused to interact with staff, and plaintiff acknowledges that the purpose in putting him in isolation was behavior modification. Tr. pp 53–55, 60.

While the parties' versions of the events of September 22, 2006 vary, I do not find the differences material to the determination of this claim. Plaintiff does not dispute that he refused to go to the side room to speak with Nowicki, nor does he deny making threats in the day room. The decision to put plaintiff in a four point restraint was made by a physician in light of plaintiff's history, his serious threats, and his refusal to follow staff direction. Plaintiff does not claim to have been restrained for a period longer than that necessary to transport him. Plaintiff has produced no evidence that the force that was used was malicious or sadistic, for the very purpose of causing him harm.

*24 Although plaintiff generally alleges that he sustained injury to his back, shoulders and neck and was denied medical treatment as a result of the incident, plaintiff does not specifically identify any injury or treatment that was needed with specificity, and he does not allege that he has suffered any continuing problems. There is no evidence of any relevant injury noted in plaintiff's CNYPC records. The record indicates, and plaintiff admits, that within two hours of being placed in the side room, he was seen by a doctor, with whom he refused to speak. Significantly, plaintiff's allegation that he was denied medical treatment

on that date directly contradicts his deposition testimony to the effect that the only time he was denied treatment was on September 18, 2006. Tr. p. 36.

Based upon the record now before the court, no reasonable factfinder could find defendant's conduct conscience-shocking. Rather, the record establishes that defendants were attempting in good faith to discipline plaintiff and restore order as a result of his failure to follow directions and his continuous threats to patients and staff at the facility. I therefore recommend that defendants' motion for summary judgment as to this claim be granted, and that plaintiff's excessive force claim be dismissed. [24]

### G. *First Amendment*

"The First Amendment Guarantees the right to 'petition the Government for a redress of grievances.'" *McKithen v. Brown,* 565 F.Supp.2d 440, 458 (E.D.N.Y.2008) (quoting U.S. Const. amend. I). Out of the Petition Clause of that amendment arises the right of access to courts, *City of New York v. Beretta U.S.A Corp.,* 524 F.3d 384, 397–98 (2d Cir.2008), *cert. denied* ––– U.S. ––––, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), as well the right to petition for redress for grievances without retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

#### 1. *Access to the Courts*

Although not specifically stated in his complaint, defendants suggest that when liberally construed in light of his deposition testimony plaintiff's complaint makes a claim of denial of access to the courts. [25]

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. [26] *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (citations and internal quotation marks omitted). "However, this right is not an abstract, freestanding right to a law library or legal assistance and cannot ground a Section 1983 claim without a showing of actual injury." *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal quotations omitted). Thus, "[t]o survive a motion for summary judgment, plaintiff must present evidence showing that he has suffered actual injury." *Jarecke v. Hensley,* No. 3:07–cv–1281, 2009 WL 2030394, at *9 (D.Conn. July 9, 2009) (citing *Lewis v. Casey,* 518 U.S. at

351–52). To prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of the defendants. [27] *Abdul–Matiyn,* 2008 WL 974409, at * 13.

**\*25** Plaintiff has failed to prove his claim that defendants' failure to provide him with a laptop computer with zoom text, a scanner and inkjet color printer, 7x magnifier, books on tape, high intensity lamp and 20/20 pens as requested in his letter to defendant Sawyer on October 13, 2006, resulted in his inability to pursue any legal action. *See* Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4), Exh. C. In fact, plaintiff admits he was able to file all of the legal proceedings that he desired. Tr. p. 67. Moreover, as defendants explain in their motion for summary judgment, CNYPC patients are afforded access to the Mental Hygiene Legal Services ("MHLS"), which provides "legal services, advice and assistance, including representation, with regards to the resident's hospitalization." Dkt. No. 79–3, p. 12. Plaintiff admits that he was familiar with the services MHLS provides, and actually attempted to bring an action with the assistance of that agency, but was transferred from CNYPC before the proceeding could move forward. Tr. p. 10. Because there is no evidence that plaintiff suffered actual injury due to defendants' alleged interference with his access to the courts, I recommend that any claim by plaintiff that he was denied such access be dismissed.

#### 2. *Retaliation*

In his complaint plaintiff alleges that defendants retaliated against him because he and his family complained to various governmental agencies and officials, and he insisted on filing criminal charges against another patient. Complaint (Dkt. No. 1) p. 11. "[C]riticism of governmental agencies is protected speech under the First Amendment." *Olesen v. Morgan,* No. 1:06–CV–959, 2008 WL 5157459, at *4 (N.D.N.Y. Dec.8, 2008) (quoting *Economou v. Butz,* 466 F.Supp. 1351, 1361 (S.D.N.Y.1979) (footnote omitted)). When adverse action is taken by governmental officials against a person being held in custody, motivated by his or her exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See *Franco,* 854 F.2d at 588–90.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there exists a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*26** Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiffs retaliation claims. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The right to file a grievance and petition the government for redress is "among the most precious of the liberties safeguarded by the Bill of Rights." *Franco,* 854 F.2d at 589 (quoting *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)). Plaintiff therefore easily meets the first prong of the governing test by demonstrating that he engaged in protected activity.

It is in connection with the requirement that the two be linked that plaintiff's retaliation claim falls short. Plaintiff first claims that defendants retaliated against him by falsifying documents in order to have him removed from the facility. Complaint (Dkt. No. 1) p. 11. Lane has failed to offer proof, however, showing that any document was falsified by defendants with the intent to have plaintiff removed from CNYPC. As District Judge David N. Hurd recognized in his decision in *Barclay v. New York,* 477 F.Supp.2d 546 (N.D.N.Y.2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay,* 477 F.Supp.2d at 558. More than conclusory allegations are required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

Here, the evidence in the record overwhelmingly demonstrates that from the outset and repeatedly throughout his confinement at CNYPC, plaintiff voiced both his discontent with being placed at the facility and his desire to return to prison. There is ample evidence in the record demonstrating that while confined at CNYPC plaintiff was involved in more than one altercation and made repeated threats to the safety of staff and other patients, including threats to start a riot and to kill another patient; the event finally precipitating his removal was his threat to cut the throat of a treatment assistant. Conversely, there is no evidence in the record that suggests that any document authored by any defendant was false, let alone that falsification of such document was motivated by a desire to retaliate against the plaintiff for his written complaints to various governmental agencies. Moreover, the incident that caused plaintiff's removal from CNYPC also formed the basis for the parole violation that precipitated plaintiffs return to prison, for which he was afforded a hearing, was represented by counsel, and was permitted to cross-examine witnesses and present his own evidence, and he was ultimately found guilty.

**\*27** The second incident that plaintiff attributes to retaliatory animus relates to his September 22–26, 2006 confinement in an isolated room after he insisted on filing criminal charges against a fellow patient who assaulted him. Complaint (Dkt. No. 1) p. 11. On this count, plaintiff

fails to demonstrate that the alleged adverse action was prompted by protected conduct. Preliminarily, it should be noted that plaintiff has repeatedly complained that he was prevented from filing any criminal charges, yet admits that following the September 18, 2006 altercation he participated in mediation with the other patient, leading to resolution of the matter. Even assuming that plaintiff pursued criminal charges, his claim would fail as it is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). Accordingly, plaintiff had no constitutionally protected right to file a criminal complaint. Finally, even if plaintiff had sufficiently established that he engaged in protected activity, he has failed to adduce any evidence demonstrating that his confinement in isolation was in any way related to his effort to pursue criminal charges in regard to the attack that occurred several days prior, or that it was maliciously motivated by a retaliatory animus.

Because plaintiff has failed to produce any evidence to support his retaliation claims, I recommend that this portion of defendants' motion for summary judgment be granted, and that those claims be dismissed.

### 3. *Investigation of Complaints*

Plaintiff's tenth cause of action purports to allege a claim for the acts or omissions of defendant Beebe in failing to investigate plaintiff's complaints regarding the conditions of confinement at the CNYPC. Complaint (Dkt. No. 1) p. 8, 12. Although the right to petition government is well established, there is no corresponding duty on the part of the government to act. *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 375 (N.D.N.Y.2003) (citations omitted), *aff'd* 83 Fed. Appx. 363 (2d Cir.2003); *Wolf v. Town of Mount Pleasant,* No. 06 Civ. 3864, 2009 WL 1468691, at *6 (S.D.N .Y. April 27, 2009) (citing *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)). Plaintiff has, therefore, failed to allege a cognizable claim. [28]

I therefore recommend that all claims against defendant Beebe be dismissed.

### H. *Personal Involvement*

Defendants move to dismiss all claims asserted by Lane against defendants Carpinello and Sawyer based upon their lack of personal involvement in the allegedly offending conduct. At the outset, because the court has determined that plaintiff was not denied a constitutional right, his supervisory claims against Carpinello and Sawyer should be dismissed. *See Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Even if there were a cognizable claim, however, the claims against Carpinello are subject to dismissal based upon a lack of personal involvement.

**\*28** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor can be found to have personal involvement in a constitutional violation if the evidence shows:

> 1) the defendant participated directly in the alleged constitutional violation, 2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowing the continuance of such a policy or custom, 4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or 5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (1995) (quoting Wright, 21 F.3d at 501).

Plaintiffs claims against defendant Carpinello, Commissioner of the New York State OMH, and defendant Sawyer, the director of CNYPC, are premised

exclusively upon their roles as supervisors. Plaintiff alleges that Carpinello was involved in the refusal of plaintiff's requests for accommodations under the ADA, refused to hire a disabilities rights coordinator, demonstrated deliberate indifference to his needs, failed to supervise employees at the facility, and instituted policies and procedures that she knew, or should have known, were unlawful. Complaint (Dkt. No. 1) pp. 9–12. For this claim plaintiff relies on a letter that he wrote to Carpinello in mid-October asking to be placed in protective custody and transferred from CNYPC. Complaint (Dkt. No. 1) p. 9. Plaintiff admits that he never received a response to his letter. Complaint (Dkt. No. 1) p. 9.

Plaintiffs allegations against Sawyer are similar. On October 13, 2006 plaintiff sent defendant Sawyer a letter requesting certain accommodations under the ADA, including such things as a laptop computer, a magnifier and books on tape. Dkt. No. 57–4, Exh. C. Additionally, plaintiff alleges that Carpinello and Sawyer should have been aware of his complaints by virtue of the letters that he and his wife had written to various state agencies and public officials. The mere receipt of a letter of complaint alone, however, is insufficient to establish personal involvement and liability under section 1983. *Porter v. Goord,* No. 04–CV–0506F, 2009 WL 2386052, at *5 (W.D.N.Y. July 20, 2009) (citations omitted); *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at *7 (S.D.N.Y. July 29, 2005) (Castel, J.) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). [29]

**\*29** Plaintiff also claims that there existed an unwritten policy and custom of patient abuse and assault at CNYPC, which had been in place for many years. Yet, plaintiff has produced no evidence of instances of alleged assault or abuse of patients, aside from the incident on September 22, 2006, of which he now complains. In opposition to defendants' motion, Lane offers the affidavit of John Palombo (Dkt. No. 84–6), a former patient confined at CNYPC from July, 2006, until November of 2007. The Palombo affidavit, however, is fatally conclusory. Palombo states that he personally witnessed staff members attack and beat patients at CNYPC on a least six different occasions, but fails to identify with any specificity the dates on which such beatings allegedly occurred, the patients that were involved, or the circumstances surrounding the alleged beatings. *Id.* ¶ 13. Nor does Palombo allege that supervisors were notified or aware of the matter, or that complaints were made

about these incidents. In fact, plaintiff has produced no evidence of any complaints of abuse made by or on behalf of patients, other than his own. In view of the foregoing, I conclude that the evidence in the record is insufficient to permit a reasonable juror to find the existence of an unwritten policy or custom of patient abuse at CNYPC. *See Upton v. County of Orange,* 315 F.Supp.2d 434, 447 (S.D.N.Y.2004).

For the foregoing reasons, I recommend that defendants' motion for summary judgment dismissing the claims against Carpinello and Sawyer for lack of personal involvement be granted. [30]

### I. *Conspiracy*

Embedded within plaintiff's complaint, though not separately stated, is a conspiracy claim asserted under 42 U.S.C. §§ 1983 and 1985. [31] Defendants also seek dismissal of that claim.

#### 1. *Section 1983*

To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983), (per curiam) *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158(1983). In order to support a claim of conspiracy to commit a civil rights violation, a plaintiff must establish the existence of such a deprivation; a claim of conspiracy, standing alone, is insufficient to support a finding of liability under section 1983. *Britt v. Garcia,* 457 F.3d 264, 269–70 (2d Cir.2006); *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (collecting cases).

Plaintiff's conspiracy claim, if existing at all, appears to rest entirely upon an e-mail from defendant Babula, a treatment assistant, to defendant Barboza, the director of the SOTP at CNYPC, dated October 20, 2006, which plaintiff construes as a concerted effort to have plaintiff's parole violated. Lane Aff. (Dkt. No. 84–2) Exh. C, p.

12. In the e-mail Babula expresses his concerns relating to plaintiff's continuing threatening conduct and goes on to say, "Sharon if there is a way to get this man violated, and you could do it, you need to ..." *Id.* While this e-mail reflects defendant Babula's safety concerns about plaintiff's continued presence at CNYPC, it is not sufficient to raise a question of fact precluding summary judgment dismissing plaintiffs claim of conspiracy.

**\*30** I note that because I have not found that plaintiff's complaint states a sustainable claim for deprivation of a constitutional right, his conspiracy claim is likewise subject to dismissal for failure to state a cause of action. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). Moreover, plaintiff has offered only conclusory allegations that defendants acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, to violate plaintiffs rights, and for this reason as well his claim of conspiracy fails.

### 2. *Section 1985*

Plaintiff's complaint also alleges violation of 42 U.S.C. § 1985. To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–39, 103 S.Ct. 3352, 3359–61, 77 L.Ed.2d 1049 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994); *Gleason v. McBride,* 869 F.2d 688, 694 (2d Cir.1989); *Patterson v. County of Oneida,* No. 5:00–CV–1940, 2002 WL 31677033, at \*4 (N.D.N.Y. Oct.30, 2002) (Hurd, J.), *aff'd in relevant part,* 375 F.3d 206 (2d Cir.2004); *Benson v. United States,* 969 F.Supp. 1129, 1135–36 (N.D.Ill.1997) (citing, *inter alia, United Brotherhood,* 463 U.S. at 434–37); *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberry,* 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v.*

*Dixon,* 709 F.2d at 175; *Williams v. Reilly,* 743 F.Supp. 168, 173 (S.D.N.Y.1990) ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Moreover, it is well settled that a plaintiff attempting to establish a claim under section 1985(3) must demonstrate that the defendant under consideration acted with class-based, invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 266–68, 113 S.Ct. 753, 758–759, 122 L.Ed.2d 34(1993).

**\*31** Plaintiff's claim of conspiracy under section 1985 fails for the same reasons that require dismissal of his conspiracy claim alleged under section 1983. Plaintiff's section 1985 claim is also subject to dismissal based upon the fact that plaintiff has produced no evidence of any class-based discriminatory animus.

In view of the foregoing, I recommend that defendants' motion as to plaintiff's conspiracy claims be granted, and that plaintiff's conspiracy claims be dismissed. [32]

### IV. *SUMMARY AND RECOMMENDATION*

Plaintiff asserts a variety of claims in his complaint relating to his involuntary commitment to CNYPC in September and October of 2006. Having carefully reviewed the extensive record before the court and considered both plaintiffs motion for partial summary judgment and defendants' cross motion for summary judgment, I find that defendants are entitled to qualified immunity with regard to plaintiff's claim that he was committed to CNYPC in violation of his right to procedural due process [33] and that defendants are entitled to immunity under the Eleventh Amendment for all of plaintiff's claims against them in their official capacities and for alleged violations of the ADA in their individual capacities, and that such claims should therefore be dismissed. As to plaintiff's remaining claims under the ADA, I conclude that he has failed to prove any violation of his rights under Title II of that statute, and that these claims should also be dismissed on the merits, as a matter of law. In addition, I find that plaintiff cannot state a claim under the Eighth Amendment for

conditions arising out of his confinement in CNYPC, and that he has failed to establish claims under the Fourteenth Amendment for failure to protect and/or intervene, medical indifference, or excessive use of force, and that these claims therefore are similarly subject to dismissal. Likewise, I have determined that plaintiff has failed to establish that he was denied access to the courts, that defendants' retaliated against him, or that he was otherwise denied his First Amendment rights, including by defendant Beebe's alleged failure to investigate, and accordingly recommend that all First Amendment claims asserted by Lane be dismissed. Because I find that plaintiff has failed to establish a constitutional violation or violation of the ADA, plaintiff's claims of conspiracy as well as those for supervisory liability against defendants Carpinello, Sawyer and Barboza are also subject to dismissal. Additionally, I find that plaintiff has failed to produce any evidence of a conspiracy, or of the personal involvement of Carpinello, Sawyer and Barboza, and therefore recommend dismissal of plaintiff's conspiracy claims and those against Carpinello, Sawyer and Barboza on this basis as well. Accordingly, it is hereby respectfully

RECOMMENDED that plaintiff's motion for partial summary judgment (Dkt. No. 57) be DENIED, defendants' cross motion for summary judgment (Dkt. No. 79) be GRANTED, and plaintiff's complaint be DISMISSED in its entirety.

**\*32** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a) and 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3074344

### Footnotes

1    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. See Burtnieks v. City of New York, 716 F.3d 982, 985–86 (2d Cir.1983) (citations omitted). It should be noted, however, that many of plaintiff's allegations regarding his case and treatment while at CNYPC are vigorously contested by defendants.

2    Plaintiff was given a vision impairment assessment on July 22, 2005 while incarcerated at Sullivan Correctional Facility, and was diagnosed as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4), Exh. B. Defendants acknowledge the existence of one artificial eye, but state their belief that plaintiff is able to use his other eye to read, write, and operate a calculator. See Affidavit of Jeffrey Nowicki, LCSW–R ("Nowicki Aff.") (Dkt. No. 79–5) ¶¶ 10–11; Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62–3) ¶ 3.

3    The CNYPC is a secure adult psychiatric center established within the New York State Office of Mental Health. Defendants' Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 79–2) ¶ 3.

4    To protect plaintiff's privacy, and with the permission of the court, defendants filed plaintiff's records from CNYPC as well as those records from the Commission on Quality of Care and Advocacy traditionally and under seal as Exhibits D and E, respectively, to the Declaration of Dean J. Higgins, Esq. ("Higgins Decl."), Dkt. No. 79–4.

5    The record is unclear as to whether the incident occurred on September 17 or 18, 2009. The parties agree, however, that plaintiff was involved in an altercation in the recreation yard during that period, as a result of which he later sought to pursue criminal charges.

6    Plaintiff's deposition transcript, which was filed as Exhibit F to Defendants' Motion for Summary Judgment (Dkt. No. 79– 7), will be referenced herein as "Tr."

7    Plaintiff ultimately agreed to settle the matter through that channel. See Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 134–35.

8    Defendant Nowicki asserts that the CNYPC staff was not aware that plaintiff needed protection and that it was actually the other residents who needed protection from the plaintiff. Nowicki Aff. (Dkt. No. 79–5) ¶ 17.

9    The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in a Special Housing Unit ("SHU").

Tier III hearings concern the most serious violations, and could result in unlimited keeplock or SHU confinement, with significant restrictions on access to exercise, showers, and other programs and privileges available in general prison population, and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. Although Lane appears to dispute their accuracy, parole records indicate that while in prison he was accused of sixty-one Tier III infractions and forty-one Tier II violations, including harassing, threatening, lewd, unhygienic and violent conduct, resulting in a total of approximately five years in keeplock, eight years of disciplinary SHU confinement and seven months of involuntary protective custody. Higgins Decl. (Dkt. No. 79–4) Exh. E, pp. 153–80.

10  Plaintiff stated during his deposition that approximately twenty staff members were present during the assault; as a result, he is unsure which defendants actually kicked and punched him. Tr. pp. 49–50.

11  Defendant Beebe's name is incorrectly spelled as "Bebe" in the caption and throughout plaintiff's complaint. The court will respectfully direct the clerk to amend the caption to reflect the correct spelling of that defendant's name.

12  The Correction Law requires that the prison superintendent first apply to the court for appointment of two examining physicians and then petition the court again for a commitment order, providing a copy of the petition to the inmate, the inmate's friend or relative, and to the Mental Hygiene Legal Service. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. The Correction Law also provides the inmate with an opportunity to request a hearing before a judge after receiving a copy of the petition but before being committed to the psychiatric hospital. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. In contrast, the requirements of MHL Article 9 do not necessitate that the examining physicians be appointed by the court, nor do they require either notice to the inmate or the opportunity for a hearing. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. In the wake of *Harkavy,* on March 14, 2007, then-New York Governor Eliot Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the MHL, creating a new legal regime for committing sex offenders to mental health facilities for treatment in the SOTP.

13  Both the Full Faith and Credit Clause of the United States Constitution, *see* U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect that it would merit under the law of the state from which it originated. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262 (1982); *Burgos v. Hopkins,* 14 F.3d at 790. This principle applies fully to claims brought pursuant to 42 U.S.C. § 1983. *Migra,* 465 U.S. at 84–85, 104 S.Ct. at 897–98; *Allen v. McCurry,* 449 U.S. at 103–04, 101 S.Ct. at 419–20. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996). Since the state court determination upon which Lane rests his res judicata and collateral estoppel argument originated in New York, the law of that state controls in determining the extent of the preclusive effect of which *Harkavy* is deserving. *Giakoumelos,* 88 F.3d at 59; *see also Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002); *LaFleur v. Whitman,* 300 F.3d 256, 271–72 (2d Cir.2002). It should be noted, however, that while the law of New York, rather than federal principles, applies to determine the preclusive effect to be given to the decision in *Harkavy,* this is a distinction without a difference since, as the Second Circuit has noted, "there is no discernable difference between federal and New York law concerning *res judicata* and collateral estoppel." *Marvel Characters, Inc.,* 310 F.3d at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n. 14 (2d Cir.2001)).

14  It is worth noting that the only named defendant who was even remotely involved in plaintiff's civil commitment was defendant Sawyer, to the extent that he signed the certification of service of a "Notice of Application for Court Authorization to Retain a Patient" on October 26, 2006, forty-four days after plaintiff was committed to CNYPC. *See* Higgins Decl. (Dkt 79–4) Exh. D, p. 391. Plaintiff has not named as defendants in this action any prison official who was involved in his commitment under the MHL. Because I ultimately recommend that such a claim against prison officials would be subject to dismissal based upon qualified immunity, I find that any attempt by plaintiff to amend his complaint to name such defendants would not cure this fatal substantive defect, and would therefore be futile. *Cuoco v. Mohtsugu,* 222 F.3d 99, 112 (2d Cir.2000).

15  In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the state. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

16    As will be seen, defendants' Eleventh Amendment argument relating to plaintiff's claims under the ADA against defendants in their official capacities are not so easily discounted. *See* pp. 38–43, post.

17    In making my analysis I have assumed, without deciding, that plaintiff's failure to include the state the OMH, and/or the CNYPC as a named defendant is not fatal to his claims.

18    That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5.

19    While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same .... " *Vallen,* 2005 WL 2296620, at * 9.

20    Though endorsing *Vallen,* I respectfully disagree, to some extent, with the court's reasoning in that case. At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis,* 523 U.S. at 845, 118 S.Ct. at 1716. Determining whether the right to due process has been violated requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty. *Youngberg,* 457 U.S. 320, 102 S.Ct. 2460. To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 at 846, 118 S.Ct. at 1717. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. at 1718. Negligence is "categorically beneath the threshold of constitutional due process." *Id.* Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S.Ct. at 1718. As the Lewis court explained,

> [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

*Id.* Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding. In *Moore,* the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient. In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg,* or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs,* 381 F.3d 771. Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights." *Moore,* 381 F.3d at 773. In addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical ... [and] ... [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.' " *Id.* (emphasis in original) (quoting *Lewis,* 523 U.S. at 851–52, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043). In discussing the concept of deliberate indifference in Lewis, the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719. Analogizing to *Youngberg,* the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n. 12, 118 S.Ct. 1719 n. 12 (internal citations omitted). In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience-shocking in that environment.

21    Plaintiff testified at his deposition that other than the particular day in question, whenever he asked for medical treatment it was provided, and "[i]n fact, I would give them credit, that their attentiveness to patients' conditions, medical conditions is good." Tr. p. 36.

22    Plaintiff further alleges in his complaint, upon information and belief, that defendant Crocitia "deliberately falsified official state documents with regards to plaintiffs [sic] request for medical attention." Complaint (Dkt. No. 1) p. 7, 11. To create a factual issue, the complaint must be based on personal knowledge, not on "mere 'information and belief or hearsay.' "

*Cabassa v. Gummerson,* No. 01–CV–1039, 2006 WL 1559215, at *2 (N.D.N.Y. Mar.30, 2006) (Lowe, M.J.). Since plaintiff's speculative allegation is not supported by any evidence, and indeed, contradicts his own testimony that he saw Crociata and did not request treatment, the court has no reason to doubt the authenticity of CNYPC records.

23  Plaintiff claims that defendants violated 14 N.Y.C.R.R. § 27.7(a), a New York regulation regarding use of restraint and seclusion in institutional care. Review of this provision and the record before the court suggests that defendants fully complied with this regulatory provision. Even if they did not, however, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).

24  To the extent that plaintiff also challenges the conditions experienced while in isolation, I find that such a claim would fall squarely within the test enunciated in *Youngberg*. The record shows that the decisions to place plaintiff in four point restraints, to isolate him and to release him were all made by a physician and effectuated in accordance with hospital policy. These decisions are entitled to deference, and are therefore presumptively valid. *Youngberg,* 457 U.S. at 322–23, 102 S.Ct. at 2461–62. While plaintiff disputes being provided with regular meals, he admits being provided at least one meal and offered liquids, and he has failed to come forward with any evidence demonstrating that the conditions of his confinement were a substantial departure from accepted professional judgment, practice or standards. *Id.* at 323, 102 S.Ct. at 2462; *Zigmund v. Foster,* 106 F.Supp.2d 352, 361–62 (D.Conn.2000). Accordingly, any claim by plaintiff that he was denied due process by the conditions of his isolation should also be dismissed as a matter of law.

25  Plaintiff testified that prior to his family providing him a magnifier in midOctober he was unable to litigate and challenge his illegal commitment. Tr. p. 62.

26  Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context. *See Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 WL 2543573, at *7 n. 6 (S.D.N.Y. June 25, 2008); *see also Samuels v. Stone,* No. 98 Civ. 776, 1999 WL 624549, at *4 (S.D.N.Y. Aug. 17, 1999).

27  In apparent recognition of some level of constraint necessarily imposed in institutional environments, courts have applied the standard applied to prison inmates to circumstances involving the involuntarily committed in claims relating to access to courts as well as retaliation. *See Lombardo,* 2008 WL 2543573, at * 6 n. 6; *Zigmund,* 106 F.supp.2d at 358.

28  Moreover, the record belies plaintiff's assertion that defendant Beebe failed to properly investigate the complaints made by plaintiff and his wife relating to plaintiff's treatment while committed at CNYPC. Defendant Beebe was assigned to investigate the complaints made by plaintiff and either engaged in personal phone calls or exchanged voice mail messages with plaintiff's wife on October 1, 2006, October 23, 2006, November 1, 2006, November 3, 2006 and November 7, 2006. Defendants' Response to Request for Admissions (Dkt. No. 62–3) ¶¶ 8–9. The record also shows that Beebe's investigation included a personal visit to CNYPC on November 21, 2006. Higgins Decl. (Dkt. No. 79–4) Exh. E, pp. 32–33.

29  Plaintiff's conclusory allegations that Carpinello and Sawyer were also made aware by repeated telephone calls are also insufficient. He fails to identify when and by whom such alleged telephone calls were made, whether he or someone on his behalf spoke to Carpinello or Sawyer, and if so, the substance of such alleged conversations.

30  Although defendants do not move to dismiss the claims against defendant Barboza, Director of the SOTP, for lack of personal involvement, it appears that the only basis for plaintiff's claims against her result from her supervisory role. The sole allegations made by the plaintiff relating to defendant Barboza are that he wrote two separate letters to her complaining of his circumstances at CNYPC. As noted above, these allegations, even if true, are insufficient to support liability against Barboza, *Porter,* 2009 WL 2386052, at *5, and I find that all claims against her should be dismissed for lack of personal involvement.

31  Plaintiff's complaint additionally alleges violation of 42 U.S .C. § 1984. No such provision exists.

32  Plaintiff's conspiracy claim, as alleged in his sixth cause of action, names Nowicki, Lucenti, Crociata, Menz, Coppola and Babula, all of whom were employed at the CNYPC. In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y.2002); *Griffin–Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10–11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). Plaintiff's conspiracy claim is thus also subject to dismissal on this basis.

33    Because I have already concluded that plaintiff has failed to allege any other constitutional violations during plaintiff's commitment at CNYPC, I have declined to address the defense of qualified immunity with respect to plaintiff's remaining claims.

2010 WL 3765847
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. Taylor, J. Berggren, V. Komareth,
K. Sangani, Dr. Hernandez, D. Sawyer,
S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08–CV–00975 (TJM/DEP).
|
Aug. 27, 2010.

**Attorneys and Law Firms**

Rudolph McQuilkin, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants
CNYPC, J. Taylor, J. Berggren, V. Komareth, Dr.,
Hernandez, D. Sawyer, S. Hanna, and G. Bodrog.

O'Connor, O'Connor Law Firm, Law Firm—Albany
Office, Peter Joslin, Jr., Esq., of Counsel, Albany, NY, for
Defendant K. Sangani.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*1 Plaintiff Rudolph McQuilkin, a former New York
State prison inmate who is proceeding *pro se* and *in
forma pauperis,* has commenced this action pursuant
to 42 U.S.C. § 1983 against the Central New York
Psychiatric Center ("CNYPC" or "Center") and several
Center employees as well as the superintendent of one
of the correctional facilities in which he was previously
housed, claiming that his civil rights were violated during
the course of his confinement. In his complaint, as
amended, plaintiff alleges that he was civilly committed
to CNYPC against his will and forcibly medicated
with various psychiatric drugs in retaliation for having
served a "notice of summons" on the superintendent of
the Gouverneur Correctional Facility ("Gouverneur"),

without his consent and in violation of his religious beliefs.
Plaintiff further complains of the seizure and destruction
of certain of his personal property. Plaintiff's complaint
seeks injunctive relief, elimination of any reference of
being a mental health patient from his institutional
record, and an award of both compensatory and punitive
damages.

In response to plaintiff's complaint one of the defendants,
Dr. Kishor R. Sangani, a psychiatrist, has moved
for dismissal alleging that plaintiff's complaint fails to
assert an actionable claim against him. Those remaining
defendants who have been served and appeared in the
action have moved for summary judgment on a variety of
grounds, both procedural and substantive including, *inter
alia,* on the basis of qualified immunity.

Having carefully considered defendants' motions, which
McQuilkin has not opposed, I recommend that they
be granted and that the second amended complaint be
dismissed in its entirety.

## I. *BACKGROUND* [1]

At the times relevant to the claims set forth in his
second amended complaint, plaintiff was a prison inmate
entrusted to the care and custody of the New York
State Department of Correctional Services ("DOCS"),
and designated to various DOCS prisons as well as the
CNYPC, a facility located in Marcy, New York and
operated under the authority of the New York State
Office of Mental Health ("OMH"). *See generally* Second
Amended Complaint. Plaintiff was released from DOCS
custody on October 27, 2009. Waldron Aff. (Dkt. No. 66)
¶ 35 and Exh. A. [2]

Plaintiff was admitted into the CNYPC from the
nearby Mid–State Correctional Facility ("Mid–State"),
on September 17, 2007, and was diagnosed with
schizophrenia, paranoid type. [3] *Id.* at ¶ 6, Exh. B. at
P2; Defendants' Rule 7.1(a)(3) Statement ¶ 2. Paranoid
schizophrenia can cause a variety of symptoms, the most
prevalent of which are delusions, auditory hallucinations
and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶
7. Individuals who suffer from this type of schizophrenia
frequently suffer from feelings of being persecuted or
plotted against and may have grandiose delusions that are
associated with protecting themselves from the perceived
plot. Waldron Aff. (Dkt. No. 66) ¶ 7. According to his

referral from Mid–State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid. He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him. He was refusing medication and mental health treatment." Waldron Aff. (Dkt. No. 66) Exh. B at P289.

**\*2** Upon his arrival at the CNYPC, plaintiff consistently refused his medications. *Id.* at P291. Plaintiff explained the basis for that refusal by stating to CNYPC personnel "these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months. *Id.* at P271–272. Following a hearing regarding the petition held on October 11, 2007, Supreme Court Justice Anthony F. Shaheen issued a ruling, over plaintiff's objection, in which he determined that McQuilkin was mentally ill and a proper subject for custody and continued treatment in the CNYPC within the meaning of New York Mental Hygiene Law ("MHL") § 9.27, and therefore approved the requested retention period. [4] Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

Based on plaintiff's refusal to consent to the administration of medication while at the Center, and following an evaluation of his condition by CNYPC staff, on or about November 1, 2007, Sawyer once again petitioned the state courts, this time for an order authorizing OMH employees to forcibly administer psychiatric medication to McQuilkin. Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B at P276–96. That involuntary treatment petition was granted on November 21, 2007, following a hearing and despite McQuilkin's objection, based upon a finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and that the administration of medication to the plaintiff was in his best interest. *Id.* at ¶¶ 19–20 and Exh. B at P318–19. The order granting the petition authorized the administration of psychiatric drugs "during the concurrent retention of Rudolph McQuilkin, and any extension thereof at [CNYPC] as well as for a period not to exceed twelve (12) months after the patient is discharged from the [CNYPC] to a psychiatric satellite unit operated

by [OMH] at a New York State Correctional facility ..." *Id.* at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into the Clinton Correctional Facility ("Clinton") on January 4, 2008, commencing the twelve-month period of court-authorized forced medication. Waldron Aff. (Dkt. No. 66) ¶ 21. During that time, plaintiff was injected with fifty milligrams of Haldol, an antipsychotic medication, once a month. *Id.* at ¶¶ 21–22 and Exh. B. at P320–23.

From the expiration of the court-ordered psychiatric treatment period on January 4, 2009 until April of 2009, plaintiff refused to be medicated, which caused him to become symptomatic. Waldron Aff. (Dkt. No. 66) ¶ 23 and Exh. B. at P327–30. On April 8, 2009, Dr. Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the Clinton Mental Health Satellite Unit ("Satellite Unit") for evaluation as to whether an involuntary psychiatric hospitalization in the CNYPC, based upon the recommendation of two physicians, should be sought and with the intent of seeking another court order permitting involuntary psychiatric medication. Waldron Aff. (Dkt. No. 66) ¶ 24 and Exh. B at P331–32. This request was based on plaintiff's ongoing refusal to take psychiatric medication and his repeated history of subsequent psychiatric decompensation, as well as his refusal to attend therapy sessions during which his mental status could be clinically monitored. *Id.*

**\*3** As a result of Dr. Gillani's request, plaintiff was escorted from his cell to the Mental Health Satellite unit at Clinton, where he was assigned to a residential crisis treatment program cell. *Id.* at ¶ 26. Once there, McQuilkin showed poor insight and judgment, continued to display symptoms of paranoia, and persisted in his denial of any mental health issues. *Id.* at ¶ 27. Plaintiff remained in the satellite unit for less than twenty-four hours, however, based upon his agreement to take his prescribed psychiatric medication (Haldol 50 mg). *Id.* at ¶ 28.

During the period that Haldol was administered, plaintiff complained of side effects including a rash.[5] Waldron Aff. (Dkt. No. 66) ¶ 32. The use of Haldol to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009. *Id.* at ¶ 33 and Exh. B at P336. Since then, plaintiff has not registered any further medical

complaints, and reports that he "like[s] the Risperdal better." *Id.* at ¶ 34.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint. Dkt. Nos. 1, 8, and 35. As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to have him involuntarily committed. Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287–88. Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding. Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses. Dkt. No. 38. For his part, Dr. Sangani has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking the dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted. Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds. Dkt. No. 66. In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect to the majority of his claims; 4) plaintiff's claims surrounding his

interfacility transfer lack merit since inmates do not have a constitutional right to be incarcerated at a correctional facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7) plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker–Feldman* doctrine [6]; 9) defendants are entitled to qualified immunity; and 10) plaintiff's claims surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

**\*4** Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Standards of Review*

#### 1. *Motion to Dismiss*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

## 2. *Summary Judgment Motions*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Assn. v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. *Plaintiff's Failure to Oppose Defendants' Summary Judgment Motion*

**\*6** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' motions, and specifically whether that failure automatically entitles defendants to the relief sought.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court

determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against dismissal or summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b) (3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.)[7]; *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed motions should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. *See Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept. of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local

Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious. [8]

### C. *Eleventh Amendment Immunity*

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

**\*7** As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N. Y.,* 900 F.2d 587, 594–95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). [9] "The law is clear that the state, and state agencies ..., are immune from prisoner § 1983 suits because of their Eleventh Amendment sovereign immunity." *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest. [10] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91 102 S.Ct. 2325, 2328–2329 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. [11] *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

Because plaintiff's section 1983 claims against the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). Additionally, to the extent that plaintiff asserts claims for damages against the defendants in their official capacities, those claims are

properly regarded as claims against the state, and are likewise barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993). Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims for damages against the CNYPC and the individual defendants in their official capacities.

## D. *Mootness*

In their motion, defendants next seek summary judgment with respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will." Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.' " *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citations omitted). A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing and quoting *Lyons* ). This limited exception does not appear to be potentially applicable in this instance.

**\*8** The record now before the court reflects that plaintiff is no longer in state custody. *See* Dkt. No. 57; Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

## E. *Exhaustion*

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [12]

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396,

2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec.11, 2000)).

**\*9** In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL 57139–08, relating to missing personal property, was processed through to completion under the IGP. *See* Bellamy Aff. (Dkt. No. 66) ¶ 10. This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have processed those grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there. At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred. [13] *See* Second Amendment Complaint (Dkt. No. 35) pp. 12–23, 26. In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in

light of adverse effects from which he claimed to suffer as a result of the medication being administered. *Id.* at pp. 12–13, 26. In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order." *See* Attachments to Second Amended Complaint (Dkt. No. 35) p. 31.

While confined at Clinton, plaintiff also filed an inmate grievance, dated April 1, 2008 and assigned grievance number CL–56924–08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10. In response to plaintiff's grievance, the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040, [14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS inmate grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11. Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id.*

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and Berggren complaining of the administration of psychiatric drugs, claiming that he was being discriminated against and harassed by certain corrections officers and nurses who administered his oral medication, and requesting a meeting to discuss the possibility of receiving all of his medication once a month by injection. *See* Second Amended Complaint (Dkt. No. 15) at pp. 24–25. Plaintiff wrote a second letter to Dr. Gillani on July 16, 2008, voicing the same complaint and again requesting that he be given all his court-ordered drugs at the same time each month. *Id.* at pp. 27–28.

**\*10** Although the plaintiff was at all relevant times an inmate in the primary care and custody of the DOCS, the conduct giving rise to his claims occurred at the CNYPC, a facility operated by the OMH. Based upon that circumstance, it is arguable that plaintiff's claims are not subject to the PLRA because they do not involve "prison life." While the court's research has not identified a case

in this circuit squarely addressing the issue, it appears that even though confined to the CNYPC at the time in question, plaintiff would still qualify as a prisoner subject to the requirements of the PLRA. *See, e.g., Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) ("[W]e hold that only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are 'prisoners' within the definition of 42 U.S.C. § 1997e...."); *Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term 'prisoner' means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation ....") (quoting 28 U.S.C. § 1915(h)), *cert. denied,* 542 U.S. 907, 124 S.Ct. 2843, 159 L.Ed.2d 273 (2004). It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation. [15]

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d 37 at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the

CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia,* that '[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.' " *Giano,* 380 F.3d at 678. Indeed, as was previously noted, the IGRC response to plaintiff's grievance number CL 56924–08 requesting discontinuation of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS Inmate grievance program." *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11. Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment. It is true that, strictly construed, plaintiff's grievance number CL 56924–08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that the his grievance complaining of being forced to take the drugs was being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the denial of the medication grievance would be rejected.

**\*11** It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment. In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to exhaust claims relating to his psychiatric treatment. For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

### F. Confinement At Clinton

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal." Second Amended Compl. (Dkt. No. 35) ¶ 3. To the extent that plaintiff attempts to premise his section 1983 claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted prisoners have no right to choose the prison they are housed in. *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922–23 (2d Cir.1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged involuntary transfer to Clinton is appropriate.

### G. Due Process Claim Based on Destruction of Personal Property

Although not alleged as a distinct cause of action, in his second amended complaint plaintiff appears to claim that all of his legal work and documentation—five draft bags altogether—were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur"). Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing inmate claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied. *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citing *Parratt,* 451 U.S. at 540, 101 S.Ct. at 1916). With regard to claims of lost or stolen

property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia,* a Court of Claims action. *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001) (citing *Love v. Coughlin,* 714 F.2d 207, 208–09 (2d Cir.1983)).

**\*12** In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides inmates like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9(2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal. [16]

### H. Expungement of Psychiatric Records

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of Action. In their motion, defendants request dismissal of this cause of action as not presenting a constitutional claim, and additionally because the relief sought is not available under New York law.

To state a valid claim under section 1983, a plaintiff must allege that he or she was deprived of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Plaintiff has identified no cognizable constitutional right at stake with regard to his mental health records. While plaintiff complains of his involuntary commitment at the Center, it appears from the record now before the court that the commitment occurred, at least in part, based upon state court proceedings conducted pursuant to New York Correction Law § 402. [17] *See generally* Waldron Aff. (Dkt. No. 66). As such, plaintiff cannot plausibly allege the denial of procedural due process associated with that commitment.

Nor has McQuilkin stated a claim under New York law, even assuming such a claim would be actionable under section 1983. Generally, expungement of psychiatric

records is not an available form of relief in New York. *Wade v. Dep't of Mental Hygiene of New York,* 49 N.Y.2d 947, 428 N.Y.S.2d 945, 406 N.E.2d 800 (1980). MHL section 33.14 does allow for the sealing of psychiatric records when

> the petitioner has demonstrated by competent medical evidence that he is not currently suffering from a mental illness, has not for a period of three years received inpatient services for the treatment of a mental illness, and the interests of the petitioner and society would best be served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW § 33.14(a)(1)(b). Plaintiff cannot avail himself of the sealing provision in this instance, however. At the outset, plaintiff cannot establish that he has not "received inpatient services for a period of three years." *Id.* Plaintiff was discharged from services on October 27, 2009 and has therefore received inpatient services within the last three years. Waldron. Aff. (Dkt. No. 66) Exh A. Additionally, plaintiff has not established, by competent medical evidence, that he is not currently suffering from a mental illness, nor has he demonstrated that both his interests and those of society would best be served by sealing his records of mental health treatment.

**\*13** For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

### I. *Religious Discrimination and Access to Court*
Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights." Second Amended Complaint (Dkt. No. 35) ¶¶ 2, 8. As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

### 1. *Religious Discrimination*
While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Salahuddin,* 993 F.2d at 308. When determining whether an action taken by prison officials impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before the court discloses any facts demonstrating religious discrimination or establishing that plaintiff's religious beliefs were somehow burdened by his confinement to CNYPC or the administration of psychiatric drugs against his will. Plaintiff's complaint does not identify his religion, nor does it explain how the forced administration of psychiatric medications infringes upon his sincerely held religious beliefs. Since plaintiff's religious deprivation claim is stated in wholly conclusory terms without the articulation of facts demonstrating the existence of a plausible claim, and in light of his failure to come forward with the evidence to support that claim in the face of defendants' summary judgment motion, I recommend that any cause of action deemed to assert a First Amendment freedom of religion violation be dismissed.

### 2. *Access to Courts*

**\*14** Turning to plaintiff's reference to his deprivation of access to the courts, I note that undeniably "[p]risoners have a constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents." *Thomas v. Egan,* 1 Fed. App'x 52, 54 (2d Cir.2001) (citing *Lewis,* 518 U.S. at 350, 116 S.Ct. at 2179) (cited in accordance with Fed. R.App. Proc. 32.1). "To state a claim of denial of access to the courts, an inmate must allege an actual injury." *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179). Conclusory allegations are insufficient. *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents. Second Amended Complaint (Dkt. No. 35) ¶ 2. Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents. Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim. *See Davidson v. Murray,* 371 F.Supp.2d 361, 366 (W.D.N.Y.2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or inaction" of defendants). Based upon this lack of supporting facts, I recommend that plaintiff's court access claim be dismissed.

### J. *Retaliation*

The claims set forth in plaintiff's complaint appear to be centered upon his involuntary commitment to the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS. In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse

action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds sub nom., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services." Second Amended Compl. (Dkt. No. 35) ¶ 2. Plaintiff also alleges

that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 ...". defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim. Both the filing of a claim with the International Trade Court and service of a notice of summons appear to qualify as constituting protected activity. *See Joseph's House and Shelter, Inc. v. City of Troy,* 641 F.Supp.2d 154, 159 n. 5 (N.D.N.Y.2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 91 (2d Cir.2002) (finding lawsuit constitutionally protected activity under the First Amendment)). In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment. *See Jones v. Harris,* 665 F.Supp.2d 384, 399 (S.D.N.Y.2009). The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with. By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action. The bare allegation that the filing of that claim is somehow linked to the defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty,* 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events. In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred. *Vega v. Lareau,* No. 9:04–CV–0750, 2010 WL 2682307, at *10 (N.D.N.Y.2010)* (Baxter, M .J.). I note, in that regard, that the record fails to support plaintiff's claim

that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC. Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

**\*16** Because the record fails to support plaintiff's retaliation cause of action, I recommend that it be dismissed.

### K. *OMH Confinement and Involuntary Treatment*
Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker–Feldman* doctrine.

#### 1. *Eighth Amendment*
The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement— the conditions must be "sufficiently serious" from an

objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach,* 103 F.Supp.2d at 546 (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07–346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

**\*17** Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton. Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment. Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Here, however, even liberally construing plaintiff's allegations there is no claim, and indeed no evidence in the record to suggest that plaintiff's medical needs were disregarded. In fact, at the heart of plaintiff's claim is his contention that he did not need mental health treatment at all. It

is well established, however, that "[c]harges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo v. City of New York,* 2003 WL 22211500, at *2 (S.D.N.Y. Sept.25, 2003) (citing *Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 292). As a result, defendants are correct in their assertion that plaintiff's Eighth Amendment challenge to his CNYPC confinement and mental health treatment must fail as a matter of law.

### 2. *Heck v. Humphrey*

Defendants also assert that any claim by plaintiff that he should not have been placed in the CNYPC or in an OMH Satellite Unit is barred by the rule enunciated in *Heck v. Humphrey.* In *Heck,* the United States Supreme Court addressed the types of claims for which state prisoners may seek redress in section 1983 actions. *Heck,* 512 U.S. at 480–82, 114 S.Ct. at 2369–70. The Supreme Court specifically held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in his or her favor "would necessarily imply the invalidity of his conviction or sentence." *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372. For a plaintiff to recover damages for actions

> whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486–87, 2372. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* The Second Circuit has observed, however, that a section 1983 suit by a prisoner, "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *[Heck]." Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999).

**\*18** In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order. Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized. It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term. Waldron Aff. (Dkt. No. 66) Exh. B P263, P318–319. Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings. As a result, it cannot be said that the instant action would affect the invalidity of a criminal judgment against the plaintiff. [18]

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in *Heck v. Humphrey.*

### 3. *Rooker–Feldman*

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the *Rooker–Feldman* doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a section 1983 action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker–Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983). "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the *Rooker–Feldman* doctrine in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Court limited application of the doctrine to "cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp.,* 544 U.S. at 284, 125 S.Ct. at 1521–22. In *Hoblock,* the Second Circuit established four elements that must be met before the *Rooker–Feldman* doctrine applies:

> First, the federal court plaintiff must have lost in state court. Second the plaintiff must 'complain[ ] of injuries caused by [a] state court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state court judgment must have been 'rendered before the district court proceedings commenced.'

*Hoblock,* 422 F.3d at 85.

**\*19** Here, the first and fourth elements of this test are clearly satisfied. First, the plaintiff lost in the New York Supreme Court proceedings which resulted in the retention and involuntary treatment described in plaintiff's complaint. *See* Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318–319. Additionally, the state court decisions at issue, dated October 11, 2007 and November 21, 2007, respectively, *see id.,* were rendered prior to the commencement of this action on September 15, 2008. *See* Dkt. No. 1.

The second and third elements of the prevailing *Rooker–Feldman* test also appear to have been established in this instance. Plaintiff's complaint is directly addressed to the injuries suffered as a result of those court determinations. Moreover, plaintiff's complaint, as amended, appears to challenge the correctness of those rulings, seeking both an order prohibiting his forced medication, despite the fact that it was accomplished pursuant to a state court order, as well as expungement of records of his treatment at the Center, also accomplished by court order. This, then, appears to present a classic case of a claim precluded under the *Rooker–Feldman* doctrine. I therefore recommend dismissal of plaintiff's confinement and administration of psychiatric drug claims on this basis.

### L. *Due Process Claims*

In their motion defendants further attack plaintiff's procedural due process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show

that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul–Matiyn v. Pataki,* 9:06–CV–1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at *5 (S.D.N.Y. Nov.16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997)).

The primary focus of plaintiff's due process claim and defendants' motion seeking its dismissal, then, is upon the sufficiency of the procedural safeguards associated with that deprivation. [19] In this instance, plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

**\*20** It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered. Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release v. Prevost,* 722 F.2d 960, 971–981 (2d Cir.1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic

medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

Plaintiff was transferred from Mid–State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition. *United States v. Waters,* 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit. [20]

For the foregoing reasons, I recommend summary judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

M. *Defendant Sangani's Motion to Dismiss*

**\*21** In his motion Dr. K. Sangani, who has yet to answer plaintiff's complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cri.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The only mention of Dr. Sangani in plaintiff's second amended complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07 ..." Amended Complaint. (Dkt. No. 35) ¶ 5. It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). I note, however, that I have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient. I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

N. *Defendants Komareth and Bodrog*

**\*22** Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons. [21] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United

States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

> [a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739–40 (11th Cir.2010).

*Murray v. Pataki,* No. 09–1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1). In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon these defendants and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on September 15, 2008. Summonses issued for defendants Komareth and Bodrog were initially returned unexecuted on January 16, 2009. See Dkt. Nos. 18, 19. The summonses were thereafter reissued and again forwarded to the Marshals for service on April 29, 2009, Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36, but were, once again, returned as unexecuted on July 23, 2007 (defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant Bodrog) Dkt. No. 46. Despite the passage of more than one year, and at least one court intervention at plaintiff's request seeking an order compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has failed to request assistance from the court in locating and serving these defendants. On that basis I recommend dismissal of plaintiff's claims against defendants Komareth and Bodrog, without prejudice. [22]

## IV. *SUMMARY AND RECOMMENDATION*

**\*23** Although defendants have asserted that certain of plaintiff's claims should be dismissed for failure to exhaust his administrative remedies, the record shows that special circumstances potentially exist that could justify excusing the plaintiff from the exhaustion requirement in this instance. I therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody. I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in their official capacities, on the basis of the immunity afforded under the Eleventh Amendment. I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious. Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker–Feldman* doctrine, and find it unnecessary, in light of these determinations, to address the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte,* without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby **ORDERED** that the clerk of the court amend the court's records to reflect the correct spelling of defendant Berggen's name; and it is further

**ORDERED THAT** the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3765847

## Footnotes

1   In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2   Because defendants' summary judgment moving papers were filed traditionally, they do not appear on the docket but collectively have been assigned docket number 66.

3   The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998. Waldron Aff. (Dkt. No. 66) ¶¶ 8–9. During the first admission, which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type. *Id.* The notes of that admission reflect that while at Mid–State plaintiff refused to take psychotropic medications. *Id.* at ¶¶ 8–9 and Exh. B at P289.

4   Pursuant to the MHL, the director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such a person. N.Y. MENTAL HYG. § 9.27(a). The examination may be conducted jointly but each examining physician must execute a separate certificate. *Id.*

5   According to defendants' submissions, this is not a side effect ordinarily associated with Haldol. Waldron Aff. (Dkt. No. 66) ¶ 32.

6   *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *District of Columbia v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

7   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

8   I note that defendants' notice of motion contains the required notice to plaintiff of the consequences of his failure to respond to the summary judgment motion. Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

9   "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Id.* at 595 (citing *Papasan v. Allain,* 478 U.S. 265, 276–77, 105 S.Ct. 2932, 2939–40 (1986)). Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment. As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison. *See* pp. 21–23, *post.*

10  In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

11  By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

12  While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

13  The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered. The page numbers referred to herein as are reflected in the court's docket.

14  DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by majority vote (3 of 4), that ... the grievant is seeking action with respect to any policy, regulation, rule

or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)." 7 N .Y.C.R.R. § 701.5(b)(4)(i)(d).

15  Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his religion, I have not addressed exhaustion of these claims.

16  The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41–43, *post.*

17  Under that provision, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill the superintendent of a correctional facility must apply to the court for designation of two examining physicians who, conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correction Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate as well as any known relative. *Id.* § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. *Id.* § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months in order that the inmate may be transferred into an OMH facility. *Id.*

18  The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies to plaintiffs who are incarcerated at the time that they file their section 1983 actions, regardless of whether they are later released." *Hamm v. Hatcher,* No. 05–CV–503, 2009 WL 1322357, at *8 n. 6 (S.D.N.Y. May 5, 2009).

19  The record does not address, and I am therefore unable to determine, whether as a result of his involuntary commitment to the CNYPC and forced medication, plaintiff suffered deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence. I have nonetheless assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

20  To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

21  That rule provides that

    [i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

    Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

22  In his complaint plaintiff alleges that defendants Komareth and Bodrog are physicians who submitted certifications in support of the applications to confine McQuilkin to the CNYPC and to require that he submit to the administration of psychiatric medication. Since I have already determined that as to the defendants Hanna and Hernandez, who also submitted certifications in support of these applications, plaintiff has failed to establish that his constitutional rights have been violated, for the same reasons I could recommend dismissal of plaintiff's against these two defendants on the merits as well.

2010 WL 3765715
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC
CENTER, J. Taylor, J. Berggren, V. Komareth,
K. Sangani, Dr. Hernandez, D. Sawyer,
S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08–CV–00975 (TJM/DEP).
|
Sept. 20, 2010.

**Attorneys and Law Firms**

Rudolph McQuilkin, New York, NY, pro se.

Krista A. Rock, New York State Attorney General, Peter
B. Joslin, Jr., O'Connor, O'Connor Law Firm, Albany,
NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. David E. Peebles,
United States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the Report–
Recommendation and Order dated August 27, 2010 have
been filed, and the time to do so has expired. Furthermore,
after examining the record, this Court has determined that
the Report–Recommendation and Order is not subject to
attack for plain error or manifest injustice. Accordingly,
the Court adopts the Report–Recommendation and
Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary
judgment (Dkt. No. 66) is **GRANTED,** and Plaintiff's
claims against the Central New York Psychiatric Center,
Berggren, Hernandez, Sawyer, Hanna and Taylor are
**DISMISSED** in all respects, with prejudice; and it is
further

**ORDERED** that Defendant Sangani's motion to dismiss
the complaint (Dkt. No. 56) is **GRANTED** and all claims
against Sangani are **DISMISSED** with prejudice; and it is
further

**ORDERED** that Plaintiff's claims against Defendants
Komareth and Bodrog are **DISMISSED,** *sua sponte,*
without prejudice.

The Office of the Clerk of the Court is instructed to close
the file in this matter.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3765715

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   1

1999 WL 9847
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lawrence SHUSTER, Plaintiff,

v.

NASSAU COUNTY, et al., Defendants.

No. 96 Civ. 3635(JGK).
|
Jan. 11, 1999.

**Attorneys and Law Firms**

Lawrence Shuster, Fountain Valley, CA, for the Plaintiff, pro se.

Gina M. Amorini, Mineola, NY, for Nassau County.

Michael Kennedy, Assistant Attorney General, Office of the Attorney General, Division of State Counsel, Litigation Bureau, New York, NY, for Hon. Zelda Jones & NYS Dept. of Motor Vehicles.

*OPINION AND ORDER*

KOELTL, J.

 **\*1** The plaintiff filed this action against various defendants alleging false arrest and malicious prosecution for violations of the New York Vehicle and Traffic Law (VTL). The docket sheet reflects that the complaint was filed on May 15, 1996. Defendants Judge Zelda Jonas, the New York State Department of Motor Vehicles (collectively, the "State defendants"), and Nassau County, who have not answered or moved with respect to the complaint or the amended complaint, have requested that the amended complaint be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because they have never been properly served with the summons and complaint or amended complaint. The docket sheet in this action does not reflect any service on any defendant. The Court therefore by Order dated February 17, 1998 directed the plaintiff to advise the Court in writing why this action should not be dismissed for failure to serve the summons and complaint on the defendants within 120 days of filing of the complaint. While the plaintiff has responded, it is clear that he has never properly served any of the defendants.

I.

Rule 4(m) authorizes a court upon motion to dismiss an action without prejudice as against a defendant if service of the summons and complaint is not made upon that defendant within 120 days after the filing of the complaint. This Rule also authorizes courts to dismiss an action sua sponte, provided that the court first gives notice to the plaintiff. *See* Fed.R.Civ.P. 4(m); *see also Gowan v. Teamsters Union (237),* 170 F.R.D. 356, 359–60 (S.D.N.Y.1997) (dismissing action filed by a pro se, in forma pauperis plaintiff pursuant to Rule 4(m)).

Separate rules govern service upon state agencies and upon individuals. Under the Federal Rules of Civil Procedure, "[s]ervice upon a state ... or other governmental organization ... shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state...." Fed.R.Civ.P. 4(j)(2). Service upon an individual is made by delivering a copy of the summons and complaint to the individual personally, by leaving a copy thereof at the individual's dwelling house or usual place of abode with a person of suitable age and discretion residing there, or by delivering a copy to an agent authorized to receive service of process. *See* Fed.R.Civ.P. 4(e)(2). The rule further provides that an individual may also be served in accordance with state law. *See* Fed.R.Civ.P. 4(e)(1).

Under New York law, a state officer sued in an official capacity or a state agency must be served by:

> (1) delivering the summons to such officer or to the chief executive officer of such agency or to a person designated by such chief executive officer to receive service, or (2) by mailing the summons by certified mail, return receipt requested, to such officer or to the chief executive officer of such agency, and by personal service upon the state in the manner provided by subdivision one of this section.

 **\*2** N.Y. C.P.L.R. 307(2). Subdivision (1) provides that "personal service upon the state shall be made by

delivering the summons to an assistant attorney-general at an office of the attorney-general or to the attorney-general within the state." Hence, "[s]ervice on a state officer may be made either by personal delivery to the officer or by certified mail to the officer. Service on a state agency may be made either by personal delivery to the chief executive officer of the agency (or the chief executive's designee) or by certified mail to the chief executive." N.Y. C.P.L.R. 307(2) supplemental practice commentaries (McKinney 1998).

The New York rules for serving an in-state natural person parallel Fed.R.Civ.P. 4(e)(1), but with additional requirements. Like Rule 4, service may be by personal delivery to the person being served, *see* N.Y. C.P.L.R. 308(1), or to a duly appointed agent for service. *See* N.Y. C.P.L.R. 308(3). Service may also be made by delivering the summons to a person of suitable age and discretion at the actual place of business, dwelling place, or usual place of abode of the person to be served, provided that the summons is also mailed to that person's last known residence or sent by first class mail to that person's actual place of business. *See* N.Y. C.P.L.R. 308(2).

In addition, where service under sections 308(1) and (2) cannot be made with due diligence, service may be effected by nailing the summons to the door of the actual place of business, dwelling place, or usual place of abode of the person to be served, and by mailing the summons to that person at his or her last known residence or by sending the summons by first class mail to that person's actual place of business. *See* N.Y. C.P.L.R. 308(4). Under sections 308(2) and (4), the delivery and mailing must occur within twenty days of each other. *See* N.Y. C.P.L.R. 308(2) & (4).

## II.

On May 15, 1996, the plaintiff filed the original complaint in this action. On August 14, 1996, the plaintiff filed an amended complaint. In February 1998, well past the 120–day limit for timely service of process, the State defendants requested dismissal of the action pursuant to Rule 4(m). (*See* Letter from Michael Kennedy dated Feb. 13, 1998). The plaintiff was ordered to advise the Court by March 2, 1998 why the case should not be dismissed on that basis. (*See* Order dated Feb. 17, 1998). The plaintiff filed a response dated February 17, 1998. The plaintiff also filed a response received on August 13, 1998. In August 1998,

more than two years after the original complaint was filed and nearly two years after the amended complaint was filed, the State defendants and defendant Nassau County requested dismissal of this action on the grounds that they still had not been served. (*See* Letter from Michael Kennedy dated Aug. 3, 1998; Letter from Gina Amorini dated Aug. 3, 1998).

### (A)

The plaintiff does not argue that he complied with Rule 4 by delivering the summons and complaint to the chief executive officer of the DMV. Nor does he allege that he delivered the summons and complaint to Judge Jonas, who is sued in her personal and official capacities, personally or to a person of suitable age and discretion at Judge Jonas' dwelling place or usual place of abode. Nor has there been compliance with N.Y. C.P.L.R. 307(2) with respect to either the DMV or Judge Jonas. With respect to the DMV, there has been neither personal delivery to the chief executive officer of the DMV or the chief executive's designee or by certified mail to the chief executive with personal service on an assistant attorney-general or the attorney-general. The plaintiff also has not complied with similar provisions with respect to Judge Jonas.

**\*3** Instead, the plaintiff contends that he had served the State defendants by twice delivering the summons and complaint to the Nassau County Regional Office of the State Attorney General, on July 30, 1996 and February 6, 1998. (*See* Return of Service (unsigned), attached to Feb. 17, 1998 Shuster Letter). To support his argument that service on the Nassau office constituted effective service on the State defendants, the plaintiff submitted a copy of a letter from the Office of the Attorney General stating that its Nassau office would accept service on behalf of, among others, Judge Zelda Jonas in a different action. In addition, he argues that the complaint was also attached to the Order to Show Cause which was served on the Nassau office. (*See* Order to Show Cause attached to Feb. 17, 1998 Shuster Letter). The plaintiff also argues that under New York State law, service on the Attorney General's Office is sufficient.

Under New York law, delivering the summons and complaint to a regional office of the State Attorney General does not by itself constitute effective service on a state agency or an individual officer sued in her official

capacity. *See Berkowitz v. New York City Bd. of Educ.,* 921 F.Supp. 963, 968 (S.D.N.Y.1996); *Dawkins v. Hudacs,* 159 F.R.D. 9, 10 (N.D.N.Y.1994); *Town of Clarkstown v. Howe,* 206 A.D.2d 377, 614 N.Y.S.2d 327, 328 (2d Dep't 1994); *Sannella v. Regan,* 111 A.D.2d 964, 490 N.Y.S.2d 61 (3d Dep't 1985). Moreover, there is no evidence that the Nassau office was authorized to accept service on behalf of the DMV. As to Judge Jonas, the fact that the Nassau office had been designated to receive service on her behalf in another case does not authorize that office to accept service for her in this case.

The plaintiff also contends that he served the State defendants by handing their attorney a copy of the complaint in this Court on or about July 30, 1996. Even if proven, this is also not sufficient under the Federal Rules and New York law unless the attorney is authorized by appointment or by law to receive service of process. *See United States v. Ziegler Bolt and Parts Co.,* 883 F.Supp. 740, 749 (Ct. Int'l Trade 1995); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1289 (S.D.N.Y.1989); *Gibbs v. Hawaiian Eugenia Corp.,* 581 F.Supp. 1269, 1271 (S.D.N.Y.1984). The plaintiff has neither alleged nor provided proof that the State defendants intended to be bound by the acceptance of the complaint by their attorney. While the authority of an attorney to accept service may be implied from the surrounding circumstances indicating the intent of the client, *J & L Parking Corp., Inc. v. United States,* 834 F.Supp. 99, 102 (S.D.N.Y.1993); *Olympus Corp. v. Dealer Sales and Serv., Inc.,* 107 F.R.D. 300, 305 (S.D.N.Y.1985), there is no evidence in this case to establish such intent. The State defendants never acted in any way to indicate that the attorney was authorized to accept service of process. The State defendants never answered the Complaint or filed a responsive pleading, and specifically asserted in correspondence that there had been no service of process. Indeed, the State defendants notified the plaintiff at least as early as February 1998 that service was insufficient. (*See* Feb. 13, 1998 Kennedy Letter).

**\*4** Although the plaintiff is acting *pro se,* his failure to comply with basic procedural rules cannot be excused, particularly in light of the fact that he is familiar with litigation. He has already filed numerous other lawsuits and numerous motions. *See, e .g., Shuster v. Eiberson,* No. CV–92–1524 (E.D.N.Y. Apr. 23, 1993); *Shuster v. Fenster,* No. 92 Civ. 2323; *Shuster v. Citibank,* No. 93 Civ. 4182, 1994 WL 267550 (S.D.N.Y. June 15, 1994); *Shuster v. Prudential Securities Inc.,* No. 91 Civ. 0991, 1991 WL 102500 (S.D.N.Y. June 6, 1991); *Shuster v. Olem,* 96 Civ.1993, 1997 WL 167046 (S.D.N.Y. Apr. 8, 1997); *Shuster v. Eiberson,* No. 97 Civ.1988, slip. op. (S.D.N.Y. Aug. 12, 1997); *Shuster v. Oppleman,* No. 96 Civ. 1689 (S.D.N.Y. filed Mar. 7, 1996); *Shuster v. Voel,* No. 96 Civ. 8240 (S.D.N.Y. filed Nov. 1, 1996). Accordingly, the State defendants' request for dismissal without prejudice pursuant to Rule 4(m) is granted.

### (B)

The docket sheet also does not reflect service of process on defendant Nassau County. Fed.R.Civ.P. 4(1) requires proof of service in the form of an affidavit by the server. *See* Fed.R.Civ.P. 4(1). While it is true that, by its terms, the failure to comply with Fed. R. Civ. 4(1) does not affect the validity of the service, the plaintiff has submitted no proof of timely service for any of the defendants. Nor has the plaintiff explained how he purportedly served Nassau County pursuant to federal or state law. The plaintiff has offered no explanation for his failure to serve in response to the Court's directive or to Nassau County's letter requesting dismissal. Nor has he requested an extension of the time to serve. Because the plaintiff was given notice that the case would be dismissed absent a showing of good cause for the failure to serve the defendants, and has failed to make this showing, defendant Nassau County's application for dismissal without prejudice pursuant to Rule 4(m) is also granted. *See, e.g., Urquidez v. Officer Lyon # 7505,* No. 97 Civ. 884, 1997 WL 414158 at *1 (S.D.N.Y. July 23, 1997).

### (C)

Similarly, the docket sheet also does not reflect that any of the remaining defendants named in the amended complaint have been served. They include individual defendants D. Dillon, N. Levy, Richard Kramer, "Mr. Rainville," Skip Dwyer, R. Jackson, A. Aducci, and "U.S.A. (Bruce [illegible] )," each of whom is sued in his or her official and personal capacities; the Nassau County Republican Party; and unnamed "clients of Frank Cocozzelli" (collectively, the "remaining defendants"). Although the 120–day limit for service of process has long expired, courts generally consider three factors in

determining whether "good cause" exists to warrant an extension of the time for service:

> (1) whether the delay in service was "the result of mere inadvertence," or whether there has been a "reasonable effort" to effect service[,] ... (2) prejudice to the defendant[,] ... [and 3] whether or not the plaintiff has moved under Fed.R.Civ.P. 6(b) for an enlargement of time in which to effect service.

**\*5** *Gordon v. Hunt,* 116 F.R.D. 313, 319–21 (S.D.N.Y.1987).

These factors do not support an extension of the time to serve the remaining defendants in this case. The plaintiff was directed by the Court to explain the delay in serving the defendants but failed to do so. The plaintiff has not moved for additional time to serve any of the defendants. Moreover, to permit service at this late date would unfairly prejudice the remaining defendants. *See Gowan,* 170 F.R.D. at 359–60. The delay in proceeding against them has been excessive. Accordingly, pursuant to Rule 4(m), the case against the remaining defendants is dismissed without prejudice.

### III.

The plaintiff has also filed a partially illegible "letter and motion for order" in which he seeks an injunction to stop further court proceedings in Nassau County for alleged violations of section 511 of the New York Vehicle and Traffic Law. He argues that the injunction should be granted because all of his past violations of the Vehicle and Traffic Law have been expunged from his record. The Court has already considered and denied a similar motion by the plaintiff on the grounds that the plaintiff failed to show either irreparable harm or a likelihood of success on the merits. *See Shuster v. Nassau County,* 948 F.Supp. 282 (S.D.N.Y.1996). In the present motion, which consists of one paragraph, the plaintiff offers no new facts to establish either of these requirements for a preliminary injunction. Therefore, the plaintiff's motion for a preliminary injunction is denied.

### IV.

The plaintiff also moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). This motion is plainly improper because there have been no responsive pleadings because the defendants were never effectively served. The motion is therefore denied.

### V.

The plaintiff also moves for an order directing Nassau County to send to the plaintiff a copy of the transcript of a 1996 proceeding before Judge Eiberson in which Judge Eiberson allegedly dismissed various Vehicle and Traffic Law charges against the plaintiff. To the extent that this is a discovery request, it is denied as moot.

### CONCLUSION

For the reasons explained above, this action is dismissed without prejudice. The plaintiff's motion for a preliminary injunction is denied. The plaintiff's motion for judgment on the pleadings is denied. The plaintiff's motion for an order directing Nassau County to produce a court transcript is denied as moot.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 9847

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4343978
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leon SMITH, Plaintiff,
v.
Michael HOGAN, Donald Sawyer,
Terri Maxymillian, Jeff Nowicki,
Charmaine Bill, Linda Kovich, Anthony
Gorzalaz, James Morgan, Defendants.

No. 9:09–CV–0554 (GTS/GHL).
|
Aug. 1, 2011.

**Attorneys and Law Firms**

Leon Smith, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, David L. Cochran, Esq. of Counsel,
Albany, NY, for Defendants.

*REPORT–RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

 **\*1** This *pro se* prisoner civil rights action, filed pursuant
to 42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable Glenn T. Suddaby,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Local Rules of
Practice for this Court. Plaintiff alleges that Defendants
violated his constitutional rights by strip searching him,
supervising his use of the bathroom, denying him a snack,
placing him in isolation for two days, failing to provide
him with medication, searching his cell and confiscating
items, changing his custody status, and causing him to
miss a deadline to file a motion in state court. (Dkt.
No. 1.) Currently pending is Defendants' motion for
summary judgment. (Dkt. No. 44.) Plaintiff has not
opposed the motion, despite having been advised of the
consequences of failing to do so and having been granted
an extension of the deadline by which to do so. (Dkt.
No. 44–1; Jan 24, 2011 Text Ord.) For the reasons
that follow, I recommend that Defendants' motion for
summary judgment be granted.

# I. BACKGROUND

At the time of the incident at issue in this case, Plaintiff was
civilly committed to the Central New York Psychiatric
Center ("CNYPC"). The complaint alleges that at 12:30
p.m. on February 3, 2009, Plaintiff and the other residents
of his ward were in the dining room finishing lunch. (Dkt.
No. 1 at 5. [1]) Defendant Terri Maxymillian, the director
of the facility's Sex Offender Treatment Program, came
into the dining room and told the residents that they
were going to be strip searched and that their rooms
would be searched because "somebody told her about
some drugs." (Dkt. No. 44–3 at 14:3–21. [2]) Defendant Jeff
Nowicki, the head of security, was also present. (Dkt. No.
44–3 at 28:22–30:24.) They told the residents that they
would not be allowed to return to the day room until they
consented to being escorted one by one to a side room to
be strip searched. (Dkt. No. 1 at 5.) Plaintiff and five other
residents refused to consent. *Id.*

About five minutes later, the residents in the dining room
began looking at the door toward two staff members
named Jerome Allen and Kim Clark, who are not named
defendants. (Dkt. No. 1 at 5.) When Plaintiff got up to see
what everyone was looking at, Mr. Allen shook his hand
in Plaintiff's face and said "You know I don't like you ...
so I don't know why you come to the door." *Id.* at 5–6. Ms.
Clark told Plaintiff that staff members do not "go against"
each other. *Id.* at 6. Another staff member named Robert
Taylor, who is also not named as a defendant, approached
and Ms. Clark "told him something about" Plaintiff. *Id.*
Mr. Taylor then came into the dining room and stood
there. *Id.*

At 2:30 p.m., several of the residents asked if they
could be pat-frisked and drug-tested rather than strip
searched. (Dkt. No. 1 at 7.) The complaint alleges that
Defendants Maxymillian and Charmaine Bill (a treatment
team leader) denied the request. *Id.* During the time that
the residents were kept in the dining room, they were not
allowed to make phone calls, were only allowed to use the
bathroom if they were supervised by two staff members,
and were not given their 5:00 p.m. medication or their 7:30
p.m. snacks. *Id.*

 **\*2** At approximately 8:25 p.m., Plaintiff and the other
five residents were brought to the hallway near the nurses'
station. (Dkt. No. 1 at 7.) There, Defendant Bill told them

that they were going to each be placed in an isolation room instead of their ward rooms unless they agreed to be strip searched. *Id.* Plaintiff was not allowed to return to his room for the next two days. (Dkt. No. 44–3 at 27:4–8.)

At some point while Plaintiff was detained in the dining room or in isolation, his room was searched. Plaintiff does not know who searched his room, but testified that the search was ordered by Defendant Maxymillian. *Id.* at 13:21–14:2. Plaintiff was not present when his room was searched. *Id.* at 15:15–17. A straw and tissue were confiscated. *Id.* at 15:18–21. Plaintiff testified that someone told him that Defendant Linda Kovich took some other things out of the room during the search. *Id.* at 32:2–20. Plaintiff does not remember what things were taken. *Id.* at 35:9–36:25.

On February 4, 2009, Plaintiff woke up between 7:30 a.m. and 7:45 a.m. and "waited for [his] morning meds to be delivered." (Dkt. No. 1 at 8.) Plaintiff never received his morning medication. (Dkt. No. 44–3 at 10:20–24.) At 8:00 a.m. breakfast was delivered and Plaintiff refused his meal. (Dkt. No. 1 at 8.) He asked to use the bathroom and make a legal call, but the request was refused.

At 9:00 a.m., Plaintiff was "finally allowed to go to bathroom to do morning hygiene." *Id.* Robert Taylor escorted Plaintiff to the bathroom. *Id.* at 9. Mr. Taylor asked Plaintiff if he needed anything from his room. *Id.* Plaintiff requested a toothbrush, toothpaste, and underclothes, which Mr. Taylor brought to him. *Id.*

After Plaintiff washed up, he "got the S.C.T.A. to call the nurses [so] I can get this strip[ ] search[ ] over with cause I'm sick [and] tired of being treat [ed] like I'm in some prison all over again[ ] and being punish[ed] like I'm a prison[er]." [3] *Id.* Mr. Taylor and another male staff member performed the strip search by asking Plaintiff to remove his clothes, bend over, and spread his buttocks. (*Id.;* Dkt. No. 44–3 at 19:21–20:3.) Plaintiff told them that, as a Muslim, he did not "feel right bending over for anyone who [was] not trained medical personnel or nurses." (Dkt. No. 1 at 9.) Nonetheless, he complied. *Id.* The search took ten or fifteen minutes. (Dkt. No. 44–3 at 20:9–10.) Plaintiff asserts that he was "violate[d] as Muslim by Director Donald Sawyer, Dr. Terri Maxymillian who order[ed] the strip [ ] search[ ] and Mr. Jeff Nowicki Assistant and Ms. Charmaine Bill and Mr. James Morgan ... who [was] standing in the door way looking in, and Mr. Steve

Reiling [4] R..N. who [was] at the door looking in." (Dkt. No. 1 at 9.) At his deposition, Plaintiff testified that Defendant Anthony Gorzalaz, a doctor, was also standing outside the room where Plaintiff was strip searched. (Dkt. No. 44–3 at 37:5–13.) Plaintiff believes that, as a civilian rather than a prisoner, he should not have been strip-searched that way. *Id.* at 16:3–6. He also believes that a Muslim should not be searched by non-Muslims. *Id.* at 22:13–17. Plaintiff testified that in correctional facilities in New York, Muslims are allowed to keep their underwear on during strip searches. *Id.* at 21:18–25.

**\*3** Later that day, Plaintiff's primary therapist, Ms. Keshia Barron [5], told him that he had been "moved back to MOD status." (Dkt. No. 1 at 8.) No reason was given for this decision. *Id.* Plaintiff informed his lawyer and told her that he could not "participate in groups because of said demotion of status." *Id.* Plaintiff also learned that residents who had agreed to be strip searched "were moved off the MOD ward to regular wards as a reward for being searched." *Id.* Plaintiff believes this demotion was a "deliberate act of punishment by the staff of CNYPC–SOTP for no [t] willingly agreeing to participate in the ... strip search ...." *Id.*

Plaintiff received his medication in the evening on February 4, 2009. (Dkt. No. 44–3 at 23:13–20.)

Plaintiff asserts that the strip search, cell search, and demotion in status violated the OMH Official Policy Manual and the CNYPC–SOTP Residents Manual. (Dkt. No. 1 at 10.) Specifically, Plaintiff asserts that the search violated (1) page three of the Residents' Manual, which states that all residents will be treated respectfully and that SOTP maintains a nonjudgmental and non-punitive therapeutic atmosphere; and (2) the OMH Official Policy regarding patient searches, which states that strip searches will only be conducted when less intrusive measures have been considered or attempted, that one of the staff members present must be a member of the clinical staff, that the searchers be the same gender as the patient, that searches must be conducted with respect for the patient's dignity and, where possible and appropriate, only after attempting to resolve a patient's concerns about the search; and (3) the OMH Official Policy regarding room searches. *Id.* at 10–14.

Plaintiff missed the deadline to file a 440 motion in state court because he was not allowed to call his lawyer and

because he was placed in isolation for two days. (Dkt. No. 44–3 at 17:12–15; 28:9–13.) Plaintiff asked for an extension, which was granted, and he was ultimately able to file his 440 motion. *Id.* at 28:14–21.

A few days later, Plaintiff filed a complaint against Mr. Allen, who had shaken his hand in Plaintiff's face in the dining room. (Dkt. No. 1 at 6.) An unnamed risk management employee told Mr. Allen "do not worry about the [complaint] against him cause you are not going [no]where." *Id.* Mr. Allen told Plaintiff "you know I had to cover my ass" and smiled. *Id.*

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Unopposed Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [6] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

**\*4** When a plaintiff fails to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, practically speaking, the Court must (1) determine what material

facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on the *undisputed* material facts, the law indeed warrants judgment for the defendants. *See Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See* N.D.N.Y. L.R. 7.1(a)(3); *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *Champion,* 76 F.3d at 486.

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

**\*5** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

### III. ANALYSIS

#### A. Claims Regarding the Strip Search

Plaintiff essentially makes three claims regarding the strip search: (1) that Defendants Maxymillian and Nowicki should not have entered the dining hall and ordered that the residents there be strip-searched; (2) that Defendants Maxymillian and Bill should have accepted the residents' request to be pat-frisked and drug-tested rather than strip searched; and (3) that the search itself violated Plaintiff's rights in a number of ways. I will address each of these claims separately.

##### 1. *Initial Order*

Read broadly, the complaint may allege that Defendants Maxymillian and Nowicki violated Plaintiff's constitutional rights by entering the dining hall and requesting that the residents there submit to a strip search. Defendants have not addressed this claim. I find that the claim is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2) because "[t]he mere act of requesting

that a person submit to a search does not, in and of itself, run afoul of the Fourth Amendment ..." *Groves v. New York,* No. 9:09–CV–0412 (GLS/DEP), 2010 U.S. Dist. LEXIS 29722, at \*16, 2010 WL 1257858, at \* 5 (N.D.N.Y. Mar.1, 2010) (dismissing another resident's claim arising from the same incident of which Plaintiff complains). [7] Therefore, I recommend that the Court dismiss this claim.

##### 2. *Denial of Proposed Alternative*

Read broadly, the complaint may allege that Defendants Maxymillian and Bill violated Plaintiff's rights by refusing to allow the residents to be pat-frisked and drug-tested rather than strip-searched. (Dkt. No. 1 at 7.) Specifically, Plaintiff may be arguing that Defendants Maxymillian and Bill violated OMH official policy by refusing to attempt less intrusive measures before strip searching the residents. *Id.* at 11. Defendants have not addressed this claim. These allegations do not state a federal cause of action because a "violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (collecting cases). Therefore, I recommend that the Court dismiss Plaintiff's claims.

##### 3. *Claims Regarding Manner in Which the Strip Search Was Conducted*

**\*6** Plaintiff asserts several objections to the manner in which the strip search was ultimately conducted. First, Plaintiff contends that the manner in which the strip search was conducted violated his beliefs as a Muslim (Dkt. No. 1 at 9; Dkt. No. 44–3 at 22:13–17) and that the search should have been conducted differently because he is a civilian rather than a prisoner. (Dkt. No. 44–3 at 16:3–6.) Second, Plaintiff objects to the fact that several people stood outside the doorway looking in while he was searched. (Dkt. No. 1 at 9; Dkt. No. 44–3 at 37:5–13.) Third, read very broadly, Plaintiff may be alleging that Mr. Taylor conducted the search in order to retaliate against Plaintiff for the incident in the dining room involving himself, Jerome Allen, and Kim Clark. (Dkt. No. 1 at 5–6.) Defendants argue that any claim regarding the manner in which the strip search was conducted must be dismissed because Plaintiff has not named anyone as a defendant who conducted the search. (Dkt. No. 44–5 at 6. [8] ) Defendants are correct.

Plaintiff has not alleged, and the evidence does not show, that any named defendant either conducted the search or ordered that it be conducted in the manner of which Plaintiff complains. Mr. Taylor and the unnamed staff member who actually conducted the search are not named defendants. Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior)* is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[9] Here, there is no evidence that any of the *Colon* categories applies to any named defendant.[10] Therefore, I recommend that the Court dismiss Plaintiff's claims regarding the manner in which the strip search was conducted.

**\*7** Plaintiff's failure-to-intervene claim against the officials who were standing at the door while the search was conducted is also subject to dismissal. Under the Due Process Clause, applicable to non-prisoners such as Plaintiff, the failure of a state official to intervene to prevent harm is a constitutional violation where the official acts with deliberate indifference to a substantial risk of serious harm. *Rosen v. City of New York,* 667 F.Supp.2d 355, 359–60 (S.D.N.Y.2009). An official displays deliberate indifference "when he has adequate time to assess a serious threat against an [individual] and a fair opportunity to protect the [individual] without risk to himself, yet fails to intervene." *Id.* at 360. A "serious threat" is an "unquestioned and serious deprivation of basic human needs." *Id.* (punctuation omitted). Here, there is no evidence that Plaintiff was subjected to any unquestioned and serious deprivation of basic human needs. Therefore, I recommend that the Court dismiss Plaintiff's failure-to-intervene claims regarding the strip search.

Finally, to the extent that Plaintiff claims that Mr. Taylor conducted the strip search to retaliate against Plaintiff for the earlier incident in the dining room, the claim fails because Mr. Taylor is not a named defendant. Therefore, I recommend that the Court dismiss Plaintiff's claims regarding the strip search.

### B. Claims Regarding the Incident with Non–Defendants Allen, Clark, and Taylor

Plaintiff's complaint includes allegations about an incident in the dining room with non-defendants Jerome Allen, Kim Clark, and Robert Taylor. (Dkt. No. 1 at 5–6.) Defendants do not directly address these allegations. I recommend that the Court *sua sponte* dismiss the claim for failure to allege personal involvement by any named defendant.

### C. Claims Regarding Restrictions on Bathroom Use, Failure to Provide Snacks, and Placement in Isolation

Plaintiff alleges that he was supervised in the bathroom during the time he and the five other residents were confined to the dining room, that he was not given his 7:30 p.m. snack on February 3, and that he was placed in isolation for two days. *Id.* at 7–8. I construe these claims as alleging that Defendants subjected Plaintiff to unconstitutional conditions of confinement. Defendants have not addressed these claims.

Because Plaintiff was civilly committed at the time of the incident, his claims are analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment. *Groves,* 2010 WL 1257858, at \* 6. However, the same standard applies. *See Caiozzo v. Koreman,* 581 F.3d 63, 66 (2d Cir.2009) (applying standard from Eighth Amendment jurisprudence to

pretrial detainee's due process claims regarding medical care). Such claims have both an objective and a subjective component. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). To prove the objective component of a conditions-of-confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

**\*8** Here, there is no evidence from which a reasonable juror could conclude that Plaintiff was deprived of the minimal civilized measure of life's necessities. Regarding the allegation that Plaintiff was supervised in the bathroom, "[h]owever embarrassing this incident might have been to the plaintiff, it does not rise to the level of a constitutional violation." *Groves,* 2010 WL 1257858, at \*8. Similarly, the denial of one snack is not a constitutional violation. *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (finding that complaint failed to state Eighth Amendment claim where prisoner alleged he was denied one meal). Finally, Plaintiff did not plead any facts in his complaint or testify to any facts at his deposition from which a reasonable juror could conclude that Plaintiff was subjected to extreme deprivations during his two days in isolation. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's conditions-of-confinement claims.

### D. Medical Care

Plaintiff alleges that he was not given his 5:00 medication on February 3 or his morning medication on February 4. (Dkt. No. 1 at 7; Dkt. No. 44–3 at 10:20–24.) Defendants have not addressed this claim.

As with Plaintiff's conditions-of-confinement claims, the allegations regarding the denial of medication are analyzed under the Due Process Clause of the Fourteenth Amendment, which uses the same test as Eighth Amendment medical claims. *Caiozzo,* 581 F.3d at 66. There are two elements to a plaintiff's claim that officials violated his right to receive medical care: "[t]he plaintiff must show that she or he had a serious medical condition

and that it was met with deliberate indifference." *Id.* at 72 (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant ... acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

Here, Plaintiff has not pleaded, and the evidence does not show, that he suffered from any serious medical condition. Neither the complaint nor Plaintiff's deposition reveal what medication Plaintiff was taking, what condition the medication was supposed to treat, or any adverse effects that Plaintiff suffered as a result of missing two doses. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's claim regarding the denial of medication.

### E. Claims Regarding Search of Plaintiff's Room

**\*9** Plaintiff alleges that Defendant Maxymillian authorized Defendant Linda Kovich and other unnamed staff members to search his cell. (Dkt. No. 44–3 at 13:21–14:2, 32:2–20.) Plaintiff alleges that the search violated OMH and CNYPC policies and that Defendant Kovich took some items out of the room during the search. (Dkt. No. 1 at 12–13; Dkt. No. 44–3 at 32:2–20.)

Defendants argue that Plaintiff cannot state a constitutional claim regarding the alleged loss of property in the room search. (Dkt. No. 44–5 at 3.) Defendants are correct. "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if

a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (emphasis omitted). This Circuit has held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims. *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, I recommend that the Court dismiss Plaintiff's claim regarding the loss of property.

As discussed above, to the extent that Plaintiff claims that the search violated his constitutional rights because it did not comply with OMH and CNYPC policies, the complaint fails to state a federal claim. Therefore, I recommend that the Court dismiss Plaintiff's claim that the search did not comply with OMH and CNYPC policies.

Finally, construed liberally, Plaintiff may be alleging that Defendants Maxmillian and Kovich violated his Fourth Amendment rights by searching his room. Defendants have not addressed this claim. At least one court in this Circuit has held that, due to the security concerns that locked psychiatric facilities share with prisons and jails, involuntarily committed individuals do not have a right to privacy in their rooms and thus cannot assert Fourth Amendment claims regarding room searches. *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, at *21–24, 2008 WL 2543573, at *7–8 (S.D.N.Y. June 25, 2008).[11] I find the reasoning of *Lombardo* persuasive and agree with its holding. Therefore, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim regarding the search of his room.

### F. Claim Regarding Change in Status

Plaintiff claims that as a result of his failure to immediately consent to a strip search, he was "moved back to MOD

status." (Dkt. No. 1 at 8.) Defendants do not directly address this claim, although it may be implicitly included in their argument that Plaintiff has not stated a retaliation claim. (Dkt. No. 44–5 at 5–6.) I liberally construe the complaint as asserting a retaliation claim and a procedural due process claim regarding the change in Plaintiff's status.

#### 1. Retaliation

**\*10** Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted:

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a

similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

Here, there is simply no evidence that any named defendant was involved in the decision to place Plaintiff on MOD status. Plaintiff alleges that Ms. Keshia Barron, whom Plaintiff characterizes as a defendant but is not named as such in the complaint, was the person who told him that he had been placed on MOD status. (Dkt. No. 1 at 8; Dkt. No. 44–3 at 13:14–20.) However, Plaintiff does not allege in his complaint and did not testify at his deposition that Ms. Barron actually made the decision. Accordingly, even if one assumes that Plaintiff was engaged in protected conduct and that the change in status constituted adverse action, there is no evidence that any named defendant took adverse action against Plaintiff. Therefore, I recommend that the Court dismiss this claim.

### 3. *Due Process*

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty or property interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). I can find no authority suggesting that Plaintiff has either a liberty or a property interest in being assigned to any particular status at CNYPC. *See Groves,* 2010 WL 1257858, at *8–10 (dismissing due process claim regarding change to MOD status arising from same incident of which Plaintiff complains). Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's due process claim regarding the change to MOD status.

### G. Claims Regarding Plaintiff's Late 440 Motion

**\*11** Plaintiff claims that Defendants Bill and Maxymillian prevented him from accessing his legal work.

(Dkt. No. 44–3 at 31:13–24.) Defendants argue that Plaintiff cannot prevail on his claim regarding access to the courts because there is no evidence that he suffered any injury. (Dkt. No. 44–5 at 4–5.) Defendants are correct. To state a claim for denial of access to the courts, a plaintiff must demonstrate both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.). Here, Plaintiff suffered no actual injury because he was able to obtain an extension of time to file his 440 motion. (Dkt. No. 44–3 at 28:14–21.) Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's access-to-the-courts claim.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' unopposed motion for summary judgment (Dkt. No. 44) be ***GRANTED*** and judgment be entered in favor of Defendants; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Groves v. New York,* No. 9:09–CV–0412 (GLS/DEP), 2010 U.S. Dist. LEXIS 29722, 2010 WL 1257858 (N.D.N.Y. March 1, 2010); and *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y. June 25, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 4343978

Footnotes

1    Page references in citations to the complaint refer to the page numbers assigned by the Court's electronic filing system.

2    Page references in citations to Plaintiff's deposition refer to the page numbers on the original document rather than the page numbers assigned by the Court's electronic filing system.

3    Although the complaint alleges that the strip search occurred on February 4, Plaintiff testified at his deposition that he was strip searched on February 3. (Dkt. No. 44–3 at 10:14–16.) From the context, it seems clear that the search occurred on February 4, the day after Plaintiff initially refused to be searched.

4    At his deposition, Plaintiff testified that he intended to name Mr. Reiling as a defendant, but that he "forgot to finish, to put his name on top of it. I had it on only a piece of paper. I forgot to put it on there." (Dkt. No. 44–3 at 12:15–13:10.)

5    Plaintiff testified at his deposition that Keshia Barron is a defendant in this case. (Dkt. No. 44–3 at 13:14–20.) However, she is not listed in the caption of the complaint or the complaint's list of parties. (Dkt. No. 1 at 1–3.)

6    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

7    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

8    Page references in citations to Defendants' memorandum of law refer to the page numbers on the original document rather than the page numbers assigned by the Court's electronic filing system.

9    In *Ashcroft v. Iqbal,* ―― U.S. ――, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal'* s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

10    Plaintiff testified that Terri Maxymillian said that the cell search and strip search were "authorized by the superintendent and Donald Sawyer was the superintendent." *Id.* at 25:18–23. However, there is no evidence that Defendant Sawyer issued any order regarding the manner in which the search was to be conducted or that he was aware of Plaintiff's religious beliefs.

11    The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

---

**End of Document**         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4343809
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leon SMITH, Plaintiff,
v.
Michael HOGAN; Donald Sawyer; Terri
Maxymillian; Jeff Nowicki; Charmaine
Bill; Linda Kovich; Anthony Gorzalaz;
and James Morgan, Defendants.

No. 9:09–CV–0554 (GTS/GHL).
|
Sept. 14, 2011.

**Attorneys and Law Firms**

Leon Smith, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, David L. Cochran, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

### *MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil
rights action filed by Leon Smith ("Plaintiff") against
the eight above-captioned individuals ("Defendants"),
are the following: (1) Defendants' motion for summary
judgment (Dkt. No. 44); and (2) United States Magistrate
Judge George H. Lowe's Report–Recommendation
recommending that Defendants' motion be granted and
Plaintiff's Complaint be dismissed (Dkt. No. 51). For the
reasons set forth below, Magistrate Judge Lowe's Report–
Recommendation is accepted and adopted in its entirety;
Defendants' motion is granted; and Plaintiff's Complaint
is dismissed.

### I. RELEVANT BACKGROUND

#### A. Plaintiff's Claims

Plaintiff filed his Complaint in this action on March
16, 2010. (Dkt. No. 1.) Construed with the utmost
of liberality, Plaintiff's Complaint alleges that, while
he was incarcerated at Central New York Psychiatric

Center ("CNYPC") in Marcy, New York, Defendants
violated his constitutional rights by strip searching him,
supervising his use of the bathroom, denying him a snack,
placing him in isolation for two days, failing to provide
him with medication, confiscating items during a cell
search, changing his custody status, and causing him to
miss a motion filing deadline in state court. (*See generally*
Dkt. No. 1 [Pltf's Compl.].) For a more detailed recitation
of the factual allegations of Plaintiff's Complaint, or the
claims arising from those allegations, reference is made
to the Complaint in its entirety, and to Magistrate Judge
Lowe's Report–Recommendation.

#### B. Defendants' Motion

On October 6, 2010, Defendants filed a motion
for summary judgment seeking dismissal of Plaintiff's
Complaint. (Dkt. No. 44.) In support of their motion,
Defendants argue as follows: (1) Plaintiff's claim for lost
property does not state a cause of action; (2) Plaintiff's
claims against Defendants Hogan and Sawyer should be
dismissed for lack of personal involvement; (3) Plaintiff's
denial-of-access-to-the-courts claim should be dismissed
because he has failed to adduce admissible record evidence
establishing (a) that he suffered an actual injury, and/or
(b) deliberate or malicious interference with any right;
and (4) Plaintiff's retaliation claim should be dismissed
because (a) the allegations giving rise to this claim are
wholly conclusory, and (b) the alleged conduct giving rise
to this claim was carried out by two individuals who are
not defendants in this action. (*Id.*)

Plaintiff did not submit a response to Defendants' motion.

#### C. Magistrate Judge Lowe's Report–Recommendation

On July 11, 2011, Magistrate Judge Lowe issued a Report–
Recommendation recommending that Defendants'
motion be granted in its entirety. (Dkt. No. 51.)

More specifically, Magistrate Judge Lowe recommended
as follows: (1) that Plaintiff's illegal-stripsearch claim
against Defendants Maxymillian and Nowicki based on
their requesting residents to submit to a search be *sua
sponte* dismissed because the mere act of requesting
Plaintiff to submit to a strip search does not constitute
a violation of his Fourth Amendment rights; (2) that
Plaintiff's illegal-strip-search claim against Defendants
Maxymillian and Bill based on their alleged violation
of Office of Mental Health official policy be *sua sponte*

dismissed because a violation of state law, in and of itself, does not give rise to liability under 42 U.S.C. § 1983; (3) that Plaintiff's illegal-strip-search claim based on the manner in which the search was conducted be dismissed because he has failed to adduce admissible record evidence establishing that any of the named Defendants conducted the search or ordered it to be conducted in the manner of which Plaintiff complains; (4) that Plaintiff's claims based on an incident in the dining hall involving certain non-defendants be *sua sponte* dismissed for failure to allege facts plausibly suggesting the personal involvement of any named Defendant; (5) that Plaintiff's conditions-of-confinement claims based on supervised bathroom use, denial of snacks, and placement in isolation, be dismissed because these claims do not rise to the level of a constitutional violation; (6) that Plaintiff's medical indifference claim be *sua sponte* dismissed based on his failure to allege facts plausibly suggesting (let alone adduce admissible record evidence establishing) that he suffers from a serious medical condition that requires medication; (7) that Plaintiff's unlawful-seizure-of-property claim be dismissed because the intentional deprivation of property by a state employee does not constitute a Fourteenth Amendment violation for loss of property; (8) that Plaintiff's illegal search claim against Defendants Maxymillian and Kovich based on their search of his room be *sua sponte* dismissed because involuntarily committed individuals do not have a right to privacy in their rooms; (9) that Plaintiff's retaliation claim with respect to his change in status be *sua sponte* dismissed because he has failed to adduce admissible record evidence establishing that any named Defendant was involved in the decision to place Plaintiff on "MOD status"; [1] (10) that Plaintiff's due process claim with respect to his change in status be *sua sponte* dismissed because he has failed to allege facts plausibly suggesting that he was deprived of a liberty or property interest without due process of law based on his change in status; and (11) that Plaintiff's denial-of-access-to-thecourts claim be dismissed because he has failed to adduce admissible record evidence establishing that he suffered an actual injury as a result of the denial. (Dkt. No. 51.)

**\*2** Familiarity with the remaining grounds of Magistrate Judge Lowe's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [2] When only general objections are made to a magistrate judge's report-recommendation, or where the objecting party merely reiterates the same arguments made in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).* [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Legal Standard Governing an Unopposed Motion for Summary Judgment and a Motion to Dismiss for Failure to State a Claim

Magistrate Judge Lowe correctly recited the legal standards governing an unopposed motion for summary judgment under Fed.R.Civ.P. 56, and a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b) (6). (Dkt. No. 51.) As a result, these standards are incorporated by reference in this Decision and Order. The Court would add only that, because Plaintiff is proceeding in this action *in forma pauperis,* the Court has the authority to *sua sponte* review the sufficiency of the allegations that Plaintiff has set forth in his Complaint pursuant to 28 U.S.C. § 1915A(b).

## III. ANALYSIS

Because Plaintiff has not filed an Objection to Magistrate Judge Lowe's Report–Recommendation and the time in which to do so has expired, the Court need review the

Report–Recommendation for only clear error, pursuant to the standard or review recited above in Part II.A. of this Decision and Order. After doing so, the Court concludes that Magistrate Judge Lowe's Report–Recommendation is not clearly erroneous. Magistrate Judge Lowe employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. The Court would add only that Magistrate Judge Lowe's thorough and correct Report–Recommendation would survive even a *de novo* review.

**\*3 ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Lowe's Report–Recommendation (Dkt. No. 51) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 44) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** in its entirety.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4343809

Footnotes

1   Plaintiff's Complaint does not elaborate as to the significance of that status, or its effect, if any, on the conditions of his confinement.

2   On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3   *See also Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

---

KeyCite Yellow Flag - Negative Treatment
Disagreed With by Lane v. Carpinello, N.D.N.Y., September 24, 2009

2005 WL 2296620
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Barry Lee VALLEN Plaintiff,

v.

S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A.
Gonzales; S.H.T.A. Malfatone; S.H.T.A.
Nelson; S.H.T.A. Leper; Dr. Beneb Ting; Senior
S .H.T.A. John Doe; S.H.T.A. March; S.H.T.A.
Adams; S.H.T.A. Brown; S.H .T.A. Jones;
and Various S.H.T.A. John Does, Defendants.

No. 02 Civ. 5666(PKC).
|
Sept. 20, 2005.

*MEMORANDUM AND ORDER*

CASTEL, J.

 **\*1** Plaintiff Barry Lee Vallen brings this action, pursuant
to 42 U.S .C. § 1983, alleging that he was the victim
of multiple patient-to-patient assaults and deprivations
of property during the time that he resided at the Mid-
Hudson Forensic Psychiatric Center ("Mid-Hudson"),
a facility operated by an agency of the state of New
York. In a Memorandum and Order dated September
2, 2004, I dismissed defendants New York State Office
of Mental Health and Mid-Hudson on the basis of the
state's constitutionally-based immunity from suit. *Vallen
v. Mid-Hudson Forensic Office of Mental Health,* 2004
WL 1948756 (S.D.N.Y. Sept. 2, 2004). I concluded that
the Complaint set forth allegations sufficient to state
claims against the individual defendants for deliberate
indifference to confinement conditions that were seriously
and dangerously unsafe. *Id.* at \*3. I held that plaintiff's
claim did not arise under the Eighth Amendment because
he was not serving a term of imprisonment pursuant
to a conviction, but, generously construed, his *pro se*
Complaint could be read as alleging that persons acting
under color of state law had deprived him, as an
involuntarily detained person, of rights protected by the
Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants
have moved for summary judgment dismissing the
plaintiff's claims. For the reasons explained below, the
defendants' motion is granted.

*Background*

The following facts are taken from plaintiff's pleadings, his
sworn deposition testimony or are otherwise not disputed.
Where multiple inferences can be drawn from the facts,
I have considered only the one most favorable to Mr.
Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of
second-degree murder in connection with the death of his
parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty
by reason of mental illness or defect and was diagnosed
as a paranoid-schizophrenic. (Vallen Dep. at 169-71) A
Justice of the New York Supreme Court, Orange County,
found that, at that point in time, the plaintiff suffered
from a dangerous mental illness and ordered that he
be committed to a psychiatric facility. (Vallen Dep. at
170) Subsequently, plaintiff was discharged to outpatient
care on two occasions, but in each instance he was later
recommitted. (Vallen Dep. at 172-84) From April 18, 1997
through June 14, 2000, plaintiff was an inpatient at Mid-
Hudson. (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael
B. Mukasey dismissed plaintiff's deprivation of property
claim and ruled that the State of New York provided
adequate post-deprivation remedies for the recovery of
lost property. (July 22, 2002 Order at 3) He also ruled
that the Complaint inadequately detailed the assault
claims, and dismissed those claims without prejudice.
(July 22, 2002 Order at 2, 4-5) Plaintiff filed an Amended
Complaint ("AC") dated January 24, 2003.

The AC alleges that, during his three years of treatment
at Mid-Hudson Forensic Psychiatric Facility, the plaintiff
was subjected to violence and threats of violence, and that
the individual defendants promoted or failed to prevent
these incidents. The individual defendants were employed
as security hospital treatment assistants ("SHTAs") who
were responsible for assisting psychiatric patients in their
day-to-day needs and activities. (DeLusso Aff. ¶¶ 2-3)

 **\*2** Each of the incidents set forth in the AC are discussed
below. Generally described, the plaintiff alleges that the

defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid-Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless must

'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial." ' *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

**\*3** The defendants have served the *pro se* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.2. I am mindful of the latitude afforded to a *pro se* party opposing a summary judgment motion. *See Forsyth,* 409 F.3d at 570 ("special solicitude" owed to *pro se* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ.,* 2003 WL 21983025, at \*5 (S.D.N.Y. Aug. 20, 2003) (obligation to construe leniently *pro se* opposition papers on a summary judgment motion). However, a party's *pro se* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, at \*9 (S.D.N.Y. Aug. 25, 2004).

### Discussion

#### 1. *Statute of Limitations Defense*

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure,* 488 U.S. 235, 249-50 (1989). "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action." ' *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

This action was filed in the *pro se* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the *pro se* office on December 10, 2001. *See Ortiz v. Cornetta,* 867 F.2d 146 (2d Cir.1999); *Toliver v. Sullivan County,* 841 F.2d 41 (2d Cir.1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears the burden of proof on tolling. *See Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794 (3d Dep't 2005); *Assad v. City of New York,* 238 A.D.2d 456, 457 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am.,* 55 N.Y.2d 543 (1982). The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted". *Id.* at 548. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548-549. New York courts have

consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. *See, e.g., Eberhard v. Elmira City School Dist.,* 6 A.D.3d 971, 973 (3d Dep't 2004) (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York,* 294 A.D.2d 177, 178 (1st Dep't 2002) ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society". I assume for the purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff., Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C) [1] *Vallen v. State of New York,* Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical attack. [2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y.Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property;

in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y.Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS).[3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y.Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *pro se,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. *Cf. Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813 (1993) (considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

**\*5** In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling. The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56.2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a

book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

To the state employees who are named as individual defendants in plaintiff's Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend themselves against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has felt aggrieved.

I conclude that the plaintiff has failed to raise a triable issue of fact on his claim that he was "unable to protect [his] legal rights" for the period commencing from November 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. *Holy See (State of Vatican City),* 17 A.D.3d at 794; *Assad,* 238 A.D.2d at 457. However, there remains the question of which incidents occurred more than three years prior to the commencement of this action, *i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid-Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix. According to the AC, during his first months at Mid-Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that patient John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219-20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56-59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

**\*6**  The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this action on December 10, 2001. [4]  The defendants' summary judgment motion is granted as to Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the plaintiff's action is dismissed. Though claims based upon these occurrences are barred by the statute of limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's opposition to the other prongs of defendants' motion. *See Jute v. Hamilton Sanstrand Corp.,* Docket No. 04-3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title VII).

2. *Lack of Showing of a Defendant's Personal Involvement*
The defendants, each of whom is individually accused of having deprived plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should be dismissed because there is no evidence of personal involvement in the events giving rise to the asserted claims. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983*." ' *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

There are five ways in which a plaintiff may show the personal involvement of a defendant in a constitutional deprivation: (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, having been informed of a violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which constitutional violations occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant displayed deliberate indifference to the inmates' rights by failing to act on information that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability may not be anchored in a theory of *respondeat superior. Collins v. City of Harker Heights,* 503 U.S. 115, 122 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid-Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11-12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and 3. [5]  (Vallen Dep. Tr. at 106-07) As such, his claims arising from this incident (No. 4) are dismissed.

**\*7**  The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120-21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid-Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10-11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise to the level of a constitutional violation. *Cf. Moncrieffe v. Witbeck,* 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid-Hudson patient, A.A., had a long history of attacking people, and that Mid-Hudson staff intentionally placed A.A. in the plaintiff's proximity. (AC at 15-16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson

positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15-16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid-Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N., kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24-25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid-Hudson staff who were involved in these incidents. As a result, all claims arising from these three incidents (Nos.14-16) are dismissed as to all defendants.

### 3. *Defendants' summary judgment*
### *Motion as to plaintiff's remaining claims*

**\*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of

confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323. This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively valid." *Id.* In defining its use of the term "professional", the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that

the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs. [6] In *Lewis,* the Court reasoned:

> **\*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."

*Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *See DeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See, e.g., Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug. 20, 2001) (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims. I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004). However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the

"deliberate indifference" standard, the result is the same: no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89-96; AC at 9-10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C.J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

**\*10** Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA Leper told Mid-Hudson patient C.J. to enter a bathroom

that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20-21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See, e.g., Rodriguez v. Ames,* 287 F.Supp.2d 213, 219-20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf. Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid-Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or

practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid-Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *see also Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9-10; Vallen Dep. Tr. at 97-98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

### 4. *Qualified Immunity and Law of the Case*

**\*11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

### *CONCLUSION*

The defendants' summary judgment motion is GRANTED. The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

*APPENDIX TO MEMORANDUM AND ORDER
IN VALLEN V. CARROL, 02 CIV. 5666(PKC)*

1. *Allegations Based on Events that Occurred During Plaintiff's First Few Months at Mid-Hudson Forensic*
SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff" were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid-Hudson Forensic-within a few months of April 8, 1997. (Vallen Dep. Tr. 216, 219-20)

2. *The First Patient C.J. Allegation*
SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. at 89-91, 95-96; AC at 9-10)

3. *The Patient S.W. Allegation*
Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9-10)

4. *The Second Patient C.J. Allegation*
Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11-13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106-07)

5. *The Third Patient C.J. Allegation*
Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120-21)

6. *The Fourth Patient C.J. Allegation*
**\*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10-11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

7. *The Patient A.A. Allegation*
Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15-16)

8. *The Allegation Against SHTA Leper*
Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16-17)

9. *The "Reshawn" Allegation*
After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17-21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37-38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. 222-23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff., Exh. C, at 1)

10. *The Gantz Bathroom Allegation*

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21-22; Vallen Dep. Tr. at 56-59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56-57; Peeples Aff., Exh. C, at 1)

### 11. *The SHTA March Bathroom Allegation*

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

### 12. *The SHTA Brown Allegation*

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

### 13. *The SHTA Malfatone Water Allegation*

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231-32)

### 14. *The Patient N. Allegation*

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24-25) Plaintiff cannot identify the staff members. (AC at 24-25; Vallen Dep. Tr. at 233-35)

### 15. *The $35.00 Allegation*

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235-39)

### 16. *The Patient B. Bathroom Allegation*

**\*13** Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238-39)

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2296620

---

Footnotes

1   The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff., Ex. F)

2   To protect their privacy, all Mid-Hudson patients other than the plaintiff will be identified via their initials.

3   *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

4   Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997 to November 18, 1998, plaintiff had three years from November 18, 1998, *i.e.* until November 18, 2001 to assert the claims. He did not assert the claims prior to that date.

5   According to Donna DeLusso, director of Human Resources at Mid-Hudson, SHTA Nelson has not been employed by Mid-Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

6   In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). Officials must take " 'reasonable measures to guarantee the safety of the inmates," ' including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim, the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).

                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 983819
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Willie James YELDON, Plaintiff,

v.

Michael HOGAN, PhD; Donald Sawyer, PhD;
Jeffrey Amodon, MD; Barbara Stapholz, RN;
Maureen Adams, RN; Charmaine Bill, RN;

Sam Lilly, RN; Terrimax Millian, [1] MD; Jeffrey
Norwicki, Chs; Mary Bullivant, RN, Defendants.

No. 9:08-CV-769 (NAM/RFT).
|
March 15, 2010.

**Attorneys and Law Firms**

Willie James Yeldon, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Adam Sil Verman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendats.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff brought this action under 42 U.S.C. § 1983. The complaint (Dkt. No. 1) alleges violations of his First, Fourth, Eighth, and Fourteenth Amendment rights stemming from several policies that were enforced during his civil confinement at the Central New York Psychiatric Center ("CNYPC") located in Marcy, New York, in 2008. Defendants moved for summary judgment dismissing the action (Dkt. No. 30). Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Randolph F. Treece issued a thorough Report and Recommendation (Dkt. No. 37) recommending that summary judgment be granted and the complaint be dismissed.

Plaintiff has submitted an objection (Dkt. No. 38) to the Report and Recommendation. In view of plaintiff's objections, pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review. Upon *de novo* review, the Court adopts and accepts the Report and Recommendation in all respects.

It is therefore

ORDERED that United States Magistrate Judge Randolph F. Treece's Report and Recommendation (Dkt. No. 37) is accepted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 30) is granted the complaint (Dkt. No. 1) is dismissed in its entirety, and it is further

ORDERED that the Clerk enter judgment accordingly.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

Presently before the Court is Defendants' Motion for Summary Judgment. Dkt. No. 30. By his Complaint, brought pursuant to 42 U.S .C. § 1983, Plaintiff alleges violations of his First, Fourth, Eighth, and Fourteenth Amendment rights stemming from several policies that were enforced during his civil confinement at the Central New York Psychiatric Center ("CNYPC") located in Marcy, New York, in 2008. Dkt. No. 1, Compl.

Plaintiff's Response in Opposition to the Defendants' Motion consists only of a Response to Defendants' Statement of Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1. *See* Dkt. No. 31, Pl.'s Resp. Plaintiff has provided no memorandum of law nor any affidavit or other evidence in support of his Opposition. *Id.* In a letter, dated August 12, 2009, which was attached to Plaintiff's Response in Opposition to Defendants' Motion, Plaintiff asserted that he did not have in his possession certain documents relevant to the case, but stated that as soon as he received the documents he would "be more than happy to send them to [Defendants' attorney] and the Court." Dkt. No. 31, Pl.'s Lt., dated Aug. 12, 2009.

Since the filing of that letter, the Court has received no additional documents from Plaintiff in support of his Opposition, nor has Plaintiff submitted any request to extend the deadline in order to supplement his Response to Defendants' Motion. As such, we consider the matter fully briefed and will render a recommendation based upon the documents provided by the parties.

**\*2** For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **granted**.

### I. BACKGROUND

In 2007, the New York State Legislature enacted the Sex Offender Management and Treatment Act ("SOMTA"), which became effective on April 13, 2007. Dkt. No. 30, Adam W. Silverman, Esq., Affirm., dated July 15, 2009, Ex. A, Office of Mental Health ("OMH") Rep., dated Jan. 28, 2008, at p. 1. The centerpiece of SOMTA is Article 10 of New York's Mental Health Law. *Id.* at p. 1. Article 10

> establishes an elaborate process for evaluating the mental condition of certain sex offenders who are scheduled to be released from the custody of "agencies with jurisdiction" to determine whether the individual is a "sex offender requiring civil management." A sex offender requiring civil management can be either (1) a dangerous sex offender requiring civil confinement (who would be confined to a secure treatment facility operated by OMH), or (2) a sex offender requiring strict and intensive supervision and treatment (who would be supervised by a Parole Officer in the community).

*Id.*

The process begins when an agency with jurisdiction, such as the Department of Correctional Services ("DOCS"), refers a detained sex offender to OMH for evaluation. *Id.* at p. 3. Next, OMH determines, through a procedure that includes psychiatric interviews and evaluations, whether the referred sex offender "suffers from a mental abnormality which predisposes him or her to sexual

offending." *Id.* If that inquiry is answered affirmatively, OMH provides a psychiatric report and notifies the Office of the Attorney General ("OAG"), who has the discretion to file a petition for civil management in the courts. *Id.* Article 10 provides that a probable cause hearing must commence within thirty (30) days of the filing of the civil management petition, wherein a determination is made as to whether probable cause exists to believe that the respondent is a sex offender who poses a danger to the community, thereby necessitating his secured confinement pending a civil commitment determination in a jury trial. N.Y. MENTAL HYG. LAW § 10.06(g) & (k).

On February 25, 1997, Plaintiff was convicted in New York State Supreme Court of, *inter alia,* rape, sexual abuse, and sodomy. Silverman Affirm., Ex. C, Pl.'s Inpatient & Med. Records [2] at p. 2 of 41. On August 7, 2007, prior to his release from jail and pursuant to SOMTA, a psychological report was issued concluding that, to a reasonable degree of professional certainty, Plaintiff suffered from a mental abnormality affecting his "emotional, cognitive, or volitional capacity in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in his having serious difficulty in controlling such conduct." *Id.* at p. 11 of 41. Thereafter, the OAG filed a petition for civil management against Plaintiff and from August 9, 2007, through March 3, 2008, probable cause proceedings took place in order to determine whether Plaintiff would be civilly confined and placed in the Sex Offender Treatment Program ("SOTP"), a program designed to "treat sexual deviance and personality disorders." OMH Rep. at p. 7; Silverman Affirm., Ex. C, Order, dated Mar. 3, 2008, at p. 12 of 41. On March 3, 2008, the Honorable John L. Michalski concluded that probable cause existed to detain Plaintiff in a secure treatment facility pending his civil commitment trial. [3] *Id.* at p. 13 of 41. On March 10, 2008, Plaintiff was transferred from DOCS' custody to CNYPC, where he began the SOTP. Plaintiff remained at CNYPC until January 13, 2009. [4] Silverman Affirm., Ex. B, Pl.'s Dep., dated Mar. 9, 2009, at p. 72.

**\*3** The claims alleged in Plaintiff's Complaint concern policies enforced during his residency at CNYPC from March 10, 2008, through January 13, 2009. *See* Compl. Specifically, Plaintiff alleges that during his stay at CNYPC he was denied access to the courts, legal materials, his medical records, and local news

television broadcasts and newspapers, and was subjected to restricted telephone use, improper censoring of his incoming and outgoing mail, and illegal searches of his personal effects. *Id.* Plaintiff also alleges he was forced into a test program called "Motivation on Deck" without his consent, where he was denied treatment, recreation, and interaction with the general resident population at CNYPC.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is ]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Due Process Claims

**\*4** Plaintiff alleges that he was forced to participate in a test program called "Motivation on Deck," ("MOD"), without his consent, thereby violating his constitutional rights. In *Youngberg v. Romeo,* 457 U.S. 307 (1982), the Supreme Court made clear that civilly committed persons retain various constitutional rights. *See also DeShaney v. Winnebago County Dept. of Soc. Servs .,* 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). The plaintiff in *Youngberg,* who was involuntarily civilly confined, brought a § 1983 claim alleging that the administrators of a mental institution violated his substantive due process rights by restraining him in shackles for prolonged periods of time and failing to provide adequate habilitation. The Supreme Court held that the plaintiff retained protected liberty interests in freedom of movement and adequate training under the Fourteenth Amendment, and that "whether [a civilly committed person's] constitutional rights have

been violated must be determined by balancing his liberty interests against the relevant state interests. 457 U.S. at 319 & 321. In considering such claims, courts must "show deference to the judgment exercised by qualified professional[s]," whose decisions are entitled to a "presumption of correctness." *Id.* at 322-24.

In this case, the record shows that on April 19, 2008, Plaintiff punched another resident in the face during an altercation. Pl.'s Dep. at p. 32. Thereafter, Plaintiff was escorted into a "side room," where he was seen by Dr. Brown, [5] a facility physician, who encountered Plaintiff in an agitated and threatening posture, and decided that Plaintiff was in need of medication. *Id.;* Silverman Affirm., Ex. C, Assessment and Order for Restrictive Intervention, dated Apr. 19, 2008, at p. 18 of 41. Plaintiff refused the medication and was forcibly placed in a "five point restraint" by staff members, and thereafter injected with Thorazine and Benadryl in two separate shots. Silverman Affirm., Ex. C, Progress Notes, dated Apr. 19, 2008, at pp. 22 & 26 of 41; *see also* Pl.'s Dep. at p. 32 (stating that staff gave him two shots). After Plaintiff calmed down, he was released from the restraints and allowed to return to his room. Progress Notes at p. 26 of 41. CNYPC Staff closely monitored Plaintiff throughout the night and made behavioral observations every fifteen (15) minutes from 7:30 p.m. on April 19th through 9:00 a.m. the next day. Silverman Affirm ., Ex. C, Observation Log, dated Apr. 19-20, 2008, at pp. 28-30 of 41.

On April 21, 2009, Plaintiff was informed by his treatment team that he was going to be transferred from Unit 405, located on the fourth floor of CNYPC and used for incoming residents entering Phase I of SOTP, to the MOD Unit, also known as Ward 304. Dkt. No. 30, Terri Maxymillian, Psy. D., Decl., dated July 14, 2009, at ¶ 22; Silverman Affirm., Ex. C, Progress Notes, dated Apr. 21, 2008, at p. 38 of 41. The MOD unit is a self-contained residential and treatment floor for residents who have "engaged in violence, threats of violence, or other chronic treatment interfering behaviors and as a result were treated in a setting that allowed for more containment and observation." Maxymillian Decl. at ¶ 33. While the physical layout of the MOD floor was the same as on the other floors, MOD residents, as opposed to residents in other units, did not leave the floor for treatment or therapy and were only given twenty (20) minutes of outside recreation time each day. Pl.'s Dep. at pp. 30-31. As MOD residents progress in their treatment,

they begin to attend treatment groups off the MOD unit, followed by recreation and other activities off the unit; successful completion of those stages leads to transfer out of the MOD unit. Maxymillian Decl. at ¶ 34. Plaintiff stayed in the MOD unit for approximately three months before moving to another unit. Pl.'s Dep. at p. 33. Plaintiff alleges that the restrictions placed on him while in the MOD unit denied him access to the treatments outlined in his treatment plan and that he was unable to associate with residents in other units. Compl. at ¶¶ 25(2) [6] & 27.

**\*5** As previously stated, when considering a due process claim arising out of liberty restrictions placed on persons who are civilly committed, a court must balance the resident's liberty interests against the relevant state interests. *Youngberg v. Romeo,* 457 U.S. at 319. In this case, as described above, the MOD program entails greater liberty restrictions than those imposed upon the general SOTP population. However, these additional restrictions are not arbitrary nor are they arbitrarily applied. Terri Maxymillian, Psy.D., is a licensed doctoral psychologist and has been the Director of the Sex Offender Treatment Program at CNYPC since March 2007. Maxymillian Decl. at ¶ 1. According to Maxymillian, the MOD unit is for residents who have engaged in violent behavior or "other chronic treatment interfering behaviors," and it provides CNYPC staff with greater observation of residents in a contained environment. *Id.* at ¶¶ 33-34. MOD residents are given increasing access to the normal SOTP program as they progress in their treatment. *Id.* at ¶ 34. Therefore, we cannot say that these liberty restrictions constituted "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo,* 457 U.S. at 323.

The record before us shows that the MOD program was implemented for legitimate reasons made by qualified professionals. Plaintiff has offered no evidence to rebut the presumption of correctness that must be afforded such a decision. *Id.* at 324. Courts are bound to show deference to the judgment of qualified professionals and should be circumspect in interfering "with the internal operations of these institutions." *Id.* at 322.

For these reasons, we recommend **dismissal** of Plaintiff's substantive due process claims.

### C. Equal Protection Claims

Plaintiff brings two claims under the Equal Protection Clause of the Fourteenth Amendment: (1) residents in the MOD program are treated differently from residents in the regular SOTP program; and (2) residents in the SOTP at CNYPC are treated differently than those at St. Lawrence Psychiatric Center, located in Ogdensburg, New York. Compl. at ¶ 31(III).

The Equal Protection Clause of the Fourteenth Amendment states "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly situated ... be treated alike." *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999) (internal citations and quotation marks omitted). As a general rule, the Equal Protection Clause protects "suspect classes and fundamental interests against inequitable treatment, but other types of inequities and classifications may be justified by a showing of mere rationality." *LeClair v. Saunders,* 627 F.2d 606, 611 (2d Cir.1980) (citing *Dandridge v. Williams,* 397 U.S. 471, 487 (1970)). However, an equal protection claim may be brought "by a 'class of one' where a plaintiff alleges that she has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362-63 (2d Cir.2002) (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)).

**\*6** To establish a valid equal protection claim based on selective enforcement, a plaintiff must demonstrate that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders,* 627 F.2d at 609-10.

#### 1. *Transfer to MOD Unit*

Plaintiff alleges his forced relocation to the MOD unit violated his equal protection rights. However, in order to establish a valid Fourteenth Amendment equal protection claim, Plaintiff must demonstrate that his selective treatment was based on impermissible considerations such

as race, religion, or intent to punish. In this case, by Plaintiff's own admission, the reason for his transfer to the MOD unit was his physical altercation with another resident that occurred on April 19, 2008. Pl.'s Dep. at p. 32. Plaintiff has offered no evidence to oppose Defendant Maxmillian's sworn statement that the reason for his transfer was to "allow[ ] for more containment and observation" of violent residents. Maxmillian Decl. at ¶ 34. As such, Plaintiff's equal protection claim based on the conditions imposed on him during his residence in the MOD unit is without merit and should be **dismissed.**

#### 2. *CNYPC vs. St. Lawrence Psychiatric Center*

Plaintiff's second equal protection claim is based on his allegation that residents in the SOTP at CNYPC are treated differently than those at St. Lawrence Psychiatric Center. Specifically, Plaintiff states that his equal protection rights were violated, along with all the other CNYPC residents, [7] because residents at the St. Lawrence Psychiatric Center are given a $200 personal clothing allowance and are allowed to choose their own clothing, while CNYPC residents are issued uniforms consisting of black and tan pants, sweatshirts, polo shirts, velcro sneakers, L.L. Bean boots, and a coat. Compl. at ¶ 26.

The record shows that CNYPC residents were issued articles of clothing totaling over $200 per patient. Maxmillian Decl. at ¶ 5. Thus, although Plaintiff was not afforded the opportunity to choose his own clothing, he was given a wardrobe of equal value to that allegedly received by residents of the St. Lawrence Psychiatric Center, and therefore, was not treated differently from others similarly situated in any constitutionally significant respect. Nor is there any evidence that such selective treatment was based on impermissible considerations such as race, religion, or intent to punish.

Therefore, we recommend that this equal protection claim also be **dismissed.**

### D. First Amendment Claims

Plaintiff alleges his First Amendment rights were violated because he was denied (1) the right to "freely communicate with those on the outside of the facility because of

Defendants['] blanket censorship of phone and [incoming and outgoing] mail;" (2) access to the courts and legal materials; (3) access to his own medical records; and finally, that he was (4) retaliated against for seeking redress of his grievances from the government. Compl. at ¶ 31.

### 1. Phone, Mail, and other Restrictions

**\*7** Plaintiff takes issue with several policies in place during his stay at CNYPC, including restrictions on phone use, mail and stamps, visitations, and access to news media. In the prison context, the Supreme Court has held that an "inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Thus, there can be little doubt that civilly committed persons also retain certain First Amendment rights, especially given the Supreme Court's declaration that involuntarily committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo,* 457 U.S. at 322.

Less clear is the appropriate standard to be applied when a person who is civilly committed challenges an action or policy on First Amendment grounds, an issue the Second Circuit has yet to address. In *Turner v. Safely,* 482 U.S. 78, 89-91 (1987), the Supreme Court established a balancing test pursuant to which courts analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. 482 U.S. at 89-91. Courts in other circuits have applied the *Turner* test in order to analyze First Amendment claims brought by civilly confined persons. *See Ivey v. Mooney,* 2008 WL 4527792, at *4 n. 7 (D.Minn. Sept. 30, 2008) (applying *Turner,* but noting that a civil confinement is significantly different from a criminal confinement); *Francis v. Watson,* 2006 WL

2716452, at *3 (D.S.C. Sept. 22, 2006) (citing cases that have applied *Turner* in cases involving civilly confined persons); *Marsh v. Liberty Behavioral Health Care, Inc.,* 2008 WL 821623, at *5 (M.D.Fla. Mar. 27, 2008) (applying *Turner* and citing *Hydrick v.. Hunter,* 500 F.3d 978, 991 (9th Cir.2007)); *Beaulieu v. Ludeman,* 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

We agree that the *Turner* test is appropriately applied to First Amendment claims brought by civilly committed individuals alleging that they have been precluded from exercising their First Amendment rights. Essentially, the First Amendment analysis under *Turner* mirrors the due process analysis under *Youngberg;* in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside. *See Beaulieu v. Ludeman,* 2008 WL 2498241, at *20 n. 15 (finding *Turner* to be consistent with *Youngberg* because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so"). Therefore, we will apply the *Turner* test in order to analyze these First Amendment claims.

### a. Phone Use

**\*8** Plaintiff makes the following allegations regarding phone use at CNYPC: (1) staff are two to three feet away when residents make legal calls; (2) residents must use a phone card in order to call private attorneys, state agencies, and all other outside persons/organizations; (3) residents cannot call 1-800 numbers; (4) phone cards are restricted to $20 per month; and (5) personal calls are limited to ten (10) minutes. Compl. at ¶¶ 25(1) & 28.

According to Maxymillian,

> residents were required to fill out
> disbursement forms to purchase
> phone cards in order to make phone
> calls to anyone other than legal
> entities, the Commission on Quality
> of Care, accrediting agencies, and
> patients' rights organizations. As of
> February 2009, calling cards were
> also needed to make calls to legal
> entities. Also, because there were
> a limited number of telephones

available for the residents on each unit, time on the telephones was limited to approximately ten minutes per resident when another resident was waiting. In order to make free legal calls, residents were required to receive pre-approval before using the legal telephone. The pre-approval process entailed the resident providing the facility with the name and telephone number of the attorney he would like to call so that the number could be verified prior to the call being authorized. After the request was approved, a member of the staff was required to watch the resident dial the telephone so that no free calls were being used to call a nonapproved telephone number.

Maxmillian Decl. at ¶¶ 17-21.

In his deposition, Plaintiff affirmed Maxmillian's breakdown of the phone policy, and clarified that there were four phones made available to residents, three for personal calls and one exclusively for legal calls; calls to Mental Hygiene Legal Services were free, but calls to private attorneys had to be paid for with a phone card. Pl.'s Dep. at pp. 42-47.

Based on the above descriptions of CNYPC's phone policy, it does not appear that Plaintiff was prohibited from exercising his First Amendment rights. Plaintiff was not prevented from making phone calls, rather, he was simply required to pay for certain calls. Moreover, the other restrictions on phone use are rational, common sense policies reasonably related to issues that arise in an institutional setting. Finally, Plaintiff was free to communicate with the outside world through the post, which is discussed below.[8]

### b. *Mail*

Plaintiff alleges that at CNYPC, stamps are considered contraband and that outgoing mail is censored, requiring pre-approval by the treatment team. Compl. at ¶¶ 25(1) & 31. CNYPC residents were not permitted to have

stamps "because they are often used as a commodity, leading to counter-therapeutic behaviors." Maxmillian Decl. at ¶ 16. As such, in order to send out a piece of mail, Plaintiff was required to fill out a disbursement form to be approved by staff. Pl.'s Dep. at p. 53. Other than being required to fill out a disbursement form for stamps, Plaintiff does not allege that his outgoing mail was intentionally interfered with in any other way.[9] As such, Plaintiff again does not allege that he was prevented from exercising his First Amendment rights, just that CNYPC's policies inconvenienced him.

**\*9** In terms of incoming mail, Plaintiff testified that on two occasions, pictures were removed from his incoming personal mail, one a picture of his sixteen-year-old niece and a picture of his eight or nine-year-old grandson.[10] *Id.* at p. 54. CNYPC did not permit residents to have pictures of children under the age of 18 because many residents have committed sexual offenses against children and/or have deviant sexual arousal towards children. Maxmillian Decl. at ¶¶ 14-15. For the same reasons, CNYPC residents are not permitted to have visitors under the age of 18 who are not also their children. Maxmillian Decl. at ¶ 14. Thus, Plaintiff's request to allow his five to seven-year-old nephew visit was denied. Compl. at ¶ 20; Pl.'s Dep. at p. 41.

Restrictions on incoming mail containing pictures of minors in a group home where many residents have committed sexual offenses against children is a policy that is rationally related to legitimate government interests. In addition, there is no way to permit certain individuals to possess such photos without potentially negatively affecting the treatment of other SOTP residents. As such, there are no less-restrictive means to ensure the safety of the public and the treatment of SOTP residents.

### c. *News Media*

Plaintiff complains that CNYCP residents were denied access to local news channels and local newspapers. Compl. at ¶ 25(1). Maxmillian states that "[r]esidents are restricted from reading the local paper and magazines and are also restricted from viewing local television programming because of the potential risk to staff members and their families if residents were to have access to personal information about them." Maxmillian Decl. at ¶ 12. CNYPC has a valid interest in protecting

its staff members and their families. Allowing residents access to local news media could provide them with information about staff members and their families, thereby undermining the safety of those persons. In addition, Plaintiff does not allege that he was denied access to all newspapers and news broadcasts, just local ones. Compl. at ¶ 25(1). These restrictions are rationally related to legitimate government interests and are not overly broad in their scope.

For the foregoing reasons, we find Plaintiff's First Amendment claims based on his freedom of speech should be **dismissed.**

## 2. *Access to the Courts*

Plaintiff alleges he was denied access to the courts through the aforementioned phone policy, restrictions placed on the ordering of legal materials and the number of books residents were allowed, and the unavailability of a typewriter, "full sized writing instruments," and carbon paper. Compl. at ¶¶ 18, 25(1), 28-29, & 31. To state a claim for denial of access to the courts, a plaintiff must allege that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 354 (1996); *Cusamano v. Sobek,* 604 f. supp.2d 416, 498 (N.D.N.Y.2009). Defendants assert that Plaintiff's claim must fail because he has not demonstrated that the Defendants caused him an actual injury, i.e., that prison officials frustrated or impeded his efforts to pursue a non-frivolous legal claim. *Lewis v. Casey,* 518 U.S. at 354. We agree. Nowhere in his Complaint does Plaintiff identify a lawsuit that was impeded or frustrated by Defendants. Although Plaintiff stated in his deposition that he had another federal lawsuit pending during his time at CNYPC in 2008, Pl.'s Dep. at pp. 66-68, in his Response to Defendants' Statement of Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1, Plaintiff admits that, apart from the instant lawsuit, he has only been a party to one other federal lawsuit, a case that was closed on February 2, 2005, well before Plaintiff arrived at CNYPC. Dkt. No. 30-6, Defs.' 7.1 Statement at ¶ 37; Pl .'s Resp. at ¶ 25.

**\*10** There being no evidence or allegation before the Court that Plaintiff has actually been impeded from pursuing a legal action, we recommend that this claim be **dismissed.**

## 3. *Access to Medical Records*

Plaintiff alleges Defendants Bill and Maxymillian denied his requests to see his clinical records in order to find out the medication he was forcibly given during the incident on April 19, 2008, and by whom. Compl. at ¶¶ 21-24. However, Plaintiff made clear in his deposition that he received the clinical records he requested just before he left CNYPC. Pl.'s Dep. at p. 76. Also, the Second Circuit has held that there is "no basis for the proposition that mental patients have a constitutionally protected property interest in the direct and unrestricted access to their [psychiatric] records." *Gotkin v. Miller,* 514 F.2d 125, 128 (2d Cir.1975). Plaintiff does not assert any injury stemming from the delay in the provision of those records and, as such, that claim is now moot. Thus, we recommend **dismissal** of this claim. [11]

## 4. *Retaliation*

Reading his Complaint liberally, Plaintiff alleges Defendants Sawyer, Norwicki, Maxymillian, Bill, and other CNYPC staff members punished him for exercising his right to seek redress from the government by writing negative clinical notes and placing him in the MOD unit, thereby precluding his association with other CNYPC residents. Compl. at ¶ 31.

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

In this case, Plaintiff has failed to show that he was engaged in constitutionally protected conduct. Although he states that he sought "[t]o petition [ ] the government for redress of grievance[s]," Plaintiff does not state which government actor he petitioned, nor in what form. Plaintiff attached to his Complaint copies of petitions he sent to various OMH employees seeking to gain access to his medical records. *See* Compl., Attach. Exs. However, he does not state that such petitions and appeals

were the motivating factor behind the alleged retaliatory acts taken against him. Nor does he explain why such petitions would have inured adverse sentiment among CNYPC staff members. Moreover, to the extent Plaintiff asserts that his transfer to the MOD unit constituted an adverse action against him, the record is clear that he was transferred because he was involved in a physical altercation with another resident, not as a reprisal for his engagement in constitutionally protected activity. Pl.'s Dep. at p. 32; Maxymillian Decl. at ¶ 33.

In sum, this retaliation claim is conclusory and finds absolutely no evidentiary support in the record. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007) (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). For those reasons, we recommend **dismissal** of Plaintiff's retaliation claim.

### E. Fourth Amendment Claims

**\*11** Plaintiff alleges Defendants violated his Fourth Amendment right against unreasonable searches and seizures when they searched his property without probable cause. Compl. at ¶¶ 25(2) & 31(II). Like several of his other claims, this claim is stated in wholly conclusory terms and could be properly dismissed on that basis alone. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545. Though unexplained in the Complaint, Plaintiff stated at his deposition that on one occasion he left CNYPC for a court appearance and returned to find his room in disarray. Pl.'s Dep. at pp. 73-74. Plaintiff stated he inquired of Defendant Bill and other staff members, but no one provided any information about who was in his room or why his room was searched.[12] *Id.*

While the Complaint accuses Defendants Sawyer, Norwicki, Bill, and Maxymillian of harassing residents by "repeatedly searching [their] personal property," Compl. at ¶ 25(2), Plaintiff does not allege any facts in his Complaint or deposition implicating those Defendants in an improper search. Thus, Plaintiff has not alleged any personal involvement on the part of a Defendant that could lead to liability under § 1983 for alleged violations of the Fourth Amendment. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under § 1983") (citations omitted).

Plaintiff also states in his Fourth Amendment claim that "a clinician should be physically present whenever a staff member has to put his hands on a [resident's] physical being." Compl. at ¶ 31(II). This statement is also conclusory and, to the extent it is a veiled reference to the incident that occurred on April 19, 2008, the record shows that a physician was present and ordered Plaintiff's physical restraint and medication. *See supra* Part II.B.

Because these claims are conclusory and fail to implicate personal involvement on the part of any Defendant, it is recommended that they be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 30) be **GRANTED** and the Complaint (Dkt. No. 1) **DISMISSED;** and it is further

**ORDERED,** that the Clerk place under seal Plaintiff's Medical Records (filed traditionally with the Court as Exhibit C to the Affirmation of Adam W. Silverman, Esq.); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 983819

## Footnotes

1       Defendant Terrimax Millian's actual name is Terri Maxymillian. *See* Dkt. No. 30, Terri Maxymillian, Psy. D., Decl., dated July 14, 2009. We will use the correct spelling of this Defendant's name.

2       On July 15, 2009, the Court granted Defendants' motion to file Plaintiff's medical records traditionally with the Court because of their confidential nature. Dkt. No. 29, Order, dated July 15, 2009. Those records include a summary of Plaintiff's criminal history, which contains un-redacted names of certain victims of sexual offenses committed by Plaintiff. Therefore, the Clerk is ordered to place this file under seal in order to protect the identity of the victims. *See Brown v. Duncan,* 2003 WL 21294476, at * 1 n. 1 (N.D.N.Y. June 4, 2003); *see also* New York Civil Right's Law § 50-b ("[T]he identity of any victim of a sex offense ... shall be confidential. No report, paper, picture, photograph, court file or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection.").

3       The probable cause determination was delayed by Plaintiff's August 30, 2007 motion to remove the trial to Erie County and the parties' consent to adjourn the proceedings on that same date. Silverman Affirm., Ex. C, Order, dated Mar. 3, 2008, at p. 12 of 41. Probable cause hearings were thereafter held on December 6 and 13, 2007, January 22, 2008, and March 3, 2008. *Id.*

4       After his release on January 13, 2009, Plaintiff was subsequently returned to CNYPC because he violated the terms of his release. Dkt. No. 30, Terri Maxymillian, Psy.D., Decl., dated July 14, 2009, at ¶ 35.

5       Dr. Brown is not a named Defendant in this lawsuit.

6       Plaintiff included two consecutive paragraphs numbered "25." We will refer to them as "25(1)" and "25(2)," respectively.

7       Plaintiff asks the Court to consider his Complaint a class action and at various points in his Complaint, makes allegations on behalf of other CNYPC residents regarding alleged constitutional violations that did not involve him. *See* Compl. at ¶¶ 28-30. However, a *pro se* plaintiff cannot represent other individuals in a class action. *See, e.g., Gorelik v. Lippman,* 2006 WL 941800, at *4 (S.D.N.Y. Apr. 12, 2006). Therefore, only Plaintiff's claims regarding constitutional violations that *he* allegedly suffered are considered by the Court.

8       To the extent Plaintiff seeks to bring an access to the courts claim based on the phone use policy at CNYPC, that claim is addressed in Part II.C.2 below.

9       Plaintiff stated at his deposition that he had two "minor" incidents wherein correspondences were returned to him due to clerical errors, one of which was his own fault. Pl.'s Dep. at pp. 56-58.

10      Plaintiff was given the pictures back upon his release from CNYPC. Pl.'s Dep. at p. 55.

11      To the extent Plaintiff seeks to bring a cause of action under New York State Mental Hygiene Law based on the alleged failure to timely disclose medical records, because we recommend dismissal of all of Plaintiff's federal claims, we recommend that the district court not exercise supplemental jurisdiction over such state claim.

12      Plaintiff does not allege in his Complaint nor did he testify at his deposition that any of his property was stolen during his stay at CNYCP.

**End of Document**                                © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1995839
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Willie James YELDON, Plaintiff,

v.

Donald SAWYER, Director; James Morgan,
Director; Maxmillian, Dr., Director; Bill Charmain,
Treatment Leader; [1] Kumar Bahl, Dr., Physical;
Brennan, T.A.; Fairbrother, T.A.; Espinosa, T.A.;
Searcy, T.A.; Crocket, Nurse; Forstie; Frazier,
T.A.; Fical, T.A.; Pirachia, T.A.; [2] Ashley, T.A.;
McCann, T.A.; Leonard, T.A.; Parrish, T.A.;
Gray, N.A.; Delmedico, N.A.; Brett Davis, T.A.;
Hollenbeck, T.A.; Donna Nardozza, Nurse; Lauren
Barrett, Nurse; Nurse Media, [3] Defendants.

Civ. No. 9:10–CV–266 (TJM/RFT).
|
April 26, 2012.

**Attorneys and Law Firms**

Willie James Yeldon, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Dean J. Higgins, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants. [4]

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Willie James Yeldon, who is currently
confined at the Central New York Psychiatric Center,
commenced this action pursuant to 42 U.S.C. § 1983,
alleging that the Defendants used excessive force against
him and failed to protect him from the use of such
excessive force. Dkt. No. 1, Compl. Defendants now bring
a Motion for Summary Judgment under Federal Rule of
Civil Procedure 56. Dkt. Nos. 41 & 45. Plaintiff opposes
the Motion. Dkt. No. 47. For the reasons that follow, this
Court recommends that Defendants' Motion be **granted** in
part and **denied** in part.

## I. BACKGROUND

The following facts were derived mainly from the
Defendants' Statement of Material Facts, submitted in
accordance with this District's Local Rules of Practice,
which was not specifically countered nor opposed by
Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ("*The Court shall
deem admitted any facts set forth in the Statement of
Material Facts that the opposing party does not specifically
controvert.*" ) (emphasis in original). [5]

At all times relevant to the claims included in the
Complaint, Plaintiff was under civil commitment and
participating in the sexual offender treatment program
at the Central New York Psychiatric Center ("CNYPC")
located in Marcy, New York. Dkt. No. 41–2, Defs.'
Statement Pursuant to Rule 7.1(a)(3) [hereinafter "Defs.'
7.1 Statement"], at ¶ 1. On November 18, 2009, Plaintiff
was moved from Ward 305 to a holding ward side room in
Ward 604 for disciplinary reasons and was kept there until
the other residents returned from recreational activities.
*Id.* at ¶¶ 15–16. Plaintiff initially resisted his transport to
the holding ward by refusing to move, but he eventually
consented. *See* Dkt. No. 45–1, Pl.'s Dep., at pp. 24–25.
Plaintiff was very upset that he had to wait in this side
room. Defs.' 7.1 Statement at ¶ 17.

At approximately 6:30 p.m., Plaintiff was escorted back
to Ward 305 by various Secure Care Treatment Assistants
("TA"), TA Piracha, and Nurse Madia. *Id.* at ¶ 18; Pl.'s
Dep. at p. 28. On the elevator, Plaintiff told Defendant
Piracha that he "didn't want him in [Plaintiff's] face," and
when they arrived on Ward 305, Defendant Madia told
Plaintiff to go into the side room. Pl.'s Dep. at pp. 28–29;
Defs.' 7.1 Statement at ¶ 19.

Plaintiff claims that when he was in the side room of Ward
305, Defendant TA Davis came into the side room and
called in "all of the other [D]efendants ... [who] rushed
in and threw [Plaintiff] to the floor, started kicking [him]
and beating [him]." Pl.'s Dep. at p. 33; *see also* Defs.' 7.1
Statement at ¶ 22. Plaintiff claims this beating lasted about
twenty minutes. Defs.' 7.1 Statement at ¶ 35.

Defendants submit evidence claiming that Plaintiff was
very upset at his confinement in the side room on Ward
305 and was arguing with Defendant Piracha and loudly

threatening the CNYPC staff. *Id.* at ¶¶ 21 & 25–26. After Piracha left the side room and stood in the hallway, out of Plaintiff's sight, Plaintiff started screaming, "I'm going to kill that little m-f-er" and attempted to push the door to the hallway open. Dkt. No. 41–16, Nicholas Hollenbeck Decl., dated Sept. 21, 2011, at ¶¶ 19–30. As Plaintiff "pointed to Piracha," and screamed, "I'm going to kill that m-f-er," he punched Defendant Hollenbeck in the left ear. *Id.* at ¶¶ 30–31; Defs.' 7.1 Statement at ¶ 30. Other TAs, including Defendant McCann, responded and grabbed Plaintiff and took him to the ground, but it "wasn't a hard takedown." Hollenbeck Decl. at ¶¶ 32–34 & 39; Defs.' 7.1 Statement at ¶¶ 31–33. Plaintiff struggled hard until he was placed in restraints on the bed in the room. Hollenbeck Decl. at ¶¶ 41–46.

**\*2** Conversely, Plaintiff testified that he did not punch nor hit any of the staff, and that he did not have any particular problem with Defendant Piracha, but rather that the Defendants gathered on this occasion as a "beat-up crew" to assault the Plaintiff. Pl's Dep. at pp. 34–35, 41 & 64. He claimed that he saw "all of the other defendants listed in [his][C]omplaint" in or around the side room on Ward 305. *Id.* at p. 39. He also claims that Defendant Madia was the "boss," such that he would give TAs directions, and that Madia, Crocket, Forstie, Gray, and Delmedico were present but did not hit Plaintiff, and instead "looked the other way and let [the abuse] happen." *Id.* at pp. 36–37 & 42. In his deposition, Plaintiff specifically names Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, McCann, and Nardoza as participating in the attack. *Id.* at pp. 43–46. He states that Charmaine Bill, Maxymillian, Morgan, and Sawyer were not present at the time of the assault, and that he sued them solely because of their supervisory roles. *See id.* at pp. 43–47. He did not know who Defendant Barrett was when asked during his deposition. *Id.* at p. 44.

Lastly, Plaintiff claims that Defendant Dr. Bahl administered medication to him while he was in restraints. *Id.* at p. 47. However, Defendants submit evidence that Dr. Bahl did not see Plaintiff after he was transferred from Ward 604 back to Ward 305, nor did he have any role in Plaintiff's restraints or medication. *See* Dkt. No. 41–8, Kumar Bahl, M.D., Decl., dated Sept. 21, 2011. The evidence shows that Plaintiff's injuries were relatively minor. *See* Pl.'s Dep. at pp. 62–64 (describing

headaches treated with pain medication, swelling and bruises that have gone away, and a treatment of ointment for abrasions on Plaintiff's legs); Defs.' 7.1 Statement at ¶ 36. Plaintiff refused any medical evaluation or treatment after he was released from his restraints, but wanted his "slightly swollen" left ear area and "superficial abrasions [that looked liked] scrapes as if from going up a ladder" on his right lower leg documented. *See* Dkt. No. 41–19, Stephanie Oldick Decl., dated Sept. 26, 2011.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d at 54 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*3** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001).

## B. Unserved Defendants

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [6] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, dismissing the case without prejudice as to that defendant. *Id.*

In this case, there is no indication that Defendants Crocket or McCann have been properly served. *See* Dkt. Nos. 11, Summons Returned Unexecuted as to Crocket, McCann, & 29, Summons Again Returned Unexecuted as to Crocket. In a Letter–Motion and Notice of Appearance, Dean Higgins, Esq., Attorney for the Defendants, notified Plaintiff and this Court that Defendants McCann and Crocket—as well as Defendant Nardozza—"no longer work at the Central New York Psychiatric Center," and that their whereabouts were unknown. *See* Dkt. No. 15.

More than the required 120 days have passed since the complaint was filed herein. Further, the Discovery deadline in this litigation has expired as of June 19, 2011.

Plaintiff has provided no explanation nor good cause for his failure to serve these Defendants. Under these circumstances, the claims against Defendants Crocket and McCann should be **dismissed** without prejudice to renew, pursuant to FED. R. CIV. P. 4(m).

## C. Excessive Force

**\*4** Plaintiff claims that on November 18, 2009, he was beaten, held in restraints, and administered medication against his will. Defendants maintain that only a modest amount of force was used to maintain order after Plaintiff attacked a TA, and thus they should be entitled to summary judgment.

As an initial matter, Plaintiff asserts that certain policies and restrictions imposed on him at the CNYPC amount to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff, however, was released by the New York State Department of Corrections and Community Supervision to CNYPC upon the completion of his prison term and thus is no longer a prison inmate. The Eighth Amendment, which prohibits the "cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances." *Lane v. Carpinello,* 2009 WL 3074344, at * 18 (N.D.N.Y. Sept. 24, 2009) (citing *Youngberg v. Romeo,* 457 U.S. 307, 312 (1982)). This does not mean that a patient involuntarily committed for treatment is without constitutional protections; rather, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg v. Romeo,* 457 U.S. at 315–16 (1982). [7] Plaintiff's claims predicated upon violations of the Eighth Amendment are instead analyzed and evaluated under the Due Process clause of the Fourteenth Amendment. *See Lane v. Carpinello,* 2009 WL 3074344, at * 18 & *22 (citing *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. Mar. 15, 2007) and *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) for the proposition that "individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians"). However, the Eighth and Fourteenth Amendment tests that apply to the claims of excessive force are essentially the same. *See United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999) (citing *Hudson v. McMillian,* 503 U.S. 1 (1992)).

To determine whether an excessive force violation occurred, the "core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. at 6–7 (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an excessive force claim, the plaintiff must show (1) objectively, that the defendants' actions violated "contemporary standards of decency," and (2) subjectively, that the defendants acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted). The Second Circuit has provided additional guidance in evaluating an excessive force claim in the non-prisoner environment, noting that the district court must consider

> **\*5** the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm .... [I]f the force was maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, then the conduct is presumptively unconstitutional .... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience.... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d at 251–52 (internal quotation marks and citations omitted).

Here, the record shows two conflicting views of what transpired in the side room on Ward 305. Plaintiff claims

that a "beat-up crew" consisting of Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, McCann and Nardoza threw Plaintiff on the floor, punched and kicked him for about twenty minutes. *See generally* Dkt. No. 45–1, Pl.'s Dep. He was then placed in restraints, and Defendant Bahl administered medication to him against his will. *Id.* at p. 47. Plaintiff claims his injuries consisted of a swollen ear and his shin being scraped. *Id.* at pp. 62–64; *see also* Dkt. No. 41–4, Ex. A, Investigative Report, at pp. 85–87 (photos taken of the Plaintiff's injuries). Defendants, on the other hand, submit considerable evidence that Plaintiff, agitated at being placed in the holding ward in Ward 604 during recreation time, verbally threatened the CNYPC staff, pushed open the door of the side room in Ward 305, shouted obscenities at Defendant Piracha, and punched Defendant Hollenbeck in the left ear. *See, e.g.,* Dkt. Nos. 41–10, Brett Davis Decl., dated Sept. 22, 2011; 41–16, Nicholas Hollenbeck Decl.; 41–19, Stephanie Oldick Decl.; & 41–21, Qasim Piracha Decl., dated Sept. 21, 2011. Further, many Defendants claim to have not been present on Ward 305 at the time Plaintiff was restrained. *See, e.g.,* Dkt. No. 41–8, Kumar Bahl, M.D., Decl., dated Sept. 21, 2011 (also stating he did not administer medication to Plaintiff); 41–12, Michael Fairbrother Decl., dated Sept. 21, 2011; & 41–22, Jason Searcy Decl., dated Sept. 25, 2011; *see also* Dkt. No. 41–23, Christopher Smith Decl., dated Sept. 22, 2011 (stating that he was on Ward 305 and "heard the commotion from the sideroom ... but that Smith] remained where [he] was because there were enough staff with Resident Yeldon already and [he] was monitoring the dayroom"). Lastly, Defendants submit evidence that the abrasion on Plaintiff's left leg was self-inflicted and caused from picking a scab off. *See* Dkt. No. 41–15, Luis Hernandez, M.D ., Decl., dated Sept. 21, 2011 (noting that Dr. Hernandez, who is not a Defendant in his action, examined Plaintiff while in restraints and did not find any injury, but later noticed red area on right shin that "appeared to be an old lesion that [Plaintiff] had picked the scab off").

**\*6** If the circumstances of Plaintiff's restraint were as Defendants' evidence states that they were, Plaintiff's claim should be dismissed on summary judgment as Defendants only used *de minimis* force for a limited period of time and only for the purpose of restoring order. However, if Plaintiff's sworn testimony in his deposition is to be believed, Defendants assaulted Plaintiff without

any "reason, because [he] didn't do anything to them .... [Plaintiff] was complying with the rules." Pl.'s Dep. at p. 50. Despite Defendants' overwhelming evidence, a genuine issue of material fact exists as to whether "force was maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective." *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d at 251. These two versions of the event are best reconciled by a jury, rather than by this Court on a summary judgment review. *See, e.g., Robbins v. Aetna Life Ins. Co.,* 2006 WL 2589359, at *10 (E.D.N.Y. Sept. 8, 2006) ("In light of the conflicting ... evidence, the court finds that neither party has succeeded in eliminating any genuine issue of material fact, making summary judgment on the merits inappropriate."). Therefore, we recommend that Defendants' Motion for Summary Judgment be **denied** as it relates to Plaintiff's claim that Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, Nardoza, and Bahl used excessive force in the Ward 305 side room.

This Court additionally notes that Plaintiff also claims that Defendants Hollenbeck and Piracha kick, beat, punched, hit, and "sexually harassed" him while he was in the side room in Ward 604, before being brought down to Ward 305. *See* Dkt. No. 1, Compl., at ¶ 52. In his Deposition, however, Yeldon explicitly stated that no one placed their "hands on [Plaintiff] or assaulted [Plaintiff] ... until [he] returned back to 305 Ward." Pl.'s Dep. at pp. 31–32. Plaintiff provides this Court with no other evidence regarding this assault allegation in Ward 604. Accordingly, because no issue of material fact exists such that a reasonable jury could find that Plaintiff was subjected to excessive force while he was in the side room of Ward 604, it is recommended that Defendants' Motion for Summary Judgment be **granted** as to any such claim.

### D. Failure to Protect

Plaintiff also brings claims against Defendants Madia, Crocket, Forstie, Gray, and Delmedico, the medical staff at CNYPC, for failing to protect Plaintiff during the incident in Ward 305, who he claims instead "looked the other way and let [the abuse] happen." *See* Pl.'s Dep. at pp. 36–37 & 42.

As with excessive force claims, claims of failure to protect by patients who are involuntarily committed are analyzed within the framework of the Fourteenth Amendment, instead of the Eighth Amendment. *See, e.g., Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) ("The Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being.' ") (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U .S. 189, 199–200 (1989) (alterations in original)). However, the "Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter." *Lane v. Carpinello,* 2009 WL 3074344 at * 18.

**\*7** As the Supreme Court established in *Youngberg,* "involuntarily committed mental patients have substantive due process rights, .... [and] held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* 2005 WL 2296620, *8 (S.D.N.Y. Sept. 20, 2005) (quoting *Youngberg v. Romeo,* 457 U.S. at 310). However, some courts in this district have held that the general approach to substantive due process claims asserted under section 1983, which requires that a plaintiff show that the defendants' actions involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level," would result in an unduly heavy burden being placed upon a plaintiff who is under the care and control of the state. *Id.* at *8– *9. Analogizing the plaintiff's rights to those of a pre-trial detainee, these courts have suggested their agreement with the "deliberate indifference" standard employed in analyzing such circumstances. *See id.* at *9 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998)).

We need not resolve this issue here, because whether the Defendants' actions are measured under the "conscience-shocking" and "substantial departure" standard or the "deliberate indifference" standard, the result is the same. The evidence posits two conflicting stories. If the Defendants' narrative and evidence is to be believed, Plaintiff was unruly, violent, and presented a danger

to staff and to himself. In that situation, "failing to protect" Plaintiff from being restrained and administered medication would neither shock the conscience or consist of deliberate indifference towards Plaintiff's health or safety. However, if Plaintiff's answers in his Deposition are truthful, Defendants Madia, Crocket, Forstie, Gray, and Delmedico stood idle outside the Ward 305 side room while other CNYPC staff assaulted the Plaintiff, without provocation, for about twenty minutes. This action would violate both of the above-listed standards. The Court may not now, on a motion for summary judgment, "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [our] judgment for that of the jury." *Nimely v. City of New York,* 414 F.3d 381, 390 (2d Cir.2005) (quoting *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995). Therefore, as with Plaintiff's claims of excessive force, we recommend that Defendants' Motion for Summary Judgment on Plaintiff's failure to protect claims against Defendants Madia, Forstie, Gray, and Delmedico be **denied.**

### E. Personal Involvement

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U.S. 312, 325 (1981) (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown when:

**\*8** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent

in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [8]

Defendants contest that Defendants Maxymillian, Sawyer, Bill, and Morgan were personally involved in any of Plaintiff's alleged constitutional violations; rather, they were included by virtue of their supervisory positions only. Dkt. No. 41–24, Defs.' Mem of Law, at p. 15. All evidence in the record agrees with that contention. In his deposition, Plaintiff explicitly states that he included these Defendants in his lawsuit because they were "the head person[s] of the program" but were not "directly involved in the assault." Pl.'s Dep. at pp. 43–47. Our review of the record undisputedly establishes that Plaintiff had failed to show any direct participation by Defendants Maxymillian, Sawyer, Bill, and Morgan in the alleged violations, that the Defendants' policies allowed the continuance of constitutional violations, or that the Defendants were negligent in their supervision of subordinates. Therefore, Defendants' Motion for Summary Judgment should be **granted** and Plaintiff's claims against Defendants Maxymillian, Sawyer, Bill, and Morgan should be **dismissed** for want of personal involvement.

Likewise, Defendant Barrett should be **dismissed** from this action. In his Complaint, Plaintiff claims that Barrett was also present during the assault on him, and that Barrett wrote a note on November 19, 2009, stating that Plaintiff had refused to take his insulin medication. Compl. at ¶¶ 45 & 54. However, Plaintiff made no allegations against Barrett at his Deposition. *See* Pl.'s Dep. at p. 43. Plaintiff has submitted no evidence that Defendant Barrett was involved in any wrongdoing in his action, and accordingly, this Court recommends dismissal of any claims against him as lacking in personal involvement.

### F. Eleventh Amendment

Defendants also raise in their Motion for Summary Judgment dismissal of Plaintiff's claims made against

them in their official capacity, pursuant to the Eleventh Amendment. *See* Defs.' Mem of Law at p. 6–7.

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although by its terms, the amendment bars suit by citizens of one State against another State, the Supreme Court has held that such amendment similarly bars suits against a State by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the State, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing, *inter alia, Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*9** In appropriate circumstances, the jurisdictional bar of the Eleventh Amendment may immunize a state official acting in his or her official capacity. *See In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007) (citation omitted). However, under the doctrine of *Ex Parte Young,* 209 U.S. 123 (1908), a suit may proceed against a state official in his or her official capacity—notwithstanding the Eleventh Amendment—when a plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency,* 482 F.3d at 618 (quotations and citations omitted).

Here, Plaintiff seeks injunctive relief as well as compensatory damages against state employees. *See* Compl. at ¶ 55. Therefore, as state officials, Defendants cannot be sued in their official capacities in a claim for money damages. However, Plaintiff may seek monetary damages from them in their individual capacities. Further, Plaintiff may sue the Defendants for declaratory and injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989)). Accordingly, Defendants' Motion for Summary Judgment should be **granted** to the extent that Plaintiff asserts claims for monetary relief against them in their official capacities.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 41) be **granted in part** and **denied in part** as follows:

1. Defendants McCann and Crocket should be **dismissed** from this action based upon Plaintiff's failure to effectuate service of process within 120 days of the filing of his Complaint, pursuant to Federal Rule of Civil Procedure 4(m);

2. To the extent asserted, Plaintiff's excessive force claims against Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, Nardoza, and Bahl, relating to an assault on Plaintiff in the CNYPC side room of Ward 305, should survive Defendants' Motion;

3. To the extent asserted, Plaintiff's excessive force claims against Defendants Hollenbeck and Piracha, relating to an assault on Plaintiff in the side room in Ward 604, should be **dismissed;**

4. To the extent asserted, Plaintiff's failure to protect claims against Defendants Madia, Forstie, Gray, and Delmedico, relating to an assault on Plaintiff in the CNYPC side room of Ward 305, should survive Defendants' Motion;

5. To the extent asserted, Defendants Maxymillian, Sawyer, Bill, Morgan, and Barrett should be **dismissed** from this action based upon Plaintiff's failure to assert their personal involvement in any wrongdoing;

6. All causes of action seeking monetary relief should be **dismissed,** pursuant to the Eleventh Amendment, insofar as they are stated against the Defendants in their official capacities; and it is further

 **\*10 ORDERED,** that the Clerk of the Court update the Docket to reflect the correct spellings of the names of Defendants Charmaine Bill, Qasim Piracha, and Marianna Madia; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1995839

Footnotes

1    The record before the Court indicates that the correct spelling of this Defendant's name is Charmaine Bill. *See* Dkt. No. 15–1, Notice of Appearance.

2    The correct spelling of this Defendant's name is Qasim Piracha. *See* Dkt. No. 15–1, Notice of Appearance.

3    The correct spelling of this Defendant's name is Marianne Madia. *See* Dkt. No. 15–1, Notice of Appearance.

4    Dean J. Higgins, Esq., has appeared on behalf of the Defendants, *except* Defendants McCann and Crocket, who have not been served. *See infra* Part II.B.

5    In his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff includes a section entitled "Statement of Facts ." *See* Dkt. No. 47 at p. 3. However, this section appears to contest only the Defendants' Memorandum of Law and the legal conclusions drawn thereof; it does not, as Local Rule 7.1(a)(3) requires, mirror the movant's Statement by matching numbered paragraphs, or set forth specific references to the record where the material fact is alleged to have arisen. Even a liberal reading of Plaintiff's "Statement of Facts" does not provide this Court with any specific factual allegations Plaintiff is either offering or contesting.

In a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001). The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *See Giguere v. Racicot,* 2002 WL 368534, at *2 (N.D.N.Y. Mar. 1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K–Z Rental Leasing, Inc.,* 2001 WL 237218, at *1 (N.D.N.Y. Mar. 9, 2001)). Nothing in Rule 56 imposes an obligation on the Court to conduct an independent search and review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002).

6    Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

7    While Plaintiff does not allege that the conditions at CNYPC are unsafe, the same rationale applies to his general Eighth Amendment claims of freedom from cruel and unusual punishment due to excessive force and a failure to protect. *See, e.g., Youngberg v. Romeo,* 457 U.S. at 316; *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. Mar. 15, 2007) ("However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment.")

8   Several lower courts have struggled with the impact *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) had upon *Colon,* and specifically whether *Iqbal* calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (collecting cases). Because the Second Circuit has not yet issued a decision settling this matter, *Colon* remains good law.

**End of Document**                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1987134
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Willie James YELDON, Plaintiff,

v.

Donald SAWYER, Director; James Morgan,
Director; Maxymillian, Dr., Director; Charmaine
Bill, Treatment Leader; Kumar Bahl; Dr., Physical;
Brennan; T.A.; Fairbrother, T.A.; Espinosa, T.A.;
Searcy, T.A.; Crocket, Nurse; Forstie; Frazier,
T.A.; Fical, T.A.; Ashley, T.A.; Mccann, T.A.;
Leonard, T.A.; PArrish, T.A.; Gray, N.A.; Delmedico,
N.A.; Brett Davis, T.A.; Hellenbeck, T.A.; Donna
Nardozza, Nurse; Lauren Barrett, Nurse; Qasim
Piracha, T.A.; Marianne Madia, Nurse, Defendants.

No. 9:10–CV–00266.
|
June 4, 2012.

Attorneys and Law Firms

Willie James Yeldon, Marcy, NY, pro se.

Dean J. Higgins, New York State Attorney General,
Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, District Judge.

 **\*1** This matter brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. Randolph F. Treece, United
States Magistrate Judge, for a Report–Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

No objections to the April 26, 2012 Report–
Recommendation have been raised. After examining the
record, this Court has determined that the Report–
Recommendation is not subject to attack for plain error

or manifest injustice. Accordingly, this Court adopts the
Report–Recommendation for the reasons stated therein.

It is, therefore, ORDERED that:

(1) any claims against Defendants McCann and Crocket
are DISMISSED without prejudice;

(2) any claims of excessive force in the side room
to Ward 305 against Defendants Ashley, Brennan,
Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck,
Leonard, Parrish, Piracha, Searcy, Nardozza, and Bahl,
survive summary judgment and Defendants' motion is
DENIED as to these claims;

(3)any claims of Excessive Force in the side room to Ward
604 against Defendants Hollenbeck and Piracha, do not
survive summary judgment and Defendants' motion is
GRANTED as to these claims;

(4)any claims of Failure to Protect against Defendants
Madia, Forstie, Gray, and Delmedico relating to an
assault on Plaintiff in the side room of Ward 305 survive
summary judgment and Defendants' motion is DENIED
as to these claims;

(5)any claims against Defendants Maxymillian, Sawyer,
Bill, Morgan, and Barrett, are DISMISSED and
Defendants' motion for summary judgment is
GRANTED as to these claims;

(6)any claims seeking monetary relief from Defendants
based on their conduct while acting in their official
capacities are DISMISSED pursuant to the Eleventh
Amendment; and

(7) the Clerk of the Court shall note the correct spelling of
the names of Defendants Charmaine Bill, Qasim Piracha,
and Marianne Madia.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1987134

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.